# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. VIEIRA, | Case No.  1:05-CV-01492-AWI-SAB |
| Petitioner, | DEATH PENALTY CASE |
| v. | MEMORANDUM AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, and (2) ISSUING CERTIFICATE OF APPEALABILITY FOR CLAIMS 2 AND 6 (ECF No. 37) |
| KEVIN CHAPPELL, Warden, | |
| Respondent. | ORDER DENYING MOTION FOR EVIDENTIARY HEARING AND EXPANSION OF THE RECORD (ECF No. 107) |
| | CLERK TO SUBSTITUTE RON DAVIS AS RESPONDENT AND ENTER JUDGMENT |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by Wesley A. Van Winkle, Esq., of the Law Offices of Wesley A. Van Winkle, and Lissa J. Gardner Esq., of the Office of the Federal Defender.  Respondent Kevin Chappell[1] is named as the Action Warden of San Quentin State Prison.  He is represented in this action by Catherine Chatman, Esq., and Ward Campbell, Esq.,

---

[1] Pursuant to Fed. R. Civ. Proc. 25(d), Ron Davis  is substituted as Respondent in this matter, as he is the current Acting Warden of San Quentin State Prison.

1

of the Office of the California Attorney General.

# I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Stanislaus, following his conviction by jury trial on September 6, 1991, of four counts of first degree murder and one count of conspiracy to commit murder for the deaths of Franklin Raper, Richard Ritchey, Dennis Colwell, and Darlene Emmie Paris. The jury found true the alleged special circumstance of multiple murder as to each count. In addition, the jury found that Petitioner personally used a deadly weapon in commission of the murders. The jury determined that the penalty for three of the murder counts and the conspiracy to commit murder count should be death. As the remaining murder count, the jury found that Petitioner should be sentenced to life without the possibility of parole. On March 30, 1992, Petitioner was sentenced to death.

On March 7, 2005, the California Supreme Court reversed the death sentence on the count of conspiracy to commit murder, remanded the matter for Petitioner to be given a sentence of twenty-five years to life for that count, upheld the death sentence as to the other three murder counts and affirmed the judgment in all other respects. People v. Vieira, 35 Cal. 4th 264 (2005) (modified May 26, 2005).

On October 29, 2006, Petitioner filed a federal petition for writ of habeas corpus in this Court. He then filed a petition for writ of habeas corpus in the California Supreme Court on October 31, 2006. In re Richard John Vieira, No. S147688, Cal. Sup. Ct. filed October 31, 2006. (ECF No. 38, Attach. 1.) The Court ordered the federal petition held in abeyance pending exhaustion of state remedies. (ECF No. 43.) On June 24, 2009, the California Supreme Court denied the petition on the merits on each claim, and determined that multiple claims were procedurally barred. (ECF No. 58, Attach. 1.)

On January 8, 2010, the parties filed a joint statement wherein the parties agreed that the federal petition was fully exhausted. (ECF No. 68.) On February 2, 2010, Respondent filed an answer to the petition, without points and authorities. (ECF No. 74.)

On September 1, 2010, Petitioner filed a memorandum of points and authorities in support of the petition.  On July 21, 2011, Respondent filed a memorandum of points and authorities in support of his answer.  On January 9, 2012, Petitioner filed a reply to Respondent's memorandum.

## II.

## STATEMENT OF FACTS

The factual summary is taken from the California Supreme Court's summary of the facts in its March 7, 2005, opinion.  Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the state court's summary of facts is presumed correct.  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

*A. Guilt Phase*

At the time the murders took place in 1990, defendant lived at a location known as "the Camp" at 4150 Finney Road in Salida in Stanislaus County. The Camp consisted of a number of houses and trailers. Defendant lived in a trailer with codefendant David Beck, near a house occupied by codefendant Gerald Cruz and his wife. Codefendant Jason LaMarsh lived in another nearby trailer. Cruz was the acknowledged leader of this informal group. Beck was generally in charge of discipline. Everyone in the group pooled their money. Ron Willey was also associated with the group, but did not live at the Camp during the relevant time period. Defendant held a low status within the group. Michelle Evans, who was also involved in the group and was for a time LaMarsh's girlfriend, testified that defendant was a "slave" to the other members of the group, and was given such tasks as cooking, bathing Cruz's children, and undertaking various repairs. Evans, who was charged with the same first degree murder and conspiracy to commit murder charges as defendant, entered into a plea bargain in which she received a one-year sentence in exchange for her trial testimony. According to her testimony, defendant was beaten by Beck, at Cruz's order, for various deficiencies in his work. He was also given the task of guarding the camp late into the night, as well as often spending days doing construction work.

Cruz and Beck bought assault weapons and several camouflage masks and knives. Two weeks before the murders, they purchased a police-style baton.

One of the Camp residents, Franklin Raper, a man in his 50's, was known to be selling drugs from his trailer. The noise and other activities attendant upon drug sale and use, as well as hypodermic needles and other drug paraphernalia left by Mr. Raper's customers, became a concern to Cruz and other Camp residents. Also of concern was Raper's treatment of an elderly man named Jiggs. Raper used Jiggs's electricity to power his trailer, refused to compensate him for it, and threatened to kill Jiggs when the latter threatened to disconnect the former's

3

power. Cruz, according to Evans's testimony, looked out for people in the Camp, and became upset by this behavior. He and others asked Raper to leave the Camp, but Raper initially refused.

Then began a series of confrontations between Raper and Cruz's group. Cruz and others pushed Raper's car across the street and set it on fire. Raper agreed to leave the Camp and had his trailer towed to 5223 Elm Street. But Raper returned soon after and destroyed a newly repaired fence near Cruz's house. Cruz had Raper arrested and taken to jail. Two weeks before the murders, Jason LaMarsh and others in the group got into a physical altercation with Raper at the latter's Elm Street residence, accusing him of stealing one of their guns, until others broke up the fight. Later the same evening, Dennis Colwell, one of the people present at the Elm Street residence during the fight, drove slowly by the Camp and was pursued by Cruz and other Camp residents. They dragged Colwell from the car and beat him, seeking to have him tell them what was going on at the Elm Street residence. Defendant watched as the beating took place.

Michelle Evans's sister, Tanya, had lived at the Elm Street residence, but was evicted around the same time as Raper moved his trailer there. Raper lived in the residence and allowed others to stay there as a kind of "crash pad." The afternoon of the murders, Cruz asked Evans to prepare a diagram of the residence. Later that day, Cruz met with Beck, LaMarsh, Evans, Willey and defendant in LaMarsh's trailer. Cruz announced that the plan was to go over to the Elm Street residence "to do 'em and leave no witnesses." Cruz gave each person a plan of entry and an assignment. Evans's task was to enter the residence as a visitor, to account for all the people at the residence and attempt to move them into the living room, to open up the back window and then leave and wait in the car. LaMarsh was to enter with her. Beck was to come in through the back window. Cruz, Willey and defendant were supposed to come through the front door after Evans had completed her assignment. Cruz told the group that whoever "messed up" in carrying out their assignments would "join" the victims, and he looked directly at defendant when he made the statement.

Cruz then handed out weapons to be used. There were two baseball bats, a Ka-bar knife and an M–9 knife. Cruz took one of the knives, along with a police baton. Defendant was given a baseball bat and also had his own .22–caliber handgun. Before going to the Elm Street residence, defendant and Willey were seen swinging their bats and "dancing around" to hard rock music. Defendant and others put on camouflage masks.

The group then proceeded to the Elm Street residence just after midnight on May 21, 1990, driving over together in a Mercury Zephyr. Raper, Colwell, and two others present at the house at the time, Richard Ritchey and Darlene ("Emmie") Paris, were murdered. Donna Alvarez, who had been sleeping in one of the bedrooms when the attack began, managed to escape to a neighbor's house.

Ritchey ran through the front door and into the street. A neighbor (Earl Creekmore) and Evans testified that Willey and Cruz caught up to Ritchey and beat him. Cruz then slit his throat with his knife. Raper's and Colwell's throats were also slit and they had multiple wounds, including severe skull fractures inflicted by a baseball bat or police baton. In Raper's case, the top of the head was caved in and there were severe lacerations to the brain.

Defendant killed Emmie Paris. The day after the murder he told Evans that Paris began screaming and Cruz ordered him to shut her up. Defendant hit her with a

4

baseball bat several times but did not succeed in silencing her. Cruz then handed him his knife and he stabbed her. When this also failed, defendant grabbed Paris's hair and sawed at her throat till "it felt like her head was going to come off." Evans testified that he laughed when he told her this. According to Dr. Ernoehazy, who performed the autopsy for the coroner, Paris died from a slicing wound to the throat.

Two days later, in a conversation with his girlfriend, Mary Gardner, defendant admitted having been at the murder scene but denied killing anyone. He blamed LaMarsh for allowing Alvarez to escape, telling her that the plan had been to leave no witnesses. Gardner became upset because she knew three of the people who were killed and defendant said that they deserved to die, they had been "warned" and should not have been there.

Police investigating the crime scene found a baseball bat and Ka-bar knife with bloodstains matching those of the victims, as well as several masks that had been worn by the killers. Sheriff's detective Deckard, the principal investigator, questioned Donna Alvarez and from her description of one of the men she had seen, and with a [sic] help of passersby acquainted with LaMarsh, he was able to assemble a photographic lineup that included LaMarsh. Alvarez identified him as having been one of the assailants. Suspicion soon focused on the Camp residents. Evans was arrested, and in subsequent statements, implicated her codefendants. Defendant was initially interrogated and released the day after the murders, acknowledging that he knew the codefendants but denying he had any role in the murders and claiming he had been at the Oakdale Motel the night the homicides occurred. Two days later, defendant was arrested and further interrogated. He admitted he participated in planning the murders and that he was present at the murder scene. Initially during the interview, he stated that it had been his function to stand guard in the hall, but later in the interview he admitted that he had struck one of the victims in the legs several times with a baseball bat. Defendant stated that he "completely condoned" the murders.

The defense put on no witnesses disputing the role in the murders that Evans and others attributed to defendant. As will be explained below, the core of the defense was apparently testimony regarding defendant's cult membership and his incapacity to form the requisite criminal intent. For reasons discussed below, the principal defense witness, Randy Cerny, was not permitted to testify at the guilt phase.

*B. Penalty Phase*

At the penalty phase, the prosecution argued solely the circumstances of the crime and did not allege past violent criminal activity or prior felony convictions on defendant's part.

The defense called several childhood friends, neighbors and family members, who portrayed defendant as a fairly quiet and nonviolent youth. His father introduced him to smoking marijuana when defendant was eight years old. Since that time, defendant became a habitual marijuana user, smoking it at least once a week. He also had trouble in school, having a condition his mother, Barbara Vieira, identified as "lazy eye," which caused him to have difficulty with reading and to be held back a year in the sixth grade. Defendant did not complete high school. He left his regular high school after failing to make the football team, enrolling in a continuation high school which he left after being suspended for possessing marijuana. Soon after, he found work hanging sheetrock with his father and later his uncle. He never learned how to drive. His mother testified that he was a good

boy and eager to do chores around the house.

Defendant's sister, Angela Young, testified that it was she who introduced defendant to Cruz and his circle when defendant was 15. (He was 21 at the time of the murders.) Defendant's sister lived for a few months in 1987 and 1988 with Cruz and others in a house in Modesto. Cruz led others in the study of the occult and the performance of supposedly occult rituals that included candles, robes, and chanting. Cruz told Young that "to sacrifice your first newborn was ... the greatest thing you can ever do" and that it was "for the satisfaction of Satan ...," although there was no evidence any such sacrifices had occurred. Young soon moved out of the house, but arranged for her brother, who was seeking independence from the family, to move in.

Defendant's sister and mother testified to changes they noticed in defendant after he went to live with Cruz. He required permission from Cruz to visit his family, and when he did visit, he would telephone Cruz to ask permission to stay for dinner or to have a beer. He always looked tired, with dark circles under his eyes, and was thin, nervous and withdrawn. He often appeared to have been beaten up, with black eyes, fat lips, and slashes on his arms.

A deputy sheriff assigned to the county jail testified that defendant had no incidents of misconduct in his approximately one year and four months of incarceration.

Randy Cerny, a retired deputy sheriff who had become an expert on cults, and lectured on cults for law enforcement agencies, also testified for the defense. Based on his general study of cults, his review of a diary defendant had written in the 18 months before the murder while living with Cruz, and his interviews with defendant, Cerny formed the opinion that defendant was involved in a "cult style group" with Cruz as the leader. Defendant was subject to "a process of mind control" that included sleep deprivation, regular physical punishment, and minimization of contact with family and others outside the group. According to the diary, the punishment included shock treatments with an exposed electric wire, beatings from other members of the group, and various forms of sexual humiliation. Cerny testified that it was apparent from the diary that defendant had internalized many of Cruz's values: in it he expressed the desire to sacrifice himself so that Cruz's health would improve and expressed gratitude for Cruz being "merciful" in not having him beaten when he made a certain mistake. Cerny also described the cult as having occult and satanic underpinnings, with Cruz directing the members of the group to read and study the books of the English occultist Alistair Crowley, of whom Cruz believed himself to be the reincarnation, and to engage in various rituals.

On cross-examination, Cerny admitted he had no way of verifying that the events described in the diary actually occurred. He also related, at the prosecution's behest, portions of the diary in which defendant wrote about administering punishment to another member of the group, entertaining obsessive and sometimes violent fantasies about a woman who had rejected him, and participating in the group's heavy use of drugs.

Vieira, 35 Cal. 4th at 273-78.

**III.**

6

1

**JURISDICTION**

2

Relief by way of a petition for writ of habeas corpus extends to a person in custody

3 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

4 or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

5 Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

6 guaranteed by the U.S. Constitution.  The challenged conviction arises out of Stanislaus County

7 Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

8 U.S.C. § 2241(d).

9

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

10 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

11 enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499

12 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and

13 is therefore governed by its provisions.

14

**IV.**

15

**STANDARD OF REVIEW**

16

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

17 barred unless a petitioner can show that the state court's adjudication of his claim:

18
19

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

20
21

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

22 28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 784 (2011); Lockyer

23 v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

24

As a threshold matter, this Court must "first decide what constitutes 'clearly established

25 Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at

26 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law"

27 this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

28 as of the time of the relevant state-court decision."  Williams, 592 U.S. at 412.  "In other words,

7

1    'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

2    set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

3    the Supreme Court decision must "'squarely address [] the issue in th[e] case'; otherwise, there is

4    no clearly established Federal law for purposes of review under AEDPA." Moses v. Payne, 555

5    F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); see also

6    Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no

7    clearly established Federal law exists, the inquiry is at an end and the Court must defer to the

8    state court's decision.  Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.  In

9    addition, the Supreme Court has recently clarified that habeas relief is unavailable in instances

10   where a state court arguably refuses to extend a governing legal principle to a context in which

11   the principle should have controlled.  White v. Woodall, __ U.S. __, 134 S. Ct. 1697, 1706

12   (2014).  The Supreme Court stated: "'[I]f a habeas court must extend a rationale before it can

13   apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time

14   of the state-court decision.'" Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)).

15        If the Court determines there is governing clearly established Federal law, the Court must

16   then consider whether the state court's decision was "contrary to, or involved an unreasonable

17   application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28

18   U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

19   if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

20   question of law or if the state court decides a case differently than [the] Court has on a set of

21   materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

22   72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite

23   in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's

24   Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be

25   contrary to [Supreme Court] clearly established precedent if the state court applies a rule that

26   contradicts the governing law set forth in [Supreme Court] cases." Id.

27        "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

28   the state court identifies the correct governing legal principle from [the] Court's decisions but

8

1    unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

2    413.  "[A] federal court may not issue the writ simply because the court concludes in its

3    independent judgment that the relevant state court decision applied clearly established federal

4    law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411;

5    see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fair-

6    minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's]

7    precedents." Richter, 131 S. Ct. at 784.  The Supreme Court stated:

8
9          As a condition for obtaining habeas corpus from a federal court, a state prisoner
           must show that the state court's ruling on the claim being presented in federal
10         court was so lacking in justification that there was an error well understood and
           comprehended in existing law beyond any possibility for fair-minded
           disagreement.

11   Id. at 786-87.  In other words, so long as fair-minded jurists could disagree on the correctness of

12   the state courts decision, the decision cannot be considered unreasonable. Id. at 784.  In applying

13   this standard, "a habeas court must determine what arguments or theories supported . . . or could

14   have supported the state court's decision; and then it must ask whether it is possible fair-minded

15   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

16   decision of [the Supreme Court]." Id. at 786.  This objective standard of reasonableness applies

17   to review under both subsections of 28 U.S.C. § 2254(d).  See Hibbler v. Benedetti, 693 F.3d

18   1140, 1146-47 (9th Cir. 2012).  If the Court determines that the state court decision is objectively

19   unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

20   error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619,

21   637 (1993).

22         Petitioner has the burden of establishing that the decision of the state court is contrary to

23   or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

24   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

25   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

26   state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669

27   (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

28         The AEDPA requires considerable deference to the state courts.  "[R]eview under §

2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S. Ct. 1388, 1398-99 (2011). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. See Panetti, 551 U.S. at 953 (when section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

In this case, many of Petitioner's claims were raised and rejected by the California Supreme Court on direct appeal. However, many of his claims were raised in his state habeas petition to the California Supreme Court, and summarily denied on the merits. In such a case where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784. The Supreme Court stated that "a habeas court must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786 (emphasis added). Petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 131 S. Ct. at 784).

When reviewing the California Supreme Court's summary denial of a petition, this Court must consider that the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that:

10

> [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the petitioner's claims.

Pinholster, 131 S. Ct. at 402 n. 12 (quoting In re Clark, 5 Cal. 4th 750, 770, 21 Cal.Rptr.2d 509, 855 P.2d 729 (1993) and citing People v. Duvall, 9 Cal. 4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252 (1995)). Accordingly, if this Court finds Petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

## V.

## PROCEDURAL BARS

All of Petitioner's claims have been raised to the California Supreme Court and denied on the merits. In addition, many of his claims were denied as procedurally barred. As to those claims, Respondent has argued that California's timeliness rule for state habeas petitions, California's rule barring claims on state habeas that could have been presented on direct appeal, and California's contemporaneous objection rule are all adequate and independent state grounds that bar federal habeas review. The Court will not address procedural default with this order to the extent the claims lack merit because the Court finds the question of procedural default to be relatively complicated in this case. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (Courts may reach the merits of a case prior to addressing procedural default); Bell v. Cone, 543 U.S. 447, 451, 451 n.3 (2005); Loggins v. Thomas, 654 F.3d 1204, 1215 (11th Cir. 2011). In the event that any claims survive review on the merits, the parties will be directed to further brief the issue of procedural default as to those claims.

## VI.

## REVIEW OF CLAIMS

### A.     Claim 1

In his first claim for relief, which includes numerous subclaims, Petitioner alleges he received ineffective assistance of counsel throughout the guilt phase of the trial. This claim,

including all of its subclaims, was presented to the California Supreme Court by petition for writ of habeas corpus.  In a decision unaccompanied by an explanation, the claim was rejected on the merits and as untimely.  As noted above, in such a case as this where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786 (emphasis added).  The Court will address the claims in the order they are presented in the petition.

1.      Clearly Established Law

The clearly established federal law for ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Richter, 131 S. Ct. at 787; Strickland, 466 U.S. at 687; Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).

First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Richter, 131 S. Ct. at 787 (citing Strickland, 466 U.S. at 688); United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995)).  Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence."  Id. at 689.  Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

time." Id.; see also Richter, 131 S. Ct. at 789.  A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Richter, 131 S. Ct. at 787 (quoting Strickland, 466 U.S. at 687); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." Pinholster, 131 S. Ct. at 1407.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 521 (2003) (quoting Strickland, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." Summerlin, 427 F.3d at 629. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. However,

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 690–91); see also Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Reynoso v. Giurbino, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); Jennings v. Woodford, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

13

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." Strickland, 466 U.S. at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Richter, 131 S. Ct. at 787 (quoting Strickland, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Richter, 131 S. Ct. at 787-788 (quoting Strickland, 466 U.S. at 687).  Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." Richter, 131 S.Ct. at 792 (quoting Strickland, 466 U.S. at 696).  That is, only when "[t]he likelihood of a different result [is] substantial, not just conceivable," id., has the defendant met Strickland's demand that defense errors were "so serious as to deprive the defendant of a fair trial." Id., at 787-788 (quoting Strickland, 466 U.S. at 687.)   A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Under AEDPA, the Court does not apply Strickland de novo.  Rather, the Court must determine whether the state court's application of Strickland was unreasonable.  Richter, 131 S. Ct. at 785.  Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult. Richter, 131 S. Ct. at 788.  Since the standards created by Strickland and § 2254(d) are both 'highly deferential,' when the two are applied in tandem, review is 'doubly' so.  Richter, 131 S. Ct. at 788 (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).  Further, because the Strickland rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial." Id. at 786; Premo v. Moore, __ U.S. __, __, 131 S. Ct. 733, 740 (2011).

2.    Factual Background

The crime occurred after midnight on May 21, 1990.  RT[2] 1430.  Investigating officer, Detective Gary Deckard, questioned Petitioner later that evening.  RT 1430.  Petitioner stated he had no knowledge of what had taken place.  RT 1431.  He advised the detective that he had been at the Oakdale Motel at the time of the crime.  RT 1432.  Two days later, Petitioner was placed under arrest, advised of his <u>Miranda</u>[3] rights, and questioned further.  RT 1434; Pet. Exhs., vol. 6, pp. 1777-1848.  He again stated he had no knowledge of the crime.  RT 1434.  Later in the interview, he admitted that he had been present and participated in the planning stage of the crime.  RT 1434; Pet. Exhs., vol. 6, p. 1783.  He stated the group went over a diagram of the house, and he was given the assignment of guarding a hallway to prevent anyone from escaping. RT 1435; Pet. Exhs., vol. 6, p. 1784.  Initially, he stated he had been unarmed and had not attacked anyone.  RT 1435-37.  Later, he changed his statement and said he had struck one of the victims in the leg several times with a baseball bat.  RT 1438; Pet. Exhs., vol. 6, p. 1826.  When confronted with his changing statements, Petitioner admitted: The "only reason why I been bullshitting you people is cause I know man, heh, it's big time."  RT 1440-41; Pet. Exhs., vol. 6, p. 1828.  He stated it was his understanding that the victims were to be beaten, but not killed.  RT 1454; Pet. Exhs., vol. 6, pp. 1797-98.  He admitted that he "completely condoned" what had taken place.  RT 1443; Pet. Exhs., vol. 6, p. 1847.  He denied that he had killed anybody. Pet. Exhs., vol. 6, pp. 1825-26.

Petitioner was indigent and could not afford private counsel.  Because there were multiple defendants and the county public defender's office could not represent all defendants, on May 24, 1990, John Grisez of the county "conflicts" firm of Grisez, Orenstein and Hertle was appointed to represent Petitioner.  RT 126.  Immediately, Grisez and the prosecutor began negotiating a plea agreement whereby Petitioner would testify against the other defendants, and in exchange, Petitioner would plead guilty to four counts of first degree murder, without special circumstances and with the possibility of parole.  RT 92-93; CT[4] 1127.  Pursuant to the agreement, Petitioner agreed to provide another interview with the investigating detectives on

---

[2] "RT" refers to the Reporter's Transcript on Appeal.
[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
[4] "CT" refers to the Clerk's Transcript on Appeal.

1   May 31, 1990.  RT 92.  In that interview, Petitioner admitted that Cruz had planned the killings

2   in advance.  CT 1101, 1131.  He further stated that Cruz had instructed that everyone in the

3   house was to be killed.  CT 1131.

4       As part of the agreement, Petitioner was to take a polygraph examination.  RT 96-97, CT

5   1128.  On June 18, 1990, polygraph examiner George L. Johnson met with Petitioner for purpose

6   of examining Petitioner.   RT 112-13.   During the pretest phase, Petitioner offered new

7   information including admitting that he had stabbed victim Darlene Emmie Paris one time in the

8   side, inserting the knife about 5-6 inches deep, and then cutting her throat.  CT 1132.  He stated

9   Cruz had directed him to do this, and Cruz had given him his "Ka-Bar" knife to do so.  CT 988,

10  1132.  He stated that the victim had been lying on her stomach when he pulled her head up by

11  her hair, and then cut her throat.  CT 1132.  He stated that the cut was deep "as it felt like he

12  almost cut her head off."  CT 1132.  He stated he had done this because Cruz had directed him to

13  do so.  CT 1132.  Because of the new admissions, the examiner could not create polygrams, and

14  so the meeting was concluded without conducting an examination.  CT 1132.

15      Thereafter, Petitioner met again with Detective Deckard.   RT 988.   Deckard asked

16  Petitioner whether he had stabbed Paris, and Petitioner admitted he had stabbed her in the left

17  side and then cut her throat.  RT 988.  Petitioner stated the cut to her throat was "pretty deep"

18  because "her head felt like a loose tooth" and "had a lot of play in it."  RT 988.  He stated he had

19  done so because Cruz had motioned with a gesture that he should.  RT 989.

20      Five months later, in October of 1990, Petitioner rejected the plea agreement against

21  Grisez's wishes.   RT 140-41, 257.   In late October or early November, one of Grisez's

22  colleagues in the firm, Mary Ellen Hertle, took over the case.  RT 126.  On November 28, 1990,

23  during the preliminary hearing, Hertle declared a conflict and she was relieved as counsel.  CT

24  687-88.  The preliminary hearing proceeded with the remaining defendants.  CT 704.

25      On November 29, 1990, the court appointed Paul Ligda to represent Petitioner.   CT

26  693(e). On December 11, 1990, on the fourth day of the preliminary hearing, Ligda moved to

27  sever Petitioner's case and begin the preliminary hearing anew.  CT 697.  The prosecutor

28  objected stating that all of the evidence was already in.  CT 697.  Ligda explained that he would

1   need an additional two months to prepare because he had not yet received all of the transcripts

2   and more work needed to be done.  CT 697-98.  He observed that the other attorneys had been

3   given approximately five months to prepare, implying that two months would not be

4   unreasonable.  CT 698.  He stated he would not need five months like the other attorneys

5   because he had the advantage of some of the work already having been done.  CT 698.  The

6   court granted the motion and severed Petitioner's case.  CT 698.

7         As noted by Respondent, when Ligda was appointed, he faced a case in which Petitioner

8   had provided several voluntary and incriminating statements to investigators which established,

9   by themselves, every element of the charges against him.  In addition, Petitioner had already

10   rejected the plea agreement and negotiations were not likely to resume due to additional

11   statements having been procured from other witnesses.  RT 2129.  Ligda attempted to exclude all

12   of Petitioner's statements from evidence by filing motions in limine.  CT 1098, 1103-04.  On

13   August 12, 1991, a hearing was held on the motion and the trial court initially ruled that only the

14   June 18 interview with Detective Deckard would be excluded.  RT 47, 163.  After additional

15   briefing, the court ruled that the statement to the polygraph examiner would be admissible "up to

16   the point where Mr. Johnson developed a serious question about his ability to give [Petitioner] a

17   polygraph."  RT 209.  Ligda requested that the court reconsider its ruling as to the May 31

18   statement, but the court declined.  RT 209.

19         Ligda also challenged portions of the audiotapes of the May 21 and 23 interviews.  RT

20   247.  The prosecutor agreed not to use the audiotapes during those portions of the interviews, and

21   instead would have the detectives testify.  RT 267.  The trial court then returned to the May 31

22   and June 18 statements.  After considering Ligda's arguments and cited cases, the court ruled

23   that both statements were inadmissible since they were made in the course of plea negotiations.

24   RT 259.  Therefore, Ligda was successful in excluding from evidence the most damaging and

25   incriminating statements made by Petitioner wherein he admitted he took an active role in the

26   conspiracy and personally stabbed and sliced the throat of one of the victims.

27         Ligda's strategy was to present Petitioner as a slave of Gerald Cruz's group.  RT 815-16.

28   His theory which he argued to the jury was that Petitioner did not possess free will and only did

what he was told to do by Cruz, or he would suffer physical and mental consequences, even death.  RT 815-16; 1703.  Ligda argued that Petitioner thus could not have premeditated or deliberated on the murders.  RT 1703-05.  Further, the defense theory was that Petitioner possessed no intent to kill, that the plan among the group was only to beat the occupants, and that Petitioner had only conspired to assist in beating the victims.  RT 1705.  Ligda was able to rely on Petitioner's May 23 statement and Michelle Evans's testimony in support of this theory.  He was able to point out that the only evidence of Petitioner having personally killed someone came from Evans, and he attacked her credibility in several ways.  RT 1706-14.  Had the other statements been admitted, this defense theory would not have been tenable.

At the motion for new trial, Ligda explained his defense strategy as follows:

> Well, essentially, [Petitioner's] defense rested on a jury acceptance and understanding of the fact that [Petitioner] was subservient to Cruz; that he had been for some particular time and that it was evidenced by a number of things culminating, as it were, on the evidence that evening that he was threatened in the presence of other witnesses that harm could come to him if he did not carry out his assigned project that particular evening.

RT 2104.

3.    Claim 1B

Petitioner first alleges trial counsel, Paul Ligda, rendered ineffective assistance by failing to complete investigation of the case, opting instead to proceed to trial prematurely.  Also, he claims counsel performed ineffectively by seeking a severance and by failing to take steps necessary to have Petitioner's case joined with his codefendants.

a.    **Severance of Case; Failure to Move to Consolidate**

Petitioner claims counsel rendered ineffective assistance by moving to sever his case from that of his codefendants, and by later failing to move to consolidate the cases.  He claims that since Petitioner was a physically small and neurologically impaired young man whom the Cruz group treated and abused as their slave, Ligda inexcusably sacrificed one of the few advantages Petitioner had, which was his lack of culpability when compared to the other codefendants.  He argues it is a virtual certainty that the sympathy the jurors would have felt for Petitioner would have assured a sentence less than death and probably second degree murder.

1    The Court notes first that bifurcation of the case was contemplated by the trial court, at

2    the urging of the prosecutor, as a result of the previous attorney's conflict and prior to the

3    appointment of Ligda.  CT 688.  Ligda  was appointed in the midst of the preliminary hearing

4    and appeared on the fourth day of the examination.  CT 697.  At that time, he moved to sever the

5    case because he was essentially beginning work on the case.  He stated he had only received two

6    of the three transcripts and was in the middle of reviewing the police reports.  CT 697.  He asked

7    that the case be severed and a new preliminary hearing be ordered for Petitioner in order that he

8    could complete work and prepare for the hearing.  CT 697.  Based on this, it is clear that a fair-

9    minded jurist could have found that Petitioner failed to establish a prima facie case of

10   ineffectiveness for Ligda's decision to request severance.

11   Petitioner also faults Ligda for later failing to move to consolidate the cases.  Petitioner

12   was arraigned on March 8, 1991.  At that time, the trial court asked whether there would be a

13   motion to consolidate Petitioner's case with his codefendants.  RT 4.  The prosecutor responded,

14   "No. No, your Honor, there is not. There is an Aranda problem in trying this defendant along

15   with the other ones." RT 4.  The trial court then responded: "All right. Vacate the trial date that I

16   just suggested.  May the minute order reflect that the District Attorney will not be moving to

17   consolidate this matter because of Aranda problems."  RT 4.  Petitioner claims that despite the

18   statement of the prosecutor and the ruling of the court, Ligda should have moved to consolidate

19   so that he could have benefitted by being tried alongside his more culpable codefendants.

20   Respondent counters that consolidation would have been denied under Aranda, and in any case,

21   consolidation might have been damaging to the defense.

22   There is nothing in the record concerning Ligda's reasons for not seeking consolidation.

23   Therefore, the Court must "affirmatively entertain the range of possible reasons" he may have

24   had for his action or omission.  Pinholster, 131 S. Ct. at 1407.

25   The Aranda problem the prosecutor declared refers to the Aranda/Bruton rule, which

26   "bars admission in a joint trial of one defendant's out-of-court confession that powerfully and

27   facially incriminates a codefendant, even if the court instructs the jury to consider the confession

28   only against the declarant."   People v. Smith, 135 Cal. App. 4th 914, 921-22 (2005) (citing

1   Bruton v. United States, 391 U.S. 123, 135-136 (1968) and People v. Aranda, 63 Cal. 2d 518,

2   531-32 (1965)).   As noted by Respondent, Petitioner's several statements did powerfully and

3   facially incriminate his codefendants, and at that time none of Petitioner's statements had been

4   excluded, so there was in fact an Aranda problem.  Ligda himself conceded there was an Aranda

5   problem.  Pet. Exhs., vol. 7, p. 1868.  Petitioner fails to demonstrate a likelihood that any motion

6   for consolidation would have been successful in the face of the prosecutor's declaration.  A fair-

7   minded jurist could conclude based on this that Petitioner failed to establish a prima facie case

8   that Ligda's alleged omission was objectively unreasonable.

9        For the trial court to allow consolidation, Petitioner's statements would have had to be

10   redacted to avoid references to codefendants.   Respondent contends that doing so could have

11   damaged Petitioner's defense.    Respondent posits that evidence pointing to the greater

12   culpability of a codefendant would have been redacted from the incriminating statement.  This is

13   a weak argument but still a reasonable possibility.  As noted above, the defense theory was that

14   Petitioner did not premeditate and deliberate; rather, he had no free will and merely did what

15   Cruz commanded him to do.  Petitioner made two statements, one during the pretest phase of the

16   polygraph examination, and the other to Detective Deckard, wherein Petitioner stated that he

17   sliced Paris' throat because Cruz told him to do so or Cruz motioned that he do so.  CT 1132; RT

18   989.    Under Aranda/Bruton, these statements would necessarily have been redacted.    It is

19   plausible that at that time, Ligda, in attempting to defend Petitioner in the face of multiple

20   powerfully incriminating statements, could have wanted every statement showing Cruz directed

21   the killing in evidence so as to buttress the defense theory.   The reviewing court indulges a

22   "'strong presumption' that counsel's representation was within the 'wide range' of reasonable

23   professional assistance." Richter, 131 S. Ct. at 787 (quoting Strickland, 466 U.S. at 687).

24   Therefore, a fair-minded jurist could conclude that Petitioner failed to present a prima facie case

25   that Ligda's decision not to seek consolidation was objectively unreasonable.

26        **b.     Decision to Expedite Trial**

27        Petitioner claims Ligda rendered ineffective assistance by proceeding to trial before he

28   had completed his investigation.  Petitioner states that Ligda had an extensive vacation planned,

1   and therefore, he rushed the case to trial so as not to interfere with his plans.  Petitioner points to

2   Ligda's statement, provided 15 years later, that Petitioner "was tried first in part because I had an

3   extended prepaid trip planned beginning in November of 1991."  Pet. Exhs., vol. 14, p. 4060.

4        The record does not support Petitioner's claim that Ligda was determined to set the trial

5   as early as possible in order to satisfy his personal interests at the expense of Petitioner's

6   defense.  Ligda was appointed on November 29, 1990.  Petitioner faults Ligda for advancing the

7   date of trial to August 19 from the previously set date of September 9, 2011.  This is not an

8   accurate reading of the record.  At the arraignment on March 8, 1991, the parties agreed initially

9   to set trial for September 9, 1991.  RT 5.  However, the clerk advised the court that September 10

10  was a court holiday and the clerk did not know if any other trials were set for that week.  RT 5.

11  The trial court then suggested September 16 and Ligda agreed. RT 5.  The prosecutor, however,

12  advised the court that he had another capital case scheduled to commence in early October.  RT

13  5.  The parties thereafter agreed to a trial date of August 19, 1991, and in fact trial commenced

14  on that date.  RT 6, 274.  At that time, Petitioner's codefendants' trial was actually scheduled

15  earlier, to wit, June 17, 1991.  RT 9.  On March 27, 1991, the codefendants moved for a

16  continuance to October.  RT 11.  During the motion for continuance, the prosecutor opined that

17  there was a large amount of material to go through, but the earlier date of June 17 was realistic.

18  RT 12.  The motion for continuance was granted for October 28, 1991, with an alternate date of

19  February 18, 1992, and ultimately, that trial commenced on or around April of 1992.  RT 24; Pet.

20  Exhs., vol. 4, p. 1018.  Therefore, the record shows that the parties had both agreed to September

21  9, 1991, which at that time was after the codefendants' trial was scheduled to commence.  Had

22  Ligda wanted to set the trial as soon as possible, he could have asked the case be joined with the

23  codefendants so as to set the trial a full month earlier.  Additionally, when the trial court

24  appeared to have a conflict with the September 9 date, the court suggested September 16 and

25  Ligda readily agreed.  The August 19 date was agreed upon because the prosecutor had a conflict

26  with the later date.  As noted by Respondent, Ligda's vacation plans never even entered into the

27  discussion of scheduling until after the trial had concluded and during a motion for new trial.  RT

28  1994, 2004.  Accordingly, Ligda's actions do not demonstrate a motivation to get the case

1  scheduled as soon as possible.

2  Nevertheless, even assuming that Ligda was motivated to set the trial prior to his

3  preplanned vacation, there is nothing unreasonable or sinister in an attorney taking a vacation

4  into account in scheduling a trial.  Ligda stated he would be prepared for trial on the scheduled

5  date, and the record provides no reason why he should have sought a continuance at any time

6  prior to trial.  Ligda never stated that his discovery was incomplete.  He never stated his

7  preparation for trial was lacking, or that he could have used more time to prepare for trial.  There

8  is no evidence that Ligda had obligations between the time of his appointment and the time of

9  trial that would have interfered with his preparation.

10  Petitioner points to additional discovery that was obtained by the codefendants after

11  Petitioner's trial.  Petitioner claims Ligda should have asked for a continuance so that this new

12  evidence would have been available to him.  However, the evidence was not known to him prior

13  to trial.  Counsel cannot be deemed ineffective because he failed to continue a trial as long as

14  possible in the hope that additional evidence, unknown at the time, might be discovered at a later

15  date.  While it is true that the codefendants' attorneys asked for additional time, Ligda's vacation

16  plans had nothing to do with that decision.  A trial involving four attorneys and four defendants

17  is substantially more complex; therefore, it cannot be deemed unreasonable that they would

18  request a continuance while Ligda did not.

19  Petitioner further points to the declaration of Ramon Magana, defense counsel for

20  codefendant LaMarsh.  In his declaration, Magana stated that Ligda pushed for a quick trial.  Pet.

21  Exhs., vol. 14, p. 4066.  As discussed above, the record does not show Ligda did this.  Rather,

22  the record shows Ligda had agreed to a trial date that was initially set beyond the codefendants'

23  trial.  He did not request a continuance, but there is no reason evident in the record that Ligda

24  needed one prior to the trial.  Magana faults Ligda for the discovery he obtained after Petitioner's

25  trial, but Magana concedes the evidence only became known after the trial.  For example, the

26  witness Rosemary McLaughlin was only discovered later through a newspaper article regarding

27  a motel fire. In addition, the tape recordings of Starn and some of the codefendants were made

28  available after Petitioner's trial.  Magana concedes that prior to Petitioner's trial, the prosecutor

1    had informed the defense attorneys that they did not exist.  Ligda cannot be faulted for failing to

2    obtain material he did not know existed.  "A fair assessment of attorney performance requires

3    that every effort be made to eliminate the distorting effects of hindsight . . . and to evaluate the

4    conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.

5        Moreover, Magana's statement consists of hearsay of what Ligda allegedly told Magana,

6    and conjecture as to what Magana "believed" Ligda was thinking.  Pet. Exhs., vol. 14, p. 4066

7    ("I believe he wanted the money from the trial for his trip.").  This is not sufficient to rebut the

8    presumption of counsel's effectiveness.  See Greiner v. Wells, 417 F.3d 305, 325 (2d Cir. 2005).

9    This Court finds that the California Supreme Court could have reasonably chosen not to consider

10   Magana's declaration, or given it little weight, in determining whether Petitioner's claim

11   established a prima facie case.

12       **c.    Prejudice**

13       Petitioner claims that Ligda's motion to sever the case, his failure to move to consolidate

14   the cases, and his actions in proceeding to trial prematurely prejudiced him as demonstrated by

15   the evidence that was later discovered and the outcome the evidence had on the retrial of

16   codefendants Willey and LaMarsh.   Petitioner notes that Willey and LaMarsh were each found

17   guilty of four counts of second degree murder and one count of conspiracy to commit second

18   degree murder.  Pet. Exhs., vol. 7, p. 1871.  Willey received a sentence of 62 years to life, and

19   LaMarsh received a sentence of 64 years to life.  Id. at 1897.  Petitioner on the other hand was

20   found guilty of four counts of first degree murder and one count of conspiracy to commit murder

21   and was sentenced to death.  The Court notes that codefendants Cruz and Beck were also found

22   guilty of four counts of murder and one count of conspiracy and sentenced to death.  Id. at 1871.

23   Petitioner argues that he would have fared as well or better than Willey and LaMarsh had he

24   been tried with them and had Ligda delayed the trial so as to obtain the additional discovery.

25       The Court does not find that comparing Petitioner's trial with the Willey-LaMarsh retrial

26   demonstrates prejudice.  There were many differences between the two trials.  First, Petitioner

27   made several highly incriminating statements which by themselves established every element of

28   the crimes charged.  Although Ligda was successful in excluding the most damaging statements

from the trial, Petitioner's initial statements to detectives were admissible at trial. In the May 23, 1990, statement, Petitioner recounted how he was part of the group during the planning stage and the distribution of the weapons, he admitted he entered the house with the group, he admitted he attacked one of the occupants of the house, and he stated he condoned the conspiracy. Pet. Exhs., vol. 6, pp. 1777 et seq. He further made statements to his girlfriend Mary Gardner and to Michelle Evans, which were admissible at trial. In those statements, Petitioner had stated that everyone in the house was supposed to die and admitted that he personally stabbed a victim and then cut her throat. RT 1066-67, 1313-14. Willey and LaMarsh had made no such statements.

In addition, Willey and LaMarsh both testified at their trial. LaMarsh testified that he had gone to the victims' house with Evans so that Evans could take some of Tanya Miller's clothing. Id. at 1891. LaMarsh testified that he brought a bat along as a scare tactic in case the occupants tried to hurt Evans. Id. He stated that he did not know of any plan to hurt or kill anyone. Id. LaMarsh testified that Raper yelled at him when he entered the house. Id. He accompanied Evans to a bedroom whereupon Ritchey became aggressive and told him, "It's time for you to go, Jason." Id. LaMarsh took out his .22-caliber handgun, pointed it at Ritchey, and told him to leave. Id. LaMarsh then exited the house out the back window. Id. He stated he then ran to the front door to get Evans and went back inside the house. Id. at 1892. When he went inside, Raper attacked him with a knife, so he used his bat to protect himself. Id. Raper grabbed his arm, which appeared to be broken, and dropped his knife. Id. Cruz then attacked Raper by hitting him over the head with a baton. Id. LaMarsh ran out the back window again, came to the front door again to survey the scene, and then fled to the car. Id.

Willey testified that he went to the victims' house to help move furniture. Id. at 1895. He testified that when he approached the house, LaMarsh yelled to him that "the shit's starting," and Ritchey ran out the front door. Id. at 1896. Willey stated he then tackled Ritchey and started to punch him so he couldn't get away to get help. Id. Beck then came up, pushed Willey off of Ritchey, and then cut Ritchey's throat with a large knife. Id.

Petitioner however did not testify in his defense. Had he done so, he would have been impeached with his highly incriminating statements which Ligda had successfully excluded.

1    Moreover, as pointed out by Respondent, if Petitioner had been tried alongside Willey
2    and LaMarsh, additional incriminating evidence would have been proffered.  At the Willey-
3    LaMarsh retrial, witness James Richardson testified that he had known Evans for six years. Id. at
4    1887.  He stated that Evans and a man, inferably Petitioner, discussed how the man had just
5    murdered a girl with a baseball bat.  Id.  Witness Larry Cortinas testified that he was incarcerated
6    at the Stanislaus County Jail with Cruz, Beck, and Petitioner, and they had all admitted to him
7    that they had beaten people to death at the Elm Street house.  Id. at 1888.  LaMarsh testified that
8    Petitioner was armed with a bat and a knife on the night of the murders.  Id. at 1891.  He testified
9    that he saw Petitioner during the attack kneeling by the kitchen table and pulling someone out
10   from beneath it.  Id. at 1892.  Willey also testified that Petitioner was armed with a bat and a
11   knife. Id. at 1895.

12   Given the differences noted above, the outcome of the Willey-LaMarsh retrial cannot be
13   considered proof that Petitioner was prejudiced by Ligda's decision to sever or his failure to
14   consolidate the cases.

15   Petitioner also points to specific evidence that was discovered subsequent to Petitioner's
16   trial.  He claims the evidence supports his contention that Ligda's decision to go to trial
17   prematurely prejudiced his defense.  He argues that this evidence would have been discovered
18   had Petitioner not forced the case to trial.  He claims the evidence was crucial to the defense.
19   However, as previously discussed, there is no evidence in the record that Ligda "forced" the case
20   to trial prematurely.  The trial was scheduled in a normal fashion, and while Ligda did not seek
21   continuances like the codefendants' attorneys did, there is no reason that he should have done so
22   prior to trial.  Petitioner does not demonstrate that any of the specific evidence addressed below
23   was known to Ligda or could have been discovered prior to trial.  Counsel cannot be faulted for
24   failing to request continuances in the hope that additional unknown evidence might be
25   discovered.  For this reason, the claim fails. Nevertheless, the Court will address each item of
26   evidence identified by Petitioner.

27   i.    Sherry Trammel

28   Petitioner states that certain police reports involving Michelle Evans were turned over to

the prosecution after Petitioner's trial.  In his declaration, Ligda did not recall seeing the police reports prior to trial. Pet. Exhs., vol. 14, p. 4059.  He does not state whether he knew about Trammel, whether he investigated her, or whether he would have found her testimony helpful. He states he would have used whatever was available to attack Evans' credibility. Id.

In one police report dated July 9, 1991, in an incident involving Evans and Trammel, Evans allegedly threatened Trammel that she would "slice you like I sliced the rest."  Pet. Exhs., vol. 2, p. 537.  Respondent correctly notes that no declaration from Trammel was submitted, and it is unknown whether Trammel would have testified if called or what her testimony would have been.  Petitioner cannot demonstrate prejudice where he fails to demonstrate that the witness could have been called to testify, state with specificity what that witness would have testified to, or show that the witness was actually available and willing to testify.  Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  Petitioner submits no affidavit from the witness and only speculates as to her testimony. See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir.), as amended by 253 F.3d 1150 (9th Cir. 2001) (mere speculation of possible helpful information from potential witnesses is not sufficient to show ineffective assistance of counsel).  The California Supreme Court could have reasonably chosen to disregard this evidence.

ii.     Michell Mercer

Petitioner also points to police reports involving Michell Mercer that were discovered after Petitioner's trial.  Pet. Exhs., vol 2, p. 542.  Mercer testified at the subsequent Cruz-Beck trial that Evans confessed to being present at the house during the killing of Raper, and that Evans had "helped slice up Darlene [Paris]."  Pet. Exhs., vol. 2, p. 584.  Petitioner contends that Mercer's testimony would have undermined Evans' credibility since Evans had testified she was not present when the murders took place.  Mercer provided a declaration wherein she stated she would have testified to the same at Petitioner's trial had she been contacted.  Pet. Exhs., vol. 14, pp. 4056-57.

Again, Ligda does not recall having seen this police report.  He does not state whether he knew about Mercer, whether he investigated her, or whether he would have found her testimony

helpful.  Counsel cannot be blamed for failing to put on a witness he did not or should not have known about.

In any case, a fair-minded jurist could conclude that Mercer's testimony would not have changed the outcome.  Mercer testified that she was biased against Evans.  She stated that Evans had broken up a relationship between Mercer and her boyfriend.  Pet. Exhs., vol. 2, p. 591.  Mercer testified that she still cared about the boyfriend a lot.  Id.  When asked whether Mercer liked Evans, she stated, "No, sir, I can't say I do."  Id. at 590.  Therefore, Mercer's bias would have undermined the impeachment value of her testimony.  As pointed out by Respondent, Mercer and Evans both testified at the Cruz-Beck trial, and both Cruz and Beck were convicted and sentenced to death.

Moreover, Mercer's testimony did not call Petitioner's own culpability into question.  Even if Mercer's statements were taken as true, they would only have established that Evans also participated in the attacks.   None of her statements would have exculpated Petitioner.   In addition, the jury was instructed that Evans' testimony as an accomplice had to be corroborated.  RT 1673-74, 1709.  The circumstantial evidence corroborating her testimony was overwhelming.

   iii. <u>Evidence of Benefits in Exchange for Testimony</u>

Petitioner claims counsel's decision to proceed prematurely also prejudiced him because it deprived him of the information and records showing that financial and other benefits and inducements had been made to Evans and Alvarez in exchange for their testimony.  Petitioner states that while his case was being tried, counsel for two of his codefendants sought records of moneys paid or any offer of consideration offered to any witness in the matter.  Pet. Exhs., vol. 3, pp. 689-97.

Ligda did not discuss this information in his declaration, but it is clear from the record that he was aware of it.  In her preliminary hearing testimony, Evans states she was given a motel room, money for meals, and assistance in relocation expenses by the District Attorney's Office.  CT 931-33.  Evans further stated that the assistance did not influence her testimony in the case.  CT 933.  Since counsel clearly knew of the information, Petitioner cannot demonstrate prejudice resulting from his allegedly proceeding  to trial prematurely.

iv.   Evidence of Cruz's Influence and Control over the Cult

Petitioner claims that Ligda's decision to proceed to trial prematurely deprived him of all of the material available concerning Cruz's cult, including what he terms the "Master's tapes," which were tapes made by Cruz containing his occult teachings.  He further claims Ligda did not possess the complete diaries of all the cult members.  He contends that these materials, which were turned over after Petitioner's trial, would have been crucial to a cult expert or mental health expert in evaluating Petitioner's mental state and the influence of Cruz and other members.

Ligda makes no mention of these items in his declaration.  He does not state whether he knew about them, investigated them, or whether he would have found them helpful.  In any case, Ligda did in fact consult and present an expert on cults and mind control of cult members.  RT 1859.  The expert, Randy Cerny, reviewed police reports, Petitioner's diary which he maintained from 1988 to 1990, and trial transcripts.  RT 1867.  In addition, Cerny interviewed Petitioner on two occasions, as well as Petitioner's sister, Angela Young, who was a former member of Cruz's cult.  RT 1867.  Petitioner complains that the additional materials would have been crucial, but he does not state what additional information the materials would have provided that would have assisted the defense.  Cerny reviewed much of the same information and came to the same conclusions as the codefendants' expert, Patrick O'Reilly.

Both Cerny and O'Reilly determined that the group was a cult and Cruz was the leader of the cult. RT 1868; Pet. Exhs., vol. 1, pp. 4, 20.  Cerny concluded that Petitioner was subjected to a process of mind control by Cruz.  RT 1868.  Likewise, O'Reilly found that Cruz used highly effective measures of influence, persuasion and intimidation to retain Petitioner as a member of the group.  Pet. Exhs., vol. 1, p. 4.  Cerny noted that Petitioner was subjected to extended periods of sleep deprivation as a method of mind control.  RT 1869-71.  O'Reilly also found that sleep deprivation was a controlling tool that Cruz used consistently.  Pet. Exhs., vol. 1, p. 28.  Cerny noted from Petitioner's diary that Petitioner was subjected to constant and repeated brutal physical punishment at Cruz's direction.  RT 1871-75.  O'Reilly found the same.  Pet. Exhs., vol. 1, pp. 25-26.  Cerny discussed shock treatments that would be administered by Cruz.  RT 1872. An exposed orange extension cord would be placed on the testicles or the forehead of Petitioner

1   or other members, and Cruz would turn on the light switch to supply shocks.  RT 1872.  Cerny

2   recounted one incident where Petitioner could not stand the sight of another member, Steve

3   Perkins, being electrocuted in this manner.  RT 1872.  This angered Cruz which caused Cruz to

4   subject Petitioner to the same torture.  RT 1872-73.  O'Reilly described the same electrocution

5   torture, also noting the incident with Perkins.  Pet. Exhs., vol. 1, pp. 25-26.  Cerny described how

6   Cruz would punish Petitioner by forcing Petitioner to engage in sodomy with other members.  RT

7   1873.  O'Reilly also noted the same punishment.  Pet. Exhs., vol. 1, pp. 27-28.  Cerny discussed

8   how Petitioner was isolated from outside influences and restricted from seeing his family

9   members as a form of control.  RT 1875-76.  On occasions when he would leave the camp he

10  usually had to have someone accompany him.  RT 1876.  O'Reilly also discussed these same

11  restrictions.  Pet. Exhs., vol. 1, p. 23.  Cerny also noted that Petitioner was required to ask

12  permission from Cruz to do things.  RT 1876.  O'Reilly noted the same.  Pet. Exhs., vol. 1, p. 23.

13  Cerny noted that Petitioner was required to work and turn all of his funds over to Cruz as a form

14  of cult control.  RT 1876.  O'Reilly also noted that Petitioner had to work and turn over all his

15  earnings to Cruz.  Pet. Exhs., vol. 1, p. 23.  Cerny and O'Reilly also noted that Cruz followed the

16  teachings of occultist Aleister Crowley and even considered himself Crowley's reincarnation.

17  RT 1877; Pet. Exhs., vol. 1, p. 24.

18        In light of the foregoing, Petitioner's expert discovered and presented most of the same

19  information that his codefendants' expert did.  He also came to the same conclusion that

20  Petitioner had been subjected to a process of mind control by Cruz.  Therefore, Petitioner cannot

21  establish that he suffered any prejudice by Ligda's failure to procure these additional materials.

22        v.    James Richardson

23        In addition to witnesses Trammel and Mercer, Petitioner claims Ligda's decision to

24  proceed with trial prematurely deprived him of the benefit of testimony of James Richardson.

25  Petitioner claims Richardson would have contradicted Evans' allegation that Petitioner had

26  confessed to her and Richardson that he killed Paris.

27        Petitioner concedes that Richardson moved and was not located until October 25, 1991,

28  which was after Petitioner's trial.  For this reason alone, the claims fails.  Counsel cannot be

expected to delay trial indefinitely in the hope that a witness might turn up at a later date.

At the Cruz-Beck trial and the LaMarsh-Willey retrial, Richardson testified that he received a call from Evans shortly after the homicides to pick her up.  Pet. Exhs, vol. 3, pp. 601-602.  At some point, they picked up Petitioner who gave Evans her purse.  Id. at 623, 673.  Richardson testified that Evans told him that she had "set it all up" and that she had enjoyed watching it.  Id. at 644, 650.  However, Richardson also testified that Evans identified Petitioner as one of the men "that actually did the homicide."  Id. at 643, 648, 685.  Richardson stated Evans informed him that Petitioner was "the one that killed the girl."  Id. at 648-49.  Richardson also overheard Petitioner stating that he had hit the girl with a baseball bat.  Id. at 649, 660.

Thus, Richardson's testimony would not have been helpful.  It did not contradict Evans' allegation that Petitioner had admitted to killing Paris.  Richardson stated that Evans and Petitioner spoke for some time behind the truck and beyond his hearing.  It is entirely possible that Petitioner's admission took place during that conversation.  Moreover, the rest of Richardson's testimony would only have bolstered and corroborated Evans' testimony.  His testimony would have reaffirmed Evans' statement that Petitioner was the person who actually killed Paris, and his testimony that he heard Petitioner state he had hit the girl with the baseball bat would have corroborated Evans' testimony that Petitioner attacked Paris.  A fair-minded jurist could reasonably have determined that Petitioner failed to present a prima facie case that he suffered prejudice as a result of counsel's failures concerning Richardson.

vi.   Rosemary McLaughlin

Petitioner also claims he was prejudiced by counsel's decision to advance the trial date insofar as he was denied the benefit of testimony from Rosemary McLaughlin.  McLaughlin was a former member of Cruz's group.  Petitioner maintains that she could have testified that Petitioner was the cult's slave and was mistreated and abused at the hands of other cult members, thus generating sympathy for Petitioner.  McLaughlin was discovered subsequent to Petitioner's trial "through a newspaper article regarding a motel fire."  Pet. Exhs., vol. 14, p. 4067.

Once again, there is no indication that Ligda knew of this witness or could have discovered this witness prior to trial.  In fact, as noted above, it was only through happenstance

1   that she was discovered through a newspaper article published after Petitioner's trial.   It is

2   unreasonable to find that counsel erred because he failed to seek a continuance on the chance

3   such a witness might materialize.

4          In addition, McLaughlin's testimony would have been cumulative to the evidence already

5   presented by Ligda.   Petitioner states McLaughlin would have testified that Petitioner was a

6   slave and mistreated by the group.   At the Willey-LaMarsh retrial, McLaughlin testified that she

7   had been a member of Cruz's group in the past, that Cruz was the leader, and that Petitioner was

8   treated like a slave.   Pet. Exhs., vol. 7, p. 1882.   She stated that Cruz controlled members of the

9   group using threats, violence, manipulation, and sleep deprivation.   <u>Id</u>.   She left the group in

10  1987 or 1988 but visited on occasion starting in 1989.   <u>Id</u>.   She testified that on May 20, 1990, at

11  around 10:00 p.m., she was at home watching television with her boyfriend, Phillip Wallace,

12  when she received a call from Cruz.   <u>Id</u>. at 1885.   The purpose of the call was to recruit the two

13  of them to help Cruz "go beat someone up."   <u>Id</u>.   They refused.   <u>Id</u>.   The next day Beck came to

14  their house wearing new shoes, stating his old shoes were covered in blood.   <u>Id</u>. at 1886.   Beck

15  grinned, stating "[w]e slit some throats."   <u>Id</u>.

16         Respondent correctly states that Ligda had presented evidence concerning the cult and

17  Petitioner's treatment within the cult through Evans' direct testimony, her cross-examination,

18  Deckard's testimony, and various other witnesses.   RT 1336-43, 1351-52, 1366, 1451-52, 1536,

19  1564-67, 1581.   In addition, Ligda presented substantial evidence concerning the cult through his

20  expert, Randy Cerny.   RT 1859-81.   McLaughlin would not have provided any new information.

21  Petitioner cannot show prejudice.

22         vii.   <u>Change of Venue</u>

23         Petitioner claims counsel's decision to proceed separately from the codefendants and rush

24  the case to trial deprived him of the assistance of a competent venue expert.   Petitioner contends

25  that Ligda was forced to rely on the survey of investigator Alan Peacock.   Petitioner's motion to

26  change venue was subsequently denied.   On the other hand, the codefendants relied on Dr.

27  Stephen Schoenthaler to conduct a change of venue survey.   The codefendants' motion was

28  granted and venue was changed to Alameda County.

1   Petitioner's argument is not well-taken.  Ligda initially sought funds to have a survey

2   conducted by experts of his choice, to wit, the National Jury Project.  Pet. Exhs., vol. 7, p. 1852-

3   54.   The trial court denied the motion and advised Ligda that he should have the survey

4   conducted instead by one of the investigators already retained.  Id. at 1858.  The court stated it

5   was "confident that . . . the investigators that have been . . . retained in this case are competent

6   investigators."  Id. at 1861.  As a result, Ligda retained investigator Alan Peacock, who was a

7   licensed private investigator.  RT 166.  Utilizing the survey conducted by Peacock, Ligda moved

8   for change of venue.  A hearing was conducted and the trial court denied the motion.  RT 164-

9   204.

10   Petitioner argues that had Ligda delayed or joined his case with the codefendants, he

11   would have had the benefit of the expertise provided by Schoenthaler.  However, Schoenthaler

12   was contacted only after Ligda's motion was denied and at the recommendation of Peacock.  Pet.

13   Exhs., vol. 14, p. 4035.  In other words, Schoenthaler was only retained because of Ligda's

14   choice to retain Peacock.  Thus, it is completely speculative to say Ligda would have had the

15   benefit of Schoenthaler's expertise had he delayed or joined with his codefendants.

16          viii.   Juror Questionnaires

17   As evidence of prejudice, Petitioner points to jury questionnaires distributed to jurors by

18   the prosecution following the Cruz-Beck trial.  Petitioner identifies five responses.  He does not

19   state whether additional responses from the other jurors exist.   Petitioner claims that the

20   responses demonstrate that had Petitioner been tried with his codefendants at a later date, he

21   would have received a lesser sentence or been acquitted.  Petitioner submits that when asked

22   whom they believed cut Paris' throat, one of the respondents thought Petitioner had done so, two

23   jurors said that either Beck or Petitioner had done so, one said that Cruz had done so, and one

24   responded: "Not sure at all. Could have been Rick Vieira, Beck, Cruz, or even Michelle Evans.

25   Probably Vieira or Beck. I didn't rule out 'Missy.'"  Pet. Exhs., vol. 3, pp. 699-718.

26   Petitioner's argument is not persuasive.  The prosecution was not seeking Petitioner's

27   conviction at the Cruz-Beck trial.  Relevant evidence of Petitioner's guilt, such as Evans'

28   testimony of Petitioner's description of the way in which he cut Paris' throat, was not presented

or argued.  Such evidence would have been presented had Petitioner been on trial with his codefendants.  Therefore, the jury's conclusion regarding Petitioner's guilt is not relevant.  A fair-minded jurist could reasonably have chosen to disregard this evidence.

### d.  Conclusion

In sum, Petitioner fails to show that no reasonable jurist could have found that he failed to make a prima facie showing that counsel rendered ineffective assistance by moving for severance, by failing to move for consolidation, and by advancing the trial prematurely.  Reasonable grounds existed for counsel's initial motion for severance as well as for his alleged failure to move to consolidate Petitioner's case with his codefendants.  Also, the record does not reflect that Ligda purposefully advanced the trial prematurely to the detriment of Petitioner.

Even if the Court considered Ligda's decisions or omissions to constitute ineffectiveness, Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to make a prima facie showing of prejudice.  Petitioner's comparisons to the trials of his codefendants cannot be considered as proof of prejudice.  As to the additional evidence, none of it was known to Ligda, and the evidence would not have altered the outcome of the trial.  This claim is denied.

### 4.  Claim 1C

Petitioner claims Ligda performed ineffectively by opting to forego second counsel in exchange for a higher hourly pay rate for himself.  Petitioner argues that Ligda placed his own financial interests ahead of the best interests of his client.

Initially, Petitioner points to American Bar Association guidelines which recommend the appointment of two qualified attorneys in cases where the death penalty is sought.  Nevertheless, the Supreme Court has stated that "Strickland stressed, however, that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." Bobby v. Van Hook, 558 U.S. 4, 8 (2009) (quoting Strickland, 466 U.S. at 688).  Rather, "the Federal Constitution imposes one general requirement; that counsel make objectively reasonable choices." Id. (quoting Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000)).

Petitioner also notes that federal law requires the appointment of two counsel, at the defendant's request, when a defendant is indicted for a capital federal offense.  18 U.S.C. § 3005.

However, as this case concerns a state conviction, federal statutes do not govern.

Petitioner further argues that California law compelled Ligda to request second counsel. Cal. Penal Code § 987(d) provides:

> In a capital case, the court may appoint an additional attorney as a co-counsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. Any affidavit filed with the court shall be confidential and privileged. The court shall appoint a second attorney when it is convinced by the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation. If the request is denied, the court shall state on the record its reasons for denial of the request.

Cal. Penal Code § 987(d).

In Keenan v. Superior Court, the California Supreme Court held that the decision whether an additional attorney should be appointed remains within the sound discretion of the trial court. Keenan v. Superior Court, 31 Cal. 3d 424, 430 (1982).  However, a second attorney is required only upon "a showing of genuine need." Id. at 434.   The burden "is on the defendant to present a specific factual showing as to why the appointment of a second attorney is necessary to his defense against the capital charges." People v. Lucky, 45 Cal. 3d 259, 279 (1988).

In this case, prior to Ligda's appointment, Ken Faulkner, counsel for codefendant Beck, negotiated an arrangement with the superior court clerk wherein all attorneys for the defendants charged with the murders agreed to a compensation arrangement whereby the attorneys agreed to forego second counsel in exchange for a $125 hourly rate. Pet. Exhs., vol. 14, pp. 4070-71. When Ligda was appointed as replacement for Grisez, the following colloquy occurred:

> MR. LIGDA: Your Honor, . . ., I would understand my appointment would be under the same circumstances as the appointment of counsel on the other defendants?"
>
> THE COURT: Can you tell me very briefly what those circumstances are? We're talking financial?
>
> MR. LIGDA: Yes. Whatever they are, the same.
>
> THE COURT: And as far as you know, whatever financial agreements that have been made with those counsel have been made through the superior court?
>
> MR. LIGDA: Judge Stone, I believe.

34

1    THE COURT: That will, I'll make that order.

2  RT 5-6.

3         The discussion above shows that Ligda merely accepted the arrangement that had already

4  been established by all other counsel.  It does not support Petitioner's allegation that Ligda

5  waived second counsel in exchange for a higher hourly rate, with the implication that he acted to

6  maximize his income at Petitioner's expense.  Moreover, there is nothing in the record to

7  indicate that this case was so complex that Ligda could have or should have made a specific

8  factual showing of genuine need at that time, nor is there anything in the record which shows

9  Ligda felt constrained by the fee arrangement or that it affected his performance in any way, and

10  Petitioner makes no such showing now.  In support of his allegation, Petitioner points to Ligda's

11  statement made fifteen years later, that "[i]n hindsight, having co-counsel would have been

12  helpful, especially during the trial."  Pet. Exhs., vol. 14, p. 4059.  But this statement reflects only

13  Ligda's view *in hindsight*, and the Supreme Court has warned not to judge counsel's decisions in

14  the "harsh light of hindsight." Richter, 131 S. Ct. at 789 (quoting Bell v. Cone, 535 U.S. 685,

15  702 (2002)).  Moreover, he does not state that there was a genuine need for additional counsel,

16  only that it would have been helpful, and having additional counsel would be helpful in many

17  cases.

18         Petitioner also claims that it was the policy of the Stanislaus County Superior Court to

19  discourage lead counsel in indigent capital cases from requesting second counsel.  Petitioner

20  states the court would pay lead counsel a higher rate of $125 per hour rather than the standard

21  rate of $100 per hour if counsel agreed to forego second counsel.  Pet. Exhs., vol. 6, p. 1732.

22  Reference to the written policy of the Stanislaus County Superior Court reveals no such purpose.

23  The policy states that "[t]he court shall appoint a second attorney when it is convinced by the

24  reasons stated in the affidavit that the appointment is necessary to provide the defendant with

25  effective representation."  Id.  This is in accord with California law.  The policy provides for a

26  fee payment of $100 per hour in a special circumstance murder case.  Id. at 1739.  In an

27  extraordinary special circumstance case, the attorney may apply for a fee adjustment up to $125

28  per hour.  Id.  However, there is nothing in the policy precluding an attorney earning $125 per

1    hour from applying for appointment of second counsel.  According to the policy, second counsel

2    may be appointed upon a showing of good cause, which is again in accord with California law.

3    Id. at 1743.

4         In sum, a fair-minded jurist could have found that Petitioner failed to make a prima facie

5    showing that Ligda erred.  This claim is denied.

6         5.    Claim 1D

7         Petitioner next claims Ligda failed to competently investigate, develop evidence,

8    confront, and cross-examine Evans.  The parties both agree that Evans was the key witness for

9    the prosecution.  She was a member of the group and she provided a detailed first-hand account

10   of the events leading up to the murders and the group's flight thereafter.  Like Petitioner and the

11   other codefendants, she was originally charged with four counts of first degree murder with

12   special circumstance of multiple murder and one count of conspiracy to commit murder. RT

13   1211.  Like Petitioner, she initially denied involvement in the murders. RT 1432.  Subsequently,

14   she admitted her involvement and entered into a plea agreement with the understanding that she

15   would testify fully and truthfully.  RT 1211.  The only information from Ligda concerning his

16   strategy and actions in regard to Evans is his statement that "[m]y goal at trial was to destroy her

17   credibility so that the jury would disregard the damaging portions of her testimony."  Pet. Exhs.,

18   vol. 14, p. 4059.

19        As previously discussed, "counsel has a duty to make reasonable investigations or to

20   make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466

21   U.S. at 691.  "[S]trategic choices made after thorough investigation of law and facts relevant to

22   plausible options are virtually unchallengeable."  Id. at 690-91.  "[S]trategic choices made after

23   less than complete investigation are reasonable precisely to the extent that reasonable

24   professional judgments support the limitations on investigation."  Id.  "In any ineffectiveness

25   case, a particular decision not to investigate must be directly assessed for reasonableness in all

26   the circumstances, applying a heavy measure of deference to counsel's judgments."  Id. at 691.

27   With this standard in mind, the Court will address Petitioner's specific claims concerning Evans.

28        a.    **James Richardson**

36

Petitioner alleges Ligda rendered ineffective assistance by failing to present the testimony of James Richardson to impeach Evans.  As previously discussed, Petitioner concedes that Richardson moved and was not located until October 25, 1991, which was after Petitioner's trial. There is nothing in the record to indicate that counsel could have discovered Richardson so he could testify at trial.  It is unreasonable to expect that counsel would delay trial indefinitely in the hope that he might turn up at a later date.  Accordingly, the claim fails.

Moreover, as previously stated, Richardson's testimony would not have impeached Evans.  Evans' allegation that Petitioner had admitted to killing Paris could have occurred out of Richardson's hearing when Petitioner spoke to Evans behind his truck.  Also, Richardson's testimony would only have bolstered and corroborated much of Evans' testimony, particularly Evans' statement that Petitioner was the person who actually killed Paris, and Petitioner's statement that he had hit the girl with the baseball bat.

### b.     Evans' Inculpatory Statements

Petitioner next claims Ligda should have presented evidence and testimony concerning Evans' own inculpatory statements.

### i.     Statements to James Beck

On May 22, 1990, Evans and Beck were left alone in an interrogation room and surreptitiously recorded.  Pet. Exhs., vol. 3, p. 787.  Much of the conversation was unintelligible because both Evans and Beck often whispered.  Id. at 780-91.  Counsel for LaMarsh and Willey had a portion of the tape recording enhanced and retranscribed so that some of the unintelligible remarks could be understood.  The tape recording was played for the jury at the Willey-LaMarsh retrial.  Id. at 810.  In one particular passage, Evans made a statement that was interpreted in two different ways, as follows:

> B [Beck]: I don't see why we should be behind bars, we didn't do anything.  You know.  They said you snuck out the window when this shit was happening, it's a good thing because it could have happened to you, while it was happening.  Boy that was a trip.
>
> E [Evans]: [defense interpretation]:  (Whispers)  And  I  also  killed somebody.[prosecution interpretation]:  (Whispers)  And I also told them . . . . (Unintelligible 13 seconds of whispering)

B [Beck]: Huh, that's good.  Ahhh.  I told them where I was too and they don't believe me.  Because Gerald was sick, you know, so he and Jennie went to Oakdale, she was at his mom's when she called, so me and Rick went over there and stayed in a motel room.  They don't believe me.  (Unintelligible) do something, it's the truth man, so it's a trip man, I didn't see anyone after I went to Oakdale.

Id. at 797.

Petitioner maintains that Ligda should have impeached Evans with her admission that she had killed someone.  However, this statement was completely disputed even after it was enhanced and retranscribed.  Certainly, the context of the statement appears to support the prosecution's interpretation, since Beck replied to Evans' statement by stating "I told them where I was *too*."  Id.  In any case, the statement could not have had any effect in impeaching Evans.  The jury already knew she was a participant in the raid on the home, and they were warned to view her testimony with caution, and that her testimony had to be corroborated.  And as previously discussed, even if the jury believed Evans had participated in the murders, this did not exculpate Petitioner from his responsibility.

Petitioner further argues that a comparison of Petitioner's trial with the Willey-LaMarsh retrial shows that had Ligda impeached Evans with this statement, Petitioner would have received the same or less penalty imposed on Willey and LaMarsh.  As already discussed, it is inappropriate to compare the two trials since there were vast differences.  Moreover, as Respondent notes, the jury were unable to reach a verdict in the initial trial of Willey and LaMarsh when the enhanced recording was not presented, but they were convicted on retrial when the recording was presented.

ii.    Statements to Sherry Trammel and Michell Mercer

Petitioner contends that Ligda was ineffective in failing to impeach Evans with the statements made by Sherry Trammel and Michell Mercer.

With respect to Trammel, as discussed above, no declaration was submitted, and it is unknown whether Trammel would have testified if called or what her testimony would have been.  Petitioner cannot demonstrate prejudice where he fails to demonstrate that the witness could have been called to testify, state with specificity what that witness would have testified to,

or show that the witness was actually available and willing to testify.  Alcala, 334 F.3d at 872-73.  Petitioner only speculates as to her testimony.  See Dows, 211 F.3d at 486; Bragg, 242 F.3d at 1088 (mere speculation of possible helpful information from potential witnesses is not sufficient to show ineffective assistance of counsel).

As to Mercer, it is unknown whether Ligda knew about her, whether he investigated her, or whether he would have found her testimony helpful.  Counsel cannot be blamed for failing to put on a witness he did not or should not have known about.  Moreover, Mercer admittedly was biased against Evans and this would have undermined the impeachment value of her testimony.  In addition, even if Mercer's testimony was accepted as true, it did not call Petitioner's own culpability into question.  As previously stated, the jury was instructed that Evans' testimony as an accomplice had to be corroborated.

  iii. Statements to Ivy Martin

Petitioner claims Ligda failed to locate, interview and present the testimony of Ivy Martin.  She was Evans' cellmate with whom Evans' drafted her handwritten statement of July 12, 1990.  According to her declaration of August 8, 2004, Martin would have testified that Evans told her she participated in the murders, that she "helped drag the girl out from under the table," and "described in great detail how James Beck slit the girl's throat."  Pet. Exhs., vol. 2, pp. 460-64.  Martin would also have testified that Evans used her as a sounding board to help her come up with a story and was "bouncing stories off me to see which ones sounded the best."  Id.

Respondent correctly points out that there was an entirely reasonable and valid explanation in the record for Ligda's decision not to call Martin: her preliminary testimony was completely different from the statements she provided in her more recent declaration.  During the preliminary hearing and while Petitioner's case was still joined with his codefendants, Evans testified that Martin had assisted her in writing her statement.  CT 444-45.  Later during the hearing, Martin testified that she had helped Evans write her statement.  CT 708.  Martin stated she did so because Evans wasn't a very good speller, Evans liked the way Martin wrote, and the statement needed to be very neat.  CT 708-09.  Martin testified that she wrote down what Evans told her and occasionally changed a word for a more formal word, but she did not alter the

context.  CT 709-10.  She testified that Evans told her "it was very important that she told the truth, because she was going to have to take a lie detector test."  CT 716.  She further testified that Evans told her "that if she was not honest in this statement and they caught her in a lie, that they would use somebody else."  CT 720.  Martin also stated that she talked to Evans just once concerning the events before she wrote the statement.  CT 721.  When asked whether she sat down and conversed with Evans about what would sound best, she stated: "No."  CT 722.  Evans cried and appeared to be under stress while Martin was writing down her statement.  CT 723. Martin testified that the statement was consistent with everything Evans had told her about the event, and Evans had not said anything that was not included in the statement.  CT 723.  Martin also stated that Evans never indicated she wished to exaggerate the role of any other individual involved in the case.  CT 724.

Therefore, prior to trial, Ligda knew only that Martin's testimony would bolster and reaffirm Evans' testimony.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  Richter, 131 S. Ct. at 789-90 (citing Strickland, 466 U.S. at 691).  Even if Ligda had some reason to believe Martin would change her testimony, she would have been impeached with her preliminary hearing testimony.

### c.    Forensic Pathology Evidence

Petitioner next alleges counsel was ineffective in failing to impeach Evans' testimony by showing that her own involvement in the killings was strongly suggested by the forensic pathology evidence and Evans' own statements.  Petitioner states Evans' testimony concerning the knives that were involved in the killing, coupled with the pathologist's testimony, suggest that Evans herself was involved in killing Paris.

Evans testified that the group brought four knives with them to the house: a Ka-Bar knife, an M-9 bayonet, a Wildcat knife, and a smaller survival knife.  Evans testified that during the preparation, Cruz sharpened his Ka-Bar knife, Cruz handed Willey the Wildcat knife, and Cruz gave Evans the smaller survival knife.  RT 1260, 1265, 1269.  When Beck came in through the window of the house, Evans saw that he carried the M-9 bayonet knife.  RT 1293.  The only knife recovered by law enforcement was the Ka-Bar knife, together with a baton and "The Edge"

1  bat. RT 864.

2       Paris sustained numerous lacerations and stab wounds to her body, including: contusions
3  and lacerations of the scalp, a stab wound to the neck, a slicing wound to the neck, a cut and
4  slicing wound to the chest wall, cut wounds on the right hand and left finger, stab and cut
5  wounds on the right thigh, a stab wound to the right chest, and multiple other contusions and
6  abrasions to her body.  RT 938.  The pathologist, William Ernoehazy, determined that the stab
7  wound to the right thigh, the stab wound to the chest, and the multiple slicing wounds to the neck
8  were caused by the Ka-Bar knife.  RT 938-45.  This was consistent with Evans' testimony that
9  Petitioner used the Ka-Bar knife handed to him by Cruz to stab Paris in the side and then cut her
10  throat repeatedly.  Petitioner points however to the small stab wound to the neck.  Ernoehazy
11  testified that he did not believe that this wound had been caused by the Ka-Bar knife because it
12  was "a little too small" for the Ka-Bar knife.  RT 944.  Ernoehazy noted that the wound had been
13  caused by a single-edged knife.  RT 944.  Petitioner points out that the only other knife identified
14  by Evans that is single-edged that was smaller than the Ka-Bar was the small survival knife she
15  carried.  The Wildcat knife was serrated and the M-9 bayonet was larger than the Ka-Bar.  While
16  Evans described her knife as being single-edged and smaller than the Ka-Bar, she stated it was
17  serrated on one side.  RT 1269.  Ernoehazy could not determine if the knife that caused the
18  smaller stab wound in question had any serrations.  RT 944.  Petitioner rests his claim on the
19  inference that the small stab wound must have been caused by Evans utilizing her small survival
20  knife.

21       There is nothing in the record regarding Ligda's perception or strategy concerning the
22  weapons.  Therefore, the Court must "affirmatively entertain the range of possible reasons" he
23  may have had for his action or omission.  Pinholster, 131 S. Ct. at 1407.  From the record, it can
24  be concluded that Ligda knew the following facts in reviewing the forensic evidence.  As noted
25  above, Paris sustained multiple wounds including cuts, stabs, lacerations, abrasions and
26  contusions.  Ernoehazy was uncertain as to what objects caused many of these wounds.
27  However, the fatal wounds to the chest and neck, and the large stab wound to the leg, were all
28  consistent with the Ka-Bar knife.  RT 938, 940-45.  Ligda knew that Evans would and in fact did

1   testify that Petitioner caused these wounds.  Evans testified that Petitioner hit Paris a few times,

2   that Cruz then handed Petitioner the Ka-Bar knife, that Petitioner then stabbed Paris in the side,

3   and then held her up by the hair while he sawed at her throat until it felt like her head was going

4   to fall off.  RT 1313-14, 1524-26.  Ligda also knew that this account was completely consistent

5   with what Petitioner had told the polygraph examiner and the detective in the excluded

6   statements.  Ligda further knew that Petitioner had provided his own description of what

7   occurred in the house: that LaMarsh had been beating Raper; that Beck had been beating

8   Colwell, and Cruz had been beating Paris.  RT 1436-37.  When Petitioner was asked specifically

9   whether he witnessed Evans hit anyone or do anything, he stated he had not.  Pet. Exhs., vol. 6,

10  p. 1839.  He further stated that he had not seen Evans at the house during the attack, but that he

11  recalled she had been waiting for the men in the car upon their return from the house.  Id. at

12  1792, 1835-37.  Eyewitnesses who saw Ritchey being attacked and men leaving the house did

13  not see a female.  RT 1023, 1046-52.

14      Therefore, Ligda could not have had any reason to suspect that Evans was involved in the

15  attack on Paris.  All of the evidence led to the only conclusion that Evans had left the house

16  when she stated she had: immediately upon letting the men in from the bedroom window.  As

17  Respondent persuasively notes, if in fact Evans had any involvement in the attack on Paris,

18  certainly Petitioner would have stated so to Ligda or provided some declaration to that effect.

19      Moreover, delving into the mystery of the small stab wound could easily have caused

20  more damage to the defense than aid.  Had Ligda made an issue of the small wound, he could

21  have drawn more attention to the fact that the fatal neck and chest wounds were consistent with

22  the Ka-Bar knife.  Also, Ligda knew that Petitioner had admitted to stabbing Paris at least once

23  in the side and repeatedly slicing her throat.  And given that Ernoehazy could not determine what

24  did cause the small stab wound, the idea that it might have been caused by Evans and her small

25  survival knife, in the face of the evidence noted above, would have been speculative at best.

26      Also, there were other plausible explanations for the small stab wound.  The four knives

27  Petitioner cites were only the knives that Evans had seen.  There may have been others she had

28  not seen.  As Respondent notes, there was evidence at Petitioner's codefendants' trials that

Petitioner was seen carrying a bat and a knife.  Pet. Exhs., vol. 7 pp. 1891, 1895; vol. 3, p. 854.

In addition, Petitioner's own expert states that the Ka-Bar knife could have been responsible for

the wound.  Pet. Exhs., vol. 1, p. 60.  Since the Ka-Bar knife has a tapered point, if it was

inserted only a short distance, the wound would have been consistent with application of the Ka-

Bar knife.  Id.

Petitioner also claims counsel should have impeached Evans concerning her testimony

that Petitioner had "sawed at" Paris' throat.  RT 1314.  Petitioner states that Ernoehazy testified

that the cutting wounds to the throat were not consistent with a "sawing" motion since the four

separate slicing cuts appeared to be made by applying the knife, lifting it, and then applying it in

the same direction. RT 942-43.  This argument is unavailing.  It is entirely reasonable for a lay

observer to refer to the repeated motions of applying the knife, lifting it, moving it back into

position, and again applying it, as a "sawing" motion while a professional pathologist would

describe the cuts in as precise terms as possible.  A reasonable jurist could reasonably conclude

that counsel's failure to challenge Evans on this point did not present a prima facie case of

ineffective assistance.

Therefore, Petitioner fails to demonstrate that no reasonable jurist could have found that

he failed to make a prima facie showing that Ligda erred by failing to impeach Evans on the

forensic pathology evidence.

### d.   Evans' Plea Agreement

Petitioner further claims counsel rendered ineffective assistance with respect to Evans by

counsel's failure to impeach her with last minute changes in her plea agreement.  Petitioner notes

that the first plea agreement signed on October 1, 1990, included six specific items to be

fulfilled.  Items five and six were: "(5) You did not personally kill any of the victims," and "(6)

You were not personally armed with a weapon at the scene of the murder."  Pet. Exhs., vol. 3,

pp. 733-35.

After Petitioner's preliminary hearing, Evans notified Detective Deckard that "she was

concerned about some information that she forgot to tell anyone about."  Pet. Exhs., vol. 3, p.

885.  She advised Deckard that she remembered she had a small survival knife in her possession

43

during the incident.  Id. at 885.  She informed Deckard that Cruz had given her the knife before they had left, and that she had placed it in her jacket but had not taken it out until the weapons were collected at the apartment.  Id.  Evans testified about these facts at trial.  RT 1269, 1307.

On August 21, 1991, shortly before Petitioner's trial, Evans signed a second plea agreement.  The plea agreement contained the following obligations:

> (1) You make yourself available as a witness in the case at all trials, re-trials, and other court appearances as required.
>
> (2) You testify fully and fairly as to your knowledge of the facts out of which the charges arose.

Pet. Exhs., vol. 3, p. 730.  Petitioner argues that the changed plea agreement reflects the prosecution's belief that Evans might have personally killed a victim.  He faults counsel for having failed to bring this to the jury's attention.

Based on the record, the Court finds nothing unusual about the second agreement that would have necessitated further inquiry at trial by Ligda.  As noted by Respondent, the first agreement was signed early on in the investigation and it spells out the status of the investigation and the requirements at that time.  For instance, the agreement required that Evans provide complete statements to the investigating detectives.  Id. at 734. It further required that Evans' testimony be corroborated by other evidence.  Id. at 734.  Prior to trial, the prosecution needed a document which accurately reflected the agreement but did not contain inadmissible and extraneous information so it could be admitted to the jury.  Thus, the "finalized" second agreement did not contain the history of the investigation like the first agreement did.  Id. at 730. It did not contain information such as the fact that Evans had submitted to a polygraph examination, or that her testimony would need to be corroborated.  Id.  In addition, the second agreement required that Evans testify "fully and fairly" rather than "truthfully," thus avoiding any unfair suggestion that the prosecution could vouch for Evans' truthfulness.

Petitioner takes issue with the removal of the two conditions, that Evans did not kill anyone and that Evans was not armed.  However, as correctly argued by Respondent, these were facts to be decided by the jury.  Having them stated as facts in the agreement might have bolstered the credibility of Evans' testimony.  Moreover, as stated above, it was not just those

two items that were removed.  The entire agreement was made in summary form so as to convey the terms of the agreement without any unnecessary and inadmissible information.  A fair-minded jurist could conclude that Petitioner failed to make a prima facie case that Ligda erred by failing to inquire into the plea agreements terms.

**e.    Inconsistencies in Evans' Testimony**

Petitioner claims Ligda failed to challenge Evans based on numerous inconsistencies in statements she had provided.

**i.    Survival Knife**

Petitioner argues that Ligda should have impeached Evans with the fact that she had not disclosed her possession of the small survival knife until after the preliminary hearing.  As Respondent points out, this would not have impeached Evans since it was she who brought this fact to the detective's attention long before trial and despite the fact it could have invalidated her plea agreement.

**ii.    Evans' Statements of Blood and Screaming**

Petitioner next highlights an inconsistency between Evans' initial statement on May 22, 1990, and her testimony at trial.  In the initial statement, Evans told Detective Ottoboni that while she was in the house she walked down the hallway and saw blood on the kitchen floor and saw Paris hiding under the kitchen table.  Pet. Exhs., vol. 5, pp. 1222, 1226.  At trial, Evans testified that prior to leaving the house, she heard a woman screaming.  RT 1294-95.

There is no inconsistency here.  In the initial statement, Evans was specifically asked what details she had viewed.  Pet. Exhs., vol. 5, pp. 1221-30.  At trial, Evans was specifically asked whether she had heard any voices. RT 1294-95.  She was not asked if she had seen a Paris hiding under the table or if she had seen blood.  Moreover, if Ligda had asked these questions at trial and Evans had answered them as she did in her initial statement, Ligda would only have succeeded in highlighting for the jury a picture of Paris cowering under a table just prior to Evans hearing her screaming in vain for her life as she left, and after Petitioner and Beck had gone down that hallway.

**iii.    Cross-examination**

1    Petitioner next argues that there were numerous other inconsistencies in the cross-

2   examinations of Evans in all of the trials of Petitioner and his codefendants.  Petitioner does not

3   point to any inconsistency in particular.  He merely incorporates the cross-examinations and

4   apparently expects the Court to identify each inconsistency and determine whether counsel's

5   failure to cross-examine Evans on each point constitutes ineffectiveness.  The Court declines to

6   do so and there can be no doubt the California Supreme Court did the same.

7               iv.     Financial Benefits

8    Petitioner faults counsel for failing to cross-examine Evans concerning the financial

9   benefits she received for testifying.  The record shows Evans received temporary housing when

10  she was released from jail, she received help in paying for meals at Denny's, and she was

11  provided assistance in relocating her residence.   CT 869-70, 931-33.    There is nothing

12  remarkable about providing a witness with assistance with housing and meals while the witness

13  is assisting the prosecution.  Ligda's failure to pursue impeachment on this subject cannot be

14  considered ineffectiveness.

15       **f.     Prejudice**

16    Even if any of the above instances can be considered deficient performance, Petitioner

17  fails to demonstrate prejudice.  Evans' detailed testimony was corroborated by several witnesses

18  as well as the forensic evidence.

19    Much of Evans' account was corroborated by Petitioner's May 23, 1990, interview with

20  Detective Deckard.  Petitioner stated he would often receive beatings by other members of the

21  group.  RT 1452.  He stated he was fearful of Cruz and Beck.  RT 1452.  He stated the initial

22  plan was to remove the occupants from the house.  RT 1452-53.  He stated they initially met in

23  LaMarsh's trailer.   RT 1434.   Petitioner stated he did not participate in the preparatory

24  conversations at the trailer; he only listened.  RT 1434, 1453.  He stated Evans sketched a

25  drawing of the house for the group.  RT 1435, 1453.  The plan was to get everyone into a room

26  and beat them up.  RT 1453.  Cruz gave out the assignments.  RT 1434.  Petitioner's particular

27  assignment was to guard the hallway and not let anyone escape.  RT 1435, 1453-54.  It was not

28  his understanding that anyone was to be killed.  RT 1454.  Evans was to go in first and let the

46

others in through a bedroom window.  RT 1435.  Petitioner stated the group was armed with bats and clubs.  RT 1436.  He stated they approached the house by car, and Evans and LaMarsh were let out of the car while the rest of the group parked the car across the street.  RT 1436.  Once inside the house, Petitioner saw LaMarsh beating on Franklin, Beck beating a male in the kitchen, and Cruz beating on another individual in the vicinity of the kitchen table.  RT 1436-37.  Petitioner admitted he had struck one of the individuals in the kitchen two or three times in the leg with a baseball bat.  RT 1438-39.  Petitioner stated he saw the victims bleeding badly.  RT 1440.  He had not seen Evans in the house during the attack.  Pet. Exhs., vol. 6, p. 1792.

Petitioner stated that after the incident in the house, the group ran to the car.  RT 1441.  Petitioner discarded his bat along the way.  RT 1442.  Evans was already waiting in the car.  RT 1441.  The group then went to Willey's house, changed clothes, and left for a motel in Oakdale.  RT 1441.  All of these statements by Petitioner were consistent and corroborated Evans' testimony.

Donna Alvarez testified that she was sleeping in one of the bedrooms on the night of the murders when Evans woke her and told her she needed to leave the room.  RT 1089-90.  Alvarez stated she then went into the living room.  RT 1090.  When she returned to the bedroom, she saw LaMarsh who then took out a gun and ordered everyone into the living room.  RT 1091-92, 1101-02.  She ran into the kitchen and hid behind a counter and then heard people wrestling.  RT 1093.  She was able to escape by running out of the garage.  RT 1095.  While she was escaping, she heard a girl scream.  RT 1095.  Alvarez's statements are also consistent and corroborate Evans' testimony.

Earl Creekmore lived near the Elm Street house.  RT 1043.  On the night of the murders, Creekmore heard someone running down the side of his house and into his air conditioner, inferably the escaping Alvarez or Ritchey.  RT 1044.  Creekmore went out the front door and heard people fighting.  RT 1045.  He witnessed two people beating on one person in the street.  RT 1046-47.  The two individuals fit the description of Cruz and Willey, and the body of Ritchey was located where Creekmore indicated the victim had been attacked.  RT 1048-49.  Willey and Cruz took turns beating Ritchey.  RT 1050.  Cruz went inside the house, returned, grabbed

47

Ritchey by the shirt, and made a cutting motion to his throat.  RT 1050-51.  Creekmore's testimony was also consistent with Evans' account.

William Duvall, another neighbor, was awakened by the sound of someone hitting one of his windows.  RT 1020.  When he looked out the window, he saw a female, presumably the escaping Alvarez, crossing his lawn on her hands and knees.  RT 1022.  Thereafter, he witnessed four males jogging double time towards the railroad tracks in a single file line. RT 1024-25. This account was consistent with Evans' testimony.

Willey's girlfriend, Patricia Badgett, confirmed that the group came to Willey's apartment after the murders.  RT 1118-19.  Willey asked her to help them come up with an alibi. RT 1120.

Petitioner's girlfriend, Mary Gardner, testified that she was with Petitioner after the murders occurred until he was arrested.  RT 1063-65.  Petitioner admitted that he had been with the group when the murders occurred.  RT 1066.  He also told her that Evans was a "weak link" and she would "turn testimony."  RT 1066.  Gardner testified that Petitioner stated the group was supposed to leave no witnesses.  RT 1066.  He stated that they deserved to die, that they had been warned, and that they should not have been there.  RT 1066.

The forensic evidence also corroborated Evans' account.  A baton, bat, and the Ka-Bar knife were recovered.  RT 864.  Blood stains on the bat and the Ka-Bar knife matched the blood of victim Paris.  RT 1171.  Fibers recovered from the baton matched fibers from the carpet inside the car Evans had said the group took to the Elm Street house.  RT 1149-50.  All of the injuries sustained by the victims were consistent with the weapons Evans said the group carried with them.  RT 918 et seq.

In light of the corroborating evidence, Petitioner has failed to show that no reasonable jurist could have found that he failed to make a prima facie showing of prejudice as a result of counsel's alleged failure to investigate, develop evidence, confront, and cross-examine Evans.

6.   Claim 1E

In his next claim for relief, Petitioner alleges trial counsel rendered ineffective assistance by failing to retain and present the testimony of a competent mental health expert at the guilt

phase.

Prior to trial, Petitioner consulted two experts concerning cults and their practices: former detective Randy Cerny and sociologist Richard Ofshe.  Vieira, 35 Cal. 4th at 291.  In his declaration, Ligda explained that he "did not request funds for a neuropsychologist or a psychiatrist because I did not see the need for one and Dr. Ofshe did not suggest that such experts would be useful."  Pet. Exhs., vol. 14, p. 4060.  He stated, "I believed that Dr. Ofshe was qualified to assess Ricky Vieira's mental state and I relied upon Dr. Ofshe."  Id.  Ligda stated that he did not know that Petitioner had brain damage, brain dysfunction, or suffered from neurofibromatosis.  Id.  If he had, he states he would have presented the evidence before the jury as mitigation.  Id.

During the guilt phase of the trial, Ligda attempted to call Cerny to testify that, due to cult leader Cruz's "mind control techniques," Petitioner was "unable to form the mental state required for first degree murder."  Vieira, 35 Cal. 4th at 291.  The trial court ruled that Cerny could testify as a cult expert on the general subject of cults and whether or not Petitioner was a cult member.  RT 1623-24.  However, the court ruled that Ligda could not offer Cerny for the purpose he proposed, which was to aid the jury in determining whether or not Petitioner had the required mental state.  RT 1624.  Citing California Penal Code § 28, the court ruled that Cerny was not qualified as an expert to testify that mind control exercised within a cult is a mental disease, mental defect, or mental disorder.  RT 1624.  Therefore, his testimony on that point was irrelevant and inadmissible.  RT 1624.

Ligda continued to argue that Cerny's testimony would be relevant to show, not that Petitioner suffered from a mental disease, defect or disorder, but that Cerny's testimony concerning mind control by a cult member might lead the jury to conclude that Petitioner lacked the mental state required for first degree murder.  Ligda specifically stated:

> I'm not saying that Ricky Vieira has a mental disease, defect, or disorder at all. We never contended that.  There's no evidence that he does.  But we do contend that a jury would be entitled to reach a conclusion that because of mind control he was unable to form the mental states required for these particular crimes.

RT 1626.

1   The court stood by its earlier ruling.  RT 1626.

2       Petitioner claims Ligda erred by attempting to present expert testimony from Randy

3   Cerny instead of retaining a qualified mental health expert and providing that expert with

4   relevant materials.  He maintains that Ligda "was on notice that Petitioner was a particularly

5   vulnerable and mentally challenged individual."  Pet. Mem. at 58.  Petitioner argues that expert

6   testimony was necessary regarding the subjects of "mind control, duress, psychological

7   vulnerability, and other mental state factors relevant to the mens rea of the charged offenses."

8   Pet. Mem. at 59.  In support of this argument, Petitioner points to the declarations of clinical

9   psychologist Patrick O'Reilly, psychologist Natasha S. Khazanov, and psychiatrist and

10  neurologist Jeff Victoroff.

11      According to Petitioner's experts, Petitioner suffered from various organic brain

12  impairments.  Petitioner's medical records showed that at age 15, he was diagnosed with "café

13  au lait spots," which is an early symptom of neurofibromatosis, a disfiguring disease that causes

14  the development of tumors on nerve endings.  Pet. Exhs., vol. 1, p. 75.  Khazanov stated that

15  research has shown that people with this disorder have a higher frequency of executive

16  functioning problems, social problems, attentional impairment, anxiety or depression, and other

17  problems suggesting brain impairment.  Id.  Khazanov stated Petitioner might have such

18  impairments.  Id. Also noted were various physical injuries in the past such as a concussion

19  injury when Petitioner was ten years old, and fractures of the right clavicle when he was nine and

20  again at eighteen. Id. at 76-77, 87.

21      Dr. Victoroff further noted the following findings concerning Petitioner: 1) He had been

22  subjected to fetal exposure to alcohol; (2) He suffers from neurofibromatosis; (3) He has a

23  history of polysubstance abuse; (4) He has a history of learning disability and cognitive

24  impairment; (5) He suffers from a dependent personality disorder; (6) He has a left eye visual

25  impairment; (7) He experiences episodes of olfactory hallucinations and altered consciousness;

26  (8) He exhibits a Glabellar reflex consistent with frontal lobe damage or dysfunction; and (9) He

27  has mild weakness in the left finger.  Id. at 96-97.

28      Tests administered to Petitioner showed he possesses normal intelligence and normal

memory functions with exception for visual memory of faces. Id. at 77-78.   Several neuropsychological tests were administered and the results indicated the likely presence of organic brain dysfunction, specifically frontal lobe impairment.  Id. at 78-81.

Dr. Khazanov concluded that Petitioner's "ability to appreciate the criminality of his conduct, to conform his conduct to the requirements of the law, to control his behavior, or to comprehend the consequences of that behavior was severely impaired."  Id. at 83.  Dr. Victoroff stated his findings "describe a man whose brain is simply not equipped with the capacity for judgment, decision making, and restraint necessary for stable, healthy social functioning." Id. at 96.  He concluded that Petitioner's "organic brain damage, personality disorder, and family influences made him much less able than the average person to resist the draw of a cult leader, to judge whether what he was told to do was rational, or to escape when he realized that his life was in danger unless he complied with Mr. Cruz's orders."  Id. at 109.

As Petitioner correctly notes, "trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."  Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003); see also Seidel v. Merkle, 146 F.3d 750, 755-56 (9th Cir. 1998) (counsel was ineffective in failing to conduct any investigation into defendant's psychiatric history and therefore neglected to pursue a potentially successful defense where there were abundant signs in the record that defendant suffered from mental illness).  In this case, despite Petitioner's expert's conclusion that his organic brain impairments "were probably present at the time of trial," the pretrial record contains no evidence that Petitioner suffered from a mental illness or disorder.  Pet. Exhs., vol. 3, p. 18.  Ligda himself admitted as much in his argument to have Cerny testify:

> I'm not saying that Ricky Vieira has a mental disease, defect, or disorder at all.
> We never contended that.  There's no evidence that he does.

RT 1626.  It is true that Petitioner was repeatedly beaten, humiliated, and treated like a slave within the cult, but this was accepted as normal within the cult hierarchy.  Other members, such as Steve Perkins, were similarly treated.  RT 1872.  These facts do not signify Petitioner suffered from a mental illness.  The record does not show that Petitioner suffered from any mental

impairments at or prior to trial.  There is no evidence that Ligda had problems communicating with Petitioner, or that Petitioner was unable to assist Ligda in his defense.  There is no evidence that Petitioner had a history of requiring psychological care.  Even Petitioner's own experts state that Petitioner possesses normal intelligence and memory, that he presents as pleasant, cooperative, alert, attentive and oriented, and he has no issue communicating. Pet. Exhs, vol. 3, pp. 76-78, 93.  The Supreme Court has not held that defense counsel must investigate a defendant's mental health at the guilt stage of trial when there is no indication of a mental impairment.  Thus, a fair-minded jurist could conclude that Ligda did not act unreasonably by failing to investigate whether Petitioner was not only a member of Cruz's cult but also mentally ill.

Even assuming counsel acted unreasonably in failing to investigate and present a mental health defense at the guilt phase, Petitioner cannot demonstrate prejudice.  In order to establish a prima facie case of prejudice, Petitioner must show a reasonable probability that, had counsel presented a mental health defense, the result of the guilt phase of the trial would have been different.  Since Petitioner was found guilty of first degree murder and conspiracy to commit murder, he only suffered prejudice if the mental health defense would have been successful to show that "because of his mental illness . . ., he did not *in fact* form the intent unlawfully to kill (i.e., did not have malice aforethought)," or form the intent to conspire to commit the murders. See People v. Saille, 54 Cal. 3d 1103, 1117 (1991) (emphasis in original), (cited in Sully v. Ayers, 725 F.3d 1057, 1070 (9th Cir. 2013)).

Petitioner has presented evidence that he suffered from some form of organic brain impairment, specifically to the frontal lobe, that was not presented at the guilt phase of the trial.  This does not mean he has shown a reasonable probability that the jury's consideration of this impairment would have changed its determination of guilt.  None of the experts suggested that Petitioner's mental health impairment would not allow him to premeditate or deliberate.  Even if Petitioner was particularly susceptible to indoctrination and domination by Cruz due to his mental health impairment, this does not show that Petitioner did not intend to kill the victims, that he did not act with malice, or that he did not premeditate or deliberate.

1    Moreover, there was significant evidence that Petitioner formed the intent for murder and
2    conspiracy to commit murder.  There is no question that Petitioner was present for the planning
3    of the attack.  Petitioner was included in the attack plan without objection.  When weapons were
4    distributed, Petitioner willingly accepted his.  The stated goal of the attack was to "do'em and
5    leave no witnesses."  Vieira, 35 Cal. 4th at 275.  Immediately after the plan was made, Petitioner
6    danced around swinging his bat to hard rock music in a sort of pep rally.  Id.  He put on a
7    camouflage mask and accompanied the group in the car to the house.  Id.  Petitioner entered the
8    bedroom window according to plan.  Id.  He secured the hallway so that no one could escape,
9    pursuant to the plan.  Id.  When Cruz told Petitioner to shut Paris up, he hit her with a baseball
10   bat several times.  Id.  When that failed, Cruz handed Petitioner his Ka-Bar knife, and Petitioner
11   stabbed her in the side.  Id.  When this did not work, he grabbed her by her hair and sliced her
12   throat repeatedly until "it felt like her head was going to come off."  Id.  He laughed when he
13   told Evans about this.  Id. at 275-76.  He fled the scene of the murders with the group and
14   discarded his bat along the way.  RT 1441-42.  In a later conversation with his girlfriend,
15   Petitioner admitted he had been at the murder scene.  Vieira, 35 Cal. 4th at 276.  He blamed
16   LaMarsh for allowing Alvarez to escape, stating the plan had been to leave no witnesses.  Id.
17   When his girlfriend became upset, Petitioner stated the victims all deserved to die, that they had
18   been warned and should not have been there.  Id.  In light of the strong evidence of Petitioner's
19   premeditation, deliberation, and malice, a reasonable jurist could have found he failed to
20   establish a prima facie case of prejudice.  The claim is therefore denied.

21        7.    Claim 1F

22   In his next claim for relief, Petitioner contends Ligda was ineffective in failing to call
23   Cerny as a fact witness during the guilt phase of the trial.  Cerny, at the time a deputy sheriff for
24   the Stanislaus County Sheriff's Department, investigated the Cruz group in 1985 in connection
25   with another case.  The investigation "was based on information received from Rosemary
26   McLaughlin."  Pet. Exhs., vol. 14, p. 4075.  Petitioner argues that Cerny's testimony at trial
27   would have assisted a mental health expert in explaining to the jury that Cruz was the leader of
28   an undue influence cult that exercised tight control over its members.

Cerny's testimony concerning the 1985 incident would not have been relevant to the case since Petitioner did not join the group until 1987 or 1988.  RT 1807-08, 1811, 1837, 1867. Moreover, Ligda had presented evidence concerning the cult and Petitioner's treatment within the cult through Evans' direct testimony, her cross-examination, Deckard's testimony, and various other witnesses.  RT 1336-43, 1351-52, 1366, 1451-52, 1536, 1564-67, 1581.  Thus, to the extent Cerny's testimony of events in 1985 would have been at all relevant, it would have been cumulative.  A fair-minded jurist could have found that Petitioner failed to make a prima facie showing of ineffectiveness or prejudice.  The claim is denied.

8.     Claim 1G

Petitioner alleges trial counsel performed ineffectively in failing to adequately investigate, retain competent experts, develop evidence, and confront and cross-examine the forensic pathologist, Dr. William Ernoehazy, on issues of bias and incompetence with regard to the four autopsies performed on the victims.  Petitioner argues that Ernoehazy was biased toward the prosecution and shaped his testimony to conform to the prosecution's theory of the case.  He claims Ernoehazy performed the autopsies incompetently and claims Ligda should have cross-examined him on an alleged inconsistency in the direction of the slicing wound to Paris' throat, should have cross-examined him on the number of knives used in the crime, and should have cross-examined him on his conclusion that Paris was alive when her throat was cut.

Respondent is correct that for the most part, Petitioner's claim is a criticism of Ligda's cross-examination of a witness and as such is virtually unchallengeable.  Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997) (citing Willis v. United States, 87 F.3d 1004, 1006 (8th Cir. 1996)) ("We have recently observed that 'there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would pass muster.'"); Phoenix v. Matesanz, 233 F.3d 77, 83 (1st Cir. 2000) (Choices concerning cross-examination are "prototypical examples of unchallengeable strategy").  With respect to his claim that counsel failed to retain his own competent experts, the record reflects Ligda did in fact request and receive funds to have Delta Pathology review Ernoehazy's reports, and the review was completed prior to trial.  Pet. Exhs.,

54

vol. 6, pp. 1755-56.  Therefore, the allegation that Petitioner failed to retain his own expert is without merit.  As for Petitioner's challenges to Ligda's cross-examination of Ernoehazy, the Court will address Petitioner's specific instances of alleged error.

### a.  Bias

Petitioner claims Ernoehazy was biased toward the prosecution and law enforcement. Petitioner's facts do not support this claim.  Ernoehazy was a physician and surgeon who had performed autopsies for Stanislaus County for nearly twenty years.  RT 919.  Prior to that, he had served as a medical examiner and coroner for approximately eleven years.  RT 920.  He was certified by the American Board of Pathology in anatomical, clinical and forensic pathology.  RT 920.  Ernoehazy had viewed three of the victims at the house and later performed autopsies on all four victims. RT 921-22.

Petitioner claims Ernoehazy was biased because he continued to testify under contract with the county for some time after retirement; he earned a substantial portion of his income as a result of that contract; he worked closely with the Stanislaus County Sheriff's Office and even wore sheriff's office insignia; and he never raised his rates during the two decades he served as the county's pathologist.  Pet. Mem. at 70.  These facts merely show a dedicated employee. Given the fact that Ernoehazy worked alongside the sheriff's office for nearly twenty years on homicide cases, it is not surprising that he may have developed friendships or familiarity with the officers.  None of these facts demonstrate bias.

Petitioner also submits declarations from three attorneys who represented defendants in trials in which Ernoehazy testified.  These declarations are irrelevant.  Ligda cannot be faulted for failing to survey the legal community.  Even if he had uncovered these experiences of other attorneys, there is nothing he could have done with them at trial.

### b.  Competence

Petitioner also complains that Ligda failed to inquire into Ernoehazy's professional competence.  Petitioner states that Ernoehazy was known to perform about 800 autopsies a year, although accreditation standards stated that an autopsy physician cannot be required to perform more than 350 per year.  Pet. Exhs., vol. 6, pp. 1537, 1549.  Petitioner's allegation is inaccurate.

1  The Modesto Bee article concerning Ernoehazy's death stated that Ernoehazy, during his time

2  with the Stanislaus County Coroner's Office, "decided the cause of death while performing as

3  many as 800 autopsies a year."   Id. at 1537.   However, the Modesto Bee article reporting

4  Ernoehazy's retirement from the Stanislaus County Coroner's Office stated that Ernoehazy

5  "decide[d] the cause of death in as many as 800 cases a year."   Id. at 1517.   Deciding the cause

6  of death does not require an autopsy.   Id. at 1522.   More importantly, Ernoehazy was a certified

7  forensic pathologist.   Thus, it would have been very difficult for Ligda to cast doubt on his

8  competence by referring to accreditation standards.

9       Petitioner claims Ernoehazy performed incompetently by conducting autopsies of the

10  four victims in a single day.   Petitioner cites the declaration of Dr. Donald Reay, who states that

11  it is "general practice within the field of forensic pathology that pathologist should attempt to

12  perform no more than one homicide autopsy per day."   Pet. Exhs., vol. 1, p. 59.   However, Dr.

13  Reay concedes that "[t]his goal sometimes cannot be achieved, *particularly when there are*

14  *multiple victims in the same incident*, and I have myself performed numerous homicide autopsies

15  in one day."   Id. (emphasis added).   He states in such cases a support staff of three or four should

16  be present to assist the pathologist.   Id.   Ernoehazy had two assistants for Paris' autopsy.   Pet.

17  Exhs., vol. 6, p. 1574.   Petitioner also faults Ernoehazy because he "never bothered to measure

18  the length, width, or depth of any wound.   Pet. Mem. at 71.   Reference to Ernoehazy's report

19  reveals this is untrue.   Pet. Exhs., vol. 6, pp. 1574-76.   Therefore, Petitioner has not demonstrated

20  any incompetence on Ernoehazy's part.

21       **c.     Wounds to Paris' Throat**

22       Petitioner claims Ligda should have cross-examined Ernoehazy on an alleged

23  inconsistency between his conclusion in his report and his testimony at trial.   Petitioner states

24  Ernoehazy wrote in his report that the throat slashing wound began on the right side of her neck

25  and proceeded to the left.   However, Petitioner claims, at trial Ernoehazy testified that the wound

26  had almost certainly been inflicted from right to left, thus making this wound more consistent

27  with the prosecution's theory that Petitioner, who was right-handed, inflicted the wound.

28       In the autopsy report, Ernoehazy describes the cut throat "which begins below the right

56

mandibular corner and extends all the way onto the left side of the neck. On the left, there is a marked dovetailing. The slicing wound measures approximately 7 inches in length, and it shows at least 5 separate components with slight scalloping of the edges." Id. at 1574.  There is no indication from the report that Ernoehazy was describing how the wound was inflicted.  It appears he was simply describing the wound as he moved from right to left.  Likewise, at trial he appeared to be testifying only as to the location of the cuts, not the direction the knife was applied.  The prosecutor first showed Ernoehazy a photograph of the right side of the throat.  RT 942.  Ernoehazy described the wounds as they appeared on the photograph.  RT 942-43.  The prosecutor then drew his attention to another photograph depicting the left side of the victim's neck, stating: "All right.  Now, Dr. Ernoehazy, on the opposite side of this young lady's neck were there additional cuts?"  RT 943.  Dr. Ernoehazy responded: "Well, this one wound does actually begin most likely on the left side and comes across that way."  RT 943.  Viewed in context, it appears Ernoehazy was merely clarifying that there were no additional cuts on the left side, but a continuation of the cuts from the right side to the left side.  There is no inconsistency that shows proof of altered testimony demonstrating bias.

In any case, Ligda's failure to cross-examine on the alleged disparity could not have prejudiced Petitioner.  Ernoehazy never testified that the wound was inflicted by a right- or left-handed person, and the prosecutor never attempted to use this evidence to show who had inflicted the wound.  Therefore, there was no theory for Ernoehazy to bolster.  In addition, the direction was immaterial because there was no evidence showing where a perpetrator stood in relation to the victim, other than Petitioner's own statement to Evans that he grabbed Paris by her hair to cut her throat and Petitioner's excluded statement to the polygraph examiner that he stood behind her while she lay on her stomach on the floor to cut her throat.  Clearly, Ligda could not use the excluded statement, and Evans' statement was only to the effect that Petitioner grabbed her hair.  Evans did not state where Petitioner was in relation to the victim when he grabbed her hair and cut her throat.

**d.      Number of Knives**

Petitioner faults Ligda for failing to question Ernoehazy about the changes in his

1   testimony concerning the number of knives used on the victims.   During cross-examination,

2   Ernoehazy testified that "there's a minimum of four" knives shown by the wounds.   RT 956.

3   Ligda asked how this was determined and Ernoehazy pointed to the autopsy report of Ritchey.

4   RT 957.   On redirect examination, Ernoehazy stated he had misinterpreted his report when he

5   previously testified regarding the knives.   RT 983.   He clarified that when he read his report, he

6   believed the two paragraphs referred to three different knives; however, when he later reviewed

7   his report he realized that the two paragraphs concerned different stab wounds but only two

8   knives.   RT 983-84.   Ernoehazy was not conforming his testimony to the prosecution's theory;

9   rather, he was correcting his testimony to reflect his original findings.   As pointed out by

10  Respondent, his findings were made long before the prosecution developed a theory of the case.

11  In addition, Ernoehazy never testified that a fourth knife did not exist because the type of

12  instrument used to inflict some of the wounds could not be determined.   His testimony only

13  revealed that there were at least three knives used.

14          In any case, Petitioner cannot demonstrate prejudice.   As discussed above in claim 1D,

15  evidence that a fourth knife was used would not have altered the outcome.   There were other

16  plausible explanations for the small stab wound to Paris' neck, and even if it was established that

17  a fourth knife was used and that knife was wielded by Evans, it would not have changed the fact

18  that the fatal wounds suffered by Paris were inflicted by Petitioner's use of the Ka-Bar knife.

19          **e.      Blood Evidence**

20          Petitioner also claims Ligda failed to cross-examine Ernoehazy concerning his finding

21  that Paris was still alive when her throat was cut.   Petitioner points to Dr. Reay's declaration

22  wherein Dr. Reay notes that a wound which severed the carotid arteries of the victim while the

23  victim was still alive would have caused a substantial initial ejection of blood.   Pet. Exhs., vol. 1,

24  p. 62.   Reay states that it would have been very difficult for a person who inflicted such a wound

25  to avoid getting any blood on his clothes.   Id.   Petitioner points to the fact that some of his

26  clothes were tested and only his blood was found.

27          This argument fails because it was not established that the clothes that were tested were

28  indeed the clothes Petitioner wore on the night of the murders.   Four items of clothing were

tested, but they were either identified by Petitioner when he was arrested at his girlfriend's house as clothes he had worn, or Detective Deckard selected them because he believed they contained possible blood stains.  RT 1178, 1193-95, 1209-10.  Moreover, Evans testified that all members of the group made a concerted effort to clean the blood from themselves, their clothing, and their shoes, and to conceal their weapons once they arrived at Willey's apartment.  RT 1306-09.  In addition, had Ligda pursued this issue, the prosecutor could have questioned Evans whether she saw blood on Petitioner at any time.  During the preliminary hearing, she stated she saw blood on Petitioner's hands and clothes when they gathered in Willey's apartment.  CT 864.

### f.       Conclusion

In light of the foregoing, Petitioner fails to show that no reasonable jurist could have found that he failed to make a prima facie showing of ineffective assistance or that he suffered prejudice.  The claim is denied.

### 9.     Claim 1H

Petitioner claims trial counsel performed ineffectively in failing to investigate, retain and present an expert, develop evidence and cross-examine witnesses concerning the content of two tape recordings of witnesses: the recorded conversation between Evans and Beck, and Petitioner's May 23, 1990, interview with Detectives Deckard and Bennett.

### a.       Evans-Beck Tape

Petitioner contends Ligda was ineffective in failing to have the tape recording of a conversation between Evans and Beck enhanced and transcribed.  This claim was already addressed and rejected as part of claim 1D above.

### b.       Petitioner's May 23, 1990, Interview

Petitioner contends Ligda should have had the May 23, 1990, interview analyzed by an expert and compared with the original transcript.  He argues that the expert would have determined that Petitioner did not state, "I completely condoned it," as Deckard had testified.  RT 1443; Pet. Exhs., vol. 6, p. 1847.

### i.      Background

On May 23, 1990, Petitioner was arrested and interviewed by Detective Bennett and

1  Detective Deckard of the Stanislaus County Sheriff's Office.  RT 1433.  Petitioner waived his

2  Miranda rights and spoke with the detectives.  RT 1433-34; Pet. Exhs., vol. 6, pp. 1777-78.

3  Petitioner eventually admitted his involvement in the attack on the occupants of the Elm Street

4  house. RT 1434-39; Pet. Exhs., vol. 6, pp. 1782-1812.

5      Ligda filed motions to exclude this statement along with the other statements Petitioner

6  had provided. CT 1098, 1103-04, 1127, 1129-30.  Initially the Court ruled that the statement was

7  admissible because it was voluntary and Petitioner had been given his Miranda advisements.  RT

8  161.  Subsequently, Ligda argued that portions of the statement should be excluded because

9  statements the detectives had made concerning what others had told them about the murders

10  were inadmissible.  RT 247.  The parties agreed that the audiotape and the transcript would not

11  be used.  RT 267.  Instead, the prosecutor would ask questions directly of the detectives

12  regarding the statements Petitioner made.  RT 267.  During Deckard's testimony, the prosecutor

13  asked him whether Petitioner had "indicate[d] whether or not he had condoned the activity that

14  took place."  RT 1443.  After refreshing his recollection with the transcript, Deckard stated:

15  "Rick's statement was, 'I completely condoned it.'"  RT 1443; Pet. Exhs., vol. 6, p. 1847.

16      ii.    Deficient Performance

17      Petitioner claims counsel should have retained an expert to examine and enhance the

18  audio recording and compare it to the transcript.  Petitioner did so in 2006, and according to the

19  expert's declaration, Petitioner did not state "I completely condoned it."  Rather, he stated "I con

20  . . . what-a-ya-call it, condoned it?"  Pet. Exhs., vol. 1, pp. 132-33.  The expert further states that

21  Petitioner's inflection "appears to be rising at the end of the sentence, suggesting that he may be

22  asking a question or does not understand the word."  Id. at 133.  Based on this, Petitioner claims

23  his statement was only a question, not an admission.  He further claims the statement reflects he

24  did not understand the terms he was using.

25      Respondent persuasively argues that it is significant that Petitioner never submitted his

26  own declaration to the state court concerning his statement.  As Respondent points out, Petitioner

27  knew what he said.  If it was different from what the transcript set forth or what Deckard had

28  testified, it is critical to know when, if ever, he brought the problem to Ligda's attention.

1    Without any such declaration or evidence supporting the claim, the California Supreme Court

2    could only have assumed that Petitioner did not disagree with the transcript or Deckard's

3    testimony.   Respondent points out that when Petitioner disagreed with Gardner's testimony

4    concerning his post-crime statements, he immediately and urgently informed Ligda.  RT 2093,

5    2095, 2098.  Ligda responded by calling witnesses to dispute Gardner's account.   RT 1536,

6    1538, 1541, 1547, 1692-96, 2096.  It can only be assumed that if Petitioner had notified Ligda of

7    Deckard's misrepresentation of his statement, there would be evidence in the record to support

8    his claim.

9         In fact, the record appears to support the conclusion that Petitioner accepted the version

10   set forth in the transcript.  Ligda understood that Petitioner's statement that he condoned the

11   crimes was damaging, and so he developed a strategy to deal with the statement.  He argued to

12   the jury:

13   > Ricky was not a part of any planning . . . And although he did concede that he
> condoned the plan in his statement to the police on the 23rd, it was the
14   > same condoning of a plan that a slave gives to a master's plan, a private to a lieutenant,
> not because their heart's in it but because that's the pecking order.

15

16   RT 1703.

17        Ligda attempted to argue that although Petitioner stated he condoned the plan, at most it

18   was an agreement to beat up the individuals at the Elm Street house.  The point is that if

19   Petitioner knew he didn't declare that he condoned the plan, he certainly would or should have

20   brought it to Ligda's attention, especially when Ligda had to explain to the jury what Petitioner

21   meant when he made the statement.   But there is no evidence that Petitioner disputed the

22   transcript or Deckard's testimony at trial or that he alerted Ligda to the misrepresentation.

23   Therefore, Ligda cannot be faulted for failing to challenge Deckard concerning his testimony,

24   and there is no reason Ligda should have retained an expert to review the transcript for accuracy.

25        In addition, Petitioner claims Ligda should have retained a linguistics expert with

26   expertise in the field of pragmatics to analyze the audio recording.  Petitioner claims the expert

27   could have pointed out how the transcript and Deckard's testimony "distorted" Petitioner's

28   response.  He further claims the expert could have shown that Petitioner was "exhausted, sleep-

deprived, and thoroughly manipulated and coerced" during the interview.   The argument is without merit.   Ligda did in fact elicit testimony that the interview began after midnight, that Petitioner was tired, and that his eyes were red.  RT 1450-51.  Also, Petitioner's argument stands at odds with Ligda's trial strategy insofar as Ligda had argued for and succeeded in excluding the recording and the transcript of the May 23 statement.  In addition, as discussed above, based on the record there was no reason for Ligda to conclude an expert was necessary.  It can only be concluded that Petitioner failed to make a prima facie showing of ineffectiveness to the California Supreme Court.

iii.   Prejudice

Even if Ligda had erred by failing to retain an expert, Petitioner cannot demonstrate prejudice.  Assuming Petitioner's expert is correct that Deckard's testimony and the transcript are incorrect and Petitioner actually said, "I con. . . what-a-ya-call it, condoned it?", and the words were said in the form of a question, the outcome of the trial would not have been any different.

The full exchange, with Petitioner's version substituted, is as follows:

DECKARD: There's one problem that is facing you Rick, that's you are involved in a multiple murder, by law you are guilty of murder.  Do you realize that?

[PETITIONER]: Yes I do.

DECKARD: Your [sic] guilty, you conspired.

[PETITIONER]: Withholding information.

DECKARD: Not withholding information, your [sic] conspired with these other people.

[PETITIONER]: I con . . . what-a-ya-call it, condoned it?

DECKARD: Conspiracy you planned it with these other people to go over there to hurt or kill these people.  By your own admissions you, this is what happened and in conjunction with other evidence we have on you, see you got a serious problem.

[PETITIONER]: I know I got a serious problem, I know what happened was serious.

Pet. Exhs., vol. 6, pp. 1847-48.

In viewing the statement in context, it does not appear that Petitioner was confused at all

by the words, as he now argues. As pointed out by Respondent, it was Petitioner who used the word "condoned." The detectives did not use the word, and Petitioner used it appropriately. In context, it is clear that Petitioner was not confusing the terms "conspire" and "condone"; rather, as Respondent persuasively argues, it appears Petitioner was inquiring what acts he had done that would show he conspired with the group. When Deckard stated Petitioner had conspired, Petitioner offered the fact that he withheld information, essentially inquiring whether it was that fact that made him guilty of conspiracy. Deckard replied that it wasn't that he withheld information, but that he "conspired with these people." Petitioner then suggested or questioned whether it was because he condoned it. He was not attempting to define a word. He was attempting to find out which of his actions made him guilty. Whether it was a question or a statement, the admission that he condoned it still lies within. This is confirmed by the next exchange where Deckard informed him that he's guilty because he "planned it with these other people to go over there to hurt or kill these people." Petitioner responded that he knows he has a serious problem and that what happened was serious.

In sum, a fair-minded jurist could conclude that Petitioner failed to make a prima facie showing that Ligda's alleged error prejudiced him.

10.   Claim 1I

Petitioner alleges counsel erred in failing to retain an expert in knives and cutlery. He points to the small knife wound on the neck of Paris. He argues that an expert would have demonstrated that the only knife capable of inflicting this wound was the fourth knife carried by Evans. In support, he offers the declarations of knife expert Bernard Levine and forensic pathologist Donald Reay. Pet. Exhs., vol. 1, pp. 42-63.

The small knife wound was discussed in depth in claims 1D and 1G above. In sum, the experts' testimonies would not have altered the outcome of the trial. The experts do not dispute that the fatal wounds to Paris' side and neck were caused by the Ka-Bar knife which was utilized by Petitioner. Thus, even if the experts could show that Evans caused the small knife wound, it would not change the fact that Petitioner caused the fatal wounds. Moreover, Petitioner's experts could not have shown that the wound was caused by Evans' knife. Also, Petitioner's forensic

1   pathologist noted that the wound would be consistent with application of the Ka-Bar if it had

2   been inserted two inches or less.  Pet. Exhs., vol. 1, p. 60.

3       Petitioner also points to the scratch marks which appeared on the arm and face of

4   Ritchey.  He argues that the wound could not have been made by the Ka-Bar or M-9 bayonet and

5   must have been made by a knife with a unique serration pattern.  Pet. Exhs., vol. 1, p. 59.

6   However, Dr. Reay concluded that the scratch pattern could have been made by a Texas Wildcat

7   knife.  Id.  It is undisputed that Willey carried a Wildcat knife.  Therefore, the expert's

8   testimonies would not have aided the defense.

9       In sum, Petitioner has failed to show that no reasonable jurist could have found that he

10   failed to make a prima facie showing that Ligda's rendered ineffective assistance in failing to

11   retain a knife expert, or that Petitioner suffered prejudice as a result.  The claim is denied.

12       11.   Claim 1J

13       Petitioner contends trial counsel was ineffective in failing to retain a competent expert to

14   conduct a poll of prospective jurors, compile and analyze the data, and testify at the hearing on a

15   change of venue.

16       **a.   Background**

17       On July 23, 1991, an in camera hearing was held with Ligda, Ramon Magana, counsel for

18   LaMarsh, and Kent Faulker, counsel for Beck, present.  Pet. Exhs., vol. 7, p. 1851.  Ligda, joined

19   with counsel for the other defendants, made a request for county funds to engage the National

20   Jury Project to determine whether the mass media coverage of the crime had made it impossible

21   to obtain a fair and impartial jury for the defendants.  Id. at 1853.  Ligda stated he had used court

22   funds to make an initial inquiry with the National Jury Project, but that additional funds would

23   be needed to conduct a survey.  Id. at 1855.  Magana and Faulkner joined in the request and

24   stated that Ligda's choice in experts was a very well recognized authority.  Id. at 1855.  The

25   court denied the request and stated that to the extent a survey was to be done, the investigators

26   that the Court had already approved of in the case could conduct it.  Id. at 1858.

27       Ligda then retained Alan Peacock to conduct the survey to support Petitioner's motion

28   for change of venue.  Vieira, 35 Cal. 4th at 280.  Peacock was a licensed private investigator who

1   had experience conducting polls.  RT 166.  He testified in the hearing on Petitioner's motion for

2   change of venue.  RT 165-79.  After considering Petitioner's motion, the trial court determined,

3   based on the recently decided California Supreme Court case of <u>People v. Coleman</u>, 48 Cal.3d

4   112 (1989), that there was a reasonable likelihood that Petitioner would receive a fair trial in

5   Stanislaus County.  <u>Vieira</u>, 35 Cal. 4th at 280-81; RT 204.  The Court reserved final judgment

6   until voir dire revealed the actual state of knowledge of the prospective jury pool.  <u>Vieira</u>, 35 Cal.

7   4th at 281; RT 204.  Twice during jury selection, Ligda renewed his motion for change of venue,

8   but the motions were denied.  <u>Vieira</u>, 35 Cal. 4th at 281.

9        Petitioner raised this issue in a motion for new trial and also claimed that Ligda was

10  ineffective in presenting his motion for change of venue.  <u>Id</u>. at 281.  In support of the motion,

11  specially appointed counsel Kirk McCallister argued that Peacock lacked professional

12  qualifications.  <u>Id</u>.  He referred to the survey conducted by Dr. Stephen Schoenthaler in the

13  codefendants' trials.  <u>Id</u>.  He claimed the Schoenthaler survey was properly conducted, and

14  pointed out that the judge granted the motion for change of venue in those cases based on the

15  survey.  <u>Id</u>.  The court denied the motion for new trial, finding greater publicity in the

16  codefendants' subsequent trials, as a result of the publicity from Petitioner's trial.  <u>Id</u>. at 281-82.

17        **b.        Deficient Performance**

18        Ligda's performance was not unreasonable.  He requested experts of his choice and those

19  experts were well-regarded, but his request was denied.  He supported his request with a large

20  amount of legal research, tapes of television coverage, copies of newspaper articles, and data

21  compiled by Peacock concerning the prospective jury pool.  CT 1148-1206.  Petitioner makes no

22  argument that Ligda could have done more in support of his motion.

23        When the trial court denied the motion, it referred counsel to the various investigators

24  who had already been approved in the case.  Ligda reasonably chose to do what the court had

25  advised and retained one of the investigators in the case who had knowledge conducting surveys.

26  A reasonable jurist could certainly have found that Petitioner failed to make a prima facie case

27  that Ligda erred.

28        **c.        Prejudice**

65

Petitioner also fails to demonstrate prejudice.  As Respondent correctly notes, the trial court determined that Peacock was in fact competent.  RT 2060.  The court concluded that neither Ligda nor Peacock had erred.  RT 2060.  The trial court stated, "[I]n my ruling on the motion for change of venue, I've assumed that the study done by the defense was completely proper."  RT 205.  The court did not deny the motion based on any deficiencies in the survey conducted by Peacock.  RT 2060.  The court specifically noted that Peacock's compilation and submission of raw data in support of the motion was the most common method used at the time.  RT 2059-60.  Moreover, the trial court stated the Schoenthaler survey would have made no difference in Petitioner's motion for change of venue.  The trial court explained:

> The big difference between Mr. Vieira's case and the Cruz-Beck-LaMarsh-Willey case, where the change of venue was granted, was the extensive trial and post-trial publicity in Mr. Vieira's case, which notified the public that Mr. Vieira had been convicted, what the testimony actually was that was presented in his case, and, in particular, how that testimony pointed the finger of guilt or, at least, the main culprit as Mr. Cruz.

RT 2060.

The trial court found:

> Taking judicial notice of Dr. Schoenthaler's testimony at the Cruz motion, and giving it the same effect here as it was given there, the court still would not have granted the change of venue motion for Mr. Vieira because of the distinction in the pretrial publicity I just referred to.

RT 2061.

The California Supreme Court also concluded that there is no reasonable likelihood that Petitioner did not receive a fair trial despite the publicity in the case.  Vieira, 35 Cal. 4th at 282-83.  In sum, Petitioner fails to show that no reasonable jurist could have found that he failed to make a prima facie showing of prejudice as a result of counsel's alleged failures.  The claim is denied.

12.   Claim 1K

Petitioner next claims trial counsel failed to seek and obtain discovery and impeach witnesses Donna Alvarez and Michelle Evans regarding the fact that the prosecution had provided financial and other benefits in exchange for their testimony.  He further claims the

prosecution brought pressure to bear on Evans to compel her testimony.

### a.   Financial benefits

According to the record, Ligda knew of the alleged benefits Evans received at the preliminary hearing.  Evans testified that she received a motel room, meals at Denny's and assistance in relocating her residence.  CT 931-33.  Evans further testified that the assistance provided her did not influence her testimony in the case.  CT 933.  Although Ligda knew of the alleged benefits, his reasons for not inquiring into them further are unknown.  Therefore, the Court must "affirmatively entertain the range of possible reasons" he may have had for his action or omission.  Pinholster, 131 S. Ct. at 1407.

It is clear that these financial benefits were nothing more than incidental expenses.  The expenses consisted of lodging, meals, travel, and a per diem.  Pet. Exhs., vol. 6, pp. 1620-37.  They were necessary expenses that would not have been incurred but for the trial.  Payments made to assist the witnesses with these expenses is hardly remarkable.  If anything, it would be expected.  A fair-minded jurist could conclude that Ligda would not have found it helpful to pursue this subject at trial.

Petitioner also complains that Ligda failed to obtain documents that Evans had received the benefit of being placed in the California Department of Justice Witness Protection Program for a period of two months.  Pet. Exhs., vol. 6, pp. 1635, 1642-49.  Clearly, eliciting this fact from Evans could only have harmed the defense.  The most obvious inference from the fact that she was placed in a witness protection program is that her potential testimony against the codefendants had placed her at risk of retaliation by the codefendants.  This is confirmed in the witness protection documents:

> During the preliminary hearing, Michelle Lee Evans's grandmother, Mrs. Piper, received threats that her granddaughter Michelle Evans would be killed and her throat cut in the same fashion as the victims of the homicides.  There was also a box placed on the front yard of Mrs. Piper containing a toy doll with its throat cut and a note stating, "Mommy, don't testify."  These threats were implied to be received as threats against Michelle Lee Evans's six year old daughter who is residing with Mrs. Piper in Ripon, CA.

Pet. Exhs., vol. 6, p. 1642.

Clearly, Ligda did not act unreasonably in failing to use Evans' participation in a witness

1    protection program.  Doing so would have been very damaging to the defense, and would only

2    have served to bolster Evans' credibility.

3         **b.    Law Enforcement Pressure**

4         Petitioner also claims counsel failed to discover that Evans' testimony had been coerced

5    by law enforcement officers who threatened to take away custody of her daughter.  During the

6    codefendants' two trials, Evans testified that she had lost custody of her daughter as a result of

7    being arrested in this case.  Pet. Exhs., vol. 4, p. 1164.  She stated she was concerned and wanted

8    to regain custody.  Id. at 1164-65.

9         Ligda's reasons are unknown, but it is clear his omission was not unreasonable.  Had the

10   defense explored Evans' motive to testify based on the custody issue, the prosecution could have

11   introduced evidence of the various threats made against Evans and her daughter to show she had

12   a motive not to testify, thereby bolstering her credibility. Pet. Exhs., vol. 5, pp. 1341-42.

13   Therefore, a fair-minded jurist could conclude that Petitioner failed to make a prima facie case

14   that Ligda rendered ineffective assistance.  The claim is denied.

15        13.    Claim 1L

16        Petitioner claims counsel performed ineffectively in failing to move to suppress the box

17   of a Ka-Bar knife found during a search of the trailer shared by Petitioner and James Beck.  He

18   claims the evidence linked Petitioner to the Ka-Bar knife and permitted the jury to form the false

19   impression that Petitioner may have carried or used the knife to cut some of the victims.

20        In order to prevail on a claim of ineffective assistance of counsel for counsel's failure to

21   move to suppress evidence, Petitioner must demonstrate that "(1) the overlooked motion to

22   suppress would have been meritorious and (2) there is a reasonable probability that the jury

23   would have reached a different verdict absent the introduction of the unlawful evidence." Ortiz-

24   Sandoval v. Clarke, 323 F.3d 1165, 1170 (9th Cir. 2003) (citing Kimmelman v. Morrison, 477

25   U.S. 365, 375 (1986)).

26        On May 21, 1990, the day after the killings, a search warrant affidavit was filed for the

27   premises at "4510 Finney Road, Apartment 7, Salida, California."  Pet. Exhs., vol. 6, p. 1655.

28   The affidavit described the structure and included, inter alia, "any garages, storage rooms,

outbuildings, trailers and trash containers of any kind located on the above described premises."
Id. As one of his grounds for new trial, Petitioner argued that counsel was ineffective for failing
to move to suppress the knife box.  CT 1590-92.  Petitioner noted that his codefendants had
made such a motion in their cases and the motion had been granted.  CT 1591-92.  In ruling on
the motion for new trial, the court determined that the suppression motion would have been
granted had counsel so moved.  RT 2089.  The trial court determined that in this one instance
Ligda had erred; however, the court found no prejudice "in view of the overwhelming evidence
of Petitioner's guilt, aside from the K[a]-Bar knife box . . . ."  RT 2090.  In his declaration, Ligda
stated he did not make a motion to suppress because he "did not think there were grounds for
such a motion."  Pet. Exhs., vol. 14, p. 4060.

Assuming counsel erred, Petitioner fails to demonstrate a prima facie case of prejudice.
The knife box itself was insignificant compared to the other evidence connecting Petitioner to the
Ka-Bar knife.

Sylvia Zavala, an employee of the Crescent Supply Company, testified that she had sold a
Ka-Bar knife to Cruz and Beck on or about March 13, 1990.  RT 991-993.  A Ka-Bar knife was
one of the knives Evans had stated was used in the murders.  RT 1260.  She testified that Cruz
had been sharpening a Ka-Bar knife on the night of the murders.  RT 1260.  After the murders,
the group met at Willey's apartment and took inventory of the weapons.  RT 1304-08.  The
Wildcat knife, the M-9 bayonet, and the small survival knife were placed on the table.  RT 1306-
07.  Those knives were never recovered.  RT 1309.  The Ka-Bar knife, the Edge bat, and the
police baton were missing.  RT 1307.  Evans stated that Petitioner had told the group he had
thrown the missing weapons down when he was fleeing.  RT 1307-08.  The Ka-Bar knife, a
sheath that fit the Ka-Bar knife, the Edge bat, and a Bianchi police baton were recovered by law
enforcement in a grassy area where the group had parked their vehicle.  RT 850-53, 859, 863-67.
The items were tested, and Paris' blood was found on the bat and the Ka-Bar knife.  RT 1171.

Evans testified that she spoke to Petitioner the day after the murders.  RT 1313.
Petitioner told her that Cruz had told him to "shut the girl up."  RT 1313.  Petitioner hit Paris a
few times but that didn't succeed in silencing her, so Cruz handed Petitioner his Ka-Bar knife

1   whereupon Petitioner stabbed her.  RT 1313.  That also didn't work so Petitioner grabbed her

2   hair and began sawing at her throat until "it felt like her head was going to come off."  RT 1313-

3   14.  The forensic pathologist testified that the wounds to Paris' side and throat were consistent

4   with the Ka-Bar knife.  RT 938-45.

5         In light of the above, there was little that the knife box added.  Had the knife box been

6   excluded, the evidence still showed that Cruz and Beck had purchased a Ka-Bar knife, that Cruz

7   had possession of a Ka-Bar knife on the night of the murder, that the group carried with them a

8   Ka-Bar knife to the Elm Street house, that Cruz handed Petitioner a Ka-Bar knife to use on Paris,

9   that Petitioner stabbed and cut Paris using a Ka-Bar knife, that a Ka-Bar knife was found near the

10  scene, and that Paris' blood was found on the recovered Ka-Bar knife.  Accordingly, Petitioner

11  fails to demonstrate that no reasonable jurist could have found he failed to make a prima facie

12  showing of prejudice as a result of Ligda's failure to move for suppression of the knife box.  The

13  claim is denied.

14        14.   Claim 1M

15        Petitioner next claims that counsel failed to make timely and complete objections in

16  numerous instances.  Respondent contends that Petitioner fails to overcome the presumption that

17  counsel "rendered adequate assistance and made all significant decisions in the exercise of

18  reasonable professional judgment."  Strickland, 466 U.S. at 690.  Respondent further argues that

19  Petitioner's numerous subclaims are conclusory and could have been reasonably rejected as such

20  by the state court.  The court will address each instance in turn.

21        a.    Sais

22        Petitioner complains that Ligda failed to make a timely and complete objection to

23  testimony regarding two martial arts weapons called "sais."  The sais were seized pursuant to a

24  search of Cruz's cabin.  RT 904.  Ligda objected to the admission of the sais into evidence on the

25  basis of relevance.  RT 1199-1200, 1527.  The trial court overruled the objection and the sais

26  were admitted into evidence.  RT 1527.  Petitioner argues that Ligda should have also objected

27  on the basis that the items were more prejudicial than probative under California Evidence Code

28  § 352 because "[t]he sais had nothing to do with the case."  Pet. Mem. at 89.

1    Petitioner's argument is not well-taken.  Evans testified that during the meeting when the

2    group planned and prepared for the murders, she had seen Willey dancing and swinging the sais

3    around with hard rock music playing in the background.  RT 1260-61.  At the same time, she

4    saw Petitioner dancing with a bat in his hands.  RT 1261-62.  Therefore, discovery of the sais

5    corroborated Evans' testimony.  In addition, the sais were relevant to show how the group

6    members, and Willey and Petitioner in particular, were excited over the conspiracy and the

7    upcoming confrontation.  Petitioner cannot show that any additional objection would have been

8    sustained.

9    Moreover, Petitioner cannot demonstrate prejudice.  Even if the sais were not received

10    into evidence, there was still testimony that Willey wielded the sais while Petitioner wielded a

11    bat while dancing in preparation for the attack on the Elm Street house.  As Respondent states,

12    admission of the sais was inconsequential compared to the testimony of Petitioner's actions in

13    dancing around with a bat which was later recovered with Paris' blood on it.

14    **b.     Newspaper Article**

15    Patricia Badget, Willey's girlfriend, testified that she had seen Willey and his roommate

16    looking at a Modesto Bee article on the day after the murders.  RT 1133-34.  She remembered

17    that the headline read "Four Die in Salida Rampage."  RT 1143.  Out of the presence of the jury,

18    Ligda objected to the introduction of the newspaper into evidence, and the prosecution withdrew

19    the exhibit.  RT 1144.  Petitioner claims counsel performed ineffectively in failing to object and

20    move to strike the questioning concerning the newspaper.  He claims the newspaper's "lurid

21    headline and front page photograph were profoundly prejudicial and re-exposed the jury to the

22    prejudicial pretrial publicity."  Pet. Mem. at 90.

23    Petitioner fails to show counsel erred or that he was prejudiced as a result of counsel's

24    alleged error.  As noted above, counsel did object and the article was not admitted into evidence.

25    There is no evidence that the jury was shown the photograph when the prosecutor showed the

26    article to the witness.  RT 1133-34, 1142-44.  Even if he had, it was hardly prejudicial when

27    compared with the autopsy photographs that were admitted.  As for the newspaper headline, it

28    was also not prejudicial.  The jury was well aware of the fact that four people were killed in the

71

crime, and the characterization of the crime as a "rampage" was accurate and not excessive or unduly prejudicial.

### c.      California Penal Code § 128

Petitioner faults counsel for failing to object to the prosecutor's repeated references to California Penal Code § 128, which he states is an unconstitutional statute.  Cal. Penal Code § 128 provides:

> Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without the possibility of parole.  The penalty shall be determined pursuant to Sections 190.3 and 190.4.

Cal. Penal Code §128.

At trial, the prosecutor questioned Evans whether she understood that if she committed perjury and Petitioner were executed as a result, that she would face the death penalty herself. RT 1218.  Evans stated she understood this.  RT 1218-19.

The prosecutor's comments were not objectionable.  As noted by Respondent, it is an accurate statement of California law.  Additionally, in California it is proper to ask a witness in a capital case whether he or she is aware of the law.  People v. Dickey, 35 Cal. 4th 884, 911-12 (2005).  Thus, any objection would have been overruled.

### d.      Polygraph Examination

Petitioner next argues that counsel failed to object to repeated references to polygraph examinations in violation of California Evidence Code § 351.1(a), which states:

> Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results.

Cal. Penal Code § 351.1(a).

Petitioner states that discussions of plans to have him take a polygraph were made without objection throughout the preliminary examination, in a motion in limine, and in several hearings on in limine motions.

1    None of these references occurred in front of the jury.  Petitioner attempts to argue that

2   the references somehow prejudiced the trial judge.  This is a frivolous argument, since it was

3   necessary for Ligda to refer to the polygraph examination in order to exclude Petitioner's

4   statements made during the pretest phase of the examination and immediately after the

5   examination.  In addition, Petitioner cannot demonstrate prejudice:

6           In the course of ruling on motions for a change of venue or to exclude evidence
            and in dealing with other routine matters, it is inevitable that a judge will become
7           aware of information that is not presented to the jury.  As an aspect of the
            presumption that judicial duty is properly performed, we presume, nonetheless, in
8           other proceedings that the court knows and applies the correct statutory and case
            law and is able to distinguish admissible from inadmissible evidence, relevant
9           from irrelevant facts, and to recognize those facts which properly may be
            considered in the judicial decisionmaking process.
10

11   People v. Coddington, 23 Cal. 4th 529, 644 (2000).

12          **e.      Leading Questions and Prior Consistent Statements**

13          Petitioner contends counsel failed to object to the prosecutor's repeated references to

14   prior consistent statements to bolster the credibility of his witnesses.  Petitioner states that

15   California Evidence Code § 791 does not allow for admission of prior consistent statements

16   unless the witness' credibility has been challenged or a prior inconsistent statement has been

17   offered.

18          The challenged statements concerned the identification of Petitioner and his codefendants

19   by three witnesses.  Petitioner cannot demonstrate prejudice with respect to the manner the

20   identification evidence was elicited insofar as identification of the perpetrators was not a

21   contested issue at trial.

22          **f.      Alvarez's Identification of LaMarsh**

23          Petitioner alleges counsel failed to object to Detective Deckard's testimony concerning

24   the manner in which Alvarez identified LaMarsh from a photograph.  Deckard had testified that

25   when Alvarez had been shown LaMarsh's photograph in a "six-pack" lineup, "she immediately

26   became hysterical and pointed to number five [LaMarsh] and said, 'That's him!'"  Pet. Mem. at

27   94; RT 1205.

28          Any objection would have been overruled.  The manner of her identification was relevant

73

to the reliability of her identification and admissible as a spontaneous statement pursuant to California Evidence Code § 1240.  In addition, Petitioner cannot demonstrate prejudice since LaMarsh's identity as one of the perpetrators was not contested.

### g.   Zavala's Testimony Regarding Sale of Knife

Petitioner claims counsel failed to object to the testimony of Sylvia Zavala concerning knives she sold to Cruz and Beck.  He alleges counsel should have interposed an objection based on lack of foundation since Zavala did not actually sell the knives in question, she could not testify that the particular knife in evidence was actually sold by her store, she could not tell from the receipt whether the knife sold by the store was the Ka-Bar knife, and she could not identify the Ka-Bar box as one sold by her store because all Ka-Bar boxes looked the same.

There were no grounds for an objection because her testimony was supported by the facts.  She stated she worked at Crescent Supply Company.  RT 989.  She testified that Cruz and Willey often came into the store in the early part of 1990.  RT 990-991.  She testified that she recalled showing Cruz and Beck a Ka-Bar knife that they were interested in purchasing on or about March 13, 1990.  RT 991-92.  She stated she showed them the knife, then went to the back of the store while her associate Lisa completed the sale.  RT 992.  She identified a receipt from that date signed by her associate.  RT 992-994.  She testified that the selling price of a Ka-Bar knife was $42.50, and the receipt showed a transaction for sale of a knife for $42.50.  RT 992; People's Ex. 32B.  She testified that the Ka-Bar knife recovered at the scene was the type of knife she sold to Cruz and Beck.  RT 994.  In light of the foregoing, Zavala's testimony that Crescent Supply Company sold a Ka-Bar knife to Cruz and Beck was amply supported.

In addition, Petitioner cannot demonstrate prejudice from counsel's alleged failure to object.  There was overwhelming evidence apart from the sale of the knife demonstrating that Cruz possessed a Ka-Bar knife and it was used by Petitioner to kill Paris.

### h.   May 23, 1990 Interview

In completely conclusory fashion, Petitioner next claims counsel performed ineffectively in failing to lodge a full and complete objection on all grounds to the admission of Petitioner's May 23, 1990, interview.  The claim is devoid of any supporting facts or argument.  Moreover,

1  the record shows counsel argued strenuously to have Petitioner's five statements, including the

2  May 23, 1990, statement, excluded.  He was successful in excluding the three most damaging

3  statements.  As to the May 23 statement, the prosecutor agreed that only the detectives would

4  testify regarding the statement and the audiotape would be excluded.  Petitioner fails to state

5  what additional grounds Ligda could have based his objection.  The California Supreme Court

6  could have reasonably rejected this claim summarily.

7        **i.**    **Crime Scene**

8        Like the subclaim above, Petitioner makes a conclusory allegation that counsel failed to

9  object to admission of evidence of the crime scene in view of the indications that the crime scene

10  had been compromised.  Petitioner offers no support to his allegation that the crime scene was

11  compromised.  This state court could have also summarily dismissed this claim.

12        **j.**    **Hearsay Statements**

13        Petitioner next claims counsel failed to object to the prosecutor's use of hearsay

14  statements of Petitioner's codefendants.  The challenged hearsay statements were elicited from

15  Evans and they included: (1) Cruz's statement that "[w]e're going to go over there and do them

16  and leave no witnesses" (RT 1253-59, 1278); (2) Beck's statement that "it seems kind of like a

17  waste to only get three dudes and a chick" (RT 1312); (3) Cruz stating that he hoped "that Little

18  Debbie and Fat Cat were there" (RT 1312); (4) Cruz's statement: "[Y]ou know, what we just did

19  was really serious" (RT 1310); (5) LaMarsh's statement: "I must have scared that girl when I

20  pulled out my gun. That's probably why she hid" (RT 1311); (6) Willey stating he saw a man

21  standing twenty feet away, to which Cruz responded, "[Y]ou mean you didn't kill him too?" (RT

22  1311); (7) Cruz stating "I know which one you want" when handing Willey the Wildcat knife

23  (RT 1265); (8) Cruz's expressions of anger at Petitioner for throwing down weapons before the

24  group reached the car after the killings (RT 1307); and (9) Willey's statement that he had gotten

25  rid of the weapons (RT 1315).

26        Petitioner's claim is without merit since all of these hearsay statements were made during

27  and in furtherance of the conspiracy.  As such, under California law, they were admissible

28  provided there was independent evidence to establish the existence of a conspiracy.  Cal. Evid.

1  Code § 1223; People v. Sanders, 11 Cal. 4th 475, 516 (1995).  In this case, there was ample

2  evidence of a conspiracy, including but not limited to: Petitioner's statement and Evans'

3  testimony providing an account of the planning meeting; the distribution of weapons; the

4  assignments given each member; the travel of the group to the house together; the group

5  members carrying out their assignments; the group's flight to Willey's apartment to clean up;

6  their joint attempt to create alibis; and their plan to conceal the evidence.

7          Under California law,

8      Once independent proof of a conspiracy has been shown, three preliminary facts
       must be established: '(1) that the declarant was participating in a conspiracy at the
9      time of the declaration; (2) that the declaration was in furtherance of the objective
       of that conspiracy; and (3) that at the time of the declaration the party against
10     whom the evidence is offered was participating or would later participate in the
       conspiracy.'"

11

12  People v. Sanders, 11 Cal. 4th 475, 516 (1995) (quoting People v. Hardy, 2 Cal. 4th 86, 139

13  (1992)).  Here, it is clear that the statements were all made when the declarants were in the midst

14  of the conspiracy.  Second, the statements were made in furtherance of the objective of the

15  conspiracy, which was to kill the occupants of the Elm Street house.  Finally, Petitioner was an

16  active member of the conspiracy.  Accordingly, Ligda could not object on hearsay grounds.

17          Petitioner also claims his right to confront the witnesses against him was violated, citing

18  Crawford v. Washington, 541 U.S. 36, 51-52 (2004).  The Confrontation Clause of the Sixth

19  Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be

20  confronted with the witnesses against him." The Confrontation Clause is binding on the States

21  under the Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).  However, as

22  Respondent correctly notes, the Supreme Court has held that "the Confrontation Clause's reach"

23  is "limited" "to testimonial statements."  Michigan v. Bryant, __ U.S. __, __, 131 S. Ct. 1143,

24  1152 (2011).  Crawford provided some examples of "testimonial" statements: "ex parte in-court

25  testimony or its functional equivalent—that is, material such as affidavits, custodial

26  examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial

27  statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial

28  statements . . . contained in formalized testimonial materials, such as affidavits, depositions,

1   prior testimony, or confessions." <u>Crawford</u>, 541 U.S. at 51-52.   The statements Petitioner

2   challenges were nontestimonial in nature.   They were made between conspirators and friends in

3   the midst of the conspiracy.   They were not formal pretrial statements that the declarants would

4   expect to be used at a trial.   Thus, Petitioner's claim fails.

5         **k.      Evans' Testimony**

6         Last, Petitioner claims counsel erred by failing to move to suppress Evans' testimony

7   concerning his comments about his actions in cutting Paris' throat on the ground that it was the

8   "fruit of the illegally obtained statement Petitioner made to a polygraph examiner and to

9   Detective Deckard on June 18, 1990."   Pet. Mem. at 96.

10        At Petitioner's June 18, 1990, pretest interview with the polygraph examiner, and

11   subsequently at his interview with Deckard, Petitioner admitted he had stabbed Paris in the side

12   and had cut her throat repeatedly.   CT 988-89; 1132.   Both statements were consistent with what

13   Evans stated Petitioner had told her the night after the murders.   RT 1312-16.   Petitioner notes

14   that Evans did not initially inform the detectives of Petitioner's involvement in Paris' death.   He

15   argues that she learned of his statements later and then added it to her own.   However, this is

16   pure speculation.   There is no evidence in the record that her statement was the product of

17   Petitioner's interviews, or even that Evans knew of the interviews.

18        Petitioner characterizes the statements he provided during the pretest phase of the

19   polygraph examination and his subsequent statement to Deckard as "illegally obtained," but this

20   is incorrect.   The statements were not excluded because they were illegally obtained; rather, they

21   were excluded under state law because they were made in the course of negotiating a plea

22   agreement.   RT 163, 259; CT 1252.

23        Accordingly, there were no grounds for a suppression motion, and thus there is no basis

24   for Petitioner's claim of ineffective assistance.   To the extent he believes Evans had created her

25   narrative based on her knowledge of Petitioner's statement, his avenue was cross-examination.

26   In fact, Ligda did argue to the jury that Evans had fabricated her statement.   RT 1712-14.   He had

27   cross-examined Evans on her changing accounts of what happened that night, as well as her

28   knowledge that Petitioner had also been negotiating a plea deal.   RT 1447-49; 1515.   Ligda

obviously could not go further and ask Evans whether she knew of Petitioner's admission that he had stabbed Paris and cut her throat.   Therefore, Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to make a prima facie case that Ligda erred in failing to move to suppress Evans' testimony.  The claim is denied.

15.   Claim 1N

Petitioner next claims counsel performed ineffectively by failing to object to several instances of misconduct in the prosecutor's argument to the jury.

Ligda's strategy concerning the prosecutor's closing argument is unknown, as the subject was not addressed in his declaration.   In the absence of any objection by Ligda to the prosecutor's remarks, as the Supreme Court suggested in Richter, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" 131 S.Ct. at 790.   As will be discussed, Petitioner fails to overcome this presumption and the general presumption that counsel acted outside the wide range of reasonable professional assistance.

Generally, counsel are "given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253–1254 (9th Cir. 1996) (quoting United States v. Baker, 10 F.3d 1374, 1415 (9th Cir. 1993)); see also United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) (A prosecutor has wide latitude during closing argument to make reasonable inferences based on the evidence).   Further, as the Ninth Circuit has explained, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting United States v. Necoechea, 968 F.2d 1273, 1281 (9th Cir. 1993)).   "From a strategic perspective, for example, many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." Molina, 934 F.2d at 1448; see also Jaffe v.

1  Brown, 473 F. App'x 557, 559-60 (9th Cir. 2012) ("Whether to enter formal objections during a

2  prosecutor's closing arguments is a strategic decision that many trial counsel approach

3  differently").

4      Even if a petitioner demonstrates that trial counsel's failure to object to the prosecutor's

5  closing argument was outside the range of reasonable professional assistance, and the objection

6  would have been sustained, the petitioner must still show a reasonable probability that the trial

7  court's corrective actions would have resulted in a more favorable verdict.  See, e.g., Weygandt

8  v. Ducharme, 774 F.2d 1491, 1493 (9th Cir. 1985) (rejecting ineffective assistance claim because

9  it was not reasonably probable that the result of the trial would have been different had counsel

10  objected to the prosecutor's improper closing argument).

11      **a.      Comments Regarding Plea Agreement**

12      Petitioner first alleges counsel should have objected to the prosecutor's comments which

13  "explain[ed] and justif[ied] his decision to enter into a plea agreement with Michelle Evans."

14  Pet. Mem. at 98.  Petitioner claims that by doing so, the prosecutor referred to facts not in

15  evidence.

16      The prosecutor's remarks concerning Evans' plea agreement consisted mostly of

17  explaining the value of and need for her testimony in the case.  The prosecutor acknowledged

18  that she was involved in the crime and certainly no angel, but she had specific first-hand

19  knowledge of the event that was important.  The prosecutor also argued that her account was

20  credible based on the corroborating evidence.  Ligda could reasonably conclude that these

21  remarks were based on the facts in evidence.  As previously discussed, the prosecution and the

22  defense explored the plea agreement in detail when Evans testified.  At one point, the prosecutor

23  stated:

> So it comes a point in these cases when the prosecution looks at the case and says,
> what evidence does the jury need to hear? And you make a decision.  And in
> some cases you agree to give consideration to somebody in exchange for their
> testimony.  That's exactly what happened in this case.

27  RT 1719.

28      It can be reasonably concluded that this statement was based on facts that were in

1    evidence.  Evans testified that she had an agreement with the District Attorney's office that

2    called for her to testify in exchange for consideration involving the charges pending against her.

3    RT 1211.  In addition, the written plea agreement was entered into evidence.  Pet. Exhs., vol. 3,

4    p. 730.  Certainly, it cannot be concluded that the prosecutor's remarks were an egregious

5    misstatement of the facts or so objectionable as to deprive Petitioner of a fair trial.  A fair-

6    minded jurist could conclude that Petitioner failed to make a prima facie showing of error.  In

7    addition, there was no prejudice, since Petitioner cannot show that an objection would have been

8    sustained or that the trial court's corrective actions would have resulted in a more favorable

9    verdict.

10            **b.      Remarks Concerning Cal. Penal Code § 128**

11           Petitioner next argues that counsel failed to object to the prosecutor's remarks concerning

12    Cal. Penal Code § 128.  He contends the prosecutor improperly vouched for Evans.

13           As discussed in the previous claim, it is not improper for counsel to ask a witness in a

14    capital case whether he or she is aware that perjury or subornation of perjury which results in

15    conviction and execution of an innocent person could expose the perjurer to the death penalty.

16    People v. Dickey, 35 Cal. 4th 884, 912 (2005).  Ligda therefore had no grounds for objection.

17            **c.      Remarks Regarding "Conscience of the Community"**

18           Petitioner complains that counsel failed to object when the prosecutor told the jury that

19    their role was to act as "the conscience of the community."  RT 1732.  Petitioner argues that the

20    statement was objectionable as an appeal to the passions and prejudices of the jury, as an appeal

21    based on public policy grounds, and as an appeal claiming a greater social good.

22           The prosecutor's statement was not objectionable.  Referring to the jury as the

23    "conscience of the community" or as representatives of the community is not improper.  People

24    v. Ledesma, 39 Cal. 4th 641, 741 (2006) (citing Caldwell v. Mississippi, 472 U.S. 320, 333

25    (1985)) (jury is called upon to "decide that issue on behalf of the community").  Therefore, there

26    were no grounds for objection.

27            **d.      Conclusion**

28           In sum, Petitioner has failed to demonstrate that no reasonable jurist could have found

that he failed to make a prima facie showing that Ligda erred in failing to object to the prosecutor's remarks, or that he suffered prejudice therefrom.  The claim is denied.

16.     Claim 1O

Petitioner next claims counsel erred by failing to argue competently and persuasively to the jury based upon the facts presented at trial.

"The right to effective assistance extends to closing arguments." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003).   The Supreme Court set forth the following guiding principles in reviewing defense counsel's performance in closing arguments:

> [C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.

<u>Id</u>. (citation omitted).

a.      **Counsel's Performance at Closing**

Ligda's strategy at closing is unknown, and Petitioner points only to the trial record in support of his claim. In such case, counsel is "strongly presumed" to make decisions in the exercise of professional judgment. <u>Strickland</u>, 466 U.S. at 690.    A review of the record reveals that counsel's argument to the jury was coherent, reasonable, and consistent with his strategy throughout the guilt phase.

Acknowledging the overwhelming evidence that Petitioner was part of a conspiracy, Ligda argued that the conspiracy was at most an agreement to go over and beat people up.  RT 1691-92, 1705.  He noted Petitioner's previous statements to that effect, and he noted that even Evans believed the intent of the group was to beat up the Elm Street occupants, not murder them. RT 1691-92, 1698, 1702.  Ligda further argued that Petitioner could not have premeditated and deliberated on the murders, first because he was not part of any plan to kill anyone, and second because he had no free will and was in fear for his life if he challenged Cruz.  RT 1698-99; 1703-05.  Ligda attempted to diminish Petitioner's role in the conspiracy.  Acknowledging the fact that

1   Petitioner was at the preparation meeting, Ligda argued that Petitioner was tired, was never

2   consulted during the planning, contributed nothing, said nothing, and was essentially acting as a

3   slave obeying a master.  RT 1703.  Ligda supported his argument by citing numerous witnesses.

4   RT 1703-05.  Ligda pointed out that the only evidence that Petitioner did anything more than

5   beat someone was Evans, and Ligda attacked her credibility on several fronts.  RT 1706, 1709-

6   14.  He argued that her testimony should be disregarded because it wasn't corroborated.  RT

7   1709.  He argued that her changing stories showed she was lying in her account of Petitioner's

8   statement.  RT 1710.  He argued that she lied in order to get out of jail and avoid a trial where the

9   prosecutor might ask for life.  RT 1710.  He noted that Evans offered her full account only after

10  she heard that Petitioner was negotiating a plea agreement.  RT 1712-13.  Ligda concluded by

11  asking the jury to find Petitioner guilty only of what he argued the evidence showed, which was

12  conspiracy to commit assault and one count of second degree murder.  RT 1715-16.

13          Although Petitioner was found guilty, it is not because Ligda presented an ineffective

14  closing statement.  Given the record in this case, Ligda's overall strategy and argument was

15  reasonable.  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy

16  judged with the benefit of hindsight." Yarborough, 540 U.S. at 8.

17          **b.      Evans' Knife**

18          Petitioner alleges that Ligda should have argued that the stab wound to Paris' neck was

19  caused by Evans' knife.  As previously discussed, the evidence did not support this argument.

20          **c.      Petitioner's Errand**

21          Petitioner contends counsel should have argued that Petitioner was not in the trailer

22  during the planning session because he was on a "fool's errand" for Cruz.  According to

23  witnesses Deanna Messinger and Kevin Brasuell, Petitioner came to their trailer at 11:00 p.m.

24  shortly before the murders.  RT 1004-06, 1569.  Petitioner was dressed in camouflage pants and

25  a dark cap and carried a baseball bat.  RT 1006, 1017.  Brasuell stated Petitioner asked for spray

26  paint.  RT 1004-05, 1569.  No other evidence made reference to spray paint.

27          This argument is meritless.  Petitioner stated that he was in fact present for the entirety of

28  the meeting.  RT 1434-35.  Evans also provided the same account.  RT 1248-59.  Moreover, if

1    counsel had brought attention to this evidence, it could easily have bolstered the prosecutor's

2    argument that Petitioner, armed with a bat and dressed in camouflage and a black cap, was

3    actively participating in the conspiracy.   The evidence would also have provided further

4    corroboration to Evans' account.   Other adverse inferences could have been drawn from it as

5    well, such as the prosecutor's position at the motion for new trial that Petitioner was attempting

6    to obtain the spray paint in order to paint his bat to dull its shiny appearance.  RT 2128.  It was

7    reasonable for Ligda not to draw attention to this evidence.

8           **d.     Conclusion**

9           In sum, a fair-minded jurist could have found that Petitioner failed to make a prima facie

10   showing that counsel rendered ineffective assistance in his closing remarks, or that Petitioner

11   was prejudiced.  The claim is denied.

12          17.   Claim 1P

13          Petitioner claims his prior counsel, John Grisez, rendered ineffective assistance by failing

14   to attend a polygraph examination of Petitioner during the period in which Grisez represented

15   him.

16          **a.     Background**

17          Grisez was appointed on May 24, 1990.  RT 125-26.  Prior to Grisez's appointment,

18   Petitioner had been interviewed twice by detectives: the first on May 21, 1990, and the second on

19   May 23, 1990.  In his May 23, 1990, statement, Petitioner admitted that he had been present

20   during the planning meeting; that his assignment was to guard the hallway at the Elm Street

21   house; that he went with the group to the house armed with a baseball bat; that he entered the

22   house according to his assignment; and that he struck victim Dennis Colwell in the leg with the

23   bat.  Vieira, 35 Cal. 4th at 276.  Petitioner stated the plan was only to beat up the occupants, not

24   to kill them.  RT 1454.  He stated that he did not personally kill anyone, but he admitted that he

25   condoned the conspiracy.  Pet. Exhs, vol. 6, pp. 1825, 1847; Vieira, 35 Cal. 4th at 276.

26          When Grisez was appointed, he immediately began seeking a plea bargain with the

27   prosecutor in which Petitioner would plead guilty to four counts of first degree murder without

28   special circumstances and with the possibility of parole in exchange for his testimony against the

83

other defendants.  RT 92-93, 126-27, 132-35, 254-55, 2129; CT 963-64, 992, 1000-01, 1127.
Pursuant to the plea agreement, Petitioner agreed to another interview on May 31, 1990, for the
purpose of providing additional information. RT 92, 109-10, 127-28, 138; CT 965, 993, 1127.

As a further condition of the plea agreement, in order for Petitioner to receive any consideration,
he was required to satisfactorily complete a polygraph examination.  CT 995.  Grisez stated that
in his experience, polygraph examinations were routinely required as part of a plea bargain, and
he believed the purpose of the examination was only to confirm the truth of the statements
Petitioner had previously provided to the detectives.  CT 995-96, 999, 1006-07.

On June 18, 1990, Petitioner met with polygraph examiner George Johnson and Detective
Deckard for purposes of taking the polygraph examination.  CT 1131.  Petitioner's attorney, John
Grisez, elected not to attend the examination.  CT 956.  Prior to the pretest phase of the
polygraph examination, the examiner advised Petitioner of his Miranda warnings, including his
right to an attorney.  CT 950-52, 962.  Petitioner stated he understood his rights and was willing
to proceed with the examination.  CT 951.  Prior to the actual examination, Petitioner provided a
statement giving an account of the group's attack on the Elm Street house, and admitting that he
had stabbed Paris once in the side and then cut her throat repeatedly until "it felt like he almost
cut her head off."  CT 1131-32.  The actual examination did not occur because no polygrams
could be produced based on the information provided by Petitioner.  CT 1132.  Deckard then
questioned Petitioner further.  CT 959.  Petitioner told Deckard that he had stabbed Paris in the
side with the Ka-Bar knife and then cut her throat.  CT 988.  When Deckard asked him how bad
the injury to the throat had been, Petitioner stated it was "pretty bad," felt like a "loose tooth,"
and had a lot of "play" in it.  CT 988.

### b.    Deficient Performance

"[S]trict adherence to the Strickland standard" is "all the more essential when reviewing
the choices an attorney made at the plea bargain stage." Premo v. Moore, __ U.S. __, __, 131 S.
Ct. 733, 741 (2011).  "Plea bargains are the result of complex negotiations suffused with
uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities
and risks." Id.  Here, there is no reason to question Grisez's investigation and decision to seek a

1  plea bargain.  There is no evidence that Grisez conducted a less than adequate investigation.

2  And in light of Petitioner's previous statements admitting participation in the attack which

3  resulted in four murders, Grisez was not unwise in seeking a plea bargain.

4  As to Petitioner's complaint that counsel failed to attend the polygraph examination, the

5  Supreme Court has held that a defendant has the right to waive the presence of counsel at a

6  polygraph examination.  Wyrick v. Fields, 459 U.S. 42 (1982).  In Wyrick, a defendant

7  underwent a polygraph examination without the presence of counsel, who had been previously

8  retained.  Id. at 43-44.  Prior to the examination, the defendant was read his Miranda rights.  Id.

9  at 44.  He voluntarily waived his rights and chose to undergo the examination.  Id.  At the

10  conclusion of the examination, he was interrogated further by the examiner.  Id.  He was then

11  interrogated by a second investigator.  Id. at 44-45.  The Supreme Court held that the defendant

12  had waived his right to an attorney and found that there was no requirement that the police again

13  advise him of his rights before questioning him further at the same interrogation.  Id.; see also

14  United States v. Eagle Elk, 711 F.2d 80, 83 (8th Cir. 1983) (defendant could voluntarily waive

15  the presence of counsel at a polygraph examination).

16  In this case, there is no dispute that Petitioner waived his right to counsel at the beginning

17  of the polygraph examination.  Petitioner does not claim that his waiver was involuntary or

18  defective.  Therefore, he has no basis to support his ineffective assistance of counsel claim.

19  **c.  Prejudice**

20  Petitioner also fails to demonstrate prejudice.  The statements made to the polygraph

21  examiner and subsequently to Detective Deckard were never admitted at trial.  Therefore, the

22  jury never knew that Petitioner admitted to stabbing Paris and slicing her throat.

23  Nevertheless, Petitioner argues that he was prevented from testifying in his own defense

24  because he could have been impeached with these statements.  This argument is unavailing.

25  Petitioner makes no proffer that he would have testified had it not been for these statements, and

26  it is not reasonable to believe that he would have.  Unlike his codefendants, Petitioner made

27  statements admitting his active and willing participation in the conspiracy and further admitting

28  that he personally attacked one of the victims, and these statements were admissible at trial.

1   Coupled with Evans' testimony, Petitioner would have been exposed to devastating cross-

2   examination.  Therefore, even if Grisez could have prevented the statements and Petitioner had

3   then testified, the outcome of the trial would not have been different.

4          Petitioner further alleges that Evans concocted her story based on the admissions

5   Petitioner made in these statements.  As discussed in previous claims, this is pure speculation.

6   There is no evidence that Evans was aware of these admissions, and there is no reason to doubt

7   that Petitioner told Evans the details of his actions at the Elm Street house on the night after the

8   murders.  In fact, James Richardson could have corroborated the fact that Evans met Petitioner

9   on the night after the murders and discussed the crimes with him.  Pet. Exhs., vol. 7, p. 1887; vol.

10   3, pp. 649, 660.

11          **d.      Conclusion**

12          Petitioner has failed to demonstrate that no reasonable jurist could have found that he

13   failed to make a prima facie showing that Grisez rendered ineffective assistance, or that

14   Petitioner suffered prejudice therefrom.  The claim is denied.

15          18.    Claim 1Q

16          Petitioner contends that both Grisez and Ligda performed ineffectively by failing to move

17   for a court order isolating Petitioner from Cruz during his incarceration prior to trial.  He argues

18   that Cruz wielded powerful psychological influence over him.  He claims that while in jail, Cruz

19   passed "kites" to him and the other defendants warning them not to make statements and to

20   follow his instructions.  He claims Cruz also attempted to place a contract on his life and

21   threatened to harm his family members.  Petitioner contends that the failure to remove him from

22   Cruz's influence resulted in the making of several incriminating statements, his rejection of the

23   plea offer, and his inability to assist counsel in his own defense at trial.

24          In support of his claim, Petitioner points to Ligda's declaration, wherein Ligda stated:

25   "During the pre-trial and trial proceedings, my impression was that Ricky Vieira was still under

26   the influence of Gerald Cruz, that all of my discussions with my client were passed on to Cruz

27   for his input, and that Cruz dictated all of Ricky's decisions.  I did not consider attempting to

28   separate Ricky from Cruz or asking to have Ricky housed in another facility than in the

1   Stanislaus jail." Pet. Exhs., vol. 14, p. 4059.  Petitioner also refers to a declaration from Larry

2   Dial, who was incarcerated at the jail with Petitioner and Cruz.  Dial stated that he knew that

3   Cruz had tried "to put a contract out on Ricky."  Pet. Exhs., vol. 2, p. 486.  Dial further stated

4   that Cruz had passed "kites" to Petitioner and the other defendants "to keep their mouth shut, not

5   talk to anyone."  Id.  He recalled one "kite" stating, "If anybody asks you, you don't know

6   anything."  Id.  Dial also recalled a "kite" in which Petitioner's sister had been threatened.  Id.

7   He stated that Cruz would pick on Petitioner when he could by yelling at him and occasionally

8   hitting him.  Id.

9          The record, however, does not support Petitioner's claim that Cruz's influence resulted in

10  Petitioner sacrificing his own interests to advance Cruz's.  To begin, Petitioner did not submit to

11  the state court a declaration stating whether or how he was intimidated, threatened, or

12  manipulated; when it occurred; how it affected him; and if had informed his attorney of these

13  circumstances.  Moreover, the statements Petitioner provided to law enforcement did not benefit

14  Cruz.  In fact, the statements demonstrated the opposite.  They invariably incriminated Cruz as

15  the orchestrator, leader and major participant of the murders while minimizing Petitioner's own

16  conduct.  In his in depth interview on May 23, 1990, Petitioner admitted that Cruz called all the

17  shots and Petitioner was essentially a puppet.  Pet. Exhs., vol. 6, p. 1779.  He stated he didn't

18  participate in the planning, that he just sat and listened.  Id. at 1797.  He believed that they were

19  just going to go to the house and beat the occupants up.  Id.  He stated that Cruz drove the group

20  to the Elm Street house in his car.  Id. at 1785.  He stated that he saw Cruz beating on someone

21  in the kitchen inside the house.  Id. at 1788-89, 1811.  He stated he saw people cut and "bleeding

22  bad."  Id. at 1829.  He denied that he caused any of it but led the detectives to believe Cruz and

23  the other defendants were responsible for it.  Id. at 1829.

24         In spite of Cruz's alleged instructions not to speak about the crime, Petitioner continued

25  to cooperate with law enforcement through June 18, 1990, pursuant to a proposed plea

26  agreement.  RT 92-93, 96-97.  Even in later statements after he had admitted that he had cut

27  Paris' throat, he stated it was Cruz who ordered him to do it, and that Cruz had given him his

28  knife to do it, and that the knife was already bloody.  CT 1131-32.

Months later, Petitioner did withdraw from the plea agreement, but there is no evidence in the record as to why Petitioner did so.  There is no evidence whatsoever that he withdrew from the agreement because of any threats.

Therefore, there is no evidence that Petitioner acted to his detriment in order to advance Cruz's interests.  The available evidence in the record demonstrates the opposite.  Therefore, Petitioner cannot demonstrate that counsel erred by failing to move to have Petitioner isolated, or that Petitioner suffered any prejudice from counsel's omission.  A reasonable jurist could have found that he failed to make a prima facie showing of error or prejudice.  The claim is denied.

19.   Claim 1R

Petitioner claims he suffered cumulative prejudice as a result of the foregoing allegations of ineffective assistance at the guilt phase of the trial.

The combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.  Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"); see also Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978) ("[T]he cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness . . . .").  A cumulative error claim allows for habeas relief when, although no single error independently warrants reversal or rises to the level of a constitutional violation, the effect of multiple errors caused the litigant to suffer undue prejudice.  Chambers, 410 U.S. at 290 n. 3; see also United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996)

As explained by the Ninth Circuit:

> Under traditional due process principles, cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." In simpler terms, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.

Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).

In this case, Petitioner has established no constitutional error arising out of his claims of

1   ineffective assistance of trial counsel during the guilt phase.  It follows, therefore, that when

2   considering all of petitioner's contentions of error in combination, his claim of cumulative error

3   lacks merit.  In short, Petitioner cannot establish that his contentions of error, when viewed

4   singly or cumulatively, deprived him of a fair trial.  The claim is denied.

5           **B.      Claim 2**

6           In this claim, which includes several subclaims, Petitioner alleges defense counsel

7   rendered ineffective assistance during the penalty phase of the trial.  He contends defense

8   counsel failed to competently investigate, develop, and present mitigating evidence.  The claim

9   was presented to the California Supreme Court by habeas petition where it was summarily

10  denied on the merits and as untimely.  As previously stated, in such a case as this where the state

11  court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be

12  met by showing there was no reasonable basis for the state court to deny relief," <u>Richter</u>, 131 S.

13  Ct. at 784, and this Court "must determine what arguments or theories supported or *. . . could*

14  *have supported*, the state court's decision; and then it must ask whether it is possible fair-minded

15  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

16  decision of this Court."  <u>Id</u>. at 786 (emphasis added).

17          1.      <u>Legal Standards</u>

18          The basic requirements of <u>Strickland</u> apply with equal force in the penalty phase.  Thus,

19  Petitioner must show that counsel's actions fell below an objective standard of reasonableness,

20  and that the alleged errors resulted in prejudice.  <u>Strickland</u>, 466 U.S. at 687-88.  The standard is

21  more fully set forth in claim 1 above.

22          In the context of the penalty phase, just as in the guilt phase, the Supreme Court has

23  "declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

24  emphasized that '[t]he proper measure of attorney performance remains simply reasonableness

25  under prevailing professional norms.'"  <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003) (quoting

26  <u>Strickland</u>, 466 U.S. at 688).  In the penalty phase, defense counsel has an "obligation to conduct

27  a thorough investigation of the defendant's background," <u>Williams v. Taylor</u>, 529 U.S. 362, 396

28  (2000), and defense counsel has a duty to investigate, develop, and present mitigation evidence

during penalty phase proceedings, <u>Wiggins</u>, 539 U.S. at 521-23.  Counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances." <u>Williams</u>, 529 U.S. at 415 (O'Connor, J., concurring).   However, the Supreme Court has recognized that the duty to investigate does not require defense counsel "to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."  <u>Rompilla v. Beard</u>, 545 U.S. 374, 382-83 (2005) (citing <u>Wiggins</u>, 539 U.S. at 525) (further investigation excusable where counsel has evidence suggesting it would be fruitless); <u>Strickland</u>, 466 U.S. at 699 (counsel could "reasonably surmise ... that character and psychological evidence would be of little help"); <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987) (limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

<u>Strickland</u>, 466 U.S. at 690-691.

"In assessing counsel's investigation, the Court must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," <u>Strickland</u>, 466 U.S. at 688, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' <u>id</u>., at 689 ("[E]very effort [must] be made to eliminate the distorting effects of hindsight")."  <u>Wiggins</u>, 539 U.S. at 523.  Further,

> the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.

<u>Strickland</u>, 466 U.S. at 691.

Petitioner argues extensively that defense counsel failed to perform as required under the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death

1  Penalty Cases which were in effect at the time.  Petitioner also cites to the ABA Standards for

2  Criminal Justice as imposing similar standards on counsel.  The Supreme Court has stated that

3  "Strickland stressed, however, that 'American Bar Association standards and the like' are 'only

4  guides' to what reasonableness means, not its definition."  Bobby v. Van Hook, 558 U.S. at 8

5  (quoting Strickland, 466 U.S. at 688).   In his concurrence, Justice Alito stated, "[M]y

6  understanding [is] that the opinion in no way suggests that the American Bar Association's

7  Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases

8  (rev. ed. 2003) (2003 Guidelines or ABA Guidelines) have special relevance in determining

9  whether an attorney's performance meets the standard required by the Sixth Amendment."  Van

10  Hook, 558 U.S. at 13-14 (Alito, J., concurring).  Further, the Supreme Court has warned against

11  a "checklist" approach to determine effectiveness: "No particular set of detailed rules for

12  counsel's conduct can satisfactorily take account of the variety of circumstances faced by

13  defense counsel."  Strickland, 466 U.S. at 688-89.  "Any such set of rules would interfere with

14  the constitutionally protected independence of counsel and restrict the wide latitude counsel must

15  have in making tactical decisions."  Id. at 689.

16      In order to demonstrate prejudice, Petitioner must show "a reasonable probability that,

17  but for counsel's unprofessional errors, the result of the proceeding would have been different."

18  Id. at 693-94.  To assess that probability, the reviewing court must consider the totality of the

19  available mitigation evidence and reweigh it against the evidence in aggravation.  Porter v.

20  McCollum, 558 U.S. 30, 41 (2009) (citing Williams, 529 U.S. at 397-398).  The court must

21  consider whether the likelihood of a different result if the evidence had gone in is "sufficient to

22  undermine confidence in the outcome" actually reached at sentencing.  Rompilla, 545 U.S. at

23  393 (quoting Strickland, 466 U.S. at 694).

24      2.    Defense Counsel's Penalty Phase Strategy

25      As Respondent correctly notes, Petitioner failed to present to the state court any of the

26  reasonably available documentary evidence concerning defense counsel's actual investigation

27  and tactics.  Petitioner did not provide anything regarding the investigation conducted by

28  counsel, counsel's explanation of his penalty phase strategy, or any declaration stating what

1   information he had provided to counsel in preparation for the penalty phase or what he did, if

2   anything, to cooperate in developing mitigation evidence.   As the Supreme Court stated in

3   Strickland, the information supplied by the defendant is "critical" in determining whether

4   counsel's investigation decisions are reasonable.   466 U.S. at 691.   Counsel is "strongly

5   presumed" to make decisions in the exercise of professional judgment.   Id. at 690.   "That

6   presumption has particular force where a petitioner bases his ineffective-assistance claim solely

7   on the trial record, creating a situation in which a court 'may have no way of knowing whether a

8   seemingly unusual or misguided action by counsel had a sound strategic motive.'"   Gentry, 540

9   U.S. at 8 (quoting Massaro v. United States, 538 U.S. 500, 505 (2003)).

10       A review of trial court record shows Ligda conducted an investigation into Petitioner's

11   "troubling background and unique personal circumstances," Williams, 529 U.S. at 415

12   (O'Connor, J., concurring), developed a coherent and organized strategy, proffered evidence, and

13   presented a case for mitigation.

14       First, it is clear that counsel worked with an investigator during the penalty phase.   Pet.

15   Mem. at 113.   In addition, the record shows that Ligda at the very least consulted with

16   Petitioner's mother, father, sister, childhood friends, and neighbors.   Vieira, 35 Cal. 4th at 277;

17   Pet. Exhs., vol. 2, pp. 376, 398.   Ligda also consulted with two experts on cults.   Vieira, 35 Cal.

18   4th at 277-78; Pet. Exhs., vol. 14, pp. 4039, 4073.

19       In his opening remarks at the penalty phase, Ligda provided the jury with the outline of

20   his mitigation case.   He stated he would address Petitioner's unique circumstances in three

21   phases: his early life growing up with his immediate family; the period of adjustment from high

22   school to becoming gainfully employed; and the period of time when he was exposed to Cruz

23   and became part of the cult.   RT 1755.   Ligda stated that the jury would hear testimony from

24   witnesses that nothing in Petitioner's character or upbringing would indicate that he was an evil,

25   violent or vicious person.   RT 1756.   He stated that there would be evidence that Petitioner went

26   through a difficult transition period in his life when he dropped out of high school until he

27   became employed, and it was during this period that he came under the influence of Cruz.   RT

28   1757.   Ligda noted that during this time, Petitioner had moved out of his parents' home and

began living with his uncle.  RT 1759.  The circumstances and the environment were tremendously unhealthy.  RT 1759.  Therefore, the family helped Petitioner move into Cruz's home, which by comparison was substantially better.  RT 1759.  Ligda stated the evidence would show how the dynamics of the group began to change radically after Petitioner moved in.  RT 1760.  Ligda noted Petitioner's diary which he kept during this period of time.  RT 1760.  He stated a cult expert would testify how Cruz was a cult leader who subjected Petitioner to mind control techniques to the point that Petitioner eventually became no more than Cruz's slave.  RT 1760.  He stated that the expert would testify that Petitioner could be a good person again, and with time could recover from the effects of Cruz's domination and mind control.  RT 1763.

Delia San Roman testified that she was a former neighbor and friend of Petitioner's family, and she knew Petitioner as a young boy.  RT 1784-85.  She had contact with Petitioner on a daily basis.  RT 1786.  She stated that he had an eye problem which she termed a lazy eye.  RT 1786.  She testified that he was a very quiet and very good boy.  RT 1786.  She stated he was very polite and sharing, he loved animals, and she had never known him to fight.  RT 1787-88.

Michael Vickerman testified that he had been a childhood friend to Petitioner.  RT 1792-93.  He stated that Petitioner never caused any problems as a child.  RT 1795.  He stated Petitioner loved animals and would never pick on anyone.  RT 1795.  Vickerman testified that their parents would give them marijuana at a young age, and this was "just what they did."  RT 1796.

Petitioner's sister, Angela Young, testified that there were no problems in the home when she and Petitioner were growing up together.  RT 1805.  She acknowledged that her father smoked marijuana, but she stated it had no effect on her and did not appear to affect Petitioner.  RT 1805.  She stated that she had been attracted to Cruz's interests in the occult and moved into his home around 1987.  RT 1806-07.  She stated that Cruz tried to act as a father figure toward her.  RT 1816.  She would share her earnings from work and he in turn would provide her with room and board and in general look out for her well-being.  RT 1816.  She recalled one occasion when Cruz told her that the greatest thing one could ever do for Satan's satisfaction was to sacrifice her first newborn.  RT 1820.  She stated that Cruz essentially "ran the show."  RT 1816.

1    During that time, she became concerned for Petitioner, who had been living with his Uncle Jerry.

2    RT 1810.  She stated the environment at her uncle's house was very bad in that there were many

3    people at the house who were abusing drugs.  RT 1810.  One day, Petitioner contacted her and

4    told her he didn't like living with his uncle, that he was afraid to live there, and that he wanted

5    her to make arrangements so that he could move in with Cruz.  RT 1811.  On or around January

6    of 1988, Petitioner moved in with Cruz.  RT 1811.  While Young was living there, she never

7    witnessed Cruz or anyone in the group mistreat Petitioner.  RT 1817.   In March, Cruz gave

8    Young an ultimatum: she could either associate with her family or she could associate with

9    Cruz's group, but not both.  RT 1812.  Cruz's ultimatum apparently stemmed from the fact that

10   he did not get along with Young's new boyfriend.  RT 1813.  Young then made the decision to

11   move out.  RT 1812.  After she moved out, she began to notice changes in Petitioner.  RT 1813.

12   She didn't see him frequently after that, and when she did, he often appeared to have been beaten

13   up.  RT 1813-14.  She asked him about his injuries and Petitioner told her they were a result of

14   sparring or karate practice.  RT 1819.  Petitioner also appeared to be very tired.  RT 1814.

15   Young also recalled that Cruz would not permit Petitioner to associate with his family anymore.

16   RT 1814.  When she would invite Petitioner to come over to the house for dinner, Petitioner

17   stated he would have to ask Cruz for permission.  RT 1814.  As to the crime itself, Young stated

18   that it was completely out of Petitioner's character.  RT 1815.

19       Petitioner's mother, Barbara Vieira, testified that she never had any problems with

20   Petitioner.  RT 1823.  He had a bad eye that caused difficulties for him in school: he had trouble

21   reading, and he would have trouble performing athletically if the sport called for a lot of

22   coordination.  RT 1823.  She stated he did not have a speech impediment.  RT 1823-24.  She

23   testified that he was a kind child who loved animals.  RT 1824.  He got along with all the other

24   children at school and all of the teachers enjoyed him.  RT 1825.  He never had any discipline

25   issues in school and was never violent.  RT 1825-26, 1834.  She admitted that Petitioner's father

26   had provided marijuana to him when he was around eight years old.  RT 1826-27.  She stated

27   Petitioner never learned how to drive and depended on his sister if he had to go anywhere.  RT

28   1829.  She stated that Petitioner dropped out of high school after he was caught smoking

marijuana.  RT 1832.  Instead of going to school, Petitioner decided to work with his father hanging sheetrock.  RT 1833-34.  She stated Petitioner enjoyed working with his father and was a good worker.  RT 1834.

Petitioner's mother stated she met Cruz when Petitioner was approximately fifteen years old.  RT 1835.  She did not find him to be an unpleasant person.  RT 1835.  She stated she and the family helped Petitioner move in with Cruz after Petitioner turned eighteen.  RT 1837.  At that time, there was nothing in Petitioner's relationship with Cruz that appeared to be unhealthy.  RT 1837.  Cruz then hurt his back, and Petitioner had to move in with his uncle Jerry because Cruz had difficulties paying the rent.  RT 1839.  She stated that the environment at Petitioner's uncle's house was very bad, because Petitioner's uncle would bring addicts and prostitutes into the house.  RT 1839.  She stated that Petitioner's sister then helped Petitioner move back in with Cruz.  RT 1839-40.  Sometime after Petitioner moved back in with Cruz, she began to notice changes in Petitioner.  RT 1842.  Petitioner had become quiet and very tired.  RT 1842.  She recalled one occasion when Petitioner came to the house with black eyes and a swollen mouth.  RT 1843.  Petitioner told her that he had been jumped in a parking lot.  RT 1843.  She recalled another occasion when Petitioner showed up and had cuts on his left arm.  RT 1843.  Petitioner explained that he had been disciplined.  RT 1843.  She stated that Petitioner would have to get permission from Cruz if he wanted to go anywhere.  RT 1844.  She also stated that Cruz had forbidden them from visiting Petitioner at Cruz's camp.  RT 1844.  She testified that Petitioner's physical condition began to deteriorate over time.  RT 1845-46.  She further stated that since Petitioner had been incarcerated, she noticed an improvement in his condition and attitude.  RT 1847.

A sheriff who was assigned to the jail where Petitioner was incarcerated testified that Petitioner never had any negative incidents while he was housed at the jail.  RT 1851.

Randy Cerny, a former deputy sheriff, was called to testify regarding Cruz's cult.  The court determined that Cerny was qualified to testify as an expert on cults and the occult.  RT 1856.  Cerny testified that he had spent the past six or seven years studying cults, the mind control of its members, and cultic crime.  RT 1859-63.  He stated he had taken courses and

1   received training in ritual crime or cult-related crime.  RT 1860-61.  Cerny defined a cult as a

2   small group of people who have come together devoting themselves to a religious belief or aim

3   that is usually headed by a central leadership figure.  RT 1864.  Cerny stated that a destructive

4   cult is one which infringes upon the personal rights and freedom of its members and utilizes a

5   number of techniques including mind control.  RT 1865.  He stated that mind control is a long

6   process whereby a person is subjected to various techniques such as sleep deprivation, isolation,

7   restriction of the person's outside contacts, and punishment both physical and mental.  RT 1866-

8   67.  The end result is a change of identity to conform to the objectives of the group.  RT 1866.

9        Cerny testified that he studied the Cruz group by reviewing the diary maintained by

10  Petitioner, police reports, interviews with Petitioner and his sister, and the trial transcript.  RT

11  1867.  Cerny concluded that Cruz's group was in fact a cult, that Petitioner was a member, and

12  that Cruz was the leader.  RT 1868.  Cerny found that Petitioner had been subjected to various

13  forms of mind control.  RT 1868-69.  He stated that Petitioner had been sleep deprived for over a

14  year.  RT 1871.  Cerny also found that Petitioner was subjected to various forms of punishment,

15  such as withholding of food, beatings, electric shock treatments, and forcing him to participate in

16  humiliating sex acts.  RT 1871-75.  Cerny found that Petitioner had been isolated from outside

17  influences, and he had been restricted from seeing his family.  RT 1875.  He noted that Petitioner

18  needed permission to visit his family, and he was always accompanied by another cult member.

19  RT 1875-76.  Cerny also found evidence that Cruz attempted to instill his values in place of

20  Petitioner's by representing to Petitioner that he was the reincarnation of Alastair Crowley and

21  by forcing Petitioner to read books on the occult and participate in rituals.  RT 1876-77.  Cerny

22  concluded that Petitioner had succumbed to Cruz's mind control techniques to the point that he

23  contemplated suicide.  RT 1878-80.  Cerny testified that a person can recover from such

24  techniques, but it is a very long process that requires the person be completely removed from the

25  controlling factors.  RT 1880-81.

26       In summary, counsel's strategy for the penalty phase was clear.  Ligda showed that

27  Petitioner for the most part had a normal childhood upbringing.  He was a nonviolent person who

28  loved animals and got along with everyone.  Eventually he became gainfully employed and

96

1  proved to be a good and hard worker.  This changed completely when Petitioner became a part of

2  Cruz's cult.  He was then subjected to mind control techniques, eventually lost his identity, and

3  became completely dominated by Cruz.  Ligda argued that Petitioner was a follower who did not

4  have the self-esteem or confidence to resist Cruz's techniques.  Given Petitioner's non-violent

5  background, Ligda argued that Petitioner could never have participated in the murders but for

6  Cruz's influence.  Thus, Ligda argued, Petitioner did not act out of his own freewill; rather, his

7  actions were solely the result of Cruz's domination and extreme duress.

8          3.    Counsel's Performance

9          Based on the record as it stood at trial, Ligda's actions were not unreasonable.  The

10 evidence he had uncovered that was based on testimony provided by Petitioner's family and

11 close friends and neighbors showed Petitioner had a relatively normal childhood.  There were no

12 indications of mental impairment or illness.  There were no incidences of violent behavior.  The

13 prosecution presented no evidence in aggravation other than the circumstances of the crime.

14 There were no indications that Petitioner was anything but a good and kind person prior to his

15 involvement in the Cruz cult.  The evidence also showed that Petitioner changed completely

16 once he came under the influence of Cruz.  The evidence further showed that he had been

17 subjected to many forms of mind control techniques by Cruz.

18         Ligda thus reasonably argued that Petitioner was a peaceful and stable person who would

19 never have committed the crime had it not been for Cruz's influence and subjugation.  He

20 reasonably showed the jury that Petitioner's violence was an aberration that could only be

21 attributed to having been broken down by Cruz.  He reasonably pointed to the fact that his family

22 and friends loved him and would never have believed Petitioner was capable of such a crime.  He

23 also showed how Petitioner gave up control of his life to Cruz, not out of his own fault, but

24 because of the devastating mind control techniques used to strip away his values and freewill.

25 By pointing out the many instances of abuses inflicted on Petitioner, Ligda also provided reasons

26 to generate sympathy for Petitioner.  He further showed that Petitioner could recover from the

27 damage done by Cruz.  Thus, Ligda provided many reasons for the jury to select a term of life

28 imprisonment instead of death.  Courts have recognized that it is a reasonable strategy at the

penalty phase for counsel to show the crime to be an aberration in an otherwise decent life.  See Burger v. Kemp, 483 U.S. 776, 793 (1987); Lambrix v. Singletary, 72 F.3d 1500, 1504 (11th Cir. 1996).

        4.     Petitioner's Additional Evidence

Nevertheless, Petitioner faults counsel for failing to discover and present evidence that Petitioner's family was in fact highly dysfunctional and that Petitioner suffered from organic brain damage.  However, any evidence that Petitioner came from a highly dysfunctional family and was a troubled person as a result would have been at odds with Ligda's theory that the crime was an aberration.  The argument and evidence would have undermined Ligda's theory that Petitioner's actions were due to an external force upon his will.  See Burger, 483 U.S. at 793 (evidence of a troubled family background could "suggest violent tendencies that are at odds with the defense's strategy of portraying Petitioner's actions on the night of the murder as the result of Stevens' strong influence upon his will").  In addition, there was no evidence that counsel should have suspected that Petitioner suffered from brain damage.  And, arguing that Petitioner was brain damaged could constitute a "two-edged sword" that juries might find to show dangerousness.  Atkins v. Virginia, 536 U.S. 304, 321 (2002).  Ligda had argued that Petitioner could be rehabilitated in prison with time.  By arguing that he was brain damaged, the jury could conclude that he was "simply beyond rehabilitation."  Pinholster, 131 S. Ct. at 1410. The Court will address the evidence Petitioner proffered to the California Supreme Court with his habeas petition.

        a.     **Dysfunctional Family Background**

Petitioner claims Ligda performed ineffectively by failing to discover that Petitioner's family was not relatively normal, but highly dysfunctional.  He acknowledges that Ligda interviewed witnesses including his mother and sister as well as childhood friends and neighbors. However, he claims counsel performed ineffectively in failing to adequately prepare those witnesses.  He alleges that those witnesses painted an inaccurate picture of a normal suburban life.  He also claims counsel should have delved further and contacted other relatives and friends who would have shown that Petitioner's family life was fraught with risk factors for

1  developmental and psychological problems.

2         As noted by Respondent, Petitioner did not submit his own declaration to the California

3  Supreme Court explaining what information he provided to counsel.  He also failed to provide

4  Ligda's comments concerning the investigation he conducted into Petitioner's family

5  background.  Without evidence to the contrary and based on the record, the state court could

6  reasonably infer that Ligda had a reasonable explanation for his decisions.  In any case, it is clear

7  Ligda contacted and interviewed Petitioner's immediate family, friends, and neighbors.  It is not

8  known whether Ligda contacted additional relatives or acquaintances.  There is no evidence that

9  he did not do so.  Moreover, there is little indication from the testimony and declarations that the

10  witnesses provided, other than Petitioner's experimentation with drugs at a young age, that

11  Petitioner's family life was highly dysfunctional as he now claims.  "[T]here comes a point at

12  which evidence from more distant relatives can reasonably be expected to be only cumulative,

13  and the search for it distractive from more important duties."  Van Hook, 558 U.S. at 11.  Based

14  on their testimony and declarations, Ligda's strategy of showing Petitioner to be a relatively

15  stable and normal person prior to his indoctrination into the Cruz cult appears well founded.

16  Petitioner fails to rebut the presumption that counsel's decision not to pursue further

17  investigation was an informed decision.

18         Even if it could be shown that counsel knew or should have known of this evidence, and

19  that he could have proved that Petitioner came from a highly dysfunctional family, Petitioner

20  fails to show that counsel's decision not to proffer such evidence was unreasonable.  Despite the

21  problems Petitioner alleges, it is clear he came from a loving family.  Petitioner's sister noted

22  how her mother and father cared for them by working hard and always having a parent home

23  when the children were home.  Pet. Exhs., vol. 2, p. 366.  She also described her father as "caring

24  but strict."  Id. at  367.  By relying on the evidence he now proffers from distant relatives and

25  acquaintances, many of whom are unreliable, counsel would lose Petitioner's mother and sister

26  as credible and sympathetic witnesses.  He would only be able to argue that Petitioner was a

27  highly troubled person whose own dysfunction caused him to join the cult and commit the

28  crimes.  Ligda would be precluded from arguing that Petitioner would never have committed the

1   crimes but for Cruz's terrible mind control techniques.  He would also be foreclosed from

2   arguing that Petitioner could return to normalcy after being removed from Cruz's influence.

3   Rather, the jury would have been left to conclude that Petitioner was so deeply dysfunctional

4   within that there was no hope for recovery.  Pinholster, 131 S. Ct. at 1410.

5        The state court could reasonably conclude that, even assuming Ligda knew of the

6   additional information, it was a reasonable strategy to focus instead on Petitioner as a stable and

7   kind person who fell victim to brutal mind control techniques, and focus the blame for the

8   murders instead on the highly dysfunctional cult.  "Rare are the situations in which the 'wide

9   latitude counsel must have in making tactical decisions' will be limited to any one technique or

10  approach."  Richter, 131 S. Ct. at 789 (quoting Strickland, 466 U.S. at 689).

11       **b.     Organic Brain Damage**

12       Petitioner claims counsel was ineffective in failing to investigate and present mitigating

13  evidence that he suffers from several "disabling and organic and other deficits which would have

14  caused the jury to view Petitioner in a more sympathetic light and to have spared his life."  Pet.

15  Mem. at 118.  In support of his claims, Petitioner presents the declarations of psychologist

16  Natasha Khazanov and physician Jeff Victoroff.

17       With respect to the subject of mental impairment, Ligda stated the following in his

18  declaration:

19       I requested and received funding for the use of Dr. Richard Ofshe as a cult
         psychologist in this case.  I believed that Dr. Ofshe was qualified to assess Ricky
20       Vieira's mental state and I relied on Dr. Ofshe.  I did not request funds for a
         neuropsychologist or a psychiatrist because I did not see the need for one and Dr.
21       Ofshe did not suggest that such experts would be useful.  Eventually, I decided
         not to call Dr. Ofshe as a witness.
22
         I did not know that Ricky Vieira had brain damage or brain dysfunction.  If I had
23       known, I would have considered presenting such evidence before the jury as
         mitigation.   I did not know that Ricky Vieira had a disease called
24       neurofibromatosis.  If I had known, I would have considered presenting such
         evidence before the jury as mitigation.
25

26  Pet. Exhs., vol. 14, p. 4060.

27       Thus, Ligda was not aware of any mental impairment.  And notably, even if he had

28  known of the evidence, Ligda does not state that he would have used such evidence in

1    mitigation, only that he would have *considered* it.

2        i.    Dr. Khazanov

3        Dr. Khazanov was retained in 2004 for purpose of presenting the habeas petition to the

4    California Supreme Court.  Pet. Exhs., vol. 1, p. 74.  She reviewed Petitioner's vital records as

5    well as those of his family; his medical and educational records; medical, military and

6    educational records of other family members; a declaration from a social history witness; entries

7    from Petitioner's diary; and testimony from the witnesses at the penalty phase of Petitioner's

8    trial.  Id. at 74-75.  She stated she administered a battery of tests to Petitioner.  Id. at 76.  During

9    the clinical interview, she stated that Petitioner spoke rapidly but appeared pleasant and

10   cooperative.  Id.

11       After the clinical interview, she administered the current version of the intelligence test,

12   the Wechsler Adult Intelligence Scale.  Id.  The test resulted in a full scale IQ score of 96 which

13   placed him in the normal range of intelligence.  Id. at 77.  She then administered the Wide Range

14   Achievement Test, which tested subjects of reading, spelling and arithmetic.  Id.  The scores for

15   reading and spelling were normal.  Id.  The score for arithmetic was lower but not large enough

16   for a diagnosis of a learning disability.  Id. at 78.  She also administered two memory tests which

17   showed Petitioner's memory and attention were generally within the normal range, except for

18   facial recognition, which implicated frontal lobe brain dysfunction.  Id.  She then administered

19   the Halstead-Reitan Neuropsychological Battery, which test is used to evaluate brain

20   functioning.  Id. Results from the test indicated likely presence of organic brain dysfunction.  Id.

21   After compiling all of his scores, Khazanov determined that he had an impairment index of 0.2.

22   Id. at 80.  Other than stating that a score of 0.0 indicates no subtest scores were impaired and that

23   a score of 1.0 indicates all of the scores showed impairment, Khazanov did not explain the score

24   or its significance for comparative purposes.  Id.  After conducting further testing, she concluded

25   that Petitioner "appears to suffer from organic brain dysfunction" that was "probably present at

26   the time of trial."  Id. at 82.

27       As Respondent correctly argues, Petitioner's reliance on Khazanov's findings is

28   problematic because Khazanov cannot state with a reasonable degree of medical certainty that

1   Petitioner suffered from frontal lobe impairment since childhood and at the time of the trial.  Id.

2   Her testing was not conducted until 2004, which was thirteen years after the trial.  The only

3   indicators of a possible frontal lobe impairment at trial were Petitioner's childhood symptoms of:

4   a lazy eye, for which Petitioner's mother stated Petitioner underwent several tests as a child and

5   resulted in no finding of a cause, RT 1823; a possible speech impediment, which his mother

6   denied, RT 1823-24; smelling of unusual odors[5]; a concussion at age 10, which did not result in a

7   loss of consciousness; and symptoms of neurofibromatosis at age 15, which Petitioner himself

8   discounted as unremarkable.  Based on this, the state court could have reasonably rejected

9   Khazanov's report as unsupportive.

10       Even assuming Petitioner did suffer from frontal lobe impairment, the evidence would

11   not have affected the outcome.  Khazanov found that despite the impairment, Petitioner tested

12   within the normal range for intelligence, achievement and memory.  She admitted that persons

13   who suffered from frontal lobe impairments "do not suffer intellectual impairments in the form

14   of a loss of specific skills, information, or even reasoning or problem-solving ability."  Pet.

15   Exhs., vol. 1, p. 74.  In addition, Petitioner appeared to be functioning at the time of trial given

16   that he held a full-time job and had a girlfriend.

17       ii.   Dr. Victoroff

18       Petitioner also proffered the declaration of Dr. Jeff Victoroff, a physician certified in

19   neurology and psychiatry.  Pet. Exhs., vol. 1, p. 85.  Dr. Victoroff evaluated Petitioner in 2006.

20   Id. at 87.  He conducted a five-hour assessment, including a life psychiatric history, a

21   neurological history, a psychiatric examination, a neurological examination, and bedside

22   neurological tests.  Id.  Regarding Petitioner's life history, Victoroff relied on a report prepared

23   by a social historian.  Id.

24       Dr. Victoroff assessed his mental status and found Petitioner to be fluent, alert, attentive,

25   and oriented to place and time. Id. at 93.  Petitioner denied continuous depression.  Id. at 93.  He

26   was not suicidal or homicidal.  Id. at 94.  He stated he slept well and had a good appetite.  Id.

27

28   [5] Dr. Victoroff stated, "It is not appropriate to reach a specific diagnostic conclusion regarding these [olfactory] hallucinations based on the available incomplete evaluation."  Pet. Exhs., vol. 1, p. 92.

1    Victoroff found Petitioner's thought processes for the most part to be linear, relevant and

2    coherent.  Id.  After reviewing the various reports prepared by others, statements made by others

3    and after conducting his assessment, Victoroff concluded:

> In summary, Richard Vieira has an organically abnormal brain.  To a reasonable
> degree of medical certainty, his brain development was abnormal both because of
> (a) NF1 [neurofibromatosis type 1] and because of (b) fetal alcohol exposure.  It
> is also plausible – but not certain – that his brain was adversely affected by (c)
> early exposure to polysubstance toxicities, especially alcohol, (d) possible
> seizures, as well as (e) possible further dysfunction due to multiple closed head
> injuries.  His mental condition is abnormal in that (a) his cognition is measurably
> abnormal, (b) his personality is abnormal in that he exhibits classic Dependent
> Personality Disorder, (c) he is likely to have exhibited ADHD in childhood and
> exhibits some features of residual ADHD in adulthood; and (d) his mood was
> probably abnormal at the time he lived in a group led by Mr. Gerald Cruz, with
> probable suicidal ideations and severe psychic numbing close to the time of the
> index offense.  Moreover, there is also evidence that (f) he was severely sleep
> deprived at that time.

12   Pet. Exhs., vol. 1, p. 109.

13        Like Khazanov's report, the state court could reasonably have rejected Victoroff's

14   findings as not well-supported.  Many of his conclusions are qualified by terms such as "likely,"

15   "probably," and "it is also plausible – but not certain."  Moreover, his conclusions are often

16   based on scant and unreliable evidence.  For example, his diagnosis of ADHD is based on a few

17   comments in Petitioner's second grade report card that Petitioner was "hyperactive at times" and

18   "too fast at times."  Id. at 89.  His diagnosis of fetal alcohol syndrome is based on the declaration

19   of Petitioner's uncle, Jerry Girdner, and childhood photographs.  Jerry Girdner is Petitioner's

20   uncle by marriage, and he stated that Petitioner's mother drank socially while pregnant.  Id. at

21   88.  He is the same uncle whose house Petitioner moved into and soon thereafter needed his

22   family's assistance to move out, because Girdner maintained a house full of prostitutes and drug

23   users.  Pet. Exhs., vol. 2, p. 373; RT 1810-11, 1839-40.  Petitioner's mother did not confirm

24   Girdner's allegation, nor did Petitioner's father despite acknowledging his own abuse of drugs

25   and alcohol.  Pet. Exhs., vol. 2, pp. 388-99, 471-78.

26        Victoroff also concludes that Petitioner suffered from fetal alcohol syndrome based on

27   his flat philtrum (the skin between the nose and upper lip) as viewed in the photographs.  The

28   Court has reviewed the photographs submitted as evidence in this case.  See Def.'s Exhs. 96, 97;

1   People's Ex. 39.  It is difficult to ascertain the smoothness of the philtrum in Exhibits 96 and 97

2   that Victoroff refers to, since in both photographs Petitioner is smiling and this would clearly

3   affect the appearance of the philtrum.  Moreover, Victoroff fails to explain how Petitioner's

4   philtrum in Exhibit 39 is anything if not prominent.  Moreover, Petitioner fails to establish how

5   Ligda could have been alerted to this evidence.

6       As to the diagnosis of Dependent Personality Disorder ("DPD"), Respondent correctly

7   argues that Victoroff's conclusion is circular and not well-supported.  His relies on the

8   circumstances of Petitioner's involvement in the cult to conclude that Petitioner exhibits

9   symptoms of DPD, but then uses his conclusion to explain why Petitioner became associated

10  with the cult.  Pet. Exhs., vol. 1, pp. 103-05, 109-10.

11      Victoroff also determined that Petitioner suffered from neurofibromatosis (NF1), which

12  is a genetic disorder that causes tumors to grow on nerve endings.  Id. at 88; see

13  www.ninds.nih.gov/disorders/neurofibromatosis/neurofibromatosis.htm  (last visited July 29,

14  2014).  Nevertheless, "[i]n most cases, symptoms of NF1 are mild, and individuals live normal

15  and productive lives."  Id.  Victoroff states that NF1 can cause cognitive impairment,

16  disfigurement, and neurobehavioral problems.  Pet. Exhs., vol. 1, pp. 97-100.  However, he does

17  not establish that Petitioner suffered from any of these problems as a result of NF1.  When

18  Petitioner was asked whether he was troubled over the "café au lait" spots on his body during

19  childhood and adolescence, he stated it was not an issue.  Id. at 91.

20      Victoroff also referenced instances of head trauma suffered by Petitioner and includes

21  them in his diagnosis of brain dysfunction, yet there are no records to support the conclusion.

22  Medical records support that he did sustain head trauma from a fall in 1979 and a contusion to

23  his head four years after the offense, but there is nothing to indicate or support the conclusion

24  that Petitioner lost consciousness or suffered brain injury.  Id. at 90, 103.

25      As to sleep deprivation, Victoroff acknowledges that he has "no accurate measure of the

26  degree of sleep deprivation suffered by Mr. Vieira around the time of the index offense."  Id. at

27  106-07.

28      In sum, the state court could reasonably conclude that Victoroff's report did not support

1   the conclusion that Petitioner suffered from organic brain damage or mental disorder at the time

2   of the offense and thereby reject it.   Thus, the state court could conclude that even if Ligda had

3   presented the evidence, the outcome would not have been any different.   It was already

4   established at trial that Petitioner was under Cruz's domination and influence.

5           iii.    Defense Counsel's Investigation

6           Even if the Court accepts Khazanov's and Victoroff's findings to conclude that Petitioner

7   suffered from an organic brain disorder at the time of trial, Petitioner cannot establish that

8   counsel should have been alerted to investigate his mental health.   As previously noted, both

9   experts determined that Petitioner presented as a normal individual with fluent speech and linear,

10  relevant, and coherent thought processes.   He tested within the normal range for intelligence,

11  achievement, and memory.   Petitioner does not state that he advised Ligda of any mental health

12  issues, his family members did not state that he suffered from any mental impairment, and there

13  were no medical records of any mental health issues.

14          The experts state that it is possible Petitioner suffered from fetal alcohol syndrome, but

15  the only physical indicator they point to is a flat philtrum in childhood photographs, and an

16  attorney cannot be expected to suspect fetal alcohol syndrome based on this.   Petitioner's family

17  did not state that Petitioner's mother consumed alcohol during pregnancy; therefore, Ligda had

18  no reason to suspect the syndrome.   The only other evidence came from Jerry Girdner. Based on

19  the fact that Petitioner had to flee Girdner's house because of rampant drug use and prostitution,

20  it cannot be said that Ligda was unreasonable for failing to contact him.

21          Also, Ligda had no reason to suspect that Petitioner suffered from NF1.   Petitioner does

22  not state that he advised counsel that he suffered from the disorder, nor did Petitioner's family.

23  Even if counsel had been aware of its existence, he would have had no reason to further

24  investigate it.   NF1 does not normally cause brain damage, and Petitioner would certainly have

25  stated, as he did to Dr. Victoroff, that the disorder did not affect him at all when he was young.

26  Pet. Exhs., vol. 1, p. 91.

27          Even if Ligda had retained a psychologist to assess Petitioner, the state court could

28  reasonably conclude that Petitioner would have appeared normal and no relevant mitigating

1  evidence would have been discovered.  Petitioner did contact an expert, Richard Ofshe, who held

2  a Ph.D. in sociology, an M.A. in sociology, and a B.A in psychology.  Pet. Exhs., vol. 14, pp.

3  4040.  Ofshe interviewed Petitioner "at length" concerning the cult and Petitioner's involvement

4  in the cult.  Id. at 4040, 4060.  In addition to his interview of Petitioner, Ofshe reviewed incident

5  reports, investigation reports, interrogations, and Petitioner's diary.  Id. at 4041.  Ofshe was

6  directed to concentrate on mitigating factors for the penalty phase such as whether Petitioner was

7  acting under the influence of extreme duress or domination of another person.  Id.  Ofshe did not

8  suggest that Petitioner suffered from any mental impairment or organic brain disorder.  Id. at

9  4060.  He did not recommend to Ligda that further examination should be conducted by an

10 appropriate specialist.  Id.

11     The record of Petitioner's interviews with law enforcement and his testimony at the

12 pretrial hearing also reveal that Petitioner conducted himself as a normal, rational person.  There

13 is no evidence in his testimony and statements that he suffered from any mental impairment or

14 brain damage.  His answers, comments, and questions were oriented, rational, coherent, and

15 responsive.  Based on the record, the state court could have concluded that Ligda could have

16 reasonably decided that investigation into mental illness would have proven fruitless.

17     Just as the Supreme Court found in Van Hook,

18     This is not a case in which the defendant's attorney[] failed to act while
       potentially powerful mitigating evidence stared [him] in the face, cf. Wiggins, 539
19     U.S., at 525, 123 S.Ct. 2527, or would have been apparent from documents any
       reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374,
20     389–393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).  It is instead a case, like
       Strickland itself, in which defense counsel's "decision not to seek more"
21     mitigating evidence from the defendant's background "than was already in hand"
       fell "well within the range of professionally reasonable judgments."
22

23 Van Hook, 558 U.S. at 11-12 (quoting Strickland, 466 U.S. at 699).

24     5.     Mitigation Expert

25     Petitioner also contends that counsel failed to retain, consult and make use of a mitigation

26 specialist or other qualified expert to aid in the development of a mitigation case.

27     This argument is not well-taken because Ligda did in fact consult two experts, Randy

28 Cerny and Richard Ofshe, for purposes of presenting a mitigation case during the penalty phase.

1    Ligda did not call Ofshe for reasons unknown, but he did present mitigation evidence by way of

2    Cerny's testimony on cult practices and specifically the Cruz cult.   Petitioner presents the

3    declaration of clinical psychologist Patrick O'Reilly and states that an expert such as O'Reilly

4    would have provided additional mitigation evidence that would have been crucial to the defense.

5         Nevertheless, Cerny reviewed much of the same information and came to the same

6    conclusions as O'Reilly.   Both Cerny and O'Reilly determined that the group was a cult and

7    Cruz was the leader of the cult. RT 1868; Pet. Exhs., vol. 1, pp. 4, 20.   Cerny concluded that

8    Petitioner was subjected to a process of mind control by Cruz.   RT 1868.   Likewise, O'Reilly

9    found that Cruz used highly effective measures of influence, persuasion and intimidation to

10   retain Petitioner as a member of the group.   Pet. Exhs., vol. 1, p. 4.   Cerny noted that Petitioner

11   was subjected to extended periods of sleep deprivation as a method of mind control.   RT 1869-

12   71.   O'Reilly also found that sleep deprivation was a controlling tool that Cruz used consistently.

13   Pet. Exhs., vol. 1, p. 28.   Cerny noted from Petitioner's diary that Petitioner was subjected to

14   constant and repeated brutal physical punishment at Cruz's direction.   RT 1871-75.   O'Reilly

15   found the same.   Pet. Exhs., vol. 1, pp. 25-26.   Cerny discussed shock treatments that would be

16   administered by Cruz.   RT 1872.   An exposed orange extension cord would be placed on the

17   testicles or the forehead of Petitioner or other members and Cruz would turn on the light switch

18   to supply shocks.   RT 1872.   Cerny recounted one incident where Petitioner could not stand the

19   sight of another member, Steve Perkins, being electrocuted in this manner.   RT 1872.   This

20   angered Cruz which caused Cruz to subject Petitioner to the same torture.    RT 1872-73.

21   O'Reilly described the same electrocution torture, also noting the incident with Perkins.   Pet.

22   Exhs., vol. 1, pp. 25-26.   Cerny described how Cruz would punish Petitioner by forcing

23   Petitioner to engage in sodomy with other members. RT 1873.   O'Reilly also noted the same

24   punishment.   Pet. Exhs., vol. 1, pp. 27-28.   Cerny discussed how Petitioner was isolated from

25   outside influences and restricted from seeing his family members as a form of control.   RT 1875-

26   76.   On occasions when he would leave the camp he usually had to have someone accompany

27   him.   RT 1876.   O'Reilly also discussed these same restrictions.   Pet. Exhs., vol. 1, p. 23.   Cerny

28   also noted that Petitioner was required to ask permission from Cruz to do things.   RT 1876.

1   O'Reilly noted the same.  Pet. Exhs., vol. 1, p. 23.  Cerny noted that Petitioner was required to

2   work and turn all of his funds over to Cruz as a form of cult control.  RT 1876.  O'Reilly also

3   noted that Petitioner had to work and turn over all his earnings to Cruz.  Pet. Exhs., vol. 1, p. 23.

4   Cerny and O'Reilly also noted that Cruz followed the teachings of occultist Aleister Crowley and

5   even considered himself Crowley's reincarnation.  RT 1877; Pet. Exhs., vol. 1, p. 24.  Cerny

6   noted that Petitioner had become such a victim of these techniques that he began contemplating

7   suicide.  RT 1879-80.

8        Thus, Cerny discovered and presented most of the same information that O'Reilly did.  In

9   addition, the information was the centerpiece to Ligda's penalty phase theory that Petitioner had

10   lost any freewill and had come completely under the control and domination of Cruz.

11   Petitioner's argument that Ligda failed to present a mitigation expert is therefore unsupported.

12        6.   Perfunctory Claims

13        Petitioner raises numerous other subclaims in the petition that are unsupported by any

14   facts or argument.  Pet. at 101-104.  He does not expound on these claims in his memorandum.

15   Conclusory allegations are insufficient to provide a basis for granting habeas relief.  Jones v.

16   Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995).  Therefore, the claims are rejected.

17        7.   Unexhausted Claim

18        Respondent notes that Petitioner for the first time claims counsel was ineffective in

19   failing to object at trial to the prosecutor's references to the Bible during the penalty phase

20   argument.  Petitioner states the prosecutor cited both the Old Testament and New Testament to

21   urge the jury to condemn Petitioner to death.  This subclaim of ineffective assistance of counsel

22   was not presented to the California Supreme Court.

23        A petitioner who is in state custody and wishes to collaterally challenge his conviction by

24   a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).

25   A petitioner can satisfy the exhaustion requirement by providing the highest state court with a

26   full and fair opportunity to consider each claim before presenting it to the federal court.  Duncan

27   v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v.

28   Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  Since Petitioner did not do so with this claim, it is

1 unexhausted and the Court cannot grant relief.  However, pursuant to 28 U.S.C. § 2254(b)(2), the

2 Court can deny the claim on the merits notwithstanding the failure to exhaust state remedies if it

3 is plainly without merit.

4   "'Because many lawyers refrain from objecting during opening statement and closing

5 argument, absent egregious misstatements, the failure to object during the closing argument and

6 opening statement is within the 'wide range' of permissible professional legal conduct.'"

7 Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013), (quoting Necoechea, 986 F.2d at

8 1281).  Trial counsel may properly decide to "refrain from objecting during closing argument to

9 all but the most egregious misstatements by opposing counsel on the theory that the jury may

10 construe their objections to be a sign of desperation or hyper-technicality." Molina, 934 F.2d  at

11 1448.

12   In this case, the reference was certainly objectionable, as "religious arguments have been

13 condemned by virtually every federal and state court to consider their challenge." Sandoval v.

14 Calderon, 241 F.3d 765, 777 (9th Cir. 2000).  Defense counsel did not object, but chose instead

15 to address the argument in his own closing remarks.  Ligda argued that "you can pick pages out

16 of the Bible that would support either position." RT 1971.  He then turned the argument against

17 the prosecutor by recalling the Biblical story of Cain and Abel and how God himself protected

18 Cain from being killed for the murder of his brother by "banish[ing] him." RT 1971.  Thus,

19 rather than offending any jurors by objecting to the prosecutor's Biblical argument, counsel

20 skillfully turned the argument against the prosecutor.  Counsel's decision can certainly be

21 considered a reasonable tactical decision.  Strickland, 466 U.S. at 689 (explaining the strong

22 presumption that challenged actions were sound trial strategy and that counsel's tactical decisions

23 are given "wide latitude").

24   Because the claim is plainly without merit, it will be denied despite Petitioner's failure to

25 exhaust.  28 U.S.C. § 2254(b)(2).

26   8. Conclusion

27   In summary, Petitioner fails to overcome the strong presumption that counsel made

28 decisions in the exercise of professional judgment.  Strickland, 466 U.S. at 690.  As previously

discussed, Petitioner did not provide anything to the state court regarding the investigation conducted by counsel, counsel's explanation of his penalty phase strategy, or what information if any, that he had provided to counsel in preparation for the penalty phase.  Such information supplied by the defendant is "critical" in determining whether counsel's investigation decisions are reasonable.  Id. at 691.  The presumption that counsel acted reasonably has particular force where, as here, the petitioner bases his ineffective assistance claim solely on the trial record.  Yarborough, 540 U.S. at 8.

Nevertheless, as discussed above, it is clear that Ligda had a coherent and reasonable penalty phase strategy, and he presented his mitigation case in an effective manner.  Ligda presented Petitioner as a relatively normal person with some physical problems, and one who was quiet, gentle and had no history of any criminal or violent behavior.  Ligda showed how Petitioner was subjected to brutal mind control techniques which effectively broke Petitioner's will down until he was no more than Cruz's slave.  Ligda sought to engender sympathy for Petitioner, demonstrate that the crime was an aberration caused by Cruz's domination, and show that Petitioner could recover if given a life sentence.

With respect to the additional mitigation evidence Petitioner has now secured, a fair-minded jurist could conclude that Ligda was not unreasonable in failing to develop or present it.  Even if Ligda had discovered this evidence and still chose to proceed with his strategy as opposed to the strategy Petitioner now advocates, a fair-minded jurist could conclude that his decision was reasonable.  "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  Richter, 131 S. Ct. at 789.  In addition, "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."  Yarborough, 540 U.S. at 8.

Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to make a prima facie showing that Ligda rendered ineffective assistance during the penalty phase of the trial.  The claim is denied.

**C.      Claim 3**

In claim 3, which includes six subclaims, Petitioner alleges that his due process rights were violated when the State withheld and failed to disclose relevant material evidence that would have led to discovery of favorable evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

The claim and all of its subclaims were presented to the California Supreme Court by habeas petition where they were summarily denied on the merits and as untimely.  As previously stated, in such a case as this where the state court decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," <u>Richter</u>, 131 S. Ct. at 784, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  <u>Id</u>. at 786 (emphasis added).

1.   <u>Legal Standards</u>

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87.  To succeed on a <u>Brady</u> claim, a petitioner must establish that the undisclosed evidence was: (1) favorable to the accused, either as exculpatory or impeachment evidence, (2) suppressed by the prosecution, either willfully or inadvertently, and (3) material, so that prejudice to the defense resulted from its suppression. <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999).  In addition, the Court has held that evidence impeaching the credibility of a key government witness, as well as exculpatory evidence, falls under the <u>Brady</u> doctrine.  <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985); <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Id</u>. at 433–34. "A 'reasonable probability' of a different result is [ ] shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" <u>Id</u>. at 434 (citing <u>Bagley</u>, 473

1   U.S. at 678). The mere possibility that an item of undisclosed information might have helped the

2   defense, or might have affected the outcome of the trial, does not establish materiality in the

3   constitutional sense.  Barker v. Fleming, 423 F.3d 1085, 1099 (9th Cir. 2005).  It must be shown

4   that "the favorable evidence could reasonably be taken to put the whole case in such a different

5   light as to undermine confidence in the verdict."  Kyles v. Whitley, 514 U.S. 419, 435 (1995).

6         2.    Police Reports

7        Petitioner alleges that the prosecution failed to disclose five Ripon Police Department

8   incident reports involving prosecution witness Michelle Evans.   The murders took place in

9   Salida, which was within Stanislaus County.  Evans was a resident of Ripon, which is in San

10  Joaquin County.  On May 22, 1990, the day after the murders, a Ripon police officer encountered

11  Evans during a traffic stop. Pet. Supp. Exhs. (Exhs. 257, 262.)  The officer contacted Stanislaus

12  County deputies who confirmed Evans was a suspect in the murders.   The officer located and

13  detained Evans and shortly thereafter she was taken into custody in Ripon by Stanislaus County

14  deputies. Pet. Supp. Exhs. (Exhs. 257, 262.)  Petitioner also argues that the prosecution failed to

15  disclose reports of incidents that occurred in 1992 and 1999; however, those reports could not

16  have constituted the basis for a Brady violation since those incidents occurred after Petitioner's

17  trial.

18       The five reports concern incidents that took place between June 14, 1991, and July 22,

19  1991, which was prior to Petitioner's trial which commenced on August 19, 1991.  In the first

20  report dated June 14, 1991, police were called to investigate a report of a disturbance.  Pet.

21  Exhs., vol. 2, p. 540.  The incident involved an argument between Evans and her mother which

22  escalated into a fight.  Evans sustained a bloody lip and fingernail marks on her face.  Her

23  mother sustained redness and swelling under her eye.  No arrests were made.  The second report

24  concerned a telephone call received by Michell Mercer on June 18, 1991.  Id. at 542.  Mercer

25  stated she received an anonymous phone call from a male that said he had a message from

26  "Missy."  The message was that Mercer was "going to get off easy and have her ass kicked, but

27  she would find her daughter floating face down in the canal."  Id.  Mercer stated she had

28  problems with Evans' family and wished the police to speak to her.  Id.  The police attempted to

do so but Evans was not home.  Id.  In the third report, Ripon police were dispatched on July 9, 1991, to investigate a report of a threat of murder.  Id. at 537.  Sherry Trammel informed police that she had gotten into an argument with Evans, and Evans reportedly stated, "I'll slice you like I sliced the rest."  Id.  Trammel stated Evans had a butcher knife.  Id.  Police located Evans approximately 300 yards away and searched her but did not locate a knife.  Id.  Evans was arrested for possession of a hypodermic syringe.  Id.  The fourth report involved a fight that occurred between Evans and Patricia Johnson.  Pet. Exhs., Ex. 256.  Neither woman was arrested.  Id.  The fifth report concerned Evans and Johnson again.  Pet. Exhs., vol. 2, p. 544. Johnson stated that on July 22, 1991, Evans drove through her driveway, spinning her tires, and yelled out, "If you call the cops, you['re] fucking dead."  Id.  Police contacted Evans who stated she had driven by Johnson who had been on the street and had given her "the bird" as she drove past.  Id.  No arrest was made.  Id.  Concerning these five reports, Ligda stated: "While I cannot at this point recall exactly what discovery I was given prior to trial, I do not remember seeing these documents before."  Pet. Exhs., vol. 14, p. 4059.

None of these reports were material.  Had they been disclosed, there is no reasonable probability that the outcome would have been different.  To begin with, the reports consisted mainly of hearsay statements that would not have been admissible.  See People v. Baeske, 58 Cal. App. 3d 775, 780-81 (1976).  Petitioner argues that the reports would have led to admissible evidence, specifically, to Sherry Trammel and Michell Mercer, who would have provided testimony undermining Evans' credibility.  He argues that Trammel could have testified that Evans had stated that she would slice her like she "sliced the rest."  Id. at 537.  However, as discussed in claim 1B above, there is no indication in the record that Trammel would have testified at trial or that she would have testified to what is stated in the report.  Petitioner contends that Mercer would have testified that Evans had told her that she had "helped slice up Darlene [Paris]," that she "went into detail on how they sliced Darlene's throat," and that she enjoyed watching Raper die.  Pet. Exhs., vol. 2, pp. 566, 584.  He states Mercer could also have testified to having seen Evans and Paris kissing about a week before the murders.  Id. at 567. Unlike Trammel, Mercer provided a declaration that she would have testified had she been

1   called.

2       As discussed in claims 1B and 1D, testimony by Trammel and Mercer would have had

3 little impeachment value and could not have altered the outcome.  Trammel and Mercer were

4 obviously biased against Evans.  Mercer admitted that Evans had broken up a relationship

5 between Mercer and her boyfriend.  Pet. Exhs., vol. 2, p. 591.  She admitted she didn't care for

6 Evans.  Id. at 590.  In addition, the jury would have rejected any statements made by Evans in

7 light of Petitioner's own statements, as well as the physical evidence, which fully corroborated

8 Evans' account of the murders.  If defense counsel elicited testimony from Trammel and Mercer

9 that Evans had participated in the attack, it would have been refuted by Petitioner's statement of

10 May 23, 1990, wherein he admitted that he had watched the attack but had not seen Evans during

11 the murders.  RT 1436-39; Pet. Exhs., vol. 6, pp. 1810-11, 1821, 1839.  Petitioner stated that

12 Evans had been waiting for them in the car when they got there after the attacks.  RT 1441; Pet.

13 Exhs., vol. 6, pp. 1835-37.  In addition, all of the physical evidence corroborated Evans' account.

14       Moreover, Trammel's and Mercer's testimonies would not call Petitioner's own

15 culpability into question.  Even if their statements were taken as true, they would only have

16 established that Evans also participated in the attacks.  None of their statements would have

17 exculpated Petitioner or reduced his culpability.

18       Further, the reports could only have led to evidence that would have constituted

19 cumulative impeachment.  Cumulative impeachment is seldom material in the Brady context.

20 See Heishman v. Ayers, 621 F.3d 1030, 1035 (9th Cir. 2010); Miller v. Dretke, 431 F.3d 241,

21 251-52 (5th Cir. 2005).  In this case, the jury already knew Evans was not a trustworthy person.

22 The jury knew that Evans had initially lied to law enforcement about her involvement.  RT 1514.

23 The jury also knew that Evans had testified under a plea agreement.  RT 1447-48, 1515.  Also,

24 the jury was instructed that her testimony as an accomplice had to be corroborated and viewed

25 with caution.  CT 1383-88.  As discussed above, her testimony was well-corroborated by

26 Petitioner's own statements and the physical and circumstantial evidence.

27       Respondent also correctly notes that Petitioner has failed to establish that the prosecution

28 had knowledge and a duty to disclose these reports.  According to the date stamps on the reports,

1   they were not turned over from the Ripon Police Department to the Stanislaus County District

2   Attorney's Office until October 3, 1991, which was after the guilt and penalty verdicts but prior

3   to sentencing and judgment.  Pet. Exhs., vol. 2, pp. 535-37, 539-40, 542, 544.  The Supreme

4   Court has held that the prosecution has a duty to learn of any exculpatory evidence known to

5   others acting on the government's behalf, including the police.  Kyles, 514 U.S. at 437–38.

6   However, in this case, the reports involved the Ripon Police Department, which is not in

7   Stanislaus County.  Nor was the Ripon Police Department involved in the investigation or

8   prosecution of the case.  The Supreme Court has not held that a prosecutor has a duty to learn of

9   information possessed by other departments not involved in the investigation or prosecution of

10  the case.  United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996).  As previously noted, the

11  Ripon Police Department was involved only insofar as investigating disturbances concerning

12  Evans and detention of Evans until the Stanislaus County Sheriff's Department took her into

13  custody and transported her to the Stanislaus County Sheriff's Office.  Pet. Supp. Exhs. 257, 262.

14  Since the Ripon Police Department was not an agency involved in the murder investigation, the

15  prosecution was under no duty to discover the reports.

16        Since the prosecution did not discover the reports until after the verdicts, any duty to

17  disclose them could only have mattered to Petitioner's motion for new trial.  In California, "[a]s

18  a general rule, 'evidence which merely impeaches a witness is not significant enough to make a

19  different result probable'" on retrial.  People v. Green, 130 Cal. App. 3d 1, 11 (1982) (quoting

20  People v. Huskins, 245 Cal. App. 2d 859, 862 (1966)).  As discussed above, Trammel's and

21  Mercer's testimonies would have had little to no impeachment value.  Therefore, a fair-minded

22  jurist could conclude that Petitioner failed to make a prima facie case that the prosecutor failed to

23  turn over the five reports in violation of Brady.

24        3.      Larry Dial

25        Petitioner contends that the prosecution failed to disclose the notes of Detective Deckard

26  concerning his interview with Larry Dial, who was incarcerated with Cruz, Beck and Petitioner

27  in 1990.  Pet. Exhs., vol. 2, p. 486.

28        Deckard's notes reflect he interviewed Dial on June 25, 1990, and July 6, 1990, regarding

1    a plea bargain Dial was seeking with the Stanislaus County District Attorney's Office on his own

2    case.  Pet. Exhs., vol. 6, pp. 1707-09.  Dial advised Deckard that he had heard statements made

3    by Cruz, Beck and Petitioner concerning the murders.  Id. at 1707-09.  He also informed Deckard

4    that he had heard from another inmate named Seabourn that Cruz intended to have Petitioner

5    killed.  Id. at 1707.

6         Petitioner submitted Dial's declaration with his state court petition.  Pet. Exhs., vol. 2, p.

7    486.  In his declaration, Dial states that Cruz sent notes to his codefendants advising them not to

8    talk to anyone and threatening to harm their families if they did not comply.  Id. He states Cruz

9    would often yell at Petitioner, occasionally hit him, and once prevented him from getting a meal.

10   Id. at 487.  Dial further states that Petitioner told him he was shocked and surprised when Cruz,

11   Beck and LaMarsh began killing people, since he thought they were only going over there to

12   take drugs and money.  Id.

13        Deckard's interview notes described some of the actions of Cruz, Beck, and Willey.  Pet.

14   Exhs., vol. 6, pp. 1707-08.  According to his notes, Beck was armed with a bayonet and Cruz had

15   a metal baseball bat.  Id. at 1707.  A girl knocked on the door of the residence.  Id.  Three people,

16   including Petitioner entered the house through the window.  Id.  Willey hit a victim in the street

17   with a bat and cut his throat.  Id.  They fled to Willey's place.  Id.  Seabourn told Dial that Cruz

18   was trying to put a contract out on Petitioner.  Id.  As Respondent correctly argues, none of this

19   evidence was exculpatory, and therefore, the prosecution had no duty to turn over the material.

20        Petitioner however argues that the evidence would have impeached Evans' testimony that

21   Petitioner carried a bat.  This contention is refuted by Petitioner's own admission that he had

22   used a bat at the house.  RT 1438-39, 1442.  Petitioner also argues that Deckard's notes reflect

23   that three men entered the house through the window when Evans stated only Petitioner and

24   Beck entered the window.  This would not have been exculpatory because in both versions

25   Petitioner is entering the house through the window armed with a bat.  In addition, this

26   information wasn't suppressed because in Petitioner's statement to Deckard, he states that Beck

27   and Willey entered the house with him. Pet. Exhs., vol. 6, p. 1789.  In any case, none of

28   Deckard's notes would have been admissible in any case as it was all hearsay upon hearsay.

1    Petitioner further contends that the information concerning Cruz's threats against

2 Petitioner should have been disclosed to the defense so defense counsel could have arranged to

3 have Petitioner moved.  He argues that had he done so, he would have been able to accept the

4 plea bargain offered by the prosecution.  This contention does not implicate <u>Brady</u>.  "[T]here is

5 no constitutional right to plea bargain. . . . It is a novel argument that constitutional rights are

6 infringed by trying the defendant rather than accepting his plea of guilty.  <u>Weatherford v. Bursey</u>,

7 429 U.S. 545, 561 (1977).

8    Petitioner alleges Dial could have testified concerning Cruz's harassment in order to

9 show Petitioner acted out of duress.  As Respondent points out, Dial could not testify to Cruz's

10 hearsay statements.  Moreover, Dial's information came from another inmate, Seabourn, so

11 Cruz's statement would constitute double hearsay.

12    4.    Benefits Provided to Witnesses

13    Petitioner claims the prosecution failed to disclose the benefits provided to witnesses

14 Michelle Evans and Donna Alvarez.

15    As discussed in claim 1B above, the record is clear that the defense was aware of the

16 benefits.  In her preliminary hearing testimony, Evans states she was given a motel room, money

17 for meals, and assistance in relocation expenses by the District Attorney's Office.  CT 931-33.

18 Evans further stated that the assistance did not influence her testimony in the case. CT 933.

19 Moreover, it is clear this information was not at all material.  The benefits consisted merely of

20 payments for expenses necessary for their obligation as witnesses.  Even if the expenses had

21 been revealed at trial, there is no probability of a different outcome.

22    5.    Threats to Take Away Evans' Daughter

23    Petitioner alleges the prosecution should have disclosed that Evans was forced to

24 cooperate because of threats by law enforcement to take her daughter away.    At the

25 codefendants' subsequent trials, Evans revealed that she had lost custody of her daughter after

26 she was arrested and was concerned about regaining custody.  Pet. Exhs., vol. 4, pp. 1164-65.

27    This evidence also was immaterial.  The jury already knew that Evans was testifying

28 pursuant to a plea agreement in which she agreed to testify in order to avoid being found guilty

1  of first degree murder.  Moreover, had this evidence been explored, it would also have been

2  revealed that Evans had a different motivation relating to her daughter.  As previously discussed,

3  Petitioner's grandmother had received a threat that Evans would be killed and her throat cut in

4  the same fashion if she testified.  Pet. Exhs., vol. 6, p. 1642.  In addition, a box was placed in her

5  front yard with a toy doll with its throat cut and a note stating, "Mommy, don't testify."  Id.

6  Thus, the evidence of any threat by law enforcement would not have altered the outcome.

7           6.    James Richardson

8           Petitioner alleges that the prosecution suppressed the location of James Richardson.  He

9  contends that Richardson would have been a critical witness for the defense because Richardson

10  would have testified that Evans had been involved in the killings, and that her claim that

11  Petitioner told the two of them that he had cut Paris' throat was untrue.

12           However, the tape recorded interview of Richardson was disclosed by the prosecution.

13  Pet. Exhs., vol. 3, p. 737.  In that interview, Richardson described his encounter with Evans on

14  the night after the murders.  Id. at 738-53.  Therefore, all information the prosecution possessed

15  concerning Richardson was disclosed. The only detail Petitioner complains was not provided

16  was Richardson's location.  However, it is undisputed that Richardson moved away in August of

17  1991.   There is nothing in the record to indicate the prosecution had any knowledge of

18  Richardson's whereabouts such that it could have been concealed.  In addition, the prosecution is

19  under no obligation "to produce evidence or information . . . that could be obtained through the

20  defendant's exercise of diligence."  Moore v. Quarterman, 534 F.3d 454, 462 (5th Cir. 2008); see

21  also Raley v. Ylst, 444 F.3d 1085, 1095 (9th Cir. 2006).

22           Moreover, the result could not have been different had Richardson been located and

23  testified.   As previously discussed in claim 1B, his testimony would not have contradicted

24  Evans' testimony, and in fact, much of it would have corroborated Evans' account.

25           7.    Behavior of Codefendants

26           Finally, Petitioner claims that the prosecution withheld evidence that Petitioner's

27  codefendants engaged in violent and threatening behavior.  Petitioner notes there were incidents

28  occurring in jail involving LaMarsh.  He further points to Willey's prior criminal history.  He

1  argues that this information would have been relevant at the penalty stage to show the

2  codefendants were violent men whereas Petitioner was not, and therefore was not as culpable.

3      This evidence was not material to punishment.  A codefendant's character or sentence is

4  no relevant to the circumstances of the crime or the defendant's character.  See Vieira, 35 Cal.

5  4th at 300.

6      8.    Respondent alleges that the above subclaim involving the Ripon Police Reports is

7  barred by Teague v. Lane, 489 U.S. 288 (1989).  A federal court considering a habeas petition

8  must conduct an analysis under Teague when the state properly raises the issue.  Ayala v. Wong,

9  756 F.3d 656, 685 (9th Cir. 2014), citing Horn v. Banks, 536 U.S. 266, 272 (2002).  Therefore,

10 "[b]efore a state prisoner may upset his state conviction or sentence on federal collateral review,

11 he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit

12 is not 'new,'" but had been established at the time his conviction became final.  Id., (citing O'Dell

13 v. Netherland, 521 U.S. 151, 156 (1997)).  "A holding constitutes a 'new rule' within the

14 meaning of Teague if it 'breaks new ground,' 'imposes a new obligation on the States or the

15 Federal Government,' or was not *dictated* by precedent existing at the time the defendant's

16 conviction became final.'"  Id., (citing Graham v. Collins, 506 U.S. 461, 467 (1993)) (quoting

17 Teague, 489 U.S. at 301).

18     Respondent argues that Teague bars any claim by Petitioner that the prosecution should

19 have known of the reports of the Ripon Police Department concerning Evans.  However, this

20 claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague,

21 but rather because the claim lacks merit for the reasons discussed above.

22     9.    Conclusion

23     Based on the foregoing, none of the evidence is material within the meaning of Brady.

24 Therefore, a reasonable jurist could determine that Petitioner failed to make a prima facie

25 showing that the prosecution failed to disclose favorable, material evidence in violation of

26 Brady.   The claim is denied.

27 **D.    Claim 4**

28     Petitioner next alleges he was convicted on the basis of false and misleading evidence

119

1   presented by the prosecution in violation of the Constitution.   Petitioner refers to Detective

2   Deckard's testimony that Petitioner in his statement said, "I completely condoned it."   He also

3   refers to the forensic pathologist's testimony that there were at least three knives used in

4   inflicting the wounds on the victims.

5       This claim, and both its subclaims, were presented to the California Supreme Court by

6   habeas petition.   The California Supreme Court denied the claim as untimely. It further denied

7   the subclaim concerning Deckard's testimony as procedurally defaulted insofar as Petitioner had

8   failed to raise it in the trial court.   In addition, the claim was denied on the merits.   As previously

9   stated, in such a case as this where the state court decision is unaccompanied by an explanation,

10  "the habeas petitioner's burden still must be met by showing there was no reasonable basis for

11  the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what

12  arguments or theories supported or . . . *could have supported*, the state court's decision; and then

13  it must ask whether it is possible fair-minded jurists could disagree that those arguments or

14  theories are inconsistent with the holding in a prior decision of this Court."   Id. at 786 (emphasis

15  added).

16      1.   Legal Standards

17      The knowing use of false or perjured testimony against a defendant to obtain a conviction

18  is unconstitutional.   Napue v. Illinois, 360 U.S. 264 (1959).   In Napue, the Supreme Court held

19  that the knowing use of false testimony to obtain a conviction violates due process regardless of

20  whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

21  it appeared.   Id. at 269.   The Court explained that the principle that a State may not knowingly

22  use false testimony to obtain a conviction - even false testimony that goes only to the credibility

23  of the witness - is "implicit in any concept of ordered liberty."   Id.   A conviction obtained by the

24  knowing use of perjured testimony "must be set aside if there is any reasonable likelihood that

25  the false testimony could have affected the judgment of the jury."   Bagley, 473 U.S. at 678.

26  Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor

27  knowingly permitted the admission of false testimony.   United States v. Zuno-Arce, 44 F.3d

28  1420, 1423 (9th Cir. 1995).   "Discrepancies in . . . testimony . . . could as easily flow from errors

1   in recollection as from lies."  Id.  To warrant habeas relief, Petitioner must establish that: 1) The

2   testimony was actually false; 2) The prosecution knew or should have known it to be false; and

3   3) There is a reasonable likelihood that the false testimony could have affected the jury's verdict.

4   Tayborn v. Scott, 251 F.3d 1125, 1130 (7th Cir. 2001).

5          2.       Detective Deckard's Testimony

6          As discussed in claim 1H above, Petitioner provided a statement on May 23, 1990, to

7   Detectives Bennett and Deckard of the Stanislaus County Sheriff's Office.  RT 1433.   The

8   transcript of the May 23, 1990, interview of Petitioner reflects the following exchange took place

9   at the end of the interview:

> DECKARD: There's one problem that is facing you Rick, that's you are involved
> in a multiple murder, by law you are guilty of murder.  Do you realize that?
>
> [PETITIONER]: Yes I do.
>
> DECKARD: Your [sic] guilty, you conspired.
>
> [PETITIONER]: Withholding information.
>
> DECKARD: Not withholding information, your [sic] conspired with these other
> people.
>
> [PETITIONER]: *I completely condoned it.*
>
> DECKARD: Conspiracy you planned it with these other people to go over there
> to hurt or kill these people.  By your own admissions you, this is what happened
> and in conjunction with other evidence we have on you, see you got a serious
> problem.
>
> [PETITIONER]: I know I got a serious problem, I know what happened was
> serious.

21  Pet. Exhs., vol. 6, pp. 1847-48 (emphasis added).

22         Defense counsel had filed motions to exclude the entire statement along with the other

23  statements Petitioner had provided.  CT 1098, 1103-04, 1127, 1129-30.  The May 23, 1990,

24  statement was ruled admissible.  RT 161.  Ligda continued to urge that portions of the statement

25  were inadmissible.  RT 247.  Ultimately, the parties agreed that the audiotape and the transcript

26  would not be used.  RT 267.  Instead, the prosecutor would ask questions directly of the

27  detectives regarding the statements Petitioner made.  RT 267.

28         At trial, during Deckard's testimony, the prosecutor asked him whether Petitioner had

1 "indicate[d] whether or not he had condoned the activity that took place."  RT 1443.  After

2 refreshing his recollection with the transcript, Deckard stated: "Rick's statement was, 'I

3 completely condoned it.'"  RT 1443; Pet. Exhs., vol. 6, p. 1847.

4       Petitioner contends that Deckard's statement that Petitioner stated "I completely

5 condoned it" was false.  Petitioner retained an expert, Robert Skye, who reviewed the audio

6 recording in 2006.  Pet. Exhs., vol. 1, pp. 132-33.  According to Skye, Petitioner did not state "I

7 completely condoned it."  Rather, he stated "I con . . .  what-a-ya-call it, condoned it?"  Id.  The

8 expert further states that Petitioner's inflection "appears to be rising at the end of the sentence,

9 suggesting that he may be asking a question or does not understand the word."  Id. at 133.

10       Deckard's testimony cannot be considered false evidence.  Deckard merely stated what

11 he believed Petitioner had said.  He had refreshed his recollection from the transcript, and he had

12 previously testified at the pretrial motion hearing that the transcript accurately reflected what was

13 stated in the interview.  RT 103-04, 1443.  In addition, Petitioner did not dispute this version at

14 trial.  As previously discussed, Petitioner knew what he said in the interview.  If it was different

15 from what Deckard stated, he should have alerted Ligda as he did with statements made by

16 Gardner.  RT 2093, 2095, 2098.  In fact, Ligda cross-examined Deckard on the context of the

17 statement.   Ligda understood that Petitioner's statement that he condoned the crimes was

18 damaging, and so he developed a strategy to deal with the statement.  He argued to the jury:

19         Ricky was not a part of any planning . . . And although he did concede that he

20         condoned the plan in his statement to the police on the 23rd, it was the same condoning of a plan that a slave gives to a master's plan, a private to a lieutenant,

21         not because their heart's in it but because that's the pecking order.

22 RT 1703.  The only conclusion that can be derived from the record is that Petitioner agreed with

23 the version set forth in the transcript.

24       As for the inflection in the statement, even Petitioner's expert states that it "appears" to

25 be rising, "suggesting" that he "may" be asking a question.  This only confirms that there are

26 now differing interpretations on what was actually said.  This does not show that the statement

27 Deckard made was false.  "The fact that a witness may have made an earlier inconsistent

28 statement, or that other witnesses have conflicting recollection of events, does not establish that

1   the testimony offered at trial was false."  United States v. Croft, 124 F.3d 1109, 1119 (9th Cir.

2   1997).  In sum, Petitioner fails to demonstrate that the prosecution knowingly presented false or

3   perjured evidence.

4        In addition, there is no likelihood that the use of this evidence could have affected the

5   outcome of the trial.  As discussed in claim 1H, the statement, when viewed in context, shows

6   Petitioner was not confused by the words "conspire" and "condone."  He was the one who first

7   stated the word "condone" and he used it correctly.  From the context, Petitioner was merely

8   inquiring into which of his actions made him guilty.  Whether it was a question or a statement,

9   the admission that he condoned it still lies within.  This is confirmed by the next exchange where

10  Deckard informed him that he's guilty because he "planned it with these other people to go over

11  there to hurt or kill these people."  Petitioner responded that he knows he has a serious problem

12  and that what happened was serious.

13       For the foregoing reasons, a fair-minded jurist could conclude that Petitioner failed to

14  make a prima facie showing that the prosecution knowingly used false or perjured evidence as to

15  Deckard's statement.

16       3.   Testimony of Forensic Pathologist

17       Petitioner next alleges that Dr. Ernoehazy falsely changed his testimony to fit the

18  prosecution's case by stating only three knives had been used in the killing when he had

19  previously testified that four knives had been used.  He further alleges that Ernoehazy changed

20  his testimony that Paris' throat had been sliced from left to right, rather than right to left, thus

21  suggesting a right-handed perpetrator.

22       As more fully discussed in claim 1D and 1G above, Ernoehazy did not testify falsely.

23  Ernoehazy merely corrected his misstatements made previously.  He stated he had misinterpreted

24  his report when he previously testified regarding the knives.  RT 983.  He clarified that when he

25  read his report, he believed the two paragraphs referred to three different knives; however, when

26  he later reviewed his report he realized that the two paragraphs concerned different stab wounds

27  but only two knives.  RT 983-84.  Ernoehazy was not conforming his testimony to the

28  prosecution's theory; rather, he was correcting his testimony to reflect his original findings.  As

1   pointed out by Respondent, his findings were made long before the prosecution developed a

2   theory of the case.  And Ernoehazy never concluded that only three knives were used.  He stated

3   he could determine that some wounds were caused by three identified knives, but he could not

4   determine the type of instrument used to inflict some of the wounds, thus leaving open the

5   possibility of a fourth knife.

6         In any case, Petitioner cannot demonstrate prejudice.  As previously discussed in claim

7   1D, evidence that a fourth knife was used would not have altered the outcome.  There were other

8   plausible explanations for the small stab wound to Paris' neck, and even if it was established that

9   a fourth knife was used and that knife was wielded by Evans, it would not have changed the fact

10  that the fatal wounds suffered by Paris were inflicted by Petitioner's use of the Ka-Bar knife.

11        With respect to the slicing wound to Paris' neck, this again was not false testimony.  The

12  autopsy report did not conclude which way that wound was inflicted.  The autopsy report merely

13  described the various wounds and the locations.  Likewise, when his testimony is viewed in

14  context, Ernoehazy appears to be describing the location of the wound in reference to identifiable

15  parts of the body, rather than how the wound was inflicted.  There is no reason to believe the

16  testimony was false or perjured.

17        In addition, Petitioner cannot demonstrate prejudice.  Regardless of whether Ernoehazy

18  was describing the direction of the wound, he never suggested whether the perpetrator was left-

19  or right-handed.  In fact, the prosecutor never elicited testimony on the direction of the wound,

20  nor did he attempt to connect the direction of the wound to a perpetrator.  There would have been

21  no way to do so in any case, since there was no evidence from which to conclude where the

22  perpetrator was positioned in relation to the victim.

23        Accordingly, Petitioner fails to demonstrate that no reasonable jurist could have found

24  that he failed to make a prima facie case that the prosecution knowingly used false or perjured

25  evidence with respect to Ernoehazy's testimony.  The claim is denied.

26  **E.    Claim 5**

27        In his next claim for relief, Petitioner alleges the prosecutor committed misconduct by

28  making improper and prejudicial remarks during argument in the guilt phase.  Petitioner points to

1    remarks made by the prosecutor concerning the plea agreement arrangement made with Evans,

2    the consequences of her committing perjury, and an appeal made to the passions and prejudices

3    of the jurors that they were to act as the "conscience of the community."

4         This claim was presented to the California Supreme Court in the state habeas petition.

5    The California Supreme Court denied the claim as untimely. It further denied the claim as

6    procedurally defaulted for Petitioner's failure to raise it on direct appeal.  In addition, the claim

7    was denied on the merits.  As previously stated, in such a case as this where the state court

8    decision is unaccompanied by an explanation, "the habeas petitioner's burden still must be met

9    by showing there was no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at

10   784, and this Court "must determine what arguments or theories supported or . . . *could have*

11   *supported*, the state court's decision; and then it must ask whether it is possible fair-minded

12   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

13   decision of this Court."  Id. at 786 (emphasis added).

14        1.    Legal Standards

15        A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

16   the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly

17   v. DeChristoforo, 416 U.S. 637, 643 (1974).   To constitute a due process violation, the

18   prosecutorial misconduct must be "of sufficient significance to result in the denial of the

19   defendant's right to a fair trial."  Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting Bagley, 473

20   U.S. at 667).  "'Before a federal court may overturn a conviction resulting from a state trial . . . it

21   must be established not merely that the [State's action] is undesirable, erroneous, or even

22   'universally condemned,' but that it violated some right which was guaranteed to the defendant

23   by the Fourteenth Amendment."  Smith v. Phillips, 455 U.S. 209, 221 (1982) (quoting Cupp v.

24   Naughten, 414 U.S. 141, 146 (1973)).  Any claim of prosecutorial misconduct must be reviewed

25   within the context of the entire trial.  Greer, 485 U.S. at 765-66; United States v. Weitzenhoff, 35

26   F.3d 1275, 1291 (9th Cir. 1994).  The court must keep in mind that "[t]he touchstone of due

27   process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

28   culpability of the prosecutor" and "the aim of due process is not punishment of society for the

misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Phillips, 455 U.S. at 219. "Improper argument does not, per se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993)). Furthermore, the Supreme Court has stated:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, . . . , and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

Boyde v. California, 494 U.S. 370, 384-85 (1990).

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

2.    Evans' Plea Agreement

Petitioner claims the prosecutor committed misconduct by improperly vouching for witness Michelle Evans when he discussed his decision to enter into a plea agreement with her.

During argument, defense counsel attacked Evans credibility. Ligda asked the jury, "[W]hy would Missy lie about what it is Ricky told her?" RT 1710. Ligda stated it was because "[i]t's exactly what she needed to get out of jail and avoid a trial where the district attorney might ask for her life." RT 1710. Ligda stated that Evans was aware that Petitioner had been negotiating a deal, and argued that she must have known her situation was extremely grave. RT 1712-13. Ligda argued that Evans realized that "she's got to make a deal" and "she had to come up with [] something that was more attractive to the district attorney than what Ricky had to offer, and that would be a confession by Ricky to her of involvement in an actual killing." RT 1713.

In rebuttal, the prosecutor addressed Ligda's attack on Evans' credibility: "Now,

Michelle Evans, talk about her just a minute. Yeah, she made a deal.  She made a deal with the prosecution, with me in particular. Specifically, to testify in this case. Now, why was a deal made?"  RT 1718.  The prosecutor stated "the only people that actually know what happened are people that were there, that were involved in it."  RT 1718.  He stated that Evans was there when the murders were planned, and she could tell the jurors what led up to it and what happened afterward. RT 1718.  She could describe the involvement of each participant. RT 1718-19.  The prosecutor further stated:

> So it comes a point in these cases when the prosecution looks at the case and says, what evidence does the jury need to hear? And you make a decision.  And in some cases you agree to give consideration to somebody in exchange for their testimony.  That's exactly what happened in this case.
>
> Michelle Evans sat here and told you what happened.  Now, it's up to you to determine what weight you want to give to that, what the believability is.

RT 1719.

Petitioner complains that this was improper vouching.  Improper "'[v]ouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony.'"  United States v. Jackson, 84 F.3d 1154, 1158 (9th Cir. 1986) (quoting Necoechea, 986 F.2d at 1276).

Petitioner's argument is not well-taken.  There is no apparent vouching within the prosecutor's remarks.  The prosecutor did not give his personal assurance of Evans' veracity.  In fact, he stated that it was for the jury to "determine what weight" to give to her testimony and "what the believability is."  RT 1719.  Nor did he suggest that there was information not presented to the jury that supported Evans' testimony.  The prosecutor's statements were based on evidence of the plea arrangement that was already before the jury.

Even if the remarks could be considered improper vouching, there is no reasonable probability that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  The jury already knew of Evans involvement in the crime, her plea arrangement, and her motivation and propensity to lie.  Moreover, the prosecutor was merely rebutting defense counsel's attack on

1  Evans' credibility, and the prosecutor must be permitted to "respond[] reasonably" to the defense

2  argument.  United States v. Young, 470 U.S. 1, 11-12 (1985).

3         3.      California Penal Code § 128

4         California Penal Code § 128 provides: "Every person who, by willful perjury or

5  subornation of perjury procures the conviction and execution of any innocent person, is

6  punishable by death or life imprisonment without possibility of parole.  The penalty shall be

7  determined pursuant to Sections 190.3 and 190.4."  Petitioner claims the prosecutor committed

8  misconduct by referencing Cal. Penal Code § 128 when questioning her understanding of the

9  plea agreement.  The following discussion occurred:

10         Q. [Prosecutor] . . . . Is it your understanding that since the - - one of the possible
       penalties in this case against Mr. Vieira is that he suffer the death penalty.  Do
11         you understand that?

12         A. [Evans] Yes, I do.

13         Q. Do you understand that if you testify in this case and you commit perjury and
       Mr. Vieira is executed as a result of that, that you yourself are subject to the death
14         penalty?

15         A. Yes, I do.

16  RT 1218.

17         During rebuttal argument, the prosecutor again commented on Cal. Penal Code § 128 as

18  follows: "And the other motivation for her to tell the truth is that according to the law of the

19  State of California, if somebody is convicted as a result of perjured testimony and executed, that

20  person faces the death penalty also."  RT 1720.

21         Petitioner claims it was improper for the prosecutor to refer to Cal. Penal Code § 128

22  because it is unconstitutional and deceptive.  The argument is unavailing.  As Respondent points

23  out, Cal. Penal Code § 128 was and is currently the law in California.  Further, under California

24  law, it is not improper for the prosecutor to comment on § 128.  Dickey, 35 Cal. 4th at 912.

25         Petitioner contends that § 128 was rendered unconstitutional by the Supreme Court's

26  decision in Kennedy v. Louisiana, 554 U.S. 407 (2008).  Not so.  Kennedy precluded a death

27  sentence for crimes against individuals where the victim's life was not taken.  Id. at 437.  It does

28  not extend to crimes against the State.  Id.  Cal. Penal Code § 128 applies when there has been

1   interference with the state's judicial system, and that interference causes a life to be taken.

2   Moreover, <u>Kennedy</u> was not decided until after Petitioner's conviction became final.

3       4.    "Conscience of the Community"

4       Petitioner claims the prosecutor committed misconduct when he referred to the jury as

5   the "conscience of the community" during the guilt phase argument, as follows:

6           Once again, in your deliberations, punishment is not taken into account in this
    phase of the trial nor is any sympathy, passion, all the things that Mr. Ligda talked
7           about.  Those don't go into the jury room with you [].

8           And finally, I would ask you, ladies and gentlemen, on behalf of the People of the
    community, and you are the conscience of the community right now, to evaluate
9           all of this evidence, apply the law to it and return verdicts of guilty as to each of
    the four counts of murder; find that that's murder in the first degree; that the
10          defendant did personally use the weapons alleged; and finally I would ask that
    you return a finding that the conspiracy count is true also and the special
11          circumstance that there were multiple murders committed.  I thank you.

12  RT 1732-33.

13      Petitioner complains that telling the jury it is the "conscience of the community" in a

14  summation is improper.  The argument is unavailing.  "[T]he general rule is that appeals for the

15  jury to act as a conscience of the community are not impermissible, unless specifically designed

16  to inflame the jury."  <u>United States v. Lester</u>, 749 F.2d 1288, 1301 (9th Cir. 1984) (citing <u>United</u>

17  <u>States v. Kopituk</u>, 690 F.2d 1289, 1342–43 (11th Cir. 1982)).  Petitioner's citation to <u>Sinisterra v.</u>

18  <u>United States</u>, 600 F.3d 900, 910 (8th Cir. 2010) is inapposite.  In <u>Sinisterra</u>, the prosecutor did

19  more than state that the jurors were the conscience of the community.  The prosecutor went

20  further and connected the defendant to the broader drug problem of the country and directed the

21  jurors to send a message to the other drug traffickers of the world.  <u>Id</u>.  The court found such

22  argument improper because it "impinge[d] upon the jury's duty to make an individualized

23  determination" and "encumber[ed] an individual defendant with the responsibility for the

24  nation's drug problems, in addition to the defendant's personal crimes and misdeeds."  <u>Id</u>.  Those

25  same concerns are absent here.  The prosecutor did not ask the jurors to send a message to other

26  criminals.  He only asked the jurors to consider their role in evaluating the evidence in the

27  present case.  The comments were not objectionable.

28      5.    <u>Conclusion</u>

1   For the foregoing reasons, Petitioner fails to show that no reasonable jurist could have

2   found that he failed to make a prima facie showing that the prosecutor committed misconduct in

3   his remarks during the guilt phase of the trial.  The claim is denied.

4   **F.     Claim 6**

5   Petitioner next claims the prosecutor committed misconduct during the penalty phase

6   summation.  He asserts that the prosecutor appealed to the passions of the jury, told the jury that

7   the death penalty was authorized by the Bible and philosophical doctrine, and argued other

8   improper considerations.

9   The claim and all of its subclaims were presented in Petitioner's state habeas petition.

10   Some subclaims were also presented on direct review.  The subclaims will be addressed in turn.

11   The standard of review for prosecutorial misconduct is the same during the penalty phase as it is

12   in the guilt phase, as set forth above.

13   1.     Reference to the Bible

14   During argument in the penalty phase, the prosecutor made the following remarks:

15   Something I want to touch on.  And I want to tell you this is not an aggravating
    factor.  I only bring up the subject in the event any of you have any reservation
16   about it, then hopefully I can - - help you with that.

17   That's the subject of religion.  This is not aggravating at all.  People from time to
    time have a problem because they say, "Gee, in the Bible it says 'Thou shall not
18   kill,' and 'Vengeance is mine sayeth the Lord. I will repay.'"  That's found in
    Romans.  But in the very next passage right after it says "Vengeance is mine
19   sayeth the Lord," Paul goes on and calls for capital punishment and says, quote,
    "The ruler bear not the sword in vain for he is the minister of God, a revenger to
20   execute wrath upon him that doeth evil."  He's talking about - - the ruler, the
    government, whatever.
21
    Now, the Judeo-Christian ethic comes from the Old Testament - - I believe the
22   first five book - - called the Torah in the Jewish religion.  And there are two very
    important concepts that are found there.  And that's, one, capital punishment for
23   murder is necessary in order to preserve the sanctity of human life, and, two, only
    the severest penalty of death can underscore the severity of taking life.
24
    The really interesting passage is in Exodus, Chapter 21, Verses 12 to 14:
25   "Whoever strikes another man and kills him shall be put to death.  But if he did
    not act with intent but they met by act of God, the slayer may flee to a place
26   which I will appoint for you."  Kind of like life without the possibility of parole,
    haven, sanctuary.
27
    But if a man has the presumption to kill another by treachery, you shall take him
28   even from my altar to be put to death."  There is no sanctuary for the intentional

130

killer, according to the Bible.

Now, I'll leave it at that.  That was just in the event any of you have any reservations about religion in this case.

RT 1947-48.

Defense counsel did not object.  However, he responded to the prosecutor's remarks as follows:

He also mentioned religion as justification for killing.  I - - you know, I have read enough of the Bible so that I know that you can pick pages out of the Bible that would support either position.

I will just pick the first one, because the first recorded killing in the Bible is Cain's slaying of Able [sic] and then kind of being a little bit other than frank and up front with the Lord about it.

"Where is your brother Able [sic]?

I do not know.  Am I my brother's keeper?

Now, God didn't kill as a result of that, but he banished him to Nod, the land of Nod, east of Eden.  And the interesting thing is what the Lord did.  He gave him a token.  "So no one finding him should kill him."

RT 1971.

This subclaim was raised on direct review.  It was rejected as procedurally defaulted because defense counsel failed to object.  Respondent contends the Court is therefore barred from review.  The Court will first address the claim since it is without merit.

In addition to finding the claim procedurally defaulted, the California Supreme Court rejected the claim as follows:

We recently considered a very similar prosecutorial argument in *People v. Slaughter* (2002) 27 Cal.4th 1187, 1208–1209, 120 Cal.Rptr.2d 477, 47 P.3d 262. We held this line of argument to be improper (*id*. at p. 1209, 120 Cal.Rptr.2d 477, 47 P.3d 262), but nonetheless upheld the defendant's death sentence for several reasons. First, we noted that the defendant had forfeited the issue by failing to object at trial. (*Ibid*.) Second, we held that such forfeiture did not necessarily constitute ineffective assistance of counsel, reaffirming that """the choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.""" (*Id*. at p. 1210, 120 Cal.Rptr.2d 477, 47 P.3d 262.)

Third, we held the prosecutor's misconduct to be nonprejudicial. After reviewing our case law on this issue, we stated: "Biblical references that rival in length those in the present case were found harmless in *People v. Wash* [(1993)] 6 Cal.4th 215, 261, 24 Cal.Rptr.2d 421, 861 P.2d 1107, because after making the biblical references, 'the prosecutor embarked upon a lengthy and detailed argument devoted exclusively to the evidence in aggravation.... He did not return to the

subject of God or religion, but instead urged a sentence of death based upon defendant's moral culpability for the crimes in light of the statutory factors. Thus, we do not believe the objectionable remarks could reasonably have diminished the jury's sense of responsibility, or displaced the court's instructions. [Citation.] There is no possibility that the jury would have reached a more favorable verdict had the misconduct not occurred. [Citation.]' [¶] The same is true in the present case. The prosecutor's biblical references during his penalty phase argument were improper but harmless." (*People v. Slaughter, supra*, 27 Cal.4th at p. 1211, 120 Cal.Rptr.2d 477, 47 P.3d 262.)

The same can be said in the present case. Defense counsel did not object to the prosecution's biblical argument, and we cannot say from an examination of the appellate record that the lack of objection constitutes ineffective assistance of counsel. Moreover, the biblical argument quoted above was only a small part of a prosecutorial argument that primarily focused on explaining to the jury why it should conclude that the statutory aggravating factors outweighed the mitigating factors. We therefore conclude that the misconduct was not prejudicial.

Vieira, 35 Cal. 4th at 297-98.

The state court's rejection of the claim was not an unreasonable application of Supreme Court precedent. Petitioner is correct that religious arguments have been condemned by virtually every federal and state court to consider their challenge. Sandoval v. Calderon, 241 F.3d 765, 777 (9th Cir. 2001). However, the Supreme Court has not squarely considered the issue, or applied a specific rule in the context of Petitioner's claim. Richter, 131 S. Ct. at 786; Premo, 131 S. Ct. at 743. Therefore, the Court cannot conclude that the state court's determination was an unreasonable application of clearly established Federal law. Carey v. Musladin, 549 U.S. 70, 77 (2006).

Moreover, "it is not enough that the prosecutors' remarks were undesirable or *even universally condemned.*" Darden, 477 U.S. at 181 (emphasis added). The relevant question is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Here, the prosecutor's remarks, while clearly objectionable, did not render the trial fundamentally unfair.

The prosecutor was not advocating that the jury use the Bible as a guide in rendering its decision. His comments were only a digression from his overall argument that the jury must look to the court's instructions and apply them to the evidence in coming to a decision. Also, the jury was fully instructed on the law governing its decision. RT 1924-34, 1976-79. The jury was

1    instructed that it could only consider the law as provided by the court.  RT 1925.   It was

2    informed that "[s]tatements made by the attorneys during the trial are not evidence . . . ."  RT

3    1926.  It was further instructed that it must base its decision only on the evidence received at trial

4    and California's statutory factors.  RT 1931-33.  The jury was instructed that it must determine

5    "which penalty is justified and appropriate by considering the totality of the aggravating

6    circumstances with the totality of the mitigating circumstances."  RT 1933.  In light of the

7    court's instructions, there is no possibility that the jury disregarded or displaced the court's

8    instructions on the law due to the prosecutor's offhand remarks.

9          In addition, while Ligda did not object to the remarks, he did address them in his own

10   argument.  He was able to effectively dismiss the prosecutor's comments by stating he could

11   easily pick a story from the Bible to support the position that the Bible does not support the death

12   penalty.  He even supported his argument with the story of Cain and Abel, thereby upending the

13   prosecutor's argument.

14         In light of the trial court's instructions, the context and content of the prosecutor's

15   remarks, and defense counsel's counterargument, a fair-minded jurist could conclude that the

16   remarks did not so infect the trial with unfairness as to make the resulting conviction a denial of

17   due process.  Donnelly, 416 U.S. at 643.

18         Petitioner also claims the prosecutor's remarks violated the Eighth Amendment by

19   diminishing the jury's sense of responsibility, as set forth in Caldwell v. Mississippi, 472 U.S.

20   320, 326-334 (1985).   In Caldwell, the Supreme Court held that "it is constitutionally

21   impermissible to rest a death sentence on a determination made by a sentencer who has been led

22   to believe that the responsibility for determining the appropriateness of the defendant's death

23   rests elsewhere.  Id. at 328-29.  Since then, the Supreme Court has "read Caldwell as 'relevant

24   only to certain types of comment-those that mislead the jury as to its role in the sentencing

25   process in a way that allows the jury to feel less responsible than it should for the sentencing

26   decision.'"  Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (quoting Darden, 477 U.S. at 184, n.15).

27   "Thus, '[t]o establish a Caldwell violation, a defendant necessarily must show that the remarks to

28   the jury improperly described the role assigned to the jury by local law.'"  Romano, 512 U.S. at 9

1  (quoting Dugger v. Adams, 489 U.S. 401, 407 (1989)); see also Sawyer v. Smith, 497 U.S. 227,

2  233 (1990).

3      In this case, the prosecutor's remarks did not mislead the jury to believe that the

4  responsibility for determining whether Petitioner should be sentenced to death rested elsewhere.

5  On the contrary, the prosecutor consistently reminded the jury that it was for them to determine

6  whether the death sentence was appropriate.   RT 1949-50.   Therefore, Petitioner fails to

7  demonstrate a Caldwell violation.

8      **a.   Teague**

9      Respondent alleges that this subclaim is barred by Teague.  However, this claim fails not

10  because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

11  because the claim lacks merit for the reasons discussed above.

12      2.   Reference to Lord Denning

13      Petitioner claims the prosecutor committed misconduct by referencing Lord Denning

14  during his summation.

15      The prosecutor stated the following:

16      Well, the proponents of the death penalty always bring up Lord Dinning [sic] in
        the old Court of Appeal in England.  Many years ago he wrote:

17

18          Punishment is the way in which society expresses its denunciation of
            wrongdoing.  In order to maintain respect for the law, it is essential that
19          the punishment inflicted for grave crimes should adequately reflect the
            revulsion felt by the great majority of citizens for them.  It is a mistake to
            consider the objects of punishment as being deterrent or reformative or
20          preventative and nothing else.  ¶  The truth is" - -

21      I want to underline this - -

22          . . . . "The truth is that some crimes are so outrageous that society insists
            on adequate punishment because the wrongdoer deserves it, irrespective of
23          whether it is a deterrent or not."

24      Ladies and gentlemen, I submit to you that Ricky, Richard John Vieira, deserves
        the death penalty in this case.

25  RT 1950-51.

26      This claim was raised on direct appeal to the California Supreme Court and rejected as

27  follows:

28

1
2
3

> There was no misconduct. The prosecutor in this case merely asked the jury to make the individualized determination that this defendant deserved death for these crimes because they were particularly outrageous, regardless of whether or not his execution would deter other crimes. There was no likelihood the argument would have obscured the jury's proper understanding of its role at the penalty phase.

4  Vieira, 35 Cal. 4th at 298.

5       The state court reasonably determined that there was no misconduct.  The reference to

6  Lord Denning would have meant nothing to a layperson, and the quote added nothing to the

7  argument such that the trial was rendered fundamentally unfair.  The prosecutor did not misstate

8  or manipulate the evidence.  The prosecutor merely argued that the circumstances of the crime

9  were so outrageous as to warrant the death penalty.  The Supreme Court has stated that such

10  argument is proper.  Zant v. Stephens, 462 U.S. 862, 879 (1983) ("What is important at the

11  selection stage is an individualized determination on the basis of the character of the individual

12  and the circumstances of the crime").

13       Moreover, defense counsel did not object, but again turned the argument against the

14  prosecutor.  Ligda stated:

15
16
17
18
19

> Now, district attorney then moves to Lord Dinning's [sic] comments about the justification of the killing, of the outrage of society, and it's a small example.  I'm sure given time you could come up with two or three hundred quotes of various proponents of the death penalty.  And given time I suppose I could come up with another couple hundred of the persons that are not in favor of the death penalty.  You probably know that Lord Dinning's [sic] opinion did not hold sway in England.  England abolished the death penalty years ago.  The United States is one of the few remaining nations that allow the death penalty and they don't even allow it in every state.

20  RT 1971-72.

21       In light of defense counsel's comment, it is even less likely that the prosecutor's

22  statement had any effect, since defense counsel was "able to use the opportunity for rebuttal very

23  effectively."  Darden, 477 U.S. at 182.  There is no possibility that the remark "so infected the

24  trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly, 416

25  U.S. at 643.

26       3.    Sympathy for the Victims

27       Petitioner argues that the prosecutor committed misconduct by appealing to the passions

28  and prejudices of the jury by invoking sympathy for the victims, and by asking the jury to "show

[Petitioner] the exact same mercy and sympathy that he showed" the victims.  RT 1946.  The prosecutor stated the following:

> Factor (k), one of the things that you can take into consideration in addition to sympathy and mercy - - well, is sympathy and additionally mercy for the defendant, and you can take as much sympathy as you want and show as much mercy as you want.  But I submit to you that as a representative of the People of this community, I'd be happy if you show [defendant] that exact same mercy and sympathy that he showed those people on Elm Street that night.  It's absolutely none.

RT 1946.

This claim was raised and rejected on direct appeal.  The California Supreme Court stated:

> The prosecutor told the jury that under section 190.3, factor (k), the jury could consider sympathy and mercy for defendant in determining the appropriate penalty. The prosecutor then added: "I'd be happy if you show [defendant] that exact same mercy and sympathy that he showed those people on Elm Street that night. It's absolutely none." Defendant contends this was misconduct. But as we have held, it is proper for the prosecutor to argue, based on the evidence, that a capital defendant does not deserve sympathy. (*People v. Ochoa, supra*, 19 Cal.4th at pp. 464–465, 79 Cal.Rptr.2d 408, 966 P.2d 442.) The prosecutor did no more than this.

Vieira, 35 Cal. 4th at 296.

The state court rejection of this subclaim was also reasonable.  There was nothing objectionable in the prosecutor's remarks.  The prosecutor acknowledged that the jury could show sympathy, but argued that they should show none.  This was not improper, nor was it inflammatory or a misstatement.  The remark did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643.

4.    Lack of Remorse

Petitioner contends the prosecutor committed misconduct by arguing a lack of remorse as a non-statutory aggravating circumstance.  The prosecutor made the following remark during summation:

> Now, what didn't come out of his mouth to Michelle Evans, Mary Gardner, and Detective Deckard, Detective Bennett, was any remorse whatsoever.  None. What was his comment to Mary Gardner? "They deserved to die."  What was his comment to Michelle Evans? "I cut at her throat till her head almost came off," and then he laughed.

RT 1951.

136

1         This subclaim was also raised and rejected on direct review by the California Supreme

2   Court, as follows:

> During closing argument, the prosecutor commented briefly on defendant's lack
> of remorse. Defendant contends that such comment allowed the prosecutor to
> argue a nonstatutory aggravating factor, lack of remorse, in contravention of the
> death penalty statute. (See *People v. Boyd* (1985) 38 Cal.3d 762, 772–776, 215
> Cal.Rptr. 1, 700 P.2d 782.) We have held that such comment is not misconduct
> when the prosecution calls to the jury's attention that the mitigating factor of
> remorse is not present, so long as the prosecution does not comment on
> defendant's failure to testify at the penalty phase. (*People v. Crittenden* (1994) 9
> Cal.4th 83, 147–148, 36 Cal.Rptr.2d 474, 885 P.2d 887.) In the present case, the
> prosecutor did not suggest lack of remorse could be used as an aggravating factor
> and did not comment on defendant's silence at the penalty phase. Nor could the
> prosecutor's argument be properly characterized as committing *Davenport* error,
> i.e., arguing lack of mitigation as an aggravating factor (*People v. Davenport*
> (1985) 41 Cal.3d 247, 288–290, 221 Cal.Rptr. 794, 710 P.2d 861); (see
> *Crittenden, supra*, 9 Cal.4th at pp. 148–149, 36 Cal.Rptr.2d 474, 885 P.2d 887.)
> We therefore conclude the prosecutor did not commit misconduct in this instance.

12   Vieira, 35 Cal. 4th at 295-96.

13         The state court rejection of this claim was not unreasonable.  Under California law, the

14   absence or presence of remorse is a factor relevant to the jury's penalty determination.  People v.

15   Ghent, 43 Cal. 3d 739, 771 (1987); see also Harris v. Pulley, 885 F.2d 1354, 1384 (9th Cir.

16   1988).  The prosecutor's comment is impermissible only where it is "manifestly intended to call

17   attention to the defendant's failure to testify or is of such a character that the jury would naturally

18   and necessarily take it to be a comment on the failure to testify."  Beardslee v. Woodford, 358

19   F.3d 560, 586 (9th Cir. 2003).  In this case, the prosecutor never referred to Petitioner's failure to

20   testify.  Rather, he referred only to Petitioner's lack of remorse as reflected in his statements.

21   Those statements were in evidence.

22         5.    Reference to John Locke

23         Petitioner claims the prosecutor committed misconduct by referring to John Locke during

24   argument.  This claim was raised and rejected on state habeas.  The California Supreme Court

25   found it to be procedurally defaulted because it was untimely, and because it could have been,

26   but wasn't, raised on direct appeal.  It further denied the claim on the merits.  Because the claim

27   plainly fails, the Court will proceed directly to the merits.

28         The prosecutor stated that in the past people took justice into their own hands in an "eye

for an eye, tooth for a tooth" manner.  RT 1949.  He stated it was a form of retribution or

vengeance.  RT 1949.  He stated this was no longer the case, as follows:

> Well, any of you who have studied social or political science or sociology have heard of John Locke, I'm sure, and his social compact theory.  That's back in the old days the old tribes and everybody, everybody got together.  I guess there was too much killing going on, fighting, so forth.  They all got together and said, "Look.  Let's stop this.  Let's give the right to revenge and retribution to the government.  Let the government take care of us.  Okay.  You, government, in return for that have to promise us that you will take care of the situation."
>
> And the compact was made.  And we pay taxes and have police forces and sheriff's offices and prosecutors and judges.  And we have this criminal justice system that takes care of the problems, hopefully.  And because we do, we have jurors like yourself to decide these things.
>
> Now, we know that because society, hopefully civilized society, the victims' families in this case don't have the right to exact any retribution from Mr. Vieira.  Rightfully so.  They have the right to have you decide the appropriate punishment in this case.  That's what your decision's going to be.

RT 1949.

There was nothing objectionable in these remarks.  The prosecutor merely argued that it was not for the victims' families to decide what the appropriate punishment was to be, but the jury's.  The remark did not mislead the jury or misstate the evidence.  The prosecutor did not attempt to use the reference to persuade the jury to approve of a death sentence. The reference was merely historical.  There is no possibility it would have infected the trial with unfairness.  A fair-minded jurist could conclude that Petitioner failed to raise a prima facie case of misconduct based on this statement.

6.      Conscience of the Community

As discussed above in claim 1N, the prosecutor referred to the jury as the "conscience of the community" during argument.  Petitioner claims this was misconduct.  As previously stated, the prosecutor's statement was not objectionable.  Referring to the jury as the "conscience of the community" or as representatives of the community is not improper, unless designed to inflame the jury.  People v. Ledesma, 39 Cal. 4th 641, 741 (2006) (citing Caldwell v. Mississippi, 472 U.S. 320, 333 (1985)) (jury is called upon to "decide that issue on behalf of the community").  The prosecutor did not call upon the jury to address some larger social issue or to send a message.  His remarks did not improperly describe the role assigned to the jury.  Romano, 512

1   U.S. at 9.  He merely stated that the jury should act as the conscience of the community in this

2   case.  A fair-minded jurist could find that Petitioner failed to make a prima facie showing of

3   misconduct regarding these remarks.

4          7.    Reference to Victims

5        Last, Petitioner complains that the prosecutor made comments designed to inflame the

6   jury and appeal to their passions and prejudices.  The comments are as follows:

7          And a lot of times what happens is the victims just become a number, another
       number.  They're thrown on the junk heap of statistical people.  They're no longer

8          with us.  And you can't let that happen.  This is reality.  You have to think, and
       you're entitled to think, about what happened that night in the house.  Those are

9          all circumstances of the crime.  And you think about that and put that in your - -
       on your side of a scale and see how much it weighs.  And just that fact alone,

10         what happened in that house on Elm Street that night where four people were
       senselessly killed, butchered, and just that fact alone can substantially outweigh

11         anything in mitigation, I'd submit to you that it does, four dead bodies.

12  RT 1944-45.

13       These comments were not improper.  The prosecutor argued that the aggravating

14  circumstances of the crime outweighed the mitigating circumstances.  This was proper under

15  California law.  See Cal. Penal Code § 190.3.  The prosecutor also commented regarding the

16  impact on the victims.  This was also proper.  Payne v. Tennessee, 501 U.S. 808, 827 (1991).

17  Petitioner fails to demonstrate that a reasonable jurist could not have found that he failed to make

18  a prima facie case of misconduct.

19         8.    Conclusion

20       In sum, with respect to the subclaims raised on direct appeal, Petitioner fails to

21  demonstrate that the state court rejection was contrary to or an unreasonable application of

22  clearly established Federal law, or resulted in a decision that was based on an unreasonable

23  determination of the facts in light of the evidence presented.  As to those claims raised on state

24  habeas, Petitioner fails to demonstrate that no reasonable jurist could have found that he failed to

25  make a prima facie showing of prosecutorial misconduct in the penalty phase.  The claim and all

26  subclaims are denied.

27       **G.    Claim 7**

28       As he did in claim 1C, Petitioner alleges that defense counsel had a conflict of interest

1    because he placed his own interests ahead of Petitioner's when he chose to forego second

2    counsel in favor of a higher pay rate.

3           This claim was raised on state habeas where it was denied as untimely and on the merits.

4    In a review of the merits, "the habeas petitioner's burden still must be met by showing there was

5    no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court

6    "must determine what arguments or theories supported or . . . *could have supported*, the state

7    court's decision; and then it must ask whether it is possible fair-minded jurists could disagree

8    that those arguments or theories are inconsistent with the holding in a prior decision of this

9    Court." Id. at 786 (emphasis added).

10          1.      Legal Standards

11          The Sixth Amendment provides that a criminal defendant shall have the right to "the

12   Assistance of Counsel for his defense." As a general matter, a defendant alleging a Sixth

13   Amendment violation must demonstrate "a reasonable probability that, but for counsel's

14   unprofessional errors, the result of the proceeding would have been different." Strickland, 466

15   U.S. at 694.  An exception exists for cases in which counsel actively represents conflicting

16   interests. Mickens v. Taylor, 535 U.S. 162, 166 (2002); Cuyler v. Sullivan, 446 U.S. 335, 345-

17   50 (1980).  In such a case, prejudice is presumed.  Id.  However, Petitioner must establish that

18   "an actual conflict of interest actually affected the adequacy of [defense counsel's]

19   representation." Sullivan, 446 U.S. at 348-49.  Thus, "until a defendant shows that his counsel

20   *actively represented* conflicting interests, he has not established the constitutional predicate for

21   his claim of ineffective assistance." Id. at 350 (emphasis in original).

22          2.      Review of Claim

23          Petitioner claims that defense counsel actively represented conflicting interests when he

24   waived second counsel in favor of a higher pay rate for himself.  He claims he satisfies the

25   Sullivan exception and therefore need not demonstrate prejudice.  This argument is not well-

26   taken.  In Mickens, the Supreme Court noted that lower courts "have applied Sullivan

27   'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' including "even when

28   representation of the defendant somehow implicates counsel's personal or financial interests. . . .""

1   Mickens, 535 U.S. at 174.  The Supreme Court stated "that the language of Sullivan itself does

2   not clearly establish, or indeed even support, such expansive application." Id. at 175.  "The

3   Mickens Court specifically and explicitly concluded that Sullivan was limited to joint

4   representation, and that any extension of Sullivan outside of the joint representation context

5   remained, 'as far as the jurisprudence of [the Supreme Court was] concerned, an open question.'

6   Earp v. Ornoski, 431 F.3d 1158, 1184 (9th Cir. 2005) (quoting Mickens, 535 U.S. at 175).  Since

7   it is at least an open question whether the Sullivan exception extends to conflicts involving an

8   attorney's personal or financial interests, Petitioner cannot demonstrate that the state court

9   "'unreasonabl[y] appli[ed] clearly established Federal law.'"  Musladin, 549 U.S. at 77 (quoting

10  28 U.S.C. § 2254(d)(1)).

11      Even if considered under Strickland, the claim is meritless.  As discussed in claim 1C

12  above, Petitioner fails to overcome the presumption that counsel rendered effective assistance, or

13  that Petitioner suffered any prejudice.  Contrary to Petitioner's argument, California law did not

14  compel defense counsel to retain second counsel.  Under Cal. Penal Code § 987(d), counsel may

15  request the appointment of counsel upon a proper showing.  In Keenan, the California Supreme

16  Court held that the decision whether an additional attorney should be appointed remains within

17  the sound discretion of the trial court, and a second attorney is required only upon "a showing of

18  genuine need." 31 Cal. 3d at 434.   The burden "is on the defendant to present a specific factual

19  showing as to why the appointment of a second attorney is necessary to his defense against the

20  capital charges." People v. Lucky, 45 Cal. 3d at 279.  In addition, the American Bar Association

21  guidelines cited by Petitioner "are 'only guides' to what reasonableness means, not its

22  definition."  Van Hook, 558 U.S. at 8 (quoting Strickland, 466 U.S. at 688).   Likewise,

23  Petitioner's citation to federal statute is unavailing, as this concerns a state capital conviction and

24  the Constitution does not require that a capital defendant be represented by more than one

25  attorney.  Bell v. Watkins, 692 F.2d 999, 1009 (1982).

26      In this case, as more fully discussed in claim 1C, defense counsel merely accepted the

27  arrangement that had already been established in the case.  Petitioner did not submit a request for

28  appointment of second counsel, but there is nothing in the record to indicate that this case was so

1  complex that Ligda could have or should have made a specific factual showing of genuine need

2  at that time, nor is there anything in the record which shows Ligda felt constrained by the fee

3  arrangement or that it affected his performance in any way, and Petitioner makes no such

4  showing now.

5      Based on the foregoing, a fair-minded jurist could conclude that Petitioner failed to make

6  a prima facie showing that defense counsel actively represented conflicting interests, or that

7  counsel rendered ineffective assistance by failing to seek appointment of second counsel.  The

8  claim lacks merit and is denied.

9      3.    <u>Teague</u>

10      Respondent alleges that the claim is barred by <u>Teague</u>.  However, this claim fails not

11  because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

12  because the claim lacks merit for the reasons discussed above.

13      **H.**    **Claim 8**

14      As he did in claim 1C above, Petitioner alleges that the policies of the Stanislaus County

15  Superior Court regarding appointment of second counsel deprived him of the right to effective

16  assistance of counsel and to counsel free from conflicts of interest.  He claims the government

17  interfered with his right to the effective assistance of counsel under <u>United States v. Cronic</u>, 466

18  U.S. 648 (1984).

19      This claim was raised on state habeas where it was denied as untimely and on the merits.

20  In reviewing the merits, it is Petitioner's burden to show "there was no reasonable basis for the

21  state court to deny relief," <u>Richter</u>, 131 S. Ct. at 784, and this Court "must determine what

22  arguments or theories supported or . . . *could have supported*, the state court's decision; and then

23  it must ask whether it is possible fair-minded jurists could disagree that those arguments or

24  theories are inconsistent with the holding in a prior decision of this Court."  <u>Id</u>. at 786 (emphasis

25  added).

26      1.    <u>Legal Standards</u>

27      As previously stated, the Sixth Amendment guarantees a criminal defendant the right to

28  the assistance of counsel.  In general, a defendant alleging a Sixth Amendment violation must

1   demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of

2   the proceeding would have been different." Strickland, 466 U.S. at 694.  However, as discussed

3   in claim 7 above, there are exceptions where prejudice is presumed.  One such exception, as

4   previously discussed, exists for cases in which counsel actively represents conflicting interests.

5   Sullivan, 446 U.S. at 345-50.  Another exception exists where counsel is denied at a critical stage

6   of the trial.  Cronic, 466 U.S. at 659.  Likewise, prejudice is presumed where "counsel entirely

7   fails to subject the prosecution's case to meaningful adversarial testing."  Id.  Last, if a defendant

8   has been actually or constructively denied counsel due to direct government interference,

9   prejudice need not be shown.  Perry v. Leake, 488 U.S. 272, 279 (1989).

10            2.    Review of Claim

11           Petitioner claims the policies of the Stanislaus County Superior Court constituted

12   government interference which actually or constructively denied him his right to counsel.  He

13   claims his case is similar to other cases where the Supreme Court has found such a denial.  See

14   Bell v. Cone, 535 U.S. at 696 n.3 (collecting Supreme Court cases involving direct government

15   action depriving the defendant of right to counsel: Geders v. United States, 425 U.S. 80, 91

16   (1976) (order preventing defendant from consulting his counsel "about anything" during a 17–

17   hour overnight recess impinged upon his Sixth Amendment right to the assistance of counsel);

18   Herring v. New York, 422 U.S. 853, 865 (1975) (trial judge's order denying counsel the

19   opportunity to make a summation at close of bench trial denied defendant assistance of counsel);

20   Brooks v. Tennessee, 406 U.S. 605, 612–613 (1972) (law requiring defendant to testify first at

21   trial or not at all deprived accused of "the 'guiding hand of counsel' in the timing of this critical

22   element of his defense," i.e., when and whether to take the stand); Ferguson v. Georgia, 365 U.S.

23   570, 596 (1961) (statute retaining common-law incompetency rule for criminal defendants,

24   which denied the accused the right to have his counsel question him to elicit his statements

25   before the jury, was inconsistent with Fourteenth Amendment); Williams v. Kaiser, 323 U.S. 471

26   (1945) (allegation that petitioner requested counsel but did not receive one at the time he was

27   convicted and sentenced stated case for denial of due process)).

28           The instant case is not comparable.  Here, it is undisputed that Petitioner was represented

143

1    at all times by counsel.  Petitioner does not claim that the State interfered with his access to

2    Grisez or Ligda at any stage of the proceedings.  For this reason alone, the claims fails.

3            Nevertheless, Petitioner argues that the policies prevented Ligda from seeking second

4    counsel by forcing him to choose between second counsel or a higher pay rate.  As discussed in

5    claim 1C, the policies had no such effect.  According to the policies, an attorney earning the

6    maximum rate of $125 per hour was not precluded from applying for appointment of second

7    counsel.  Pet. Exhs., vol. 6, p. 1739.  Counsel could still seek appointment of second counsel

8    upon a showing of good cause.  Id. at 1743.

9             Moreover, even if Ligda was forced to choose between the higher pay rate or

10   appointment of second counsel, Petitioner was not denied his Sixth Amendment right to counsel.

11   As previously noted, there is no constitutional right to the appointment of second counsel.  Bell,

12   692 F.2d at 1009.

13           In his Memorandum and Reply, Petitioner claims the state court unreasonably applied

14   federal law in this case because it "unreasonably refuse[d] to extend that [due process] principle

15   to a new context where it should apply." Williams, 529 U.S. at 407.  The Supreme Court recently

16   rejected the "unreasonable-refusal-to-extend rule."  White v. Woodall, __ U.S. __, __, 134 S.Ct.

17   1697, 1706 (2014).

18           Petitioner fails to demonstrate that a fair-minded jurist could not conclude that he failed

19   to present a prima facie showing that the policies of the Stanislaus County Superior Court

20   actually or constructively denied him his Sixth Amendment right to counsel.  The claim is

21   denied.

22           3.      Teague

23           Respondent alleges that the claim is barred by Teague. However, this claim fails not

24   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

25   because the claim lacks merit for the reasons discussed above.

26   **I.      Claim 9**

27           Petitioner alleges that he was denied a request for funds to retain the National Jury

28   Project to conduct a study to evaluate grounds for a motion for change of venue in contravention

1  of his due process rights.  He further alleges he was denied a request for funds to retain the

2  National Jury Project to assist him in voir dire in violation of his due process rights.

3      Petitioner raised this claim in his state habeas petition.  The California Supreme Court

4  denied it as untimely and also on the merits.  When considering the merits, Petitioner bears the

5  burden to show "there was no reasonable basis for the state court to deny relief," Richter, 131 S.

6  Ct. at 784, and this Court "must determine what arguments or theories supported or . . . *could*

7  *have supported*, the state court's decision; and then it must ask whether it is possible fair-minded

8  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

9  decision of this Court."  Id. at 786 (emphasis added).

10      1.    Legal Standards

11      The Supreme Court "has long recognized that when a State brings its judicial power to

12  bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the

13  defendant has a fair opportunity to present his defense."  Ake v. Oklahoma, 470 U.S. 68, 76

14  (1985).  "A criminal trial is fundamentally unfair if the State proceeds against an indigent

15  defendant without making certain that he has access to the raw materials integral to the building

16  of an effective defense."  Id. at 77.    However, a State is not required to "purchase for the

17  indigent defendant all the assistance that his wealthier counterpart might buy."  Id. at 77 (citing

18  Ross v. Moffitt, 417 U.S. 600 (1974)).    It is sufficient if a defendant is provided "an adequate

19  opportunity to present [his] claims fairly within the adversary system."  Id.  "To implement this

20  principle, we have focused on identifying the 'basic tools of an adequate defense or appeal,' Britt

21  v. North Carolina, 404 U.S. 226, 227 (1971), and we have required that such tools be provided to

22  those defendants who cannot afford to pay for them."  Ake, 470 U.S. at 77.

23      In Ake, the Supreme Court determined that an indigent defendant was entitled to a

24  psychiatrist's assistance at the State's expense upon a preliminary showing that his sanity would

25  likely be a significant factor at trial.  Id. at 74.  But "[t]his is not to say, of course, that the

26  indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to

27  receive funds to hire his own."  Id. at 83.  Ultimately, it is within the State's discretion "on how

28  to implement this right."  Id.

1          2.      Funds for Change of Venue

2          Ligda initially sought funds to have a survey conducted by experts of his choice, to wit,

3    the National Jury Project.  Pet. Exhs., vol. 7, pp. 1852-54.  The National Jury Project had already

4    conducted an initial evaluation at county expense for $1,000.  Id. at 1855.  Ligda requested funds

5    in the amount $15,400 to cover the first step (out of three) in conducting its survey.  Pet. Exhs.,

6    vol. 6, pp. 1762-63.  An additional amount of $14,000 to $16,000 would be necessary to

7    complete the study.  Id. at 1763.  The trial court denied the motion and advised Ligda that he

8    should have the survey conducted instead by one of the investigators already retained.  Id. at

9    1858.  The court stated it was "confident that . . . the investigators that have been . . . retained in

10   this case are competent investigators."  Id. at 1861.  As a result, Ligda retained investigator Alan

11   Peacock, who was a licensed private investigator.  RT 166.  Utilizing the survey conducted by

12   Peacock, Ligda moved for change of venue.  A hearing was conducted and the trial court denied

13   the motion.  RT 164-204.

14         Petitioner complains that his right to an expert was denied under Ake.  However, Ake

15   concerned only a defendant's right to a competent psychiatrist upon a showing that sanity would

16   be at issue.  Ake, 470 U.S. at 83.  The Supreme Court has not extended this right to the

17   appointment of other types of experts.  The Supreme Court acknowledged this fact in Caldwell:

18

19          Petitioner also raises a challenge to his conviction, arguing that there was
            constitutional infirmity in the trial court's refusal to appoint various experts and
20          investigators to assist him. Mississippi law provides a mechanism for state
            appointment of expert assistance, and in this case the State did provide expert
21          psychiatric assistance to Caldwell at state expense. But petitioner also requested
            appointment of a criminal investigator, a fingerprint expert, and a ballistics expert,
22          and those requests were denied. The State Supreme Court affirmed the denials
            because the requests were accompanied by no showing as to their reasonableness.
23          For example, the defendant's request for a ballistics expert included little more
            than "the general statement that the requested expert 'would be of great
24          necessarius witness.'" 443 So.2d 806, 812 (1983). Given that petitioner offered
            little more than undeveloped assertions that the requested assistance would be
25          beneficial, we find no deprivation of due process in the trial judge's decision. Cf.
            Ake v. Oklahoma, 470 U.S. 68, 82–83, 105 S.Ct. 1087, 1096–1097, 84 L.Ed.2d
26          53 (1985) (discussing showing that would entitle defendant to psychiatric
            assistance as matter of federal constitutional law). We therefore have no need to
27          determine as a matter of federal constitutional law what if any showing would
            have entitled a defendant to assistance of the type here sought.

28   Caldwell, 472 U.S. at 323; see also Jackson v. Ylst, 921 F.2d 882, 886 (9th Cir. 1990)

1   (acknowledging no Supreme Court authority exists extending <u>Ake</u> to expert in eyewitness

2   identification); <u>Weeks v. Angelone</u>, 176 F.3d 249, 265 (4th Cir. 1999) (noting that the Supreme

3   Court declined to extend <u>Ake</u> to cover non-psychiatric experts).   Therefore, since there is no

4   Supreme Court authority which "squarely addresses the issue in this case," Petitioner cannot

5   demonstrate that the state court decision was contrary to or an unreasonable application of

6   clearly established Federal law.   <u>Wright v. Van Patten</u>, 552 U.S. at 125; <u>Musladin</u>, 549 U.S. at

7   75-76.

8          Petitioner argues that the state court unreasonably applied federal law by unreasonably

9   refusing to extend the due process principle to a new context where it should apply.   Mem. at

10  193-94 (citing <u>Williams</u>, 529 U.S. at 407).   As previously noted, however, the Supreme Court

11  recently rejected the "unreasonable-refusal-to-extend rule."   <u>White v. Woodall</u>, 134 S. Ct. at

12  1706.

13         Even if the Court were to extend the rule to cover requests for an expert to conduct a

14  study concerning a motion for change of venue, Petitioner's claim still fails.   Petitioner did in

15  fact receive funding for an expert to conduct the study, and the study was completed.   While the

16  investigator, Alan Peacock, was not counsel's expert of choice, it was sufficient that the state

17  court provided him an expert for an adequate defense.   <u>Britt</u>, 404 U.S. at 227.

18         3.     Funds for Voir Dire Expert

19         Ligda also requested funds to retain the National Jury Project to assist him during voir

20  dire in "drafting an effective questionnaire, reviewing the completed questionnaires, and

21  listening to the Court-conducted voir dire process to help interpret the critical body language."

22  Pet. Exhs., vol. 6, p. 1768.   Ligda submitted the estimated costs and explained that he believed he

23  needed the assistance because of the recently changed voir dire process.   <u>Id.</u> at 1773-75; Pet.

24  Exhs., vol. 7, p. 1866.   At that time, California Code of Civil Procedure § 223 had been amended

25  to provide that the trial court would conduct the examination of the prospective jurors.   <u>See</u>

26  <u>People v. Avila</u>, 38 Cal. 4th 491, 534 (2006).   The trial court rejected the request, stating:

27         Again, Mr. Ligda, the Court has appointed you in this particular case because of
           your expertise, and your long record of competently representing your clients.
28         You have many years of experience in defending cases, and the Court does not

147

feel that it's necessary that some national, the one that you have indicated, national jury agency, need be appointed to assist you in the selection of the jury.

Pet. Exhs., vol. 7, p. 1867.

In addition, the trial court noted that under the new system, counsel still "ha[d] the full opportunity of presenting all the questions that [he] desire[d]." Pet. Exhs., vol. 7, p. 1868. The court concluded: ". . . I don't feel it's necessary in this case to expend the funds for the services of this agency when competent counsel can fully cover the phase of presenting to the Court questions needed to be asked on voir dire." Id.

This claim fails for the same reason as discussed above regarding the venue expert. There is no Supreme Court authority extending Ake to non-psychiatric experts. For this reason, Petitioner cannot demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of clearly established Federal law. Musladin, 549 U.S. at 75-76.

Even if Ake was extended to provide for appointment of other experts such as a voir dire expert, the claim still fails. As explained by the Fifth Circuit addressing a very similar claim,

> [J]ury selection is not a mysterious process to be undertaken by those learned in the law only with the assistance of outside professionals. All competent lawyers are endowed with the "raw materials" required to pick a jury fairly disposed toward doing substantive justice. While the wealthiest of defendants might elect to spend their defense funds on jury consultants, indigent defendants are not privileged to force the state to expend its funds on this exercise in bolstering an attorney's fundamental skills. Meanwhile, of course, a defendant does not lack "an adequate opportunity to present [his] claims fairly" because he has been denied a jury consultant. Communicating with the jury is a quintessential responsibility of counsel.

Moore v. Johnson, 225 F.3d 495, 503 (5th Cir. 2000)

4.    Teague

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

5.    Conclusion

Based on the foregoing, Petitioner fails to show that no reasonable jurist could have found that he failed to make a prima facie showing that the state court denied him funds for experts in violation of his due process rights. The claims are denied.

**J.      Claim 10**

Petitioner contends that his constitutional rights were violated because the trial court refused to allow potential jurors to be fully questioned regarding their attitudes toward the death penalty, the appropriateness of the death penalty on the facts of Petitioner's case, and other important areas.

This claim and all subclaims were presented to the California Supreme Court in the state habeas petition.  One subclaim, concerning the allegation that the trial court erred in refusing to voir dire prospective jurors on whether they would automatically vote for death instead of life imprisonment if Petitioner was found guilty of multiple murder, was also raised on direct appeal.

The subclaims presented by habeas petition were rejected as untimely.  In addition, all subclaims, except for the single subclaim presented on direct appeal, were dismissed because they could have been, but were not, raised on direct appeal.  The subclaims were also denied on the merits.  When considering the merits, Petitioner bears the burden to show "there was no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786 (emphasis added).

1.      Legal Standards

 "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); see also Skilling v. United States, 561 U.S. 358, 377-78 (2010).  In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)).  Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause."  Morgan v. Illinois, 504 U.S. 719, 728 (1992).  Likewise, a juror who would

1 | automatically impose the death penalty if a defendant is found guilty is not impartial and must be

2 | removed for cause. Id. at 733; Ross v. Oklahoma, 487 U.S. 81, 85 (1988).

3 | "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire

4 | to identify unqualified jurors." Morgan, 504 U.S. at 729. "Voir dire 'is conducted under the

5 | supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'"

6 | Ristaino v. Ross, 424 U.S. 589, 594 (1976) (quoting Connors v. United States, 158 U.S. 408, 413

7 | (1895)). "[T]he trial court retains great latitude in deciding what questions should be asked on

8 | voir dire." Mu'Min v. Virginia, 500 U.S. 415, 424 (1991). "No hard-and-fast formula dictates

9 | the necessary depth or breadth of voir dire," United States v. Wood, 299 U.S. 123, 145–146

10 | (1936), and "[t]he Constitution . . . does not dictate a catechism for voir dire, but only that the

11 | defendant be afforded an impartial jury." Morgan, 504 U.S. at 729. A trial court's failure to ask

12 | certain questions does not violate the Constitution unless it "render[s] the defendant's trial

13 | fundamentally unfair." Mu'Min, 500 U.S. at 426.

14 | 2.   Trial Court Questioning Concerning Multiple Murder

15 | In the subclaim presented on direct appeal, Petitioner contends that the trial court erred

16 | by refusing to ask the jurors whether they would automatically vote for the death penalty if

17 | Petitioner were found guilty of the special circumstance of multiple murder. The California

18 | Supreme Court rejected the claim as follows:

19
20
21
22
23
24
> Prior to the commencement of voir dire, defense counsel submitted a proposed jury questionnaire that contained the following question: "Do you feel you would automatically vote for death instead of life imprisonment with no parole if you found the defendant guilty of two or more murders?" The prosecution objected that the subject areas "should be covered by the Court" in its death qualification voir dire. Defense counsel stated that he appreciated that "the Court would be doing the questioning in all aspects on [death qualification voir dire], but I think the Court will need something to get started on to get an idea of ... what questions to ask that would intelligently bring out" prospective jurors' views on the death penalty. The question was not included in the jury questionnaire. Moreover, the judge's questions to prospective jurors did not ask this or a similar question.[FN6]

25
26
27
28
> FN6.  A typical death qualification voir dire asked the following five questions:
> "BY THE COURT: Q. Mrs. B., do you have any feelings about the death penalty which are so strong that you would never find a person guilty of first degree murder?
> "Q. Do you have any feelings about the death penalty which are so strong that you would never find a special circumstance to be true?
> "Q. Do you have any feelings about the death penalty which are so strong that you

150

would never vote to impose the death penalty where it was a possible sentence?

"Q. Do you have any feelings about the death penalty which are so strong that you would always impose the death penalty in any case you had the opportunity?

"Q. Do you have any feelings about the death penalty which in your mind would substantially interfere with your ability to act as a juror?"

Defendant claims error for refusing his request to inquire into the ability of prospective jurors to vote for life imprisonment without parole in the case of multiple murder convictions. More specifically, he contends reversal of the penalty phase judgment is compelled by our holding in *People v. Cash* (2002) 28 Cal.4th 703, 718–723, 122 Cal.Rptr.2d 545, 50 P.3d 332 (*Cash*). He further claims that these errors violated his rights to equal protection, due process, a fair jury trial and protection against cruel and unusual punishment found in the United States and California constitutions. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.) We conclude there was no error.

In *Cash* the defense, anticipating that the prosecution would introduce into aggravation the defendant's murder of his elderly grandparents at age 17, attempted to ask a prospective juror during voir dire whether there were "'any particular crimes'" which would have caused the juror "'automatically to vote for the death penalty.'" (*Cash, supra*, 28 Cal.4th at p. 719, 122 Cal.Rptr.2d 545, 50 P.3d 332.) The trial court ruled the question improper, and also denied a subsequent motion to ask prospective jurors whether there were any aggravating circumstances that would cause them to automatically vote for the death penalty. (*Ibid*.)

We held the trial court erred. We began our analysis with an articulation of the basic principles of voir dire in capital cases: "Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841.) 'The real question is "'whether the jurors views about capital punishment would prevent or impair the jurors ability to return a verdict of death in the case before the juror.'"' [Citations.] Because the qualification standard operates in the same manner whether a prospective jurors views are for or against the death penalty (*Morgan v. Illinois* (1992) 504 U.S. 719, 726–728, 112 S.Ct. 2222, 119 L.Ed.2d 492), it is equally true that the 'real question' is whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of life without parole in the case before the juror." (*Cash, supra*, 28 Cal.4th at pp. 719–720, 122 Cal.Rptr.2d 545, 50 P.3d 332.)

We therefore found error in the trial court's refusal of the defense's proposed voir dire: "[T]he trial court's ruling prohibited defendant's trial attorney from inquiring during voir dire whether prospective jurors would automatically vote for the death penalty if the defendant had previously committed another murder. Because in this case defendant's guilt of a prior murder (specifically, the prior murders of his grandparents) was a general fact or circumstance that was present in the case and that could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances, the defense should have been permitted to probe the prospective juror's attitudes as to that fact or circumstance. In prohibiting voir dire on prior murder, a fact likely to be of great significance to prospective jurors, the trial court erred." (*Cash, supra*, 28 Cal.4th at p. 721, 122 Cal.Rptr.2d 545, 50 P.3d 332.)

Of particular importance for the present case was *Cash's* discussion of *People v.*

*Medina* (1995) 11 Cal.4th 694, 745–746, 47 Cal.Rptr.2d 165, 906 P.2d 2. "In *Medina*, on which the Attorney General particularly relies, the trial court initially declined to permit voir dire on whether prospective jurors could vote for life imprisonment if the defendant had committed multiple murders, but later the trial court changed its ruling and allowed such questioning. Despite dictum expressing doubt that the court's initial ruling was incorrect, we held that the initial ruling did not prejudice the defendant because 'after the trial court clarified its position with respect to the multiple murder question, defendant failed to ask to reexamine any juror on this topic.' (*People v. Medina, supra*, 11 Cal.4th at p. 746, 47 Cal.Rptr.2d 165, 906 P.2d 2.) Here, by contrast, the trial court never altered its erroneous ruling, and defendant had no opportunity to reexamine any juror with respect to the prior murder question." (*Cash, supra*, 28 Cal.4th at p. 722, 122 Cal.Rptr.2d 545, 50 P.3d 332.)

As our discussion of *Medina* in *Cash* suggests, a trial court's categorical prohibition of an inquiry into whether a prospective juror could vote for life without parole for a defendant convicted of multiple murder would be error. Multiple murder falls into the category of aggravating or mitigating circumstances "likely to be of great significance to prospective jurors." (*Cash, supra*, 28 Cal.4th at p. 721, 122 Cal.Rptr.2d 545, 50 P.3d 332.) The Attorney General does not dispute this point. [Footnote omitted.] Rather, the Attorney General argues that defendant was not denied the opportunity to conduct voir dire on the subject of multiple murder. We agree.

Although the trial court did not include the sought-after question on multiple murder in the jury questionnaire, it never suggested that defense counsel could not raise the issue in voir dire. The trial court never ruled that the question was inappropriate, and the prosecutor did not object to the question itself, but only opined that the question was "probably better asked by the court." To be sure, as discussed more fully in the next part of this opinion, the trial court conducted voir dire by itself and for the most part did not allow counsel to directly question prospective jurors. But the trial court made clear that it would permit on voir dire "supplemental questions that I would ask if you ask me to ask." Defense counsel never suggested to the court that it voir dire on the subject of multiple murder. The court presented the questions he planned to ask prospective jurors regarding the death penalty and defense counsel stated that he had "no legal objections."

Defendant contends on appeal that the trial court's invitation to ask supplemental questions "was clearly for the limited purpose of allowing the attorneys to suggest clarifying questions with respect to certain individual jurors, not an invitation for counsel to suggest additional general questions to be directed to the full jury panel." But the record belies that contention. The trial court incorporated into its general voir dire, for example, a question suggested by the prosecution informing prospective jurors that the prosecution would be calling a witness who had entered into a plea bargain and inquiring whether they believed plea bargaining to be improper. Whether or not the trial court would have approved an additional general question on voir dire asking about juror's attitudes toward multiple murderers is unclear. What is clear is that defendant did not request such a question. Nor does he contend the trial court had a sua sponte duty to ask the question on voir dire merely because it was informed that defense counsel desired such a question be included in the questionnaire.

Thus, the question is not, as defendant contends, whether his claim of *Cash* error was properly preserved, but rather whether any error was committed. Although asking the multiple-murder question in the jury questionnaire would not have

been improper, refusal to include the question was not error so long as there was an opportunity to ask the question during voir dire. Because defendant did not attempt to have the trial court conduct a multiple murder inquiry during voir dire, and the trial court was given no opportunity to rule on the propriety of that inquiry, we conclude defendant cannot claim error. (See *Cash, supra*, 28 Cal.4th at p. 722, 122 Cal.Rptr.2d 545, 50 P.3d 332; *People v. Medina, supra*, 11 Cal.4th at p. 746, 47 Cal.Rptr.2d 165, 906 P.2d 2.)

Vieira, 35 Cal. 4th at 284-87.

The claim fails for several reasons.  First, the state court reasonably determined that the record did not support his assertion that he was precluded from asking prospective jurors whether they would automatically impose a death penalty if Petitioner was found guilty of multiple murder.  The record demonstrates that defense counsel proposed asking the question regarding multiple murder in the written jury questionnaire.  CT 1139.  The prosecutor suggested that proposed questions about the death penalty "are probably better asked by the Court."  RT 187.  Ligda stated he thought the question might be "helpful" to introduce such questions in the questionnaire "as a start for the Court's questioning."  RT 190.  Court recessed with no decision on the matter.  RT 190.  Subsequently, the Court advised the parties that it would be seeking final comments on the jury questionnaire.  RT 251.  The prosecutor inquired, "As far as voir dire goes, are you going to allow any latitude to the attorneys for asking questions of the jurors if – in the death penalty part of it, of course, is what I'm really concerned about, depending upon their answers to the questionnaires?"  RT 251.  The court answered, "I would certainly permit appropriate supplemental questions that I would ask if you would ask me to ask."  RT 251.

The court then prepared its own written jury questionnaire, and defense counsel's proposed question was not included.  The parties were provided an opportunity to review it and asked whether there were any questions that should or should not be asked.  RT 260.  Several suggestions were made, but defense counsel did not revisit his proposed question.  RT 260-65.  The written questionnaire was then given to the jury.

Prior to the commencement of oral voir dire questioning, the court set forth the questions it proposed to ask the jury.  RT 440-44.  Defense counsel stated he had no objections.  RT 444.  Oral voir dire commenced and the court asked questions of the jurors concerning the death

1   penalty.  RT 571.  Throughout voir dire, the court allowed both parties to make suggestions,

2   comments or objections.  RT 490-747.  At no point did defense counsel seek to have the jurors

3   questioned concerning the imposition of the death penalty upon conviction of multiple murder.

4        From the record, therefore, it is clear that defense counsel was not precluded from asking

5   his question on multiple murder.  At most, the trial court declined to include it in the court's

6   written questionnaire.  Nothing precluded defense counsel from requesting the court to ask the

7   question during oral voir dire, and in fact, the court specifically advised the parties that it would

8   "certainly permit" supplement questions that they might have during oral voir dire if they asked.

9   RT 251.  Thus, the state court reasonably found Petitioner's claim that defense counsel was not

10  permitted to ask his question to be unsupported by the record.

11       Moreover, Petitioner cannot demonstrate that the state court decision was contrary to or

12  an unreasonable application of Supreme Court precedent.  In Morgan, the Supreme Court held

13  that a defendant in a capital case must be allowed to question jurors to determine whether they

14  "would always impose death following conviction."  Morgan, 504 U.S. at 733.  In this case, the

15  jurors were asked, "Do you have any feelings about the death penalty which are so strong that

16  you would always impose the death penalty in any case you had the opportunity."  RT 571.  This

17  question satisfied Morgan.  The Supreme Court did not extend the requirement to questions

18  concerning death penalty in the context of specific facts and circumstances.  Id.  Only in the

19  context of racial bias has the Supreme Court required questioning concerning specific

20  circumstances.  Ham v. South Carolina, 409 U.S. 524, 526-27 (1973); Turner v. Murray, 476

21  U.S. 28, 36-37 (1986).  In rejecting a similar claim, the Fourth Circuit stated:

22       Morgan does not require that a capital defendant be allowed to determine at voir
         dire what a prospective juror's sentencing decision will be if presented with a
23       specific state of evidence or circumstances. Rather, Morgan requires that a capital
         defendant be afforded an adequate opportunity at voir dire to identify prospective
24       jurors "who, even prior to the State's case in chief, [have] predetermined ... to
         impose the death penalty."
25

26  Richmond v. Polk, 375 F.3d 309, 330 (4th Cir. 2004) (quoting Morgan, 504 U.S. at 736).

27       The inquiry conducted by the trial court was in accord with Morgan's requirements.  As

28  noted above, there is "no catechism for voir dire."  Morgan, 504 U.S. at 72.  The court's decision

1    on how to structure voir dire was certainly within its broad discretion.    Ristaino, 424 U.S. at

2    594.    Therefore, Petitioner cannot show that the state court decision was contrary to or an

3    unreasonable application of Supreme Court precedent.

4            In addition, he cannot demonstrate prejudice, i.e., that the error had a "substantial and

5    injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 638 (1991).

6    As noted by Respondent, the jurors were informed at the outset that this was a case of multiple

7    murder.  RT 298.  Since the jurors were asked whether they had such strong feelings that they

8    would always impose the death penalty if the case arose, Petitioner's concern was addressed.

9            3.    Claims Concerning Written Questionnaire

10           Petitioner also claims that several questions requested by the defense were not included

11   in the written questionnaire.    The questions related to areas such as sleep deprivation,

12   psychology, religious affiliation, and precautions against crime.  Petitioner further claims that the

13   written questionnaire failed to inquire sufficiently into the pretrial publicity, and that jurors were

14   not asked whether they could return a sentence of life without possibility of parole in a multiple

15   murder case.

16           This claim fails because, as previously discussed, there is no constitutional right to have a

17   written questionnaire or that certain questions be included in one.    The trial court has broad

18   discretion in the manner in which it conducts voir dire. Ristaino, 424 U.S. at 594; Mu'Min, 500

19   U.S. at 424.  "The Constitution . . . does not dictate a catechism for voir dire, but only that the

20   defendant be afforded an impartial jury." Morgan, 504 U.S. at 729.  The questions were not

21   included on the written questionnaire, but nothing prevented defense counsel from requesting the

22   court to ask them during oral voir dire.  Thus, the state court rejection could not be contrary to or

23   an unreasonable application of Supreme Court precedent.

24           4.    Teague

25           Respondent alleges that the claim is barred by Teague. However, this claim fails not

26   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

27   because the claim lacks merit for the reasons discussed above.

28   **K.    Claim 11**

1    In his next claim, Petitioner alleges his rights under the Fifth, Sixth, Eighth and

2    Fourteenth Amendments were violated because the jury selection process was conducted in a

3    manner that skewed the process toward the death sentence and resulted in a jury improperly

4    biased against Petitioner.  He claims the trial court conducted death qualification voir dire *en*

5    *masse* rather than sequestered.

6    The claim and all subclaims were presented to the California Supreme Court in the state

7    habeas petition.  One subclaim, that the trial court erred in refusing to conduct sequestered death

8    qualification voir dire, was also raised and rejected on direct appeal.

9    The subclaims presented by habeas petition were rejected as untimely.  In addition, all

10   subclaims, except for the single subclaim presented on direct appeal, were dismissed because

11   they could have been, but were not, raised on direct appeal.  The subclaim that was presented on

12   direct appeal was procedurally barred because defense counsel did not object at trial.   All

13   subclaims were also denied on the merits.  When considering the merits of the claims raised for

14   the first time on state habeas, Petitioner bears the burden to show "there was no reasonable basis

15   for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what

16   arguments or theories supported or . . . *could have supported*, the state court's decision; and then

17   it must ask whether it is possible fair-minded jurists could disagree that those arguments or

18   theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786 (emphasis

19   added).  As to the subclaim raised on direct review, Petitioner must demonstrate that the state

20   court determination was contrary to, or an unreasonable application of, clearly established

21   Federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

22        1.    Legal Standards

23   As more fully discussed in claim 10 above, Petitioner's right to an impartial jury includes

24   the right to "an adequate voir dire to identify unqualified jurors."  Morgan, 504 U.S. at 729.  The

25   trial court has broad discretion in conducting voir dire, and retains great latitude in determining

26   what questions may be asked.  Ristaino, 424 U.S. at 594; Mu'Min, 500 U.S. at 424.    A trial

27   court's failure to ask certain questions does not violate the Constitution unless it "render[s] the

28   defendant's trial fundamentally unfair."  Mu'Min, 500 U.S. at 426.

In addition, the trial court must question jurors in the area of racial prejudice when it is at issue. Id. at 424. Also, in capital cases, voir dire must include questions to identify those "who would always impose death following conviction" and those who "in no case would vote for capital punishment, regardless of his or her instructions." Morgan, 504 U.S. at 729, 733, 735. Even so, the Supreme Court has been "careful not to specify the particulars by which this could be done." Mu'Min, 500 U.S. at 431.

2.    Sequestered Voir Dire

Petitioner contends that the trial court erred by conducting group death qualification voir dire. The claim was presented on direct review to the California Supreme Court. The California Supreme Court analyzed and rejected the claim as follows:

> Defendant claims the trial court erred in conducting group voir dire, particularly death-qualification voir dire, thereby violating his constitutional rights to due process, an impartial jury and to be free of cruel and unusual punishment. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 17.). We conclude no error was committed.
>
> In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80, 168 Cal.Rptr. 128, 616 P.2d 1301, we held that "[i]n order to minimize the potentially prejudicial effects [of open-court voir dire], this court declares, pursuant to its supervisory authority over California criminal procedure, that in future capital cases that portion of the voir dire of each prospective juror which deals with issues which involve death-qualifying the jury should be done individually and in sequestration." (Fns. omitted.) In *People v. Waidla* (2000) 22 Cal.4th 690, 713–714, 94 Cal.Rptr.2d 396, 996 P.2d 46, we recognized that our holding in *Hovey* had been abrogated by Code of Civil Procedure section 223, part of Proposition 115 enacted by the voters in 1990. That section provides in pertinent part that in criminal cases, "including death penalty cases," "[v]oir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors." (Code Civ. Proc., § 223.)
>
> Defendant argues that Code of Civil Procedure section 223 is unconstitutional because *Hovey's* requirement of individual death qualification, which this court has not overruled, is constitutionally based. He is incorrect. "In *Hovey* ... we clearly indicated that we adopted the rule pursuant to our supervisory authority over California criminal procedure and not under constitutional compulsion, and that we did so because the prejudicial effects associated with death-qualifying voir dire in open court had not been shown to be actual but only potential." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1135, 240 Cal.Rptr. 585, 742 P.2d 1306.)
>
> Further, defendant contends that Code of Civil Procedure section 223 did not overrule *Hovey* because it did not refer to that case, and because its caveat that group voir dire take place "where practicable" can be taken as a codification of *Hovey*. This was essentially the argument made by the defendant in *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 71 Cal.Rptr.2d 91. The court in *Covarrubias* examined at length the language, purpose and ballot arguments

behind Proposition 115 and concluded that "section 223 was intended to overrule *Hovey's* holding that individual sequestered voir dire is required during death qualification." (*Covarrubias, supra*, 60 Cal.App.4th at p. 1178, 71 Cal.Rptr.2d 91.) We endorsed *Covarrubias's* holding in *People v. Waidla, supra*, 22 Cal.4th at pages 713–714, 94 Cal.Rptr.2d 396, 996 P.2d 46, and do so again here.

Finally, defendant claims that voir dire in his case was not "practicable" within the meaning of Code of Civil Procedure section 223. "[S]ection 223 vests the trial court with discretion to determine the advisability or practicability of conducting voir dire in the presence of the other jurors." (*Covarrubias v. Superior Court, supra*, 60 Cal.App.4th at p. 1184, 71 Cal.Rptr.2d 91.) A trial court that altogether fails to exercise its discretion to determine the practicability of group voir dire has not complied with its statutory obligation. (*Ibid.*) Our cases have suggested that group voir dire may be determined to be impracticable when, in a given case, it is shown to result in actual, rather than merely potential, bias. (See *People v. Anderson, supra*, 43 Cal.3d at p. 1135, 240 Cal.Rptr. 585, 742 P.2d 1306.)

Defendant contends there was such indication of actual bias in the group voir dire process in the present case. In defendant's new trial motion, and again here on appeal, defendant points to the voir dire of two prospective jurors, Robert C. and Henry E., who answered affirmatively when asked "[a]re your feelings about the death penalty such that in every case in which you have the opportunity to impose the death penalty you would impose it?" In both cases, the trial court responded in ways that indicated the answers were inappropriate and not in conformity with the law. Defendant notes prospective jurors on the same panel whose voir dire followed Robert C. and Henry E. did not give the same unqualified affirmative response to that question. He surmises that these prospective jurors, including several persons who were seated as jurors on the case, were influenced by the trial court's responses to Robert C. and Henry E. and gave answers that conformed to law but may have been untruthful, i.e., they understated their pro-death-penalty bias. Defendant in the new trial motion sought to bolster this argument with testimony from Dr. Schoenthaler concerning the Hawthorne effect, a phenomenon observed in social science research whereby the act of observation changes the behavior of the subjects observed, as when research subjects change their behavior to conform to what they perceive as the expectations of the researchers. (See Risinger et al., *The Daubert/Kumho Implications of Observer Effects in Forensic Science: Hidden Problems of Expectation and Suggestion* (2002) 90 Cal. L.Rev. 1, 20, fn. 90.)

At the threshold, the Attorney General claims that defendant did not object below to group voir dire and the issue is waived. It appears that defense counsel objected to the repetitive questioning of the death-qualification voir dire, because "I think ... it's creating ... an atmosphere of guilt and death." Defense counsel did not, however, propose individual, sequestered voir dire as a solution to this perceived problem, but rather sought to have the trial court conduct death-qualification voir dire only when prospective jurors' attitudes toward the death penalty, as expressed in the questionnaire, were unclear. Defendant did not raise the issue of individual voir dire until his motion for a new trial. Defendant's claim is therefore not preserved on appeal.

Even if it were, it is without merit. The possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment. The trial court did not abuse its discretion in proceeding with group voir dire.

1   <u>Vieira</u>, 35 Cal. 4th at 287-89.

2   This claim must fail because the Supreme Court has never held that individual,

3   sequestered voir dire is required in capital cases.  The Supreme Court requires only that voir dire

4   be "adequate . . . to identify unqualified jurors."  <u>Morgan</u>, 504 U.S. at 729.  The manner in which

5   voir dire is conducted is committed to the broad discretion of the trial court.  <u>Ristaino</u>, 424 U.S.

6   at 594; <u>Mu'Min</u>, 500 U.S. at 424.  In a capital case, it is sufficient that the jurors are questioned

7   whether they "would always impose death following conviction."  <u>Morgan</u>, 504 U.S. at 733.  As

8   noted by the Eleventh Circuit,

9   . . .[G]roup questioning and non-verbal responses do not constitute a per se
    violation of <u>Witherspoon [v. Illinois</u>, 391 U.S. 510 (1968)].  <u>Witherspoon</u> governs
10  the substance of the inquiry to be made, not its form, and only requires that the
    voir dire method used for questioning and receiving responses allows a court to
11  determine in the particular case at hand that the excluded venirepersons "made
    unmistakably clear" that their attitude toward the death penalty would either
12  automatically cause them to vote against the death penalty or prevent them from
    impartially deciding the defendant's guilt.
13

14  <u>McCorquodale v. Balkcom</u>, 721 F.2d 1493, 1496 (11th Cir. 1983).

15  Since the Supreme Court has never squarely addressed the issue of group voir dire as

16  opposed to sequestered voir dire, or applied a rule in this context, it cannot be established that the

17  state court rejection of the claim was contrary to or an unreasonable application of clearly

18  established Federal law.  <u>Wright</u>, 552 U.S. at 125-126; <u>Premo</u>, 131 S.Ct. at 743; <u>Musladin</u>, 549

19  U.S. at 77.

20  As previously discussed, the only due process requirements are that the voir dire be

21  adequate and that the venire be questioned whether they "would always impose death following

22  conviction."  <u>Morgan</u>, 504 U.S. at 733.  In this case, the trial court's voir dire satisfied these

23  requirements.  Each juror was questioned in private by written questionnaire on his or her

24  feelings concerning the death penalty, including, *inter alia*, whether he or she would always

25  impose the death penalty if given the opportunity, or whether he or she would never impose the

26  death penalty.  CT 102.  In addition, each juror was specifically asked several questions

27  regarding the death penalty, including, *inter alia*, whether he or she has any feelings so strong

28  concerning the death penalty that he or she would always impose the death penalty.   RT 571;

1  Vieira, 35 Cal. 4th at 284 n.6.  The state court could reasonably determine that these questions

2  satisfied the requirements of due process.

3        In addition, there is no evidence in the record that any of the jurors were biased or

4  evasive.  Petitioner's claim that jurors conformed their answer to previous answers of other

5  jurors is pure speculation.  Thus, Petitioner fails to demonstrate that the state court rejection of

6  his claim was contrary to or an unreasonable application of clearly established Federal law, or an

7  unreasonable application of the facts.  The subclaim is denied.

8        3.    Other Subclaims Concerning Jury Questionnaire

9        Petitioner raises several other subclaims that were first presented in his state habeas

10 petition.  He claims the questionnaire was superficial and overly restrictive, and he claims that

11 the trial court conducted the death qualification voir dire by itself and in such a manner that the

12 responses were parroted and uninformative.

13       These subclaims fail for the same reasons discussed above.  There is no constitutional

14 right to a written questionnaire, and certainly no constitutional right to have it composed in a

15 specific manner.  In addition, there is no constitutional right to have defense counsel conduct

16 voir dire.  Indeed, the manner in which voir dire is conducted is committed to the broad

17 discretion of the trial court.  Skilling, 561 U.S. at 386 (quoting Ristaino, 424 U.S. at 594-95)

18 ("Jury selection, we have repeatedly emphasized, is 'particularly within the province of the trial

19 judge.'"); Mu'Min, 500 U.S. at 424.  The Supreme Court has never held that a trial court cannot

20 conduct voir dire on its own.  Thus, a fair-minded jurist could conclude that Petitioner failed to

21 demonstrate a violation of his constitutional rights.

22       4.    Teague

23       Respondent contends that Petitioner's claim and all subclaims are barred by Teague.

24 However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure

25 under Teague, but rather because the claim lacks merit for the reasons discussed above.

26 **L.    Claim 12**

27       Petitioner claims the trial court violated his due process and other constitutional rights by

28 repeatedly denying his motions for change of venue despite widespread prejudicial pretrial

publicity.

This claim was raised on direct appeal and denied on the merits. Therefore, relitigation of the claim is barred unless Petitioner can satisfy the provisions of the AEDPA. See 28 U.S.C. § 2254(d); Richter, 131 S. Ct at 784. The California Supreme Court denied the claim as follows:

> Defendant contends his motion to change venue, made several times during the proceedings, was wrongly denied, which he claims was error under state law and a violation of his right to be tried by an unbiased jury under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. We conclude the trial court committed no error.

> *1. The Law*

> "'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. [Citations.] Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. [Citations.] The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim.'" (*People v. Williams* (1989) 48 Cal.3d 1112, 1125, 259 Cal.Rptr. 473, 774 P.2d 146 (*Williams*).)

> As we further stated in *Williams*: "Of course, the question presented on appeal from a judgment of conviction is necessarily different from that on a petition for writ of mandate.... [¶] ... [B]ecause the prejudicial effect of publicity before jury selection is necessarily speculative, it is settled that '"any doubt as to the necessity of removal ... should be resolved in favor of a venue change."' [Citation.] After trial, any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial. [Citation.] [¶] Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, however, the standard of review is the same. A showing of actual prejudice 'shall not be required.' [Citations.] In a pretrial motion for change of venue, defendant need only demonstrate a 'reasonable likelihood' that absent such relief a fair trial cannot be had. [Citation.] On appeal after judgment, the defendant must show a reasonable likelihood that a fair trial was not had. [Citations.] In either case, '[t]he phrase "reasonable likelihood" denotes a lesser standard of proof than "more probable than not."' [Citations.]" (*Williams, supra*, 48 Cal.3d at pp. 1125–1126, 259 Cal.Rptr. 473, 774 P.2d 146.)

> *2. The Trial Court's Rulings*

> In ruling on the defense motion for change of venue, the trial court reviewed the pertinent factors, comparing the case to the then-recent capital case in which this court denied a change of venue, *People v. Coleman* (1989) 48 Cal.3d 112, 133–136, 255 Cal.Rptr. 813, 768 P.2d 32 (*Coleman*). As to the gravity and nature of the offense, the court admitted this factor weighed in favor of the change of venue, given the multiple murders and the "sensational aspects" of the case.

161

The trial court concluded that the second factor, the nature and extent of the news coverage, did not weigh in favor of a change of venue. There had been a number of "large and sometimes pictorial and descriptive articles about the murders" between May 22 and June 1, 1990, in the Modesto Bee, the newspaper with the largest circulation in Stanislaus County. There was intensive coverage on local television stations during the same period of time. But that coverage was comparable to that in *Coleman*, i.e., it "quickly subsided" and was not "'persistent and pervasive'" as in other cases in which a change of venue was warranted. (*Coleman, supra*, 48 Cal.3d at pp. 133, 134, 255 Cal.Rptr. 813, 768 P.2d 32.) The trial court found that articles that initially reported neo-Nazi activity and drug use in connection with the case were tempered by later comments by law enforcement officials that the killings were not drug or race related. Moreover, media coverage mentioned defendant by name only once or twice during the news coverage.

The trial court also examined survey data regarding how well acquainted the people of Stanislaus County were with the crime and the defendant. Defendant had submitted a recent telephone poll conducted by private investigator Alan Peacock. According to that survey, 263 out of 400 respondents, approximately two-thirds, had recalled hearing about the killings and 117, or approximately 29 percent, had formed an opinion that the persons arrested for the crimes were guilty. The prosecution, in arguing against the change in venue motion, disputed Peacock's expertise in conducting the survey. The prosecution submitted its own telephone survey, showing that 72 out of 100 respondents could recall hearing something about the case and 21 of those had opinions as to defendant's guilt. The trial court observed that in Coleman, only 46 percent had heard of the case, but 31 percent thought the defendant to be guilty, and that this substantial percentage was not by itself grounds for changing venue.

The third factor, the size of the community also did not weigh in favor of a change in venue. "The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area." (*Coleman*, supra, 48 Cal.3d at p. 134, 255 Cal.Rptr. 813, 768 P.2d 32.) In *Coleman*, we concluded that Sonoma County, with a population of approximately 300,000 in 1980, "[t]hough not one of the state's major population centers, ... is substantially larger than most of the counties from which this court has ordered venue changes." (*Ibid*.) The trial court in the present case concluded that the size of Stanislaus County, with a population of approximately 370,000 according to the 1990 census, also did not compel a venue change.

The trial court also found the fourth and fifth factors—the status of the defendant and the popularity and prominence of the victim—also did not weigh in favor of the change of venue, as both the defendant and the victims were unknown. Based on its assessment of all the above factors, the court concluded that "there's a reasonable likelihood that [defendant] will receive a fair trial in this County" but that the court reserved final judgment until voir dire revealed the actual state of knowledge of the prospective jury pool.

Defendant renewed the motion for a change of venue on August 22, 1991, after a review of questionnaires completed by the prospective jurors disclosed that approximately two-thirds of the prospective jurors had heard of the case and about 13 percent said they had formed an opinion based on what they had read. The court denied the motion, observing that there was a sufficient number of jurors who had not yet formed opinions.

Defendant again renewed the motion for change of venue on August 26. The defense pointed out that Prospective Juror H., before she was dismissed, had indicated she overheard three persons, perhaps prospective jurors, in the courthouse discussing their belief that appellant should receive the death penalty. Defense counsel argued that this incident underscored the "ominous atmosphere" in which the trial would be taking place. The court affirmed its earlier holding.

Finally, defendant raised the venue issue in his motion for a new trial. Kirk McCallister, specially appointed to represent defendant in the new trial motion, claimed that the pretrial survey of community prejudice conducted by Alan Peacock for previous defense counsel was flawed and that Mr. Peacock lacked professional qualifications. Dr. Stephen Schoenthaler, who had prepared a community prejudice survey for the trial of defendant's codefendants, Cruz, Beck, LaMarsh, and Willey (hereafter the Cruz trial), was called on to testify. The same trial judge who presided over defendant's trial had granted the change of venue in the Cruz trial, which commenced after defendant's trial. Dr. Schoenthaler's survey showed among other things that the percentage of people who had heard of the case and who had formed an opinion of the defendants' guilt—60 percent hearing of the case and 30 percent forming an opinion—was significantly higher in the community prejudice survey than in the pool of prospective jurors and among the actual jurors. Defense counsel argued that it was unrealistic to suppose that of the nine jurors in the case who had prior knowledge of the case, none had formed an opinion.[FN3]

FN3.  This argument, as formulated in the new trial motion, was flawed for a simple reason. The people polled in the community prejudice survey were randomly chosen whereas the seated jurors were not, and prospective jurors who admitted forming an opinion would not likely have been seated on the jury. The argument has some force, however, when it comes to the entire panel of prospective jurors, in which approximately 13 percent (23 of 173) admitted to forming an opinion, significantly less than the community at large.

The trial court denied the motion. It found the greater pretrial publicity in the Cruz trial, as a result of publicity about defendant's trial, justified the change in venue in the former trial. The court also denied the motion "based on actual juror answers to the voir dire [and] the failure to challenge any of them for cause...."

*3. Contentions on Appeal*

Defendant claims on appeal that the trial court erred in not initially granting the change of venue motion and not granting a new trial based on the failure to change venue. In making these arguments, he compares this case to *Williams*, *supra*, 48 Cal.3d 1112, 259 Cal.Rptr. 473, 774 P.2d 146, a capital case in which we reversed the judgment due to the court's failure to grant the change of venue motion. Defendant makes several arguments based on the notoriety of the case. First, approximately 66 percent of prospective jurors had heard of the case, as opposed to 52 percent in the *Williams* case. Second, 9 of 12 seated jurors had heard of the case, as compared to 8 of 12 in *Williams*. (*Williams, supra*, 48 Cal.3d at p. 1128, 259 Cal.Rptr. 473, 774 P.2d 146.) The newspaper reports in *Williams* were "frequently sensational," describing the victim's "'bullet-riddled body'" several times. Coverage of the quadruple murder, defendant argues, was also frequently sensational, or at least likely to leave an impression on the reader, with a number of front page and lead articles. The articles referred to the defendants as part of a Nazi or White supremacist organization. One article in the Modesto Bee, on the front page of the "B" Metro section, reported on the preliminary hearing

six months before trial, recounting defendant's description to Detective Deckard of how he had "nearly cut off the head of Emmie Paris." The confession was later suppressed as the product of an illegal interrogation. Press coverage of incriminating evidence later deemed inadmissible was also found significant in *Williams*. (48 Cal.3d at p. 1127, 259 Cal.Rptr. 473, 774 P.2d 146.)

Defendant also claims that the extent of community prejudice may be gauged by the comments and behavior of some of the excused jurors who had overheard or had discussed the case and been exposed to the view that defendant was guilty. Defendant further points to the fact that he exhausted all 20 of his peremptory challenges, whereas the failure to do so would lead to the inference that the defense is satisfied with the jury. (See *People v. Dennis* (1998) 17 Cal.4th 468, 524, 71 Cal.Rptr.2d 680, 950 P.2d 1035; *People v. Daniels* (1991) 52 Cal.3d 815, 853–854, 277 Cal.Rptr. 122, 802 P.2d 906.)

There are nonetheless significant differences between *Williams* and the present case that undermine defendant's position. Of great significance in *Williams* was the size of Placer County, which at the time of trial had a population of 117,000. (*Williams, supra*, 48 Cal.3d at p. 1126, 259 Cal.Rptr. 473, 774 P.2d 146.) As noted, Stanislaus County had at the time of trial a population over three times greater, including the city of Modesto with 80,000. The small size of the community in *Williams* was reflected in the fact that over one-third of the number of potential jurors knew people connected to the case, including the victim, members of her family, and the district attorney or investigators, which was not the case here. (*Ibid.*, at p. 1130, 259 Cal.Rptr. 473, 774 P.2d 146.)

Moreover, although there was a flurry of publicity around the time of the murders, and some prejudicial articles around the time of the preliminary hearing in defendant's case, six months prior to trial, in *Williams* "the publicity did not cease but continued at a fairly steady pace until the start of trial." (*Williams, supra*, 48 Cal.3d at pp. 1127–1128, 259 Cal.Rptr. 473, 774 P.2d 146.) We also found important in *Williams* the status of defendant and the victim: the victim was a White woman whose family had "'prominence in the community,'" whereas defendant was from Sacramento, an outsider, and a Black man in a county with less than 1 percent Blacks, resulting in "social, racial and sexual overtones." (*Williams, supra*, 48 Cal.3d at p. 1129, 259 Cal.Rptr. 473, 774 P.2d 146.) In such circumstances, "the risk is enormously high that the verdict may be based on a desire for revenge, or the fear of social ostracism as the cost of a mitigated verdict." (*Id.* at p. 1131, 259 Cal.Rptr. 473, 774 P.2d 146.) There were no such overtones in the present case, and although defendant characterizes the victims, especially Emmie Paris, as a "posthumous celebrity" (*Odle v. Superior Court* (1982) 32 Cal.3d 932, 940, 187 Cal.Rptr. 455, 654 P.2d 225), this case does not present the situation of an outsider defendant against a victim with "long and extensive ties to the community."[FN4] (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 46, 17 Cal.Rptr.3d 710, 96 P.3d 30 [distinguishing *Williams* on similar grounds].)

FN4. Defendant also argues that the Schoenthaler survey placed the percentage of the community that had prejudged the case at 46 percent, more than the 29 percent in the earlier Peacock survey that had been found to have judged the defendants guilty, on which the trial court's decision was partly based. The 46 percent figure, however, is misleading. That figure comprises a percentage of eligible jurors surveyed who prejudged the case because they either (1) were categorically against the death penalty; or (2) had formed an opinion that if defendants were guilty, they should get the death penalty; or (3) had formed the

opinion that defendants were guilty. But the first two categories are not pertinent to a change in venue motion. As noted, the Schoenthaler survey reported 30 percent of eligible juror respondents had prejudged defendants' guilt, a figure virtually equal to the finding of the Peacock survey.

In sum, our independent review of the record in light of the relevant factors discussed above does not support defendant's contention that the trial court abused its discretion in denying the change of venue motion.[FN5]

FN5. One shortcoming in the voir dire proceeding, which was conducted exclusively by the trial judge, appears in the record. As noted above, nine of 12 jurors indicated some familiarity with the case in their questionnaires. The questionnaires asked what details of the case the jurors remembered but a number of jurors did not indicate the extent to which they were familiar with the case, stating only that they "read about it" in the newspaper. The trial court did not voir dire the jurors on the subject of their knowledge and whether they had formed an opinion. Although the jurors professed in their questionnaires not to have formed an opinion, "[a] juror's declaration of impartiality ... is not conclusive." (*Williams, supra*, 48 Cal.3d at p. 1129, 259 Cal.Rptr. 473, 774 P.2d 146.)

As we stated in *People v. Jennings* (1991) 53 Cal.3d 334, 360, 279 Cal.Rptr. 780, 807 P.2d 1009: "[W]e examine 'the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect.'" The lack of such voir dire in this case is therefore troubling, particularly in light of the fact that prospective jurors indicated in preliminary questionnaires that they had heard of the case. Given the totality of the circumstances, however—the sporadic nature of the pretrial publicity, the fact that the jurors professed to form no opinion, and the other factors discussed above—it does not appear the trial court's failure to engage in this kind of voir dire led to an erroneous denial of the voir dire request.

Vieira, 35 Cal. 4th at 278-83.

1.    Legal Standards

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. Skilling, 561 U.S. at 377-78; Irvin, 366 U.S. at 722. The Constitution further provides that the trial shall occur "in the State where the . . . Crimes . . . have been committed." Art. III, § 2, cl. 3; see also Amend. 6 (right to trial by "jury of the State and district wherein the crime shall have been committed"). "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" Skilling, 561 U.S. at 378 (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

Nevertheless, "juror impartiality, we have reiterated, does not require ignorance." Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (Jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors

1   will not have formed some impression or opinion as to the merits of the case."); Reynolds v.

2   United States, 98 U.S. 145, 155–156 (1879) ("[E]very case of public interest is almost, as a

3   matter of necessity, brought to the attention of all the intelligent people in the vicinity, and

4   scarcely any one can be found among those best fitted for jurors who has not read or heard of it,

5   and who has not some impression or some opinion in respect to its merits.").

6        To merit relief for violation of his due process rights due to pretrial publicity, Petitioner

7   must demonstrate that the case is one in which prejudice is presumed, or he must demonstrate

8   actual prejudice. Skilling, 561 U.S. at 379, 385.

9        2.    Presumed Prejudice

10       "A presumption of prejudice . . . attends only the extreme case." Id. at 381.   The

11   Supreme Court has determined that pretrial publicity so manifestly tainted a criminal prosecution

12   that prejudice must be presumed in only three cases: Rideau v. Louisiana, 373 U.S. 723 (1963);

13   Estes v. Texas, 381 U.S. 532 (1965); and Sheppard v. Maxwell, 384 U.S. 333 (1966).

14       "The foundation precedent is Rideau."  Skilling, 561 U.S. at 379.  In Rideau, the case

15   turned on an actual filmed confession broadcast to the entire community.  Rideau, 373 U.S. at

16   724.  "What the people [in the community] saw on their television sets," the Supreme Court

17   observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail

18   the commission of the robbery, kidnapping, and murder." Id. at 725.  "[T]o the tens of thousands

19   of people who saw and heard it," the Supreme Court explained, the interrogation "in a very real

20   sense was Rideau's trial—at which he pleaded guilty."  Id. at 726.  The Supreme Court therefore

21   "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir

22   dire," that "[t]he kangaroo court proceedings" trailing the televised confession violated due

23   process.  Id. at 726–727.

24       In the two cases to follow Rideau, the analysis and holding turned on the massive media

25   interference with court proceedings and the constant and pervasive media coverage during trial.

26   Skilling, 561 U.S. at 379-80.  In Estes, "extensive publicity before trial swelled into excessive

27   exposure during preliminary court proceedings as reporters and television crews overran the

28   courtroom and 'bombard[ed] ... the community with the sights and sounds of' the pretrial

1    hearing. The media's overzealous reporting efforts, we observed, 'led to considerable disruption'

2    and denied the 'judicial serenity and calm to which petitioner was entitled.'" Id. (quoting Estes,

3    381 U.S. at 536.  In Sheppard, the Supreme Court noted that "bedlam reigned at the courthouse

4    during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into

5    the role of celebrities."  Sheppard, 384 U.S. at 353, 355.  Pretrial publicity consisted of "months

6    [of] virulent publicity about [the defendant] and the murder."  Id. at 354.  Ultimately, the

7    Supreme Court "upset the murder conviction because a 'carnival atmosphere' pervaded the trial.

8    Skilling, 561 U.S. at 380 (quoting Sheppard, 384 U.S. at 358).

9         Petitioner's case is immediately distinguishable from Estes and Sheppard.  He does not

10   allege, nor is there any evidence, that media coverage during trial interfered with his right to a

11   fair trial.  See Skilling, 561 U.S. at 358 n.14 ("Skilling's reliance on Estes and Sheppard is

12   particularly misplaced; those cases involved media interference with courtroom proceedings

13   during trial. [Citation.]  Skilling does not assert that news coverage reached and influenced his

14   jury after it was empaneled.").  Rideau is the only case in which the Supreme Court overturned a

15   conviction based on pretrial publicity.

16        Substantial differences also separate the instant case from Rideau. First, the publicity in

17   this case was not pervasive and constant.  There were news articles and television broadcasts

18   concerning the case around the time of the murders between May 22 and June 1, 1990.  Vieira,

19   35 Cal. 4th at 280.  However, the coverage quickly subsided and was not persistent and

20   pervasive.  Id.  There was additional coverage between November 1990 and February 1991

21   reporting on the preliminary hearings.  CT 1155-1204.  Then there were some brief

22   announcements concerning trial dates and a reference to the murders in an article covering a

23   different crime. CT 1201-03.  Jury selection commenced on August 9, 1991.  CT 1255.

24   "[P]retrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair

25   trial." Nebraska Press Assn. v. Stuart, 427 U.S. 539, 554 (1976).  In the rare case that prejudice is

26   presumed, there will have been a "'barrage of inflammatory publicity immediately prior to trial,'

27   [Citation], amounting to a 'huge . . . wave of public passion.'" Patton v. Yount, 467 U.S. 1025,

28   1033 (1984) (quoting Murphy v. Florida, 421 U.S. 794, 798 (1975) and Irvin, 366 U.S. at 728).

1    Here, the coverage was not at all pervasive and constant leading up to trial.  Certainly there was

2    no barrage of inflammatory publicity immediately prior to trial or in the six months leading up to

3    trial.  In addition, the newspaper articles Petitioner points to were collected from at least eight

4    different publications, and many of those publications were not in general circulation in

5    Stanislaus County.  This cannot be considered a "barrage."  And, the length of time between the

6    flurry of initial news reports and trial mitigates any bias the media might have created.  See

7    Patton, 467 U.S. at 1034 ("That time soothes and erases is a perfectly natural phenomenon,

8    familiar to all.").

9         In addition, the vast amount of publicity was not highly inflammatory and did not give

10   rise to a "wave of public passion."  Id. at 1033.  The articles were mostly factual in nature, not

11   editorial.  See Randolph v. California, 380 F.3d 1133, 1142-43 (9th Cir. 2004).  The coverage

12   was no more extensive than what usually occurs in a case such as this.  Petitioner was not

13   mentioned in the initial reports.  CT 1155-1170.  Many suspects were named and this would tend

14   to obscure Petitioner's name.  While terms such as "terror," "brutal," "grisly," and "rampage"

15   were used, they referred to the crime itself, not to Petitioner.

16        Some articles contained inflammatory facts, such as the discovery of a cache of pipe

17   bombs and weapons, as well as neo-Nazi and Ku Klux Klan materials.  However, the bombs and

18   weapons concerned Gerald Cruz, not Petitioner, and they were not related to the murder.  CT

19   1174, 1176, 1179, 1180.  As for the racial materials, the articles were not conclusive and it was

20   clear that the attack was not racially motivated.  CT 1174, 1179, 1181, 1184, 1187, 1189.  Also,

21   later articles acknowledged that the attack was not racially motivated and that officials had found

22   nothing officially tying the group to any neo-Nazi organization or group.  CT 1178.

23        Petitioner points to a prejudicial article in which it was reported that Petitioner had

24   admitted to Detective Deckard that he had slashed a woman's throat and nearly decapitated her.

25   CT 1200.  This evidence was later ruled inadmissible.  However, a confession later ruled

26   inadmissible is not in and of itself so inflammatory that voir dire could not identify jurors who

27   had viewed it and formed an opinion based on it.  Patton, 467 U.S. at 1029 (pretrial publicity

28   included report of defendant's confession); Randolph, 380 F.3d at 1142-43; Fetterly v. Paskett,

163 F.3d 1144, 1146 (9th Cir. 1998); United States v. McVeigh, 153 F.3d 1166, 1182-83 (10th Cir. 1998).  This single report of an alleged confession is not comparable to the confession in Rideau.  The report was third-hand and appeared in a news article.  This is vastly different from the televised confession in Rideau.  As the Supreme Court noted in Rideau, "the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged."  Rideau, 373 U.S. at 726.  "[T]he people of Calcasieu Parish saw and heard, not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute."  Id. at 727.

Petitioner argues that the surveys conducted before and after his trial reveal that the juror exposure to publicity was pervasive.  This argument is unavailing.  The pretrial survey showed that approximately two-thirds of the respondents remembered hearing of the case, and twenty-nine percent had formed an opinion that the suspects were guilty.  Vieira, 35 Cal. 4th at 280.  The juror questionnaires revealed that approximately two-thirds of the potential jurors had heard of the murders, but only thirteen percent had formed an opinion as to guilt.  Id. at 281.  The Supreme Court has stated that the number of jurors who remembered the case is "essentially irrelevant."  Patton, 467 U.S. at 1035.  Rather, the relevant question is whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant."  Irvin, 366 U.S. at 723.  Here, the proportion of potential jurors, thirteen percent, who had formed opinion as to guilt is substantially less than sixty-two percent of potential jurors dismissed for cause due to opinions as to the defendant's guilt in Irvin, and the seventy-seven percent of potential jurors who said they would carry an opinion as to the defendant's guilt into the jury box in Patton.  Irvin, 366 U.S. 717; Patton, 467 U.S. at 1029; see also Goss v. Nelson, 439 F.3d 621, 634 (10th Cir. 2006); Murphy, 421 U.S. at 803.

In addition, the size and characteristics of the community from which the venire was drawn was much different from Rideau.  In Rideau, the venire was drawn from a parish of 150,000 people.  Rideau, 373 U.S. at 724.  Stanislaus County, on the other hand, was more than double the size with a population of 370,000.

1    Based on the foregoing, the state court reasonably concluded that this was not an extreme

2  case wherein prejudice should be presumed from pretrial publicity.

3         3.    Actual Prejudice

4    "To establish actual prejudice, the defendant must demonstrate that the jurors exhibited

5  actual partiality or hostility that could not be laid aside."  United States v. Sherwood, 98 F.3d

6  402, 410 (9th Cir. 1996).

> When pretrial publicity is at issue, "primary reliance on the judgment of the trial
> court makes [especially] good sense" because the judge "sits in the locale where
> the publicity is said to have had its effect" and may base her evaluation on her
> "own perception of the depth and extent of news stories that might influence a
> juror." Mu'Min, 500 U.S., at 427 []. Appellate courts making after-the-fact
> assessments of the media's impact on jurors should be mindful that their
> judgments lack the on-the-spot comprehension of the situation possessed by trial
> judges.

12  Skilling, 561 U.S. at 386.

13    In this case, the trial judge considered the impact of pretrial publicity on the jurors who

14  served on Petitioner's case.  The Court noted:

> [N]ine out of the 12 jurors in Mr. Vieira's case had heard of it.  There is no record
> that any recalled any particular details about the case and none of them stated they
> had formed an opinion of Mr. Vieira's guilt or innocence or what penalty he
> should receive if found guilty.  None of those 12, the court recalls, were
> challenged for cause and the court recalls that Mr. Ligda had several peremptory
> challenges unused when the jury was sworn.

19  RT 2060-61.

20    In fact, Ligda had used all of his peremptory challenges.  RT 2063.  When the court was

21  informed of this, the court stated:

> If the record established that any of the jurors had expressed opinions about Mr.
> Vieira's guilt or innocence, but they could put aside or overcome, the court might
> very well have to reconsider its ruling based on Mr. Ligda's exercise of all the
> peremptory challenges.  But, again, what the court recalls, none of the jurors
> being challenged for cause and none having expressed that they had an opinion of
> Mr. Vieira's guilt or innocence or penalty, the Court still feels that the jury
> selected was one which provided Mr. Vieira with a fair trial.

26  RT 2064.

27    The record does not reveal any partiality or hostility on the part of any of the seated

28  jurors to call the trial court's conclusion into question.  While nine of the jurors had recalled

1    hearing about the case, this is insignificant.  It is well-established that "juror impartiality . . . does

2    not require ignorance."   Skilling, 561 U.S. at 381 (citing Irvin, 366 U.S. at 722) (Jurors are not

3    required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best

4    qualified to serve as jurors will not have formed some impression or opinion as to the merits of

5    the case."); Reynolds, 98 U.S. at 155–156 ("[E]very case of public interest is almost, as a matter

6    of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any

7    one can be found among those best fitted for jurors who has not read or heard of it, and who has

8    not some impression or some opinion in respect to its merits.").

9         Petitioner also looks to comments made by prospective jurors who were excused and

10   some who had responded to surveys.  These comments are irrelevant to a determination whether

11   the jurors who served were actually prejudiced.  "Statements by nonjurors do not themselves call

12   into question the adequacy of the jury-selection process; elimination of these venire members is

13   indeed one indicator that the process fulfilled its function."  Skilling, 516 U.S. at 389 n.24.  Thus,

14   Petitioner fails to demonstrate that any of the seated jurors were actually prejudiced.

15        4.    Conclusion

16        Based on the foregoing, the state court adjudication of this claim did not result in a

17   decision that was not contrary to or an unreasonable application of clearly established Federal

18   law, or an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

19   2254(d).  The claim is denied.

20   **M.    Claim 13**

21        Petitioner contends that his constitutional rights under the Sixth and Fourteenth

22   Amendments were denied when the trial court excluded the testimony of expert Randy Cerny

23   during the guilt phase of the trial.

24        This claim was raised on direct appeal and denied on the merits.  Therefore, re-litigation

25   of the claim is barred unless Petitioner can satisfy the provisions of the AEDPA.  See 28 U.S.C.

26   § 2254(d); Richter, 131 S. Ct at 784.  The California Supreme Court denied the claim as follows:

27        Defendant contends the trial court erred in refusing to admit at the guilt phase the
          testimony of Randy Cerny. Cerny was a former Stanislaus County Sheriff's
28        detective who specialized in the study of cults. Defense counsel offered Cerny's

testimony to establish that defendant, under the mind control techniques of Cruz, was unable to form the mental state required for first degree murder. The trial court excluded Cerny's testimony because he was not a qualified expert on whether defendant had a "mental defect, mental disorder, or mental disease" at the time he committed the murders. Defendant claims the trial court erred, and that the error deprived him of his rights to due process and compulsory process under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. We conclude there was no error.

A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10, 82 Cal.Rptr.2d 413, 971 P.2d 618.) No such abuse occurred here. "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. [Citation.] Sections 28 [[FN9]] and 29 [[FN10]] permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state." (*People v. Coddington* (2000) 23 Cal.4th 529, 582, 97 Cal.Rptr.2d 528, 2 P.3d 1081, overruled on another point by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.) Here, the trial court concluded that Cerny, who was not a psychologist or a psychiatrist, was not qualified to render an opinion as to whether defendant suffered from a mental illness at the time he committed the murders that would raise a doubt about whether defendant had the mental state requisite for first-degree murder; nor was Cerny qualified to testify generally about the relationship between mental illness and certain types of behavior. (See *Coddington* at pp. 582–583, 97 Cal.Rptr.2d 528, 2 P.3d 1081.) We conclude the trial court did not abuse its discretion in determining that Cerny's testimony was not relevant to any guilt phase issue and should be excluded.

FN9. Section 28 states: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [¶] (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing. [¶] (c) This section shall not be applicable to an insanity hearing pursuant to Section 1026. [¶] (d) Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."

FN10. Section 29 states: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

1

2   Vieira, 35 Cal. 4th at 291-92.

3       A criminal defendant has a well-recognized constitutional right to present a complete

4   defense.  Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due

5   Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation

6   clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful

7   opportunity to present a complete defense.'").  Necessary to the realization of this right is the

8   ability to present evidence, including the testimony of witnesses.  Washington v. Texas, 388 U.S.

9   14, 19 (1967).

10      However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is

11  subject to reasonable restrictions," such as evidentiary and procedural rules.  United States v.

12  Scheffer, 523 U.S. 303, 308 (1998).  In fact, "state and federal rulemakers have broad latitude

13  under the Constitution to establish rules excluding evidence from criminal trials," id., and the

14  Supreme Court has indicated its approval of "well-established rules of evidence [that] permit

15  trial judges to exclude evidence if its probative value is outweighed by certain other factors such

16  as unfair prejudice, confusion of the issues, or potential to mislead the jury."  Holmes v. South

17  Carolina, 547 U.S. 319, 326 (2006).  Evidentiary rules do not violate a defendant's constitutional

18  rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or

19  disproportionate to the purposes they are designed to serve."  Id. at 324 (alteration in original)

20  (internal quotation marks omitted); see also Scheffer, 523 U.S. at 315 (explaining that the

21  exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it

22  "significantly undermined fundamental elements of the accused's defense").  In general, it has

23  taken "unusually compelling circumstances . . . to outweigh the strong state interest in

24  administration of its trials."  Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983).

25      In the Supreme Court cases cited by Petitioner, however, the high court addressed

26  established state evidentiary rules.  In Crane, the Supreme Court rejected the Kentucky Supreme

27  Court's ruling that "once a confession has been found voluntary, . . ., the evidence that supported

28

1  that finding may not be presented to the jury for any other purpose." Crane, 476 U.S. at 687.  In

2  Washington v. Texas, the Supreme Court determined that statutes which prevented codefendants

3  or co-participants in a crime from testifying for one another, thus precluding the defendant from

4  introducing his accomplice's testimony that the accomplice had in fact committed the crime,

5  violated the Sixth Amendment because "the State arbitrarily denied [the defendant] the right to

6  put on the stand a witness who was physically and mentally capable of testifying to events that

7  he had personally observed." Washington, 388 U.S. at 23.  In Chambers, the Supreme Court

8  "found a due process violation in the combined application of Mississippi's common-law

9  'voucher rule,' which prevented a party from impeaching his own witness, and its hearsay rule

10  that excluded the testimony of three persons to whom that witness had confessed. Scheffer, 523

11  U.S. at 316 (citing Chambers, 410 U.S. at 302).

12       In this case, the issue concerns a discretionary ruling by the trial judge.  As the Ninth

13  Circuit pointed out in Brown v. Horell, "the Supreme Court has not decided any case either

14  'squarely address[ing]' the discretionary exclusion of evidence and the right to present a

15  complete defense or 'establish[ing] a controlling legal standard' for evaluating such exclusions."

16  Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) (quoting Moses v. Payne, 555 F.3d 742, 757

17  (9th Cir. 2009)).  This is fatal to Petitioner's claim.  He cannot, as the petitioners in Brown and

18  Moses could not, show that the state court's ruling was either contrary to or an unreasonable

19  application of clearly established Supreme Court precedent.

20       Even if the Court could consider whether the trial court abused its discretion in excluding

21  Cerny's testimony during the guilt phase, the claim would still fail.  As noted by the California

22  Supreme Court, the trial court concluded that defense counsel intended to offer Cerny's

23  testimony to demonstrate that Petitioner could not form the mental state required for first degree

24  murder due to the mind control techniques utilized by Cruz.  This conclusion was not

25  unreasonable.  Ligda stated he intended to call Cerny to testify regarding the subject of mind

26  control. RT 1614. Cerny himself stated he was asked to "make a determination as to whether or

27  not I felt Mr. Vieira was subjected to any of the classical signs of mind control."  RT 1608.  He

28  further stated he would conclude, based on his findings, whether Petitioner acted in accordance

1  with mind control.  RT 1608.  In essence, Cerny would have testified whether Petitioner actually

2  formed a mental state which was an element of the charged crime.  This type of evidence fell

3  squarely within California Penal Code § 28.  Thus, the state court reasonably concluded that

4  Cerny was not a qualified medical expert who could offer such testimony.

5        In addition, Petitioner cannot demonstrate that the alleged error had "substantial or

6  injurious effect or influence on the jury's verdict."  <u>Brecht</u>, 507 U.S. at 623.  As previously

7  discussed, there was already evidence presented that Petitioner was a member of a cult run by

8  Cruz, that Cruz was the leader, that Cruz abused him and dominated him, that Petitioner took

9  orders from Cruz, and that Petitioner was essentially a slave.  There was also substantial

10  evidence that Petitioner premeditated and deliberated on the murders.  He was part of the crime

11  from planning, through commission, to conclusion.  He was given an assignment which he

12  completed.  He killed Paris by beating her, stabbing her and repeatedly slashing her throat.  He

13  later stated that the plan had been to "do them" and leave no witnesses, and that everyone at the

14  house had deserved to die.  Therefore, the exclusion of Cerny's testimony at the guilt phase

15  could not have had a substantial or injurious effect on the verdict.

16        1.   <u>Teague</u>

17        Respondent alleges that the claim is barred by <u>Teague</u>.  However, this claim fails not

18  because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

19  because the claim lacks merit for the reasons discussed above.

20  **N.    Claim 14**

21        Petitioner claims that his constitutional rights under the Fifth, Sixth, Eighth and

22  Fourteenth Amendments were violated when the trial court denied his pretrial motion to exclude

23  his May 23, 1990, statement from evidence.  He contends his statement was involuntary because

24  law enforcement refused to terminate the interview after he requested they do so.

25        Petitioner raised this claim in his state habeas petition.  The California Supreme Court

26  found that Petitioner had procedurally defaulted this claim as it was untimely and also because

27  Petitioner could have raised it on direct appeal but failed to do so.  In addition, the claim was

28  denied on the merits.  When considering the merits, Petitioner bears the burden to show "there

1  was no reasonable basis for the state court to deny relief," <u>Richter</u>, 131 S. Ct. at 784, and this

2  Court "must determine what arguments or theories supported or . . . *could have supported*, the

3  state court's decision; and then it must ask whether it is possible fair-minded jurists could

4  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

5  this Court." <u>Id</u>. at 786 (emphasis added).

6       1.    <u>Background</u>

7       Defense counsel filed motions in limine to exclude Petitioner's various statements to law

8  enforcement.  CT 1098, 1103-04, 1127, 1129-30.  Among the statements he sought to exclude

9  was the interview conducted on May 23, 1990.  A hearing was held on August 12, 1991.  RT 47-

10  161.   At the conclusion of the hearing, the trial court determined that the statement was

11  admissible.  RT 161-62.  The trial court stated that Petitioner had been properly Mirandized and

12  that the statements were not coerced.  RT 161.  With respect to Petitioner's statement that he

13  wished to be taken to jail, the trial court concluded that Petitioner was not asking to terminate the

14  conversation; rather, he was expressing his fear of the consequences when he would be taken to

15  jail.  RT 161-62.

16       2.    <u>Legal Standards</u>

17       In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the Supreme Court held that "the

18  prosecution may not use statements, whether exculpatory or inculpatory, stemming from

19  custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

20  effective to secure the privilege against self-incrimination."  As to the procedural safeguards to

21  be employed, "[p]rior to any questioning, the person must be warned that he has a right to remain

22  silent, that any statement he does make may be used as evidence against him, and that he has a

23  right to the presence of an attorney, either retained or appointed." <u>Id</u>.  Nevertheless, "'[t]he

24  defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is

25  made voluntarily, knowingly and intelligently.'" <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)

26  (quoting <u>Miranda</u>, 384 U.S. at 444, 475).

27       3.    <u>Request to Go to Jail</u>

28       Petitioner first argues that he made a request to terminate the interview when he asked the

detective to take him to jail.  He contends that the detectives ignored his requests and continued with the interrogation in violation of his constitutional rights.  Under <u>Miranda</u>, if a suspect indicates "at any time prior to or *during* questioning, that he wishes to remain silent, the interrogation must cease."  <u>Miranda</u>, 384 U.S. at 473-74 (emphasis added).

The transcript of the interview shows that toward the end of the interview, Petitioner asked the detectives: "You tell me where I stand right now . . . . Am I gonna leave tonight or are you guys gonna keep me here?"  Pet. Exhs., vol. 6, pp. 1822-23.  Later, Petitioner stated: "You guys take me from here straight to jail right now."  <u>Id</u>. at 1830.  Petitioner argues this was a clear invocation of his right to terminate the interview.  However, when viewed in context, the statement does not appear to be a request to take him to jail.  The conversation, in relevant part, was as follows:

> [Petitioner]: All I'm thinkin [sic]
>
> [Detective] Bennett: Your [sic] thinking about that
>
> [Petitioner]: You guys take me from here straight to jail right now
>
> [Detective] Bennett: What I'm concerned about is this knife issue though, be straight with me on that?
>
> [Petitioner]: I'm straight with you
>
> [Detective] Bennett: Alright
>
> [Petitioner]: You know how much it took for me to tell you about these people
>
> [Detective] Bennett: I know
>
> [Petitioner] I been with for three years, I, I got like you said I got a pact with these people.

<u>Id</u>. at 1830.

Not long after, Petitioner again states: "That's why I'm scared, you know what I mean? . . . Not just because you guys put me, I, I'm in danger."  <u>Id</u>. at 1832-33.

Based on the context, the state court reasonably concluded that Petitioner was not demanding to be taken to jail, but rather, he was concerned for his safety if and when he was to be taken to jail.  This is illustrated further by Petitioner's statement toward the end of the interview: "I know any information I can give you people can jeopardize my life.  I don't mean

1  by just a simple beating either I can disappear and it wouldn't be hard but these people they

2  could take me out just because I said something about them, incriminating them." Id. at 1846.

3          Moreover, there is no merit to the claim because Petitioner's statement was ambiguous.

4  The Supreme Court has held that "an accused who wants to invoke his or her right to remain

5  silent [must] do so unambiguously." Berghuis v. Thompkins, 560 U.S. 370, 381 (2010).  "If an

6  ambiguous act, omission, or statement could require police to end the interrogation, police would

7  be required to make difficult decisions about an accused's unclear intent and face the

8  consequence of suppression "if they guess wrong." Id. at 382 (quoting Davis v. United States,

9  512 U.S. 452, 461 (1994)).  In a very similar situation, the defendant in DeWeaver v. Runnels

10  asked to "go back to jail" during a custodial interrogation.  DeWeaver v. Runnels, 556 F.3d 995

11  (9th Cir. 2009).  The Ninth Circuit concluded that the state court could reasonably conclude that

12  the defendant's request was not an invocation of his right to silence.  Id. at 1002.  The same

13  conclusion holds true here.

14          4.      Petitioner's Condition and Police Deception

15          Petitioner also contends that his statements were involuntary because he was "exhausted"

16  and "obviously sleep-deprived."   In addition, he claims the investigators made

17  misrepresentations which made his confession involuntary.

18          The Supreme Court has made clear that a statement is involuntary when the suspect's

19  "will was overborne in such a way as to render his confession the product of coercion." Arizona

20  v. Fulminante, 499 U.S. 279, 288 (1991).  In determining whether a statement is voluntary,

21  Supreme Court precedent requires consideration of "the totality of all the surrounding

22  circumstances—both the characteristics of the accused and the details of the interrogation."

23  Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412

24  U.S. 218, 226 (1973)). These surrounding circumstances include "not only the crucial element of

25  police coercion, Colorado v. Connelly, 479 U.S. 157, 167 (1986)," but may also include "the

26  length of the interrogation, its location, its continuity, the defendant's maturity, education,

27  physical condition, and mental health." Withrow v. Williams, 507 U.S. 680, 693 (1993).

28          In reviewing the totality of the circumstances, it is clear the state court could reasonably

178

1   conclude that Petitioner's statements were voluntary and not the product of police coercion.

2   Petitioner was admittedly tired, but the transcript shows he was engaged, fully

3   responsive, and articulate.  None of his responses revealed such an exhausted state that his will

4   was overborne.  Nor did the statements and misrepresentations of the detectives render the

5   confession involuntary.  While it is true that the detectives were not forthcoming on exactly who

6   had implicated Petitioner, this is insufficient to render the confession inadmissible.  See Frazier

7   v. Cupp, 394 U.S. 731, 739 (1969).  "[D]eception does not render confession involuntary.  As

8   long as the decision is a product of the suspect's own balancing of competing considerations, the

9   confession is voluntary."  United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993).

10   A fair-minded jurist could reasonably conclude that Petitioner failed to make a prima

11   facie showing that the trial court erred by failing to exclude the May 23, 1990, statement from

12   evidence.  The claim is denied.

13   **O.    Claim 15**

14   Petitioner next contends his constitutional rights under the Fifth, Sixth, Eighth and

15   Fourteenth Amendments were violated when the trial court erroneously admitted a letter from

16   the prosecutor that memorialized the plea agreement with Michelle Evans.

17   This claim was raised in the state habeas petition.  The California Supreme Court

18   determined that it was untimely and also found that Petitioner could have raised it on direct

19   appeal but failed to do so.  In addition, the California Supreme Court denied the claim on the

20   merits.  When considering the merits, Petitioner bears the burden to show "there was no

21   reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court

22   "must determine what arguments or theories supported or . . . *could have supported*, the state

23   court's decision; and then it must ask whether it is possible fair-minded jurists could disagree

24   that those arguments or theories are inconsistent with the holding in a prior decision of this

25   Court."  Id. at 786 (emphasis added).

26   1.    Background

27   On or around October 1, 1990, Michelle Evans reached a plea agreement with the

28   prosecution.  RT 1211-12.  She signed a second plea agreement on August 21, 1991.  Pet. Exhs.,

vol. 3, p. 730.  The document set forth the agreement as follows:

> In anticipation of the upcoming trials in this matter, this letter is written to finalize the agreement between yourself and the Office of the District Attorney of Stanislaus County, regarding the murders of Dennis Colwell, Emmie Darlene Paris, Franklin Raper and Richard Ritchey on May 21, 1990.
>
> In view of the compelling public interest to prosecute and convict the persons responsible for the murders, the Office of the District Attorney makes the following representations:
>
> A.  The prosecution will make favorable recommendations as further outlined below, only if:
>
>> (1)  You make yourself available as a witness in the case at all trials, re-trials and other court appearances as required.
>>
>> (2)  You testify fully and fairly as to your knowledge of the facts out of which the charges arose.
>
> B.  If the above items are not fulfilled then the District Attorney may proceed against you on all pending charges as if no agreement had been made.
>
> C.  If the above items are fulfilled the District Attorney's office will make the following recommendations:
>
>> (1)  In Stanislaus County Municipal Court, Case No. 205866, which charges you with violation of four counts of Penal Code Section 187 (Murder) and one count of Penal Code Section 182(1) (Conspiracy to Commit Murder) and a special circumstance allegation, the recommendation will be that the charges against you be dismissed subsequent to the following:
>>
>> (2)  The District Attorney shall cause to be filed a complaint charging you with one count of violation of Penal Code Section 32 (Accessory to Murder), a felony punishable by up to three years in state prison and a fine not exceeding $5,000.
>>
>> (3)  After fulfilling all of the conditions outlined in Paragraph A, you will plead guilty or no contest to the violation of Penal Code Section 32 and the prosecution will recommend that you be granted felony probation and be sentenced to a period of time in a local detention facility.
>
> D.  You are advised that the Office of the District Attorney may seek the death penalty for the persons responsible for the murders of Colwell, Paris, Raper, and Ritchey.  California Penal Code Section 128 states as follows:
> "Every person who, by willful perjury or subornation of perjury, procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole."

Id. at 730-31.

The document was submitted into evidence over defense counsel's objection.  RT 1219-

1  20.

2          2.      Review of Claim

3          The admissibility of evidence is generally an issue of state law which does not warrant

4  habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  "The issue for us, always, is whether

5  the state proceedings satisfied due process; the presence or absence of a state law violation is

6  largely beside the point."  Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  "The

7  admission of evidence does not provide a basis for habeas relief unless it rendered the trial

8  fundamentally unfair in violation of due process."  Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.

9  1995) (citing Estelle, 502 U.S. at 67-68).

10          As noted by Respondent, there is no Supreme Court precedent governing a court's

11  discretionary decision to admit evidence as a violation of due process.  In Holley v. Yarborough,

12  the Ninth Circuit stated:

13          The Supreme Court has made very few rulings regarding the admission of
        evidence as a violation of due process. Although the Court has been clear that a
14      writ should be issued when constitutional errors have rendered the trial
        fundamentally unfair, see Williams, 529 US. at 375, 120 S.Ct. 1495, it has not yet
15      made a clear ruling that admission of irrelevant or overtly prejudicial evidence
        constitutes a due process violation sufficient to warrant issuance of the writ.
16      Absent such "clearly established Federal law," we cannot conclude that the state
        court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127
17      S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power
        to issue the writ . . . .
18

19  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

20          Given that there is no governing Supreme Court precedent, Petitioner cannot demonstrate

21  that the state court denial of his claim was contrary to or involved an unreasonable application of

22  Supreme Court precedent.

23          Even if the Court were to consider the claim, it is without merit.  Plainly, the plea

24  agreement between Evans and the prosecution was relevant to her credibility.  While her

25  understanding of the plea agreement was important and relevant, so was the written agreement.

26  In People v. Fauber, the California Supreme Court noted with respect to disclosure of the entire

27  plea agreement:

28          [T]he existence of a plea agreement is relevant impeachment evidence that must

be disclosed to the defense because it bears on the witness's credibility. (*Giglio v. United States* (1972) 405 U.S. 150, 153-155 [31 L.Ed.2d 104, 108-109, 92 S.Ct. 763].) Indeed, we have held that "when an accomplice testifies for the prosecution, full disclosure of any agreement affecting the witness is required to ensure that the jury has a complete picture of the factors affecting the witness's credibility." (*People v. Phillips* (1985) 41 Cal.3d 29, 47 [222 Cal.Rptr. 127, 711 P.2d 423].)

People v. Fauber, 2 Cal. 4th 792, 821 (1992).

In this case, admission of the entire plea agreement provided the jury with a complete picture. There is no question that the state court's decision was reasonable.

Petitioner complains that the reference to Cal. Penal Code § 128 constituted improper vouching. He alleges that Cal. Penal Code § 128 is unconstitutional and a misrepresentation of the law. As previously discussed, Cal. Penal Code § 128 is in fact the law in California, and it is proper to ask a witness whether he or she is aware of the law and the possible consequences of committing perjury that results in execution of an innocent person. Dickey, 35 Cal. 4th at 912. Therefore, admission of this language was not improper. Nor did it constitute improper vouching. "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." Necoechea, 986 F.2d at 1276. Petitioner fails to explain how language setting forth the possible consequences for perjury could constitute vouching. Moreover, there is no probability that the admission of the plea agreement had a substantial or injurious effect on the verdict.

In summary, there is no clearly established Federal law squarely addressing whether admission of irrelevant or overtly prejudicial evidence can constitute a due process violation. Therefore, Petitioner cannot demonstrate that the state court rejection was contrary to or an unreasonable application of Supreme Court authority. The claim is denied.

## P.    Claim 16

In his next ground for relief, Petitioner alleges his due process rights were violated when the trial court erroneously admitted two martial arts daggers known as "sais" into evidence. He claims the sais were irrelevant and highly prejudicial.

1  This claim was also presented in the state habeas petition.  It was denied as untimely and

2 for failure to raise it on direct review.  It was also denied on the merits.  When considering the

3 merits, Petitioner bears the burden to show "there was no reasonable basis for the state court to

4 deny relief," <u>Richter</u>, 131 S. Ct. at 784, and this Court "must determine what arguments or

5 theories supported or . . . *could have supported*, the state court's decision; and then it must ask

6 whether it is possible fair-minded jurists could disagree that those arguments or theories are

7 inconsistent with the holding in a prior decision of this Court."  <u>Id</u>. at 786 (emphasis added).

8  1.  <u>Background</u>

9  Evans testified that during the planning meeting in the trailer, she viewed Ron Willey

10 swinging the sais around while listening to hard rock music.  RT 1260-61.  Evans testified that

11 Willey danced around with the sais and looked "professional[]" while doing it.  RT 1261.

12 Meanwhile, Petitioner was dancing around with a bat.  RT 1261-62.  Evans stated that Cruz had

13 given Willey the sais to dance with.  RT 1268.  There is no evidence that anyone in the group

14 took the sais with them to the Elm Street house.

15  During a search of Cruz's cabin, law enforcement officers discovered the sais.  RT 899-

16 904.  They were admitted into evidence over defense counsel's objection.  RT 1527.

17  2.  <u>Review of Claim</u>

18  As previously discussed in claim 15 above, the admissibility of evidence is generally an

19 issue of state law which does not warrant habeas relief.  <u>Estelle</u>, 502 U.S. at 67.  In addition,

20 there is no Supreme Court precedent governing a court's discretionary decision to admit

21 irrelevant or overtly prejudicial evidence as a violation of due process.  <u>Holley</u>, 568 F.3d at 1101.

22 Thus, Petitioner cannot demonstrate that the state court denial of his claim was contrary to or

23 involved an unreasonable application of Supreme Court precedent.

24  Even if the claim were considered, it is clear the state court reasonably rejected it.  There

25 were many bases on which the sais could have been relevant.  For one, their discovery

26 corroborated Evans' account of the meeting.   In addition, they were relevant to prove one of the

27 overt acts of the conspiracy, to wit, that one or more members had "obtained and armed

28 themselves."  CT 1353.  The fact that Willey and Petitioner danced around together with their

1    weapons showed a "common intent," further proving the existence of a conspiracy.  CT 1359.

2    Finally, the jurors were likely unfamiliar with the martial arts weapons described by Evans.

3    Therefore, their admission was relevant to assist the jury in understanding Evans' description of

4    Willey's and Petitioner's actions.  Since the items were relevant, there can be no due process

5    violation.  Estelle, 502 U.S. at 70.

6        In addition, Petitioner cannot demonstrate prejudice.  Admission of the sais themselves

7    was inconsequential.  The evidence already demonstrated that Petitioner danced around listening

8    to hard rock music in preparation for the attack while swinging a bat that was later recovered

9    with Paris' bloodstains on it.  There is no probability that admission of the sais had a substantial

10   or injurious effect on the verdict.

11       Based on the above, a fair-minded jurist could conclude that Petitioner failed to present a

12   prima facie case that admission of the sais violated his due process rights.  The claim is denied.

13       **Q.    Claim 17**

14       Petitioner alleges his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments

15   were violated because the trial court permitted the admission of prejudicial hearsay statements

16   made by Petitioner's codefendants.  Specifically, Petitioner identifies nine statements related by

17   Michelle Evans that were attributed to Cruz, Beck, and LaMarsh.

18       Petitioner also claims there were hearsay statements made by his codefendants that were

19   quoted by law enforcement during their testimony.  However, he does not identify the testimony

20   or the law enforcement officers involved, nor did he do so in state court.  Under Rule 2(c) of the

21   Federal Rules Governing Section 2254 Cases, a petitioner must state specific, particularized facts

22   which entitle him to relief.  Mayle v. Felix, 545 U.S. 644, 655 (2005); Adams v. Armontrout,

23   897 F.2d 332, 334 (8th Cir. 1990).  The Court will not "sift through voluminous documents . . .

24   in order to divine the grounds or facts which allegedly warrant relief.  Armontrout, 897 F.2d at

25   334.  Since Petitioner fails to state a claim with respect to the alleged hearsay statements related

26   by law enforcement, the Court will only address the nine statements related by Evans.  The nine

27   statements are specifically set forth in claim 1M above.

28       Petitioner presented this claim to the California Supreme Court in his state habeas

petition.  The California Supreme Court denied the claim as untimely.  It also denied the claim on the merits.  When considering the merits, Petitioner bears the burden to show "there was no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786 (emphasis added).

1.    Legal Standards

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  As previously discussed in claim 1M above, the Supreme Court has held that, under the Confrontation Clause, testimonial statements made by a witness who does not appear at trial are inadmissible unless the witness was unavailable to testify and the defendant had a prior opportunity for cross examination.  Crawford v. Washington, 541 U.S. 36, 53-54 (2004). However, the Supreme Court has held that "the Confrontation Clause's reach" is "limited" "to testimonial statements."  Michigan v. Bryant, __ U.S. __, __, 131 S. Ct. 1143, 1152 (2011). Therefore, "non-testimonial statements do not implicate the Confrontation Clause." Moses, 555 F.3d at 754 (citing Whorton v. Bockting, 549 U.S. 406 (2007)).

Although Crawford did not offer a precise definition of testimonial evidence, the Court offered various formulations of the core class of testimonial statements, noting that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or a former trial; and to police interrogations." 541 U.S. at 51-52; see also Davis v. Washington, 547 U.S. 813, 822 (2006) (refining Crawford's analysis of when statements made during a police interrogation are testimonial for purposes of the Sixth Amendment).  Crawford's holding regarding the difference between testimonial and non-testimonial out-of-court statements constitutes "clearly established Federal law" under 28 U.S.C. § 2254(d)(1) for purposes of AEDPA review of the state court's decision.

2.    Review of Claim

As discussed in claim 1M above, the nine hearsay statements were made during and in furtherance of the conspiracy, and therefore, admissible under California law. Cal. Evid. Code § 1223; Sanders, 11 Cal. 4th at 516. Further, the statements were non-testimonial in nature. They were made between conspirators and friends in the midst of the conspiracy. They were not formal pretrial statements that the declarants would expect to be used at a trial. As noted by the Supreme Court, "an incriminating statement in furtherance of the conspiracy would probably never be [] testimonial." Giles v. California, 554 U.S. 353, 374 (2008).

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

In sum, a fair-minded jurist could conclude that Petitioner failed to establish a prima facie case that his constitutional rights were violated by the admission of his codefendants' hearsay statements. The claim fails.

**R.    Claim 18**

Petitioner alleges that the trial court failed to properly instruct the jury on duress. He claims the court improperly instructed the jury that duress could not serve as a defense to a capital offense, and that duress does not apply where the defendant fears only future harm. He further claims the trial court erred by refusing his proposed instruction that duress can negate the element of malice.

Petitioner raised this claim on direct appeal where it was denied on the merits. Therefore, relitigation of the claim is barred unless Petitioner can satisfy the provisions of the AEDPA. See 28 U.S.C. § 2254(d); Richter, 131 S. Ct at 784. The California Supreme Court denied the claim as follows:

> Defense counsel requested the following instruction, which the trial court refused to give: "If the defendant agreed and participated in the plan [to commit murder] in the honest belief that his life or physical safety was in danger if he did not agree and participate, he would not act with malice and could not be guilty of conspiracy to commit murder." Defendant contended, and contends now, that the evidence supported such an instruction and that the trial court therefore erred in refusing to give it. We consider in turn each of the two parts of the instruction, i.e., whether in the present case the defense of duress can negate malice and whether it can be a defense to conspiracy to commit murder.

186

*1. Duress and Malice*

Penal Code section 26 declares duress to be a perfect defense against criminal charges when the person charged "committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." That section also provides that this defense does not apply to crimes "punishable with death." We recently rejected the argument that duress could negate the elements of malice or premeditation, thereby reducing a first degree murder to manslaughter or second degree murder. (*People v. Anderson* (2002) 28 Cal.4th 767, 781–784, 122 Cal.Rptr.2d 587, 50 P.3d 368.) We decline defendant's invitation to reconsider the holding in *Anderson*. Moreover, because duress cannot, as a matter of law, negate the intent, malice or premeditation elements of a first degree murder, we further reject defendant's argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder. (See *Anderson, supra,* 28 Cal.4th at p. 784, 122 Cal.Rptr.2d 587, 50 P.3d 368.)

*2. Conspiracy to Commit Murder*

Defendant contends that although duress may not be a defense to murder, it is a defense to a conspiracy to commit murder. Even assuming he is correct, the trial court committed no error, because the facts did not support a duress instruction. (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685, 160 Cal.Rptr. 84, 603 P.2d 1 [trial court obliged to instruct on a defense theory only when there is substantial evidence to support].)

"The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm." (*People v. Otis* (1959) 174 Cal.App.2d 119, 125, 344 P.2d 342; see also *People v. Bacigalupo* (1991) 1 Cal.4th 103, 125, 2 Cal.Rptr.2d 335, 820 P.2d 559.) In arguing that the evidence supports a duress instruction, defendant points to testimony of Michelle Evans that Cruz had told defendant and the others in the group, in their meeting just before they went off to commit the murders, that if any one of them "messed up" during the attack on Raper, that person would "join" the intended murder victims. Evans testified that Cruz looked directly at defendant when he made that threat. Evans also testified, as recounted above, that Cruz had ordered defendant beaten and tortured on several occasions.

We disagree that substantial evidence supports a duress instruction in the present case. Rather, the evidence points strongly to the fact that defendant's participation in the murders was not principally motivated by a fear for his life, but rather stemmed from his belief in Cruz as a figure of authority. Defendant's behavior immediately after the murder plan had been formulated (swinging a bat and dancing around to rock music), his energetic participation in carrying out the murder plan, and his subsequent statements to Detective Deckard and Mary Gardner that he condoned the murders and that the victims deserved to die, are not consistent with a defense that he was compelled to commit the murders by an immediate and imminent threat to his life. Nor did defendant hint in his conversations with Deckard, Gardner or Evans in the immediate aftermath of the murders that fear for his life was a primary motive. While the fact that defendant was dominated by Cruz is, as discussed below, a factor the jury could consider at

the penalty phase of the trial, it did not constitute duress within the meaning of section 26. The defense of duress was therefore not available to defendant as to any crime.[FN8]

FN8. Trial counsel himself came to recognize the inappropriateness of a duress defense at the guilt phase. When discussing the modification of the duress instruction, he stated: "I tend to agree that the state of the evidence that [the prosecutor] alluded to earlier would not permit a logical argument to the jury that [defendant] was in imminent fear of his life in the first place."

Defendant also claims that a sentence of death for someone who committed a murder under duress would constitute cruel and unusual punishment in violation of the United States and California Constitutions (U.S. Const., 8th Amend. 8; Cal. Const., art. I, § 17) because such an outcome would impose a "penalty '... so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People v. Frierson* (1979) 25 Cal.3d 142, 183, 158 Cal.Rptr. 281, 599 P.2d 587.) We need not decide whether an individual who kills because he faces the imminent choice between taking a life or likely forfeiting his own can be constitutionally sentenced to death. As explained immediately above, that is not this case.

Vieira, 35 Cal. 4th at 289-91.

1.   Legal Standards

As a preliminary matter, the Court notes that any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief.  Estelle, 502 U.S. at 71 (1991) (citing Marshall v. Lonberger, 459 U.S. 422, 438, n.6 (1983)) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").  "'Failure to give [a jury] instruction which might be proper as a matter of state law,' by itself, does not merit federal habeas relief." Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985)).  The Supreme Court has stated instead that a claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The burden on Petitioner is especially heavy "where . . . the alleged error involves the failure to give an instruction." Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006).

Even if constitutional instructional error has occurred, the federal court must still determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial

and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.  A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given.  <u>Clark</u>, 450 F.3d at 916.

       2.    <u>Instructions on Duress and Murder</u>

The jury was instructed with California's standard instruction CALJIC No. 4.40 as follows:

> A person is not guilty of a crime when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:
>
>     1.    Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and
>
>     2.    If such person then believed that his life was so endangered.
>
> This rule does not apply to threats, menaces, and fear of future danger to his life.

CT 1392.

The jury was further instructed with CALJIC No. 4.41 as follows:

> Where a person commits a crime punishable with death, it is not a defense that he committed the act or made the omission charged under threats or menaces of immediate death or bodily injury.
>
> Second degree murder and conspiracy to commit any assault are not punishable with death.
>
> First degree murder without special circumstances and conspiracy to commit second degree murder also are not punishable with death.

CT 1393 (Second and third paragraphs added by trial court).

Petitioner claims that the instructions failed to inform the jury that duress could negate the mens rea of the charged offense.  This claim fails because in California:

> "[D]uress is not a defense to any murder" (*People v. Maury* (2003) 30 Cal.4th 342, 421, 133 Cal.Rptr.2d 561, 68 P.3d 1) *and, in particular, does not negate malice*. (*People v. Anderson* (2002) 28 Cal.4th 767, 783–784, 122 Cal.Rptr.2d 587, 50 P.3d 368.) Duress likewise does not categorically negate premeditation and deliberation, although "[i]f a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder." (*Id.* at p. 784, 122 Cal.Rptr.2d 587, 50 P.3d 368.)

<u>People v. Hinton</u>, 37 Cal. 4th 839, 882-83 (2006) (emphasis added).

Petitioner argues that the instructions, as given, precluded the jury from concluding that

he did not premeditate or deliberate due to duress.  However, as the California Supreme Court found in Hinton, the instructions (CALJIC Nos. 4.40 and 4.41) did not "bar[] the jury from considering whether these threats – or any other facts – prevented defendant from premeditating and deliberating."  Id. at 883.  The California Supreme Court noted that it had recently rejected such an argument in People v. Anderson:

> Defendant also argues that, at least, duress can negate premeditation and deliberation, thus resulting in second degree and not first degree murder. We agree that a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder. As with implied malice murder, this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder. The trial court instructed the jury on the requirements for first degree murder. It specifically instructed that a killing "upon a sudden heat of passion *or other condition precluding the idea of deliberation*" would not be premeditated first degree murder. (Italics added.) Here, the jury found premeditation. In some other case, it might not. It is for the jury to decide. But, unless and until the Legislature decides otherwise, a malicious, premeditated killing, even under duress, is first degree murder.

People v. Anderson, 28 Cal. 4th 767, 784 (2002).  Insofar as Petitioner received the same instruction on first degree murder, the jury was not barred from considering whether Petitioner did not premeditate due to duress.

Petitioner further argues that the trial court should have instructed the jury on voluntary manslaughter under a theory of imperfect duress.  However, the California Supreme Court noted that duress cannot reduce a homicide to manslaughter by negating malice:

> "Manslaughter is 'the unlawful killing of a human being without malice.' (§ 192.) A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"-the unreasonable but good faith belief in having to act in self-defense (see *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Flannel* [(1979)] 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]).'" (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88 [96 Cal.Rptr.2d 451, 999 P.2d 675].) Neither of these two circumstances describes the killing of an innocent person under duress. Nevertheless, defendant argues that we should make duress a third way in which a defendant lacks malice.  No California case has recognized the killing of an innocent person under duress as a form of manslaughter. . . .  Accordingly, we reject defendant's argument that we should create a new form of voluntary manslaughter.

Anderson, 28 Cal. 4th at 781-84.  The Ninth Circuit has recognized that such a theory is not

1  viable under California law.  Beardslee, 358 F.3d at 576, *supplemented sub nom*. Beardslee v.

2  Brown, 393 F.3d 1032 (9th Cir. 2004).  The California Supreme Court's determination on what

3  constitutes the elements of its homicide offenses and defenses is binding on this Court.

        3.    Instructions on Duress and Conspiracy

5       Petitioner further alleges that the instructions misstated California law by advising the

6  jury that duress could not be a defense to conspiracy.  Due process requires that criminal

7  prosecutions "comport with prevailing notions of fundamental fairness" and that "criminal

8  defendants be afforded a meaningful opportunity to present a complete defense."  California v.

9  Trombetta, 467 U.S. 479, 485 (1984).  "As a general proposition a defendant is entitled to an

10 instruction as to any recognized defense for which there exists evidence sufficient for a

11 reasonable jury to find in his favor."  Mathews v. United States, 485 U.S. 58, 63 (1988); see

12 Bradley v. Duncan, 315 F.3d 1091, 1098 (9th Cir. 2002) (applying the Mathews standard to

13 federal habeas petitions challenging state convictions); see also Conde v. Henry, 198 F.3d 734,

14 739 (9th Cir. 1999) ("It is well established that a criminal defendant is entitled to adequate

15 instructions on the defense theory of the case.").  However, a "'mere scintilla' of evidence

16 supporting the defendant's theory is not sufficient to warrant a defense instruction."  United

17 States v. Johnson, 459 F.3d 990, 993 (9th Cir. 2006).  Rather, the failure to instruct on the

18 defense theory of the case constitutes a denial of due process only if "'the theory is legally sound

19 and evidence in the case makes it applicable.'"  See Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir.

20 2009) (quoting Beardslee, 358 F.3d at 577 (as amended)).

21      The instant claim fails because there was no evidence to support an instruction on duress.

22 As stated by the California Supreme Court, a duress defense will not lie unless the threat is

23 immediate and imminent.  Vieira, 35 Cal. 4th at 290.  In this case, there was no evidence of an

24 immediate or imminent threat to Petitioner.  At most, there was evidence of an implied threat of

25 future harm.  This is insufficient.  Moreover, the state court reasonably determined that the

26 evidence showed that Petitioner acted not out of duress but out of his "belief in Cruz as a figure

27 of authority."  Id.  The actions of Petitioner belied any claim that he acted out of an immediate

28 fear for his life.  Instead, Petitioner's actions evinced someone who readily and enthusiastically

1  participated in the planning and execution of the crime.  After the crime, he never stated that he

2  acted out of fear; rather, he stated he condoned the murders.

3       In addition, Petitioner cannot demonstrate prejudice, since there was no evidence of

4  duress to support an instruction.

5       4.   Teague

6       Respondent alleges that the claim is barred by Teague. However, this claim fails not

7  because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

8  because the claim lacks merit for the reasons discussed above.

9       5.   Conclusion

10      Based on the foregoing, the state court determination that the jury instructions on duress

11  did not violate Petitioner's due process rights was not unreasonable.  In addition, the state court

12  reasonably determined that any error could not have had a substantial or injurious effect on the

13  jury's verdict.  Petitioner fails to demonstrate that the state court denial of his claim was contrary

14  to, or an unreasonable application of, clearly established Federal law, or an unreasonable

15  determination of the facts.  The claim is denied.

16  **S.    Claim 19**

17      Petitioner claims the cumulative prejudicial effect of all guilt phase errors deprived him

18  of a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

19      The claim was raised on direct appeal to the California Supreme Court.  The claim was

20  denied on the merits.  In rejecting the claim, the California Supreme Court stated: "Because we

21  find no valid claim of error on appeal, we reject defendant's contention that his guilt phase

22  judgment must be reversed for cumulative error."  Vieira, 35 Cal. 4th at 294.  Petitioner also

23  raised the claim on state habeas review, relying on several claims that were presented for the first

24  time.  The claim was denied as untimely and on the merits.

25      In Parle v. Runnels, the Ninth Circuit found that "[t]he Supreme Court has clearly

26  established that the combined effect of multiple trial court errors violates due process where it

27  renders the resulting criminal trial fundamentally unfair."  Parle, 505 F.3d at 927 (citing

28  Chambers v. Mississippi, 410 U.S. 284, 298, 302–03 (1973)).  The Ninth Circuit stated that

1   "[t]he cumulative effect of multiple errors can violate due process even where no single error

2   rises to the level of a constitutional violation or would independently warrant reversal."  Id.

3   (citing Chambers, 410 U.S. at 290 n.3).

> [C]umulative error warrants habeas relief only where the errors have "so infected
> the trial with unfairness as to make the resulting conviction a denial of due
> process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40
> L.Ed.2d 431 (1974). Such "infection" occurs where the combined effect of the
> errors had a "substantial and injurious effect or influence on the jury's verdict."
> Brecht, 507 U.S. at 637, 113 S.Ct. 1710 (internal quotations omitted); see also
> Thomas, 273 F.3d at 1179–81 (noting similarity between Donnelly and Brecht
> standards and concluding that "a Donnelly violation necessarily meets the
> requirements of Brecht"). In simpler terms, where the combined effect of
> individually harmless errors renders a criminal defense "far less persuasive than it
> might [otherwise] have been," the resulting conviction violates due process. See
> Chambers, 410 U.S. at 294, 302–03, 93 S.Ct. 1038.

11  Id.

12      Petitioner has failed to demonstrate that error of a constitutional dimension occurred in

13  his case. Accordingly, "there is nothing to accumulate to a level of a constitutional violation."

14  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Fuller v. Roe, 182 F.3d 699, 704

15  (9th Cir. 1999)).  Thus, the Court cannot conclude that the California Supreme Court's rejection

16  of this claim was objectively unreasonable.  As to those claims of error presented for the first

17  time on state habeas review, Petitioner fails to demonstrate that no fair-minded jurist could have

18  found that he failed to make a prima facie showing of cumulative error.  The claim is denied.

19      Respondent alleges that the claim is barred by Teague. However, this claim fails not

20  because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

21  because the claim lacks merit for the reasons discussed above.

22      The claim is denied.

23      **T.      Claim 20**

24      Petitioner contends that the special circumstance finding does not provide a rational basis

25  for distinguishing those cases in which the defendant is rendered death eligible from those cases

26  in which he is not.  Petitioner argues that the multiple murder special circumstance does not

27  focus on the mental state of the perpetrator.

28      This claim was presented on direct appeal to the California Supreme Court.  Therefore,

relitigation of the claim is barred unless Petitioner can satisfy the provisions of the AEDPA.  See 28 U.S.C. § 2254(d); Richter, 131 S. Ct at 784.  The California Supreme Court denied the claim as follows:

> Defendant claims that the multiple-murder special circumstance violates his Eighth Amendment rights because it fails to adequately narrow the class of murderers who are eligible for the death penalty. We have rejected this argument. (*People v. Coddington, supra,* 23 Cal.4th at p. 656, 97 Cal.Rptr.2d 528, 2 P.3d 1081; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568.) Defendant advances no persuasive reason to reconsider our position.

Vieira, 35 Cal. 4th at 294.

1.    Legal Standards

> To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. See, e.g., Lowenfield v. Phelps, 484 U.S. 231, 244–246, 108 S.Ct. 546, 554–555, 98 L.Ed.2d 568 (1988); Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983).  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both). Lowenfield, *supra*, at 244–246, 108 S.Ct., at 554–555. As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. See Arave v. Creech, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm").   Second, the aggravating circumstance may not be unconstitutionally vague.   Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–1765, 64 L.Ed.2d 398 (1980); see Arave, 507 U.S., at 471, 113 S.Ct., at 1541 (court "'must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer'") (quoting Walton v. Arizona, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–3058, 111 L.Ed.2d 511 (1990)).

Tuilaepa v. California, 512 U.S. 967, 971-72 (1994).

Supreme Court cases have established that a state capital sentencing system must: "1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Kansas v. Marsh, 548 U.S. 163, 173-74 (2006).  If the "state system satisfies these requirements," then the "State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Id. (citing Franklin v. Lynaugh, 487 U.S. 164, 179

194

1   (1988) and Zant, 462 U.S. at 875–876, n.13).

2        2.        Review of Claim

3        In California, a defendant may be sentenced to death for first-degree murder if the trier of

4   fact finds the defendant guilty and also finds true one or more of [19] special circumstances

5   listed in Cal. Penal Code § 190.2.   Tuilaepa, 512 U.S. at 969.   As relevant here, one of the

6   circumstances is: "The defendant, in this proceeding, has been convicted of more than one

7   offense of murder in the first or second degree.   Cal. Penal Code § 190.2(a)(3).   There is no

8   question that this sentencing scheme satisfies constitutional requirements.   First, the subclass of

9   defendants is rationally narrowed to those who have committed multiple murders.   Second, it is

10  not unconstitutionally vague.   In rejecting this same claim in a separate case, the California

11  Supreme Court explained:

12          Defendant asserts that the multiple-murder special circumstance, which formed
            the basis for his death sentence, is "particularly deficient in terms of a narrowing
13          function" for two reasons. First he claims it encompasses an "overly broad class
            of defendants of disparate and varying culpability." To the contrary, the multiple-
14          murder special circumstance focuses on a narrow group of killers: only those who
            have murdered more than one person. Second, defendant asserts the multiple-
15          murder special circumstance improperly focuses on the nature of the act
            committed rather than the defendant's mental state. We are not persuaded. One
16          who is mentally prepared to commit repeated acts of murder, or to commit a
            murderous act that results in the death of two or more persons, is more dangerous
17          to society and more deserving of the ultimate punishment than one who has killed
            once. (See generally *People v. Coddington, supra*, 23 Cal.4th at p. 656 [holding
18          multiple-murder special circumstance constitutional].)

19
    People v. Lucero, 23 Cal. 4th 692, 740 (2000).
20
21        Petitioner's argument that the sentencing scheme is constitutionally infirm because it fails

22  to focus on mental state is without merit.   As noted above, there is no requirement that the

23  special circumstance focus on mental state.   In fact, the Supreme Court has upheld the death

24  penalty when the only special aggravating circumstance was that the defendant had intended to

25  kill or harm more than one person.   See Lowenfield v. Phelps, 484 U.S. 231, 246 (1988) ("the

26  'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty

27  of three counts of murder under the provision that 'the offender has a specific intent to kill or to

28  inflict great bodily harm upon more than one person.'").   Therefore, the state court rejection of

1    this claim was not unreasonable.

2        Respondent alleges that the claim is barred by <u>Teague</u>. However, this claim fails not

3    because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

4    because the claim lacks merit for the reasons discussed above.

5        The state court rejection of this claim was not contrary to or an unreasonable application

6    of clearly established Federal law as determined by the Supreme Court.  The claim is denied.

7        **U.**    **Claim 21**

8        In his next claim, Petitioner contends that the trial court denied his right to present

9    mitigating evidence when it sustained the prosecutor's objection to a portion of Petitioner's

10   mother's testimony during the penalty phase of the trial.

11       The claim was raised and rejected in the California Supreme Court on direct appeal.  The

12   California Supreme Court reasoned as follows:

> At the penalty phase, the defense called defendant's mother, Barbara Vieira, to testify on his behalf. Toward the end of defense counsel's direct examination, he asked her: "What would [your son's] death do to you?" She replied: "His death would destroy me." The prosecution moved to strike her remark and the trial court sustained the motion. Defendant now claims the trial court in so doing committed prejudicial error and violated defendant's Eighth Amendment right to present mitigating evidence.
>
> A statement about how a defendant's death would make the family member suffer is not relevant to an individualized determination of defendant's culpability and may be properly excluded. (*People v. Sanders* (1995) 11 Cal.4th 475, 546, 46 Cal.Rptr.2d 751, 905 P.2d 420.) As we stated in *Sanders*: "The specific questions whether family members would prefer that defendant not be executed or believe that a death sentence will stigmatize them are not, however, strictly relevant to the defendant's character, record or individual personality." (*Ibid.*) As we further clarified in *People v. Ochoa* (1998) 19 Cal.4th 353, 456, 79 Cal.Rptr.2d 408, 966 P.2d 442: "A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character. The jury must decide whether the defendant deserves to die, not whether the defendant's family deserves to suffer the pain of having a family member executed."
>
> In the present case, Barbara Vieira's statement went beyond the expression of her desire that defendant be spared the death penalty, which would have been permissible character evidence, and spoke directly of the impact the execution would have on her. Although the question is close, we conclude the trial court did not abuse its discretion in striking her testimony. Moreover, even if it was error, the error was harmless. It is evident that Barbara Vieira communicated to the jury, by the whole of her testimony, that she loved and valued her son and that his crimes were the result of his association with Cruz and his followers. Her

196

statement that his death would destroy her would not have significantly added to the jury's picture of defendant's character. (See *People v. Heishman* (1988) 45 Cal.3d 147, 194, 246 Cal.Rptr. 673, 753 P.2d 629.)

Vieira, 35 Cal. 4th at 294-95.

1.    Legal Standards

During the selection stage, the Supreme Court has imposed a requirement that the jury make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." Tuilaepa, 512 U.S. at 972-73 (citing Zant, 462 U.S. at 879, and Woodson v. North Carolina, 428 U.S. 280, 303-304 (1976)).  This "requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." Id. (citing Blystone v. Pennsylvania, 494 U.S. 299, 307 (1990)) ("requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence").  The court may not "impede[] the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender" by excluding "relevant mitigating evidence." Skipper v. South Carolina, 476 U.S. 1, 8 (1986).  Nevertheless, the court retains "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Lockett v. Ohio, 438 U.S. 586, 605 n.12 (1978).

2.    Review of Claim

In this case, Petitioner's mother was asked what impact Petitioner's death would have on her.  She replied that "[h]is death would destroy [her]." RT 1847.  The court excluded this evidence as irrelevant.  Petitioner cannot show that this decision was unreasonable insofar as there is no Supreme Court precedent which requires that a defendant be allowed to present execution impact testimony. Stenson v. Lambert, 504 F.3d 873, 892 (9th Cir. 2007) (Petitioner "cannot point to any federal case requiring admission of "execution impact" testimony because there are no such cases").  In fact, three federal circuits have concluded that the Constitution does not require that a capital defendant be permitted to introduce this type of evidence. Stenson, 504 F.3d at 892; United States v. Hager, 721 F.3d 167, 194 (4th Cir. 2013); United States v. Snarr,

1   704 F.3d 368, 401 (5th Cir. 2013).  Execution impact testimony is irrelevant to a defendant's

2   character, prior record or the circumstances of the offense.  Id.

3          Petitioner's mother was permitted and did provide relevant mitigating evidence

4   concerning Petitioner's difficulties growing up, his drug problems, his good nature and love of

5   animals, and his good work ethic.  RT 1822-34.  She further testified to Petitioner's negative

6   transformation once he fell under Cruz's control and became part of Cruz's cult.  RT 1836-43.

7   Finally, she testified to his positive changes once he was removed from Cruz's influence.  RT

8   1847.  Therefore, it is clear that the court did not impede "the sentencing jury's ability to carry

9   out its task of considering all relevant facets of the character and record of the individual

10  offender" by excluding "relevant mitigating evidence."  Skipper, 476 U.S. at 8.  The state court's

11  rejection of this claim was not unreasonable.

12         Respondent alleges that the claim is barred by Teague. However, this claim fails not

13  because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

14  because the claim lacks merit for the reasons discussed above.

15         Petitioner fails to show that the state court rejection of this claim was contrary to or an

16  unreasonable application of Supreme Court precedent.

17         Therefore, the claim is denied.

18  **V.     Claim 22**

19         Petitioner claims the trial court erred by failing to give a proper jury instruction on

20  mitigation.

21         1.     Background

22         Prior to the instruction of the jury, defense counsel requested more specific instruction

23  regarding the particular mitigation offered in the defense case.  The proposed instruction listed

24  sixteen specific factors that the jury should consider.  CT 1453-54.  The prosecutor objected to

25  the listing of the factors in this manner.  RT 1772.  The trial court denied defense counsel's

26  request and instead gave California's standard instruction CALJIC No. 8.85, which mirrored Cal.

27  Penal Code § 190.3.  The instruction read as follows:

28         In determining which penalty is to be imposed on the defendant, you shall

consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

(b) The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects [sic] of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

CT 1472-73.

2.    State Court Decision

The claim was presented on direct appeal to the California Supreme Court. The California Supreme Court denied the claim as follows:

Defendant contends the jury should have been instructed according to requested

instruction No. 2, which would have specified 16 types of penalty phase evidence that could be considered in mitigation under section 190.3, factor (k), permitting the jury to consider "any other circumstance which extenuates the gravity of the crime." For example, the requested instruction would have made clear that the jury could consider "whether the defendant was solicited by others to participate in the crimes" and "whether the defendant occupied a position of leadership or dominance of the other participants in the crimes." As we have made clear, factor (k) is adequate for informing the jury that it may take account of any extenuating circumstance, and there is no need to further instruct the jury on specific mitigating circumstances. (See *People v. Hines* (1997) 15 Cal.4th 997, 1068, 64 Cal.Rptr.2d 594, 938 P.2d 388 [rejecting the need for a "lingering doubt" instruction in addition to factor (k) ].) It is generally the task of defense counsel in its closing argument, rather than the trial court in its instructions, to make clear to the jury which penalty phase evidence or circumstances should be considered extenuating under factor (k).

Vieira, 35 Cal. 4th at 299-300.

3.    Legal Standards

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982) (adopting rule in Lockett). "The standard against which we assess whether jury instructions satisfy the rule of Lockett and Eddings was set forth in Boyde v. California, 494 U.S. 370 (1990)." Johnson v. Texas, 509 U.S. 350, 367-68 (1993). In Boyde, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" Boyde, 494 U.S. at 377 (quoting Franklin, 487 U.S. at 181 (plurality opinion)). In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Johnson, 509 U.S. at 367 (quoting Boyde, 494 U.S. at 380). "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" Id. at 368 (quoting Boyde, 494 U.S. at 381). Further, a single instruction "may not be judged in artificial

1    isolation," but must be considered in light of the instructions as a whole and the entire trial

2    record. Estelle, 502 U.S. at 72.

3         Even if constitutional trial error has occurred, Petitioner is not entitled to relief unless the

4    error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht,

5    507 U.S. at 638.

6         4.    Review of Claim

7         Petitioner complains that CALJIC No. 8.85 was insufficient and the trial court should

8    have supplemented the instruction with defense counsel's proposed instruction specifying

9    particular mitigating factors. This claim is meritless in light of the Supreme Court's decision in

10   Buchanan v. Angelone, 522 U.S. 269 (1998). In Buchanan, the Supreme Court noted that it had

11   "never . . . held that the state must affirmatively structure in a particular way the manner in

12   which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury

13   discretion is constitutionally permissible." Id. at 276-77 (citing Tuilaepa, 512 U.S. at 978–979

14   and Zant, 462 U.S. at 875). "[T]he state may shape and structure the jury's consideration of

15   mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating

16   evidence." Id. at 276 (citing Johnson, 509 U.S. at 362; Penry v. Lynaugh, 492 U.S. 303, 326

17   (1989), aff'd and rev'd on other grounds, 532 U.S. 782 (2001); Franklin, 487 U.S. at 181). There

18   is no argument that the instruction given in this case, CALJIC No. 8.85, in any way foreclosed

19   the jury from considering any relevant mitigating evidence. Moreover, as noted by Respondent,

20   the Supreme Court has examined the language in California's jury instruction on mitigation three

21   times, and upheld it against constitutional challenges every time. See Ayers v. Belmontes, 549

22   U.S. 7 (2006); Brown v. Payton, 544 U.S. 133 (2005); Boyde, 494 U.S. 370. Thus, the state

23   court rejection of the claim was reasonable.

24        Nevertheless, Petitioner complains that those Supreme Court decisions were decided

25   without the benefit of empirical research or an evidentiary record. Petitioner cites to a number of

26   articles published between 1988 and 1998 which he alleges support his contention that jurors do

27   not understand California's jury instruction, in particular, factor (k). To the extent that these

28   articles can be considered evidence, they were not presented to the California Supreme Court in

1    his appeal.  Therefore, the Court cannot consider them here.  Pinholster, 131 S. Ct. at 1398.

2        Respondent alleges that the claim is barred by Teague. However, this claim fails not

3    because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

4    because the claim lacks merit for the reasons discussed above.

5        Petitioner fails to demonstrate that the state court rejection of his claim was contrary to,

6    or an unreasonable application of, clearly established Federal law.  The claim is denied.

7        **W.    Claim 23**

8        In his next claim, Petitioner alleges the trial court erred by failing to delete inapplicable

9    and irrelevant sentencing factors.

10        Petitioner raised this claim in his direct appeal to the California Supreme Court.   In

11   denying the claim, the California Supreme Court stated: "Nor was the failure to delete

12   inapplicable mitigating factors from the instruction constitutional error. (*People v. Osband*

13   (1996) 13 Cal. 4th 622, 704 [].)"  Vieira, 35 Cal. 4th at 299.

14        As set forth in claim 22 above, the jury was instructed with CALJIC No. 8.85.  The legal

15   standard for review of penalty phase instructions is also set forth in claim 22, to wit, "whether

16   there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

17   prevents the consideration of constitutionally relevant evidence."   Boyde, 494 U.S. at 380.

18   Petitioner claims the trial court should have deleted inapplicable factors such as factor (e):

19   "Whether or not the victim was a participant in the defendant's homicidal conduct or consented

20   to the homicidal act."  RT 1770.

21        Petitioner's argument is without merit, since it is plainly not contrary to Supreme Court

22   precedent to instruct the jury with all sentencing factors.  The Supreme Court stated in Gregg v.

23   Georgia:

24        The petitioner objects, finally, to the wide scope of evidence and argument
         allowed at [penalty] hearings. We think that the Georgia court wisely has chosen
25       not to impose unnecessary restrictions on the evidence that can be offered at such
         a hearing and to approve open and far-ranging argument. So long as the evidence
26       introduced and the arguments made at the [penalty] hearing do not prejudice a
         defendant, it is preferable not to impose restrictions. We think it desirable for the
27       jury to have as much information before it as possible when it makes the
         sentencing decision.

28

1 | Gregg v. Georgia, 428 U.S. 153, 203-04 (1976) (citations omitted).

2 |      Thus, there is no requirement that a trial court redact the instructions to include only

3 | those factors deemed applicable.  Moreover, the instruction itself advises the jury to consider the

4 | factors "if applicable."  CT 1472.  In addition, the Ninth Circuit has repeatedly rejected this

5 | claim.  In Williams v. Calderon, the Ninth Circuit stated:

> Williams argues that it was error to read to the jury the entire list of factors the
> state considered relevant to the sentencing decision, even when some did not
> apply. To the contrary, the jury instructions expressly indicated that the jury was
> to consider each factor only "if applicable." Moreover, "[i]t seems clear ... that the
> problem [of jury inexperience] will be alleviated if the jury is given guidance
> regarding the factors about the crime and the defendant that the State,
> representing organized society, deems particularly relevant to the sentencing
> decision." Gregg v. Georgia, 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d
> 859 (1976) (plurality opinion). The reading of the complete list gave the jury
> more guidance, not less. We find nothing in the Constitution prohibiting the very
> practice Gregg encouraged.

12 | Williams v. Calderon, 52 F.3d 1465, 1481 (9th Cir. 1995).

13 |      In Bonin v. Calderon, the Ninth Circuit again rejected the argument, noting that "the

14 | cautionary words 'if applicable' warned the jury that not all of the factors would be relevant and

15 | that the absence of a factor made it inapplicable rather than an aggravating factor."  Bonin v.

16 | Calderon, 59 F.3d 815, 848 (9th Cir. 1995).  Therefore, Petitioner fails to demonstrate that the

17 | state court denial of his claim was contrary to or an unreasonable application of Supreme Court

18 | authority.

19 |      Respondent alleges that the claim is barred by Teague. However, this claim fails not

20 | because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

21 | because the claim lacks merit for the reasons discussed above.

22 |      As discussed above, at the time his conviction became final, Supreme Court authority

23 | held that California's instruction on mitigation was constitutional without redaction, and the

24 | legal landscape at that time would not have compelled a ruling otherwise.  The Eighth

25 | Amendment simply does not require that a jury be instructed on particular statutory mitigating

26 | factors. Buchanan, 522 U.S. at 275-77.

27 |      Petitioner fails to demonstrate that the state court rejection of his claim was contrary to,

28 | or an unreasonable application of, clearly established Federal law.  The claim is denied.

1          **X.        Claim 24**

2          Petitioner next claims the trial court failed to instruct the jury that certain sentencing

3    factors must be considered mitigating and also failed to instruct the jury that the lack of a

4    mitigating factor did not constitute an aggravated factor.  He contends the trial court erred by

5    failing to instruct the jury with his proposed instruction that would have clarified CALJIC No.

6    8.85.

7          Petitioner also raised this claim in his direct appeal to the California Supreme Court.  In

8    denying the claim, the California Supreme Court stated: "Nor need the instruction have labeled

9    which factors were mitigating and aggravating."  Vieira, 35 Cal. 4th at 299 (citing People v.

10   Benson, 52 Cal. 3d 754, 801 (1990)).

11         As set forth in claim 22 above, the jury was instructed with CALJIC No. 8.85.  The legal

12   standard for review of penalty phase instructions is also set forth in claim 22, to wit, "whether

13   there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

14   prevents the consideration of constitutionally relevant evidence."  Boyde, 494 U.S. at 380.

15         The failure to identify whether factors are aggravating or mitigating is plainly not

16   contrary to or an unreasonable application of Supreme Court authority.  In Pulley v. Harris, the

17   Supreme Court reviewed California's sentencing system, including the manner in which the jury

18   considered relevant factors in deciding the penalty.  Pulley v. Harris, 465 U.S. 37, 51 (1984).

19   The Supreme Court noted that the 1977 law (like the 1978 law applicable in this case) did not

20   identify or separate the aggravating or mitigating factors.  Id. at 53 n.14.  The Court found

21   California's death penalty law to be constitutional.  Id. at 51 ("Assuming that there could be a

22   capital sentencing system so lacking in other checks on arbitrariness that it would not pass

23   constitutional muster without comparative proportionality review, the 1977 California statute is

24   not of that sort.").

25         In Tuilaepa v. California, the Supreme Court again considered California's death penalty

26   sentencing scheme.  Tuilaepa, 512 U.S. at 975.  The Supreme Court rejected the argument that

27   California's "single list of factors" was unconstitutional.  The Court stated:

28         This argument, too, is foreclosed by our cases. A capital sentencer need not be

                                                204

instructed how to weigh any particular fact in the capital sentencing decision. In California v. Ramos, for example, we upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." 463 U.S., at 1008–1009, n. 22, 103 S.Ct., at 3457–3458, n. 22. Likewise, in Proffitt v. Florida, we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." 428 U.S., at 258, 96 S.Ct., at 2969. In Gregg, moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." Zant, 462 U.S., at 875, 103 S.Ct., at 2742. We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. 428 U.S., at 203–204, 96 S.Ct., at 2939. In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. McCleskey v. Kemp, 481 U.S. 279, 315, n. 37, 107 S.Ct. 1756, 1779, n. 37, 95 L.Ed.2d 262 (1987). "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Ramos, supra, 463 U.S., at 1008, 103 S.Ct., at 3457. Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." Zant, supra, 426 U.S., at 875, 103 S.Ct., at 2742; see also Barclay v. Florida, 463 U.S. 939, 948–951, 103 S.Ct. 3418, 3424–3425, 77 L.Ed.2d 1134 (1983) (plurality opinion). In contravention of those cases, petitioners' argument would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors. The States are not required to conduct the capital sentencing process in that fashion. See Gregg, supra, 428 U.S., at 199–200, n. 50, 96 S.Ct., at 2937–2938, n. 50.

Id. at 979-80.

Therefore, it is clear that there is no Supreme Court authority which would require the sentencing court to identify whether factors are aggravating or mitigating.  This is fatal to Petitioner's claim, since he cannot show that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court precedent.  The Ninth Circuit arrived at the same conclusion in Williams v. Calderon: "The death penalty statute's failure to label aggravating and mitigating factors is constitutional."  Williams, 52 F.3d at 1484 (citing Harris v. Pulley, 692 F.2d 1189, 1194 (9th Cir. 1982)).

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

1    In conclusion, Petitioner fails to demonstrate that the state court denial of his claim was

2  contrary to or an unreasonable application of Supreme Court authority.  Therefore, the claim is

3  denied.

4        **Y.    Claim 25**

5        Petitioner next alleges that sentencing factor (a) in Cal. Penal Code § 190.3 is

6  unconstitutionally vague.  He contends the trial court erred in failing to clarify the factor

7  pursuant to defense counsel's request.

8        This claim was also presented to the California Supreme Court on direct appeal.  In

9  rejecting the claim, the California Supreme Court stated: "Nor is section 190.3, factor (a), asking

10  the jury to consider 'the circumstances of the crime of which the defendant was convicted in the

11  present proceeding,' unconstitutionally vague. (*People v. Sanders, supra*, 11 Cal. 4th at pp. 563-

12  564 [].)"  <u>Vieira</u>, 35 Cal. 4th at 299.

13        There is no merit to this claim.  As Petitioner readily concedes, this specific claim was

14  rejected in <u>Tuilaepa</u> as follows:

15        At the penalty phase, the jury is instructed to consider numerous other factors
     listed in § 190.3 in deciding whether to impose the death penalty on a particular
16        defendant. Petitioners contend that three of those § 190.3 sentencing factors are
     unconstitutional and that, as a consequence, it was error to instruct their juries to
17        consider them. Both Proctor and Tuilaepa challenge factor (a), which requires the
     sentencer to consider the "circumstances of the crime of which the defendant was
18        convicted in the present proceeding and the existence of any special
     circumstances found to be true." Tuilaepa challenges two other factors as well:
19        factor (b), which requires the sentencer to consider "[t]he presence or absence of
     criminal activity by the defendant which involved the use or attempted use of
20        force or violence or the express or implied threat to use force or violence"; and
     factor (i), which requires the sentencer to consider "[t]he age of the defendant at
21        the time of the crime." We conclude that none of the three factors is defined in
     terms that violate the Constitution.
22
     Petitioners' challenge to factor (a) is at some odds with settled principles, for our
23        capital jurisprudence has established that the sentencer should consider the
     circumstances of the crime in deciding whether to impose the death penalty. <u>See</u>,
24        <u>e.g.</u>, <u>Woodson</u>, 428 U.S., at 304, 96 S.Ct., at 2991 ("consideration of ... the
     circumstances of the particular offense [is] a constitutionally indispensable part of
25        the process of inflicting the penalty of death"). We would be hard pressed to
     invalidate a jury instruction that implements what we have said the law requires.
26        In any event, this California factor instructs the jury to consider a relevant subject
     matter and does so in understandable terms. The circumstances of the crime are a
27        traditional subject for consideration by the sentencer, and an instruction to
     consider the circumstances is neither vague nor otherwise improper under our
28        Eighth Amendment jurisprudence.

1   Tuilaepa, 512 U.S. at 975-76.

2       Respondent alleges that the claim is barred by Teague. However, this claim fails not

3   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

4   because the claim lacks merit for the reasons discussed above.

5       Petitioner fails to show that the state court decision was contrary to, or an unreasonable

6   application of, clearly established Supreme Court authority.

7       Accordingly, the claim is denied.

8       **Z.      Claim 26**

9       In his next claim, Petitioner alleges the trial court erred in refusing to instruct the jury that

10  they could consider the fact that Michelle Evans was being allowed to plead to a lesser crime and

11  would serve a lesser sentence.

12      As previously discussed, Evans entered into a plea agreement under which she agreed to

13  testify fully and truthfully at all trials.  RT 1211.  In exchange, she would be sentenced to felony

14  probation and a period of local incarceration not to exceed one year.  RT 1211-12.  The terms of

15  the plea agreement were admitted into evidence.  RT 1211-12, 1219-29.

16      Petitioner raised this claim to the California Supreme Court on direct appeal.   The

17  California Supreme Court denied the claim as follows:

18          Defendant claims error in the trial court's failure to instruct according to requested
            instruction No. 3, that the jury may consider that accomplice Michelle Evans was
19          permitted to plead guilty to a lesser offense although equally culpable. The trial
            court refused to deliver the instruction and directed defense counsel not to argue
20          that point to the jury. The trial court did not err. "The sentence received by an
            accomplice is not constitutionally or statutorily relevant as a factor in mitigation.
21          Such information does not bear on the circumstances of the capital crime or on the
            defendant's own character and record." (*People v. Bemore* (2000) 22 Cal.4th 809,
22          857, 94 Cal.Rptr.2d 840, 996 P.2d 1152.)

23  Vieira, 35 Cal. 4th at 300.

24      As set forth in claim 22 above, the jury was instructed with CALJIC No. 8.85 during the

25  penalty phase.  The legal standard for review of penalty phase instructions is also set forth in

26  claim 22, to wit, "whether there is a reasonable likelihood that the jury has applied the

27  challenged instruction in a way that prevents the consideration of constitutionally relevant

28  evidence."  Boyde, 494 U.S. at 380.  Also, "the Eighth and Fourteenth Amendments require that

1   the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a

2   mitigating factor, any aspect of a defendant's character or record and any of the circumstances of

3   the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438

4   U.S. at 604.

5         The Supreme Court has held that sentence proportionality review is not required under

6   the Eighth Amendment. Pulley, 465 U.S. at 50-51. Thus, California's sentencing scheme is not

7   unconstitutional for failing to require proportionality review. Id. at 51-53. The Ninth Circuit has

8   noted that sentencing proportionality is not mitigation evidence of a type that must be considered

9   by the sentencing court. Smith v. Mahoney, 611 F.3d 978, 996 (9th Cir. 2010). The Ninth

10  Circuit further held that "[a]lthough a trial court is not necessarily precluded from allowing

11  consideration of co-defendant sentences, a trial court does not commit constitutional error under

12  Lockett by refusing to allow such evidence." Beardslee, 358 F.3d at 579 (as amended). Thus,

13  Petitioner fails to demonstrate that the state court denial of his claim was contrary to, or an

14  unreasonable application of, clearly established Federal law.

15        Respondent alleges that the claim is barred by Teague. However, this claim fails not

16  because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

17  because the claim lacks merit for the reasons discussed above.

18        Petitioner fails to show that the state court decision was contrary to, or an unreasonable

19  application of, clearly established Supreme Court authority.

20        Accordingly, the claim is denied.

21  **AA.    Claim 27**

22        Petitioner claims the trial court erred by failing to instruct the jury that the lack of a

23  mitigating factor does not constitute an aggravating factor.

24        This claim was presented on direct appeal to the California Supreme Court. The claim

25  was denied as follows:

26          At the very least, defendant contends, the trial court should have instructed the
    jury, according to requested instruction No. 1, that absence of a mitigating factor

27  could not be considered an aggravating factor. But as we have held, "a reasonable
    juror could not have believed ... that the absence of mitigation amounted to the

28  presence of aggravation." (People v. Benson (1990) 52 Cal.3d 754, 802, 276

Cal.Rptr. 827, 802 P.2d 330.) And, contrary to defendant's contention, nothing in the prosecution's argument noting the absence of various mitigating factors would have misled the jury to consider them as aggravating factors.

Vieira, 35 Cal. 4th at 299.

As previously stated, the jury was instructed with CALJIC No. 8.85 during the penalty phase.  Again, the legal standard for review of penalty phase instructions is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  Boyde, 494 U.S. at 380.

In this case, the jury was instructed with a list of factors that could be considered in its penalty decision.  Prior to listing the factors, the court advised the jury that they should consider the factors, "*if applicable*."   CT 1472 (emphasis added).    The jury's "commonsense understanding," Boyde, 494 U.S. at 381, clearly would be to disregard any factors that are not supported, not view them in aggravation as Petitioner argues.  The Ninth Circuit came to the same conclusion in Bonin v. Calderon, as follows:

> [T]he trial courts in both cases listed the statutory mitigating circumstances and instructed the jury to consider the listed factors that were applicable. Bonin v. Vasquez, 807 F.Supp. at 619; Bonin v. Vasquez, 794 F.Supp. at 979. Bonin argues that this allowed the juries to consider the absence of numerous possible mitigating circumstances to be aggravating circumstances.
>
> We recently rejected a virtually identical argument. Williams, 52 F.3d at 1481. Both courts instructed the juries to consider the listed factors only "if applicable." The cautionary words "if applicable" warned the jury that not all of the factors would be relevant and that the absence of a factor made it inapplicable rather than an aggravating factor.

Bonin, 59 F.3d at 848.

Nevertheless, Petitioner contends that the prosecutor drew the jury's attention to the lack of mitigating factors and argued that their absence was aggravation.  For example, the prosecutor pointed to Petitioner's demonstrated lack of remorse as an aggravating factor.  Petitioner's argument that the prosecutor turned the lack of mitigating factors into aggravating factors is belied by the record.  As noted by Respondent, when the prosecutor began speaking about factor (d), he stated to the jury:

> From here on down, these are all considered to be mitigating factors. There is no aggravation in any of the remaining factors, and I'm not going to argue to you in any way, shape, or form that there is.  All I'm going to argue to you is that there

are some things there that don't mitigate, but I'm not going to argue that that is aggravation because there is no mitigation, because that's not true.

RT 1939.  Thus, the prosecutor did not argue the lack of mitigation to be an aggravating factor; in fact he argued the opposite.

While it is true that the prosecutor did later argue that Petitioner demonstrated no remorse, "'[t]he presence or absence of remorse is a factor relevant to the jury's penalty decision' in a capital case." Pulley, 885 F.2d at 1384 (quoting People v. Ghent, 43 Cal. 3d 739, 771 (1987).  Such argument did not violate any of Petitioner's constitutional rights.

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

In sum, there is no likelihood that the jury applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence.  Boyde, 494 U.S. at 380. Petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, Supreme Court precedent.  Accordingly, the claim is denied on the merits.

## BB.    Claim 28

In his next claim for relief, Petitioner alleges that factors (d) and (g) in CALJIC No. 8.85 unconstitutionally restricted the jury's consideration of mitigating evidence.  Subsections (d) and (g) of CALJIC No. 8.85 provide:

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

. . .

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

CT 1472-73.

Petitioner takes issue with the adjectives "extreme" and "substantial," contending that the jury was precluded from considering evidence of mental or emotional disturbance or duress that was less than extreme, or the domination of another that was less than substantial.

This claim was raised on direct appeal to the California Supreme Court.  In denying the

1  claim, the California Supreme Court stated:

2      Defendant contends that section 190.3, factor (d), is constitutionally defective
       because it directs the jury to consider only "*extreme* mental or emotional
3      disturbance" (italics added) and therefore, contrary to the Eighth Amendment,
       does not permit the jury to consider all available mitigating evidence. Defendant
4      finds the same defect in factor (g), which directs the jury to consider "whether or
       not defendant acted under *extreme* duress or under the *substantial* domination of
5      another person." (Italics added.) But as we have held, these qualifying adjectives
       in factors (d) and (g) do not, when read in conjunction with the catchall provisions
6      of factor (k), preclude the jury from considering less extreme forms of duress,
       emotional disturbance, or domination. (See *People v. Turner* (1994) 8 Cal.4th
7      137, 208–209, 32 Cal.Rptr.2d 762, 878 P.2d 521.)

8  Vieira, 35 Cal. 4th at 304.

9          As set forth above, the Constitution requires that the jury must "not be precluded from

10  considering, as a mitigating factor, any aspect of a defendant's character or record and any of the

11  circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

12  Lockett, 438 U.S. at 604.  The test is "whether there is a reasonable likelihood that the jury has

13  applied the challenged instruction in a way that prevents the consideration of constitutionally

14  relevant evidence."  Boyde, 494 U.S. at 380.  Further, a single instruction "may not be judged in

15  artificial isolation," but must be considered in light of the instructions as a whole and the entire

16  trial record.  Estelle, 502 U.S. at 72.

17         In this case, it is clear from the instruction that the jury was not precluded from

18  considering relevant mitigation evidence.  As noted by the California Supreme Court, factors (d)

19  and (g) cannot be read in isolation.  Factor (k) instructs the jury that they "shall consider . . .

20  [a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal

21  excuse for the crime."  CT 1472-73.  In addition, factor (k) included a provision which directed

22  the jury to consider "any sympathetic or other aspect of the defendant's character or record that

23  the defendant offers as a basis for a sentence less than death, whether or not related to the offense

24  for which he is on trial."  CT 1473.  And, the instructions began by instructing the jury to

25  consider "all of the evidence which has been received during any part of the trial of the case."

26  CT 1472.

27         Therefore, even if the jury determined that the evidence did not show Petitioner acted

28  under "extreme" mental or emotional disturbance or duress, or the "substantial" domination of

1   another, the jury could still consider the evidence under factor (k).  In <u>Boyde v. California</u>, the

2   Supreme Court noted that factor (k) directed the jury to consider "any other circumstance that

3   might excuse the crime. . . ."  <u>Boyde</u>, 494 U.S. at 382.  Certainly, the instruction did not preclude

4   the jury from considering the mitigating evidence proffered by Petitioner.  <u>Id</u>. at 378.    The

5   Supreme Court has found that "[t]he factor (k) instruction is consistent with the constitutional

6   right to present mitigating evidence in capital sentencing proceedings."  <u>Ayers</u>, 549 U.S. at 24.

7       In addition, the Supreme Court has reviewed CALJIC No. 8.85 on several occasions.  It

8   has rejected claims that the instruction restricts the jury's consideration of mitigating evidence in

9   every instance.  <u>See</u>, <u>e.g.</u>, <u>Ayers</u>, 549 U.S. at 7; <u>Brown</u>, 544 U.S. at 133; <u>Boyde</u>, 494 U.S. 370.

10  Therefore, Petitioner fails to demonstrate that the state court rejection of this claim was contrary

11  to, or an unreasonable application of, clearly established federal law.  Surveying the legal

12  landscape at the time conviction became final, a state court would not have felt compelled to

13  hold that CALJIC No. 8.85 was unconstitutional.

14      Respondent alleges that the claim is barred by <u>Teague</u>. However, this claim fails not

15  because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

16  because the claim lacks merit for the reasons discussed above.

17      Petitioner fails to show that the state court decision was contrary to, or an unreasonable

18  application of, clearly established Supreme Court authority.

19      Accordingly, the claim is denied.

20  **CC.    Claim 29**

21      Petitioner next alleges that sentencing instruction CALJIC No. 8.88 misled the jury by

22  indicating that only the "totality" of mitigating circumstances could support a sentence less than

23  death.

24      CALJIC No. 8.88, as instructed in this case, provided:

25      It is now your duty to determine which of the two penalties, death or
    imprisonment in the state prison for life without possibility of parole, shall be
26      imposed on the defendant.

27      After having heard all of the evidence, and after having heard and considered the
    arguments of counsel, you shall consider, take into account and be guided by the
28      applicable factors of aggravating and mitigating circumstances upon which you

1   have been instructed.

2   An aggravating factor is any fact, condition or event attending the commission of
    a crime which increases its guilt or enormity, or adds to its injurious consequences
3   which is above and beyond the elements of the crime itself. A mitigating
    circumstance is any fact, condition or event which as such, does not constitute a
4   justification or excuse for the crime in question, but may be considered as an
    extenuating circumstance in determining the appropriateness of the death penalty.

5
    The weighing of aggravating and mitigating circumstances does not mean a mere
6   mechanical counting of factors on each side of an imaginary scale, or the arbitrary
    assignment of weights to any of them. You are free to assign whatever moral or
7   sympathetic value you deem appropriate to each and all of the various factors you
    are permitted to consider. In weighing the various circumstances you determine
8   under the relevant evidence which penalty is justified and appropriate by
    considering the totality of the aggravating circumstances with the totality of the
9   mitigating circumstances. To return a judgment of death, each of you must be
    persuaded that the aggravating circumstances are so substantial in comparison
10  with the mitigating circumstances that it warrants death instead of life without
    parole.
11
    You shall now retire and select one of your number to act as foreperson, who will
12  preside over your deliberations.  In order to make a determination as to the
    penalty, all twelve jurors must agree.
13
    Any verdict that you reach must be dated and signed by your foreperson on a
14  form that will be provided and then you shall return with it to this courtroom.

15  CT 1474-75.

16       Based on the language, Petitioner contends that the instruction failed to communicate to

17  the jury that one mitigating factor, standing alone, may be sufficient to outweigh all other factors

18  in favor of a life sentence.  He argues that the instruction implies that the sentence is determined

19  by counting factors.

20       This claim was raised to the California Supreme Court on direct review.  The California

21  Supreme Court denied the claim as follows:

22       Defendant also claims a defect in CALJIC No. 8.88. The jury was instructed per
         that instruction that "[i]n weighing the various circumstances you simply
23       determine under the relevant evidence which penalty is justified and appropriate
         by considering the *totality* of the aggravating circumstances with the totality of
24       the mitigating circumstances. To return a judgment of death, each of you must be
         persuaded that the aggravating evidence is so substantial in comparison with the
25       mitigating circumstances that it warrants death instead of life without parole."
         (Italics added.)
26
         Defendant argues that the instruction's language referring to the "totality" of the
27       aggravating and mitigating circumstances erroneously implied that a single
         mitigating circumstance could not outweigh all aggravating circumstances and
28       hence could not serve as a basis for the more lenient sentence. We have rejected

                                        213

that argument: "Certainly, [a reasonable] juror would not have interpreted ... language referring to the 'totality' of the aggravating and mitigating circumstances in a 'death oriented' fashion to 'relate[ ]' solely to the 'quantity ... of the factors' and not to their 'quality,' or to entail '"a *mere mechanical counting* of factors on each side of the imaginary scale...."' ... There is no reasonable likelihood that the jury misconstrued or misapplied the challenged instruction in violation of the Eighth or Fourteenth Amendment to the United States Constitution or any other legal provision or principle." (*People v. Berryman* (1993) 6 Cal.4th 1048, 1099–1100, 25 Cal.Rptr.2d 867, 864 P.2d 40, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

Vieira, 35 Cal. 4th at 300.

As recited above, in reviewing penalty phase instructions, the test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380.  Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record. Estelle, 502 U.S. at 72.

In this case, when viewing the instructions as a whole, there is clearly no merit to the argument that the jury would have believed it should simply count the factors.  The instruction specifically stated that "[t]he weighing of aggravating and mitigating circumstances *does not mean a mere mechanical counting of factors* on each side of an imaginary scale, or the arbitrary assignment of weights to any of them." CT 1474-75.  Thus, Petitioner's argument fails.

In addition, the Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation.  In Tuilaepa v. California, the Supreme Court stated, "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."  Tuilaepa, 512 U.S. at 979.  In Kansas v. Marsh, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. *"[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.*"

Kansas v. Marsh, 548 U.S. 163, 175 (2006) (quoting Franklin, 487 U.S. at 179) (citing Zant, 462 U.S. at 875–876, n.13).

1    Therefore, Petitioner fails to demonstrate that the state court rejection was contrary to, or

2    an unreasonable application of, clearly established Supreme Court authority.

3    Respondent alleges that the claim is barred by Teague. However, this claim fails not

4    because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

5    because the claim lacks merit for the reasons discussed above.

6    Petitioner fails to show that the state court decision was contrary to, or an unreasonable

7    application of, clearly established Supreme Court authority.

8    Accordingly, the claim is denied.

9    **DD.    Claims 30, 31, 32**

10    In the next three claims, Petitioner complains that the jury was not properly instructed on

11    burdens of proof and persuasion during the penalty phase.  In claim 30, he contends that the jury

12    was not instructed that death was the appropriate sentence beyond a reasonable doubt or that the

13    aggravating factors outweighed the mitigating factors beyond a reasonable doubt.  In claim 31,

14    he alleges that the jury was not instructed regarding any standard of proof to apply to the

15    aggravating factors.  In claim 32, he contends that the penalty phase instructions failed to assign

16    any burden of persuasion regarding significant determinations that the jury was required to make.

17    Petitioner presented these claims on direct appeal to the California Supreme Court.  In

18    rejecting the claims, the California Supreme Court stated:

19    Defendant argues that the trial court's failure to instruct the jury at the penalty
20    phase on a reasonable doubt standard, or indeed any standard of proof, for finding
       that the aggravating evidence is true, or outweighs the mitigating evidence,
21    violated defendant's Fifth, Eighth and Fourteenth Amendment rights. Not so. "The
       federal Constitution does not require the jury to find beyond a reasonable doubt
22    that the prosecution proved each aggravating factor, that the circumstances in
       aggravation outweigh those in mitigation, or that death is the appropriate
23    penalty." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79, 14 Cal.Rptr.2d 133, 841
       P.2d 118.) "'Unlike the guilt determination, "the sentencing function is inherently
24    moral and normative, not factual" [citation] and, hence, not susceptible to a
       burden-of-proof quantification.'" (*People v. Box* (2000) 23 Cal.4th 1153, 1216, 99
25    Cal.Rptr.2d 69, 5 P.3d 130.)

26    Defendant contends that the jury should have been instructed that the prosecution
       has the burden of persuasion to convince the jury that death was the appropriate
27    penalty. We have routinely rejected this argument. "[T]he prosecution has no
       burden of proof that death is the appropriate penalty, or that one or more
28    aggravating factors or crimes exist, in order to obtain a judgment of death."
       (*People v. Anderson* (2001) 25 Cal.4th 543, 589, 106 Cal.Rptr.2d 575, 22 P.3d

347.)

. . .

In addition, as the United States Supreme Court has held, a capital sentencer need not be instructed how to weigh the sentencing factors and may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." (*Tuilaepa v. California* (1994) 512 U.S. 967, 979–980, 114 S.Ct. 2630, 129 L.Ed.2d 750.)[FN13]

FN13. We have also rejected the argument found in defendant's reply brief that *Ring v. Arizona* (2002) 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, requires us to reassess the constitutionality of the death penalty statute. (*People v. Valdez* (2004) 32 Cal.4th 73, 139, 8 Cal.Rptr.3d 271, 82 P.3d 296.)

Vieira, 35 Cal. 4th at 301, 303.

It is beyond dispute that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). In California, for a defendant to be eligible for the death penalty, the jury must, beyond a reasonable doubt, find him guilty of murder in the first degree, and must find true one of the special circumstances set forth in Cal. Penal Code § 190.2. Tuilaepa, 512 U.S. at 975. Once convicted, however, "the prosecution has no burden of proof that death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order to obtain a judgment of death." People v. Anderson, 25 Cal. 4th 543, 589 (2001).

There is no Supreme Court authority which constitutionally requires that a jury be instructed on a burden of proof in the sentence selection phase in a capital case. Further, "[t]he United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed." Harris, 692 F.2d at 1195, *rev'd on other grounds*, 465 U.S. 379 (1984). Nor is there any Supreme Court authority which would require a burden of proof or persuasion be assigned to any of the jury's penalty phase determinations. On the contrary, the Supreme Court has held that no "specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." Marsh, 548 U.S. at 175. And, California's death penalty sentencing scheme has been consistently upheld as constitutional by the Supreme Court. Tuilaepa, 512 U.S.

1    at 975-80; <u>Pulley</u>, 465 U.S. at 53.

2        In addition, there is no merit to Petitioner's claim that the jury's selection of the death

3    penalty violates constitutional principles set forth in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) and

4    <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).   In <u>Ring</u>, the Supreme Court held that "[a]

5    defendant may not be "expose[d] . . . to a penalty exceeding the maximum he would receive if

6    punished according to the facts reflected in the jury verdict alone."   <u>Ring</u>, 536 U.S. at 602 (citing

7    <u>Apprendi</u>, 530 U.S. at 483).   Under California law, once a defendant is convicted beyond a

8    reasonable doubt of first degree murder and a special circumstance, he becomes eligible for the

9    death penalty.   <u>Tuilaepa</u>, 512 U.S. at 975.   The death penalty is thus the statutory maximum, and

10   "the only alternative is life imprisonment without the possibility of parole."   <u>People v. Salcido</u>,

11   44 Cal. 4th 93, 167 (2008).   Since the jury's sentence selection cannot exceed the statutory

12   maximum penalty, it does not run afoul of <u>Ring</u> and <u>Apprendi</u>.

13       Therefore, Petitioner cannot demonstrate that the state court rejection of these claims was

14   contrary to, or an unreasonable application of, clearly established Supreme Court authority.

15   Therefore, the claims must fail.

16       Respondent alleges that the claims are barred by <u>Teague</u>. However, the claims fail not

17   because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

18   because the claims lack merit for the reasons discussed above.

19       Petitioner fails to show that the state court decision was contrary to, or an unreasonable

20   application of, clearly established Supreme Court authority.

21       Accordingly, the claims are denied.

22       **EE.   Claim 33**

23       Petitioner next alleges that the jury was not instructed that there is a presumption of a life

24   sentence that must be overcome to allow a sentence of death.

25       This claim was presented on direct appeal to the California Supreme Court.  The claim

26   was denied as follows:

27       Nor, contrary to defendant's argument, should the jury have been instructed on a
         presumption of a life without parole sentence. "[N]either death nor life is
28       presumptively appropriate or inappropriate under any set of circumstances, but in

all cases the determination of the appropriate penalty remains a question for each individual juror." (*People v. Samayoa* (1997) 15 Cal.4th 795, 853, 64 Cal.Rptr.2d 400, 938 P.2d 2.)

Vieira, 35 Cal. 4th at 301.

There is no Supreme Court authority which requires a jury be instructed that there is a presumption of a life sentence.  Rather, in determining "whether a defendant eligible for the death penalty should in fact receive that sentence," the Supreme Court requires "'an individualized determination on the basis of the character of the individual and the circumstances of the crime.'" Tuilaepa, 512 U.S. at 972 (quoting Zant, 462 U.S. at 879).

The California Supreme Court addressed this claim in People v. Arias, and likewise concluded:

> Defendant also claims the statute is constitutionally deficient because it "fails to require a presumption that life without parole is the appropriate sentence." No authority is cited for the proposition, and it lacks merit.  If a death penalty law properly limits death eligibility by requiring the finding of at least one aggravating circumstance beyond murder itself, the state may otherwise structure the penalty determination as it sees fit, so long as it satisfies the requirement of individualized sentencing by allowing the jury to consider all relevant mitigating evidence. (See *Tuilaepa v. California, supra*, 512 U.S. 967 []; *Boyde v. California* (1990) 494 U.S. 370, 377 [] [upholding 1978 law's provision that sentencer "shall" impose death if aggravation outweighs mitigation]; *Zant v. Stephens, supra*, 462 U.S. 862, 875 [] [once defendant is death eligible, statute may give jury "unbridled" discretion to apply aggravating and mitigating sentencing factors].)

People v. Arias, 13 Cal. 4th 92, 190 (1996).

Therefore, Petitioner cannot show that the state court rejection of this claim was contrary to, or an unreasonable application of, Supreme Court authority.

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

Petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court authority.

Accordingly, the claim is denied.

**FF.   Claim 34**

Petitioner contends his constitutional rights were violated because the jury was not required to return explicit written findings regarding the aggravating and mitigating factors selected.

This claim was also presented on direct appeal to the California Supreme Court where it was rejected. The California Supreme Court stated:

"Defendant contends that the jury should have been required to make explicit findings regarding the factors that it found in aggravation and mitigation. We have rejected this claim. (*People v. Kidd* (1998) 18 Cal. 4th 349, 381 [].)"

Vieira, 35 Cal. 4th at 303.

The state court decision comports with Supreme Court precedent. In Proffitt v. Florida, the Supreme Court upheld the Florida death penalty statute which was comparable to California's procedure. 428 U.S. 242 (1976). In the Florida statute, the jury is required to make a penalty recommendation to the trial judge, unaccompanied by any specific findings, and thereafter the judge determines the actual sentence and specifies in writing the reasons in support thereof. Id. at 249-250. In interpreting the Florida law, the Supreme Court emphasized, "Since . . . the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible . . . ." Id. at 251. In a similar way, the California procedure provides for meaningful appellate review with respect to the disclosure of the reasons supporting a sentence of death. The California procedure was approved by the Supreme Court in Pulley, 465 U.S. at 51-53. The Supreme Court stated:

If the jury finds the defendant guilty of first degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. § 190.3. "After having heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." Ibid. If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. § 190.4(e). The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." Ibid. The judge is required to state on the record the reasons for his findings. Ibid. If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal. [Footnote omitted.] It does state that the trial judge's refusal to modify the sentence "shall be reviewed." §

190.4(e). This would seem to include review of the evidence relied on by the judge. As the California Supreme Court has said, "*the statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case.*" People v. Frierson, 25 Cal.3d 142, 179, 158 Cal.Rptr. 281, 302, 599 P.2d 587, 609 (1979).

. . .

The jury's "discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S., at 189, 96 S.Ct., at 2932. Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under Furman and our subsequent cases.

Id. (emphasis added).

Therefore, the state court rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court.

Respondent alleges that the claim is barred by Teague. However, this claim fails not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claim lacks merit for the reasons discussed above.

Petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court authority.

Accordingly, the claim is denied.

**GG.   Claim 35**

Petitioner claims that the cumulative effect of the errors alleged in the penalty phase of his trial deprived him of a fair trial.

A claim of cumulative error with respect to all penalty phase claims of error except for claim 2 and part of claim 6 was presented on direct appeal.  The California Supreme Court rejected the claim as follows: "Defendants contends the various penalty phase errors are, taken together, prejudicial and require reversal of the death sentence.  Because we identified only one harmless error at the penalty phase – the prosecution's biblical references – the claim of cumulative error is without merit."  Vieira, 35 Cal. 4th at 305.  A claim of cumulative error asserting all penalty phase claims of error was also raised on habeas to the California Supreme

220

1   Court where it was summarily rejected.

2          As previously discussed in claim 19, the Ninth Circuit has held that "[t]he Supreme Court

3   has clearly established that the combined effect of multiple trial court errors violates due process

4   where it renders the resulting criminal trial fundamentally unfair." Parle, 505 F.3d at 927 (citing

5   Chambers, 410 U.S. at 302–03). The Ninth Circuit stated that "[t]he cumulative effect of

6   multiple errors can violate due process even where no single error rises to the level of a

7   constitutional violation or would independently warrant reversal." Id. (citing Chambers, 410

8   U.S. at 290 n.3).

9          [C]umulative error warrants habeas relief only where the errors have "so infected
          the trial with unfairness as to make the resulting conviction a denial of due
10         process." Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40
          L.Ed.2d 431 (1974). Such "infection" occurs where the combined effect of the
11         errors had a "substantial and injurious effect or influence on the jury's verdict."
          Brecht, 507 U.S. at 637, 113 S.Ct. 1710 (internal quotations omitted); see also
12         Thomas, 273 F.3d at 1179–81 (noting similarity between Donnelly and Brecht
          standards and concluding that "a Donnelly violation necessarily meets the
13         requirements of Brecht"). In simpler terms, where the combined effect of
          individually harmless errors renders a criminal defense "far less persuasive than it
14         might [otherwise] have been," the resulting conviction violates due process. See
          Chambers, 410 U.S. at 294, 302–03, 93 S.Ct. 1038.
15

16   Id.

17          In this case, Petitioner does not show that error of constitutional dimension occurred

18   during the penalty phase. Accordingly, "there is nothing to accumulate to a level of a

19   constitutional violation." Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Fuller

20   v. Roe, 182 F.3d 699, 704 (9th Cir. 1999)). Therefore, Petitioner fails to demonstrate that the

21   California Supreme Court's rejection of this claim was objectively unreasonable. As to those

22   claims of error presented for the first time on state habeas review, Petitioner fails to demonstrate

23   that no fair-minded jurist could have found that he failed to make a prima facie showing of

24   cumulative error.

25          Respondent alleges that the claim is barred by Teague. However, this claim fails not

26   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

27   because the claim lacks merit for the reasons discussed above.

28          Petitioner fails to show that the state court decision was contrary to, or an unreasonable

1  application of, clearly established Supreme Court authority.

2       Accordingly, the claim is denied.

3  **HH.    Claim 36**

4       Petitioner contends that the trial court violated Petitioner's constitutional rights by

5  conducting an improper and erroneous sentence review under Cal. Penal Code § 190.4(e).  Cal.

6  Penal Code § 190.4(e) provides:

> In every case in which the trier of fact has returned a verdict or finding imposing
> the death penalty, the defendant shall be deemed to have made an application for
> modification of such verdict or finding pursuant to Subdivision 7 of Section 11. In
> ruling on the application, the judge shall review the evidence, consider, take into
> account, and be guided by the aggravating and mitigating circumstances referred
> to in Section 190.3, and shall make a determination as to whether the jury's
> findings and verdicts that the aggravating circumstances outweigh the mitigating
> circumstances are contrary to law or the evidence presented. The judge shall state
> on the record the reasons for his findings.
>
> The judge shall set forth the reasons for his ruling on the application and direct
> that they be entered on the Clerk's minutes. The denial of the modification of the
> death penalty verdict pursuant to subdivision (7) of Section 1181 shall be
> reviewed on the defendant's automatic appeal pursuant to subdivision (b) of
> Section 1239. The granting of the application shall be reviewed on the People's
> appeal pursuant to paragraph (6).

16  Cal. Penal Code § 190.4(e).

17       In this case, the trial court considered Petitioner's motion to modify the verdict.  (RT

18  2120-32.  The court reviewed the verdict in light of the statutory sentencing factors and denied

19  the motion.  RT 2133-37.

20       This claim was presented on direct appeal to the California Supreme Court.  The claim

21  was denied as follows:

> The trial court refused defendant's motion to modify the jury verdict of death
> pursuant to section 190.4, subdivision (e). Defendant contends the trial court
> erred. We disagree.
>
> Defendant focuses on a statement made by the trial court in the course of
> explaining its refusal to modify the motion. The court stated: "The function of the
> court in this motion is to review the evidence, consider and to take into account
> and be guided by the aggravating and mitigating circumstances, *and then make a
> determination as to whether the jury's finding and verdicts were or were not
> contrary to law*." Defendant contends that the italicized portion of this statement
> represents a misunderstanding on the trial court's part of its proper function, and
> that this misunderstanding undermines the validity of its ruling on the motion to
> modify the verdict.

222

As we have stated: "'In ruling on a verdict-modification application, the trial judge is required by section 190.4 [subdivision] (e) to "make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law." [Citations.] That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. [Citation.]'" (*People v. Marshall* (1990) 50 Cal.3d 907, 942, 269 Cal.Rptr. 269, 790 P.2d 676.)

Although the italicized portion of the trial court's statement quoted above may leave some doubt about whether the trial court understood that it was to independently review the jury verdict under section 190.4, subdivision (e), its very next statement removes that doubt. The court stated: "Naturally, the court did reweigh the evidence in making those determinations." A review of the remainder of the court's statement of reasons for denying defendant's motion, in which it explained its independent assessment of each aggravating and mitigating factor and the relative weight given to each, makes clear the trial court understood its proper role and acted accordingly.

Defendant also contends trial court error can be found in the court's statement that a "strong argument could be made" that the death sentence would not have been justified if Raper had been the sole victim, in light of defendant's lack of a criminal record and violent past, as well as his subservient status in Cruz's cult. Defendant argues that the murder of Raper alone would not have made defendant death eligible, and that the trial court's statement that it might modify the death sentence only under a circumstance that would have made defendant ineligible for the death penalty shows that the court "effectively abrogated" its function under section 190.4, subdivision (e).

Defendant distorts the meaning of the trial court's statements. The trial court used the example of the sole murder of Raper as a means of explaining the weight it gave the mitigating evidence. While the court concluded the mitigating evidence was not inconsiderable, and could have led to a reversal of the death sentence had a less aggravated crime been committed, the mitigating evidence did not in the trial court's judgment outweigh the four planned, gruesome murders in which defendant participated as perpetrator and accomplice. The trial court did not suggest, as defendant implies, that it would automatically affirm the verdict because defendant was guilty of multiple murder. Taken in its proper context, we find no error in the trial court's statements.

Vieira, 35 Cal. 4th at 301-02.

Habeas relief does not lie for errors of state law. Estelle, 502 U.S. at 67; Pulley, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law."). Petitioner's claim that the trial court incorrectly conducted its review of the jury's sentencing verdict is not cognizable on federal habeas. See Turner v. Calderon, 281 F.3d 851, 871 (9th Cir. 2002). The Supreme Court has not held that such a review is required, and the high court has found California's review procedure to be constitutional. Pulley, 465 U.S. at 51-53. The death

1   penalty is constitutional if it "is imposed only after a determination that the aggravating

2   circumstances outweigh the mitigating circumstances present in the particular crime committed

3   by the particular defendant, or that there are no such mitigating circumstances." Blystone, 494

4   U.S. at 305.   In this case, it is clear that the trial court reviewed the verdict and made an

5   individualized determination of whether death was the proper punishment.   Turner, 281 F.3d at

6   871.   The California Supreme Court's conclusion that the trial court's review was proper under

7   state law is binding on this Court.   Wainwright v. Goode, 464 U.S. 78, 84 (1983) (per curiam).

8          Respondent alleges that the claim is barred by Teague. However, this claim fails not

9   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

10  because the claim lacks merit for the reasons discussed above.

11         Petitioner fails to show that the state court decision was contrary to, or an unreasonable

12  application of, clearly established Supreme Court authority.

13         Accordingly, the claim is denied.

14  **II.      Claims 37 and 39**

15         In claim 37, Petitioner alleges the death sentence in this case was unconstitutional

16  because it was arbitrary, capricious, discriminatory, and disproportionate.  He argues that it was

17  imposed without comparative sentence review at any level.  He claims the inappropriateness of

18  his sentence is evident when compared to the lesser sentences received by his codefendants.

19         In claim 39, Petitioner contends his sentence is unconstitutional because California's

20  death penalty law does not have comparative appellate review and no such review was

21  undertaken in this case.

22         Both of these claims were presented on direct appeal to the California Supreme Court.

23  The claims were rejected as follows:

24         Defendant contends that his death sentence is unconstitutionally arbitrary,
       discriminatory and disproportionate. Specifically, defendant requests that his
25     sentence be reversed pursuant to intercase proportionality review, due to his lack
       of prior convictions, his youth, and his contention that he acted out of fear for his
26     own life. Additionally, defendant requests an intracase proportionality review,
       claiming that some of his codefendants who received less severe sentences were
27     more culpable than he was. It is well settled that neither is required. (*People v.
       Anderson, supra*, 25 Cal.4th at p. 602, 106 Cal.Rptr.2d 575, 22 P.3d 347.) For that
28     reason, we reject also defendant's related claim that comparative appellate review

1    is constitutionally compelled.

2  Vieira, 35 Cal. 4th at 303.

3         Both of these claims are foreclosed by the Supreme Court's decision in Pulley, 465 U.S.

4  37.  In Pulley, the high court reviewed California's death penalty procedure, and in particular,

5  considered the fact that California did not require any sort of comparative proportionality review.

6  Id.  The Supreme Court found that the Eighth Amendment did not require a "state appellate

7  court, before it affirms a death sentence, to compare the sentence in the case before it with the

8  penalties imposed in similar cases if requested to do so by the prisoner."  Id. at 43-44.  Further,

9  the Supreme Court held that "[o]n its face, [California's] system, without any requirement or

10  practice of comparative proportionality review, cannot be successfully challenged under Furman

11  [v. Georgia, 408 U.S. 238 (1972)] and our subsequent cases."  Id. at 53.

12         Nevertheless, Petitioner argues that his rights to equal protection were violated because

13  comparative proportionality review was available to defendants sentenced under California's

14  Determinate Sentencing Law.   As the Ninth Circuit explained in Allen v. Woodford, this

15  argument fails:

16         Allen's claim is premised on California's requirement that the Board of Prison
17         Terms review every sentence imposed under the Determinate Sentencing Law to
           ascertain its proportionality with other sentences, and the lack of a comparable
18         requirement in the capital sentencing scheme. Allen's due process argument is
           foreclosed by the Supreme Court's holding in Pulley v. Harris, 465 U.S. 37, 43-
19         46, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), that neither the Eighth Amendment nor
           due process requires comparative proportionality review in imposing the death
20         penalty. The California Supreme Court has agreed that "neither the federal nor the
           state Constitution compels comparative sentence review." People v. Sanders, 51
21         Cal.3d 471, 529, 273 Cal.Rptr. 537, 797 P.2d 561 (1990); see also Lang, 49
           Cal.3d at 1045, 264 Cal.Rptr. 386, 782 P.2d 627. To the extent that Allen's equal
22         protection claim survives the above holdings, we agree with the California
           Supreme Court that defendants sentenced under the Determinate Sentencing Law
23         are not similarly situated to defendants sentenced in the capital system. See Allen,
           42 Cal.3d at 1286-88, 232 Cal.Rptr. 849, 729 P.2d 115. We thus reject this claim
24         as a basis for habeas relief.

25  Allen v. Woodford, 395 F.3d 979, 1018-19 (9th Cir. 2005).

26         Petitioner also claims that his sentence is disproportional compared to those of his

27  codefendants.   As noted above, however, the Eighth Amendment does not require such

28

                                        225

proportionality.  The Eighth Amendment requires that a state capital sentencing system must: "1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." <u>Marsh</u>, 548 U.S. at 173-74.  In <u>Pulley</u>, the Supreme Court determined that California's system complied with these requirements. 465 U.S. at 53-54.

Petitioner thus fails to demonstrate that the state court denial of his claims was contrary to, or an unreasonable application of, Supreme Court precedent.

Respondent alleges that these claims are barred by <u>Teague</u>. However, the claims fail not because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather because the claims lack merit for the reasons discussed above.

Petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court authority.

Accordingly, the claims are denied.

**JJ.    Claim 38**

Petitioner contends his death sentence is unlawful and unconstitutionally imposed because California's capital punishment system fails to rationally narrow the class of death-eligible defendants and allows improperly overbroad, capricious and discriminatory prosecutorial discretion in determining which cases to seek the death penalty.

This claim was presented on direct appeal to the California Supreme Court.  It was denied as follows:

> Defendant contends that the California death penalty scheme is unconstitutional because it allows individual district attorneys unbridled discretion as to which cases will be prosecuted as death penalty cases. This argument is without merit. As we stated in *People v. Lucas* (1995) 12 Cal.4th 415, 477, 48 Cal.Rptr.2d 525, 907 P.2d 373: "Prosecutors have broad discretion to decide whom to charge, and for what crime.... Absent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty." Because defendant has not raised a claim of invidious discrimination or vindictive prosecution, his argument fails.

<u>Vieira</u>, 35 Cal. 4th at 304.

Supreme Court authority clearly allows for prosecutorial discretion in selecting the cases in which to seek the death penalty.   In <u>Gregg v. Georgia</u>, the Supreme Court rejected a defendant's similar complaint with respect to Georgia's capital punishment procedure, as follows:

> First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.
>
> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. <u>Furman</u>, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. <u>Furman</u> held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

<u>Gregg</u>, 428 U.S. at 199.

The Supreme Court again addressed prosecutorial discretion in <u>McCleskey v. Kemp</u>:

> McCleskey's argument that the Constitution condemns the discretion allowed decisionmakers in the Georgia capital sentencing system is antithetical to the fundamental role of discretion in our criminal justice system. Discretion in the criminal justice system offers substantial benefits to the criminal defendant. Not only can a jury decline to impose the death sentence, it can decline to convict or choose to convict of a lesser offense. Whereas decisions against a defendant's interest may be reversed by the trial judge or on appeal, these discretionary exercises of leniency are final and unreviewable. [] Similarly, the capacity of prosecutorial discretion to provide individualized justice is "firmly entrenched in American law." 2 W. LaFave & D. Israel, Criminal Procedure § 13.2(a), p. 160 (1984). As we have noted, a prosecutor can decline to charge, offer a plea bargain,[] or decline to seek a death sentence in any particular case. See n. 28, *supra.* Of course, "the power to be lenient [also] is the power to discriminate," K. Davis, Discretionary Justice 170 (1973), but a capital punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice." <u>Gregg v. Georgia</u>, 428 U.S., at 200, n. 50, 96 S.Ct., at 2937, n. 50.

<u>McCleskey v. Kemp</u>, 481 U.S. 279, 311-12 (1987).

Petitioner cannot demonstrate that the state court rejection of his claim was contrary to,

227

1  or an unreasonable application of, clearly established Federal law.

2        Respondent alleges that the claim is barred by <u>Teague</u>. However, this claim fails not

3  because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

4  because the claim lacks merit for the reasons discussed above.

5        Petitioner fails to show that the state court decision was contrary to, or an unreasonable

6  application of, clearly established Supreme Court authority.

7        Accordingly, the claim is denied.

8      **KK.**    **Claims 40 and 43**

9        In claim 40, Petitioner alleges that California's special circumstances statute set forth in

10  Cal. Penal Code § 190.2 fails to narrow the class of death-eligible individuals as required under

11  the Constitution.  He claims that virtually all first-degree murders are within one of the

12  enumerated special circumstances, and that there is no genuine narrowing or selection of

13  particularly serious or elevated types of murder.

14        In claim 43, Petitioner contends that a study demonstrates how most convicted first

15  degree murderers are death eligible under California's system. Pet. at 271 (citing Shatz &

16  Rivkind, <u>The California Death Penalty Scheme: Requiem for Furman?</u>, 72 N.Y.U.L.Rev. 1283

17  (1997)).

18        These claims were raised and rejected before the California Supreme Court, as follows:

19      Defendant contends that the California death penalty statute fails to narrow the
    class of offenders eligible for the death penalty and thus violates the Eighth
20      Amendment, and article I, section 17 of the California Constitution. In support of
    this contention, defendant offers a statistical analysis based on an examination of
21      published appeals of murder convictions for the years 1988 to 1992, claiming the
    statistics show that the California statute fails to narrow the class of death-eligible
22      defendants, particularly because of the broad sweep of the lying-in-wait special
    circumstance and the various felony murder special circumstances. We come to
23      the same conclusion as we did in *People v. Frye* (1998) 18 Cal.4th 894, 1029, 77
    Cal.Rptr.2d 25, 959 P.2d 183, that California's "special circumstances 'are not
24      overinclusive by their number or terms.'... Defendant's statistics do not persuade
    us to reconsider the validity of these decisions."

25

26  <u>Vieira</u>, 35 Cal. 4th at 303-04.

27      1.    <u>Legal Standards</u>

28        Because of the uniqueness of the death penalty, the Supreme Court held in <u>Furman</u> "that

it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Gregg, 428 U.S. at 188 (discussing Furman, 408 U.S. 238). "[T]he concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." Id. at 195.   Further, the Supreme Court decisions in Furman and Gregg establish that a state capital sentencing system must:

> 1) [R]ationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime. So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed.

Marsh, 548 U.S. at 173-74.

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder.   Sawyer v. Whitley, 505 U.S. 333, 342 (1992).   A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors." Id.; see also Gregg, 428 U.S. at 196-97.

In California, murder is separated into two degrees: first degree murder and second degree murder.   Cal. Penal Code § 189.   To become eligible for the death penalty or life without the possibility of parole, a defendant must be found guilty of first degree murder, and a special circumstance must be found true beyond a reasonable doubt.   Cal. Penal Code § 190.2.   If the prosecution seeks the death penalty, the jury must make the penalty decision during a bifurcated penalty proceeding where the parties have the opportunity to present evidence of aggravating and mitigating factors.   Cal. Penal Code § 190.3.

2.    Review of Claims

Petitioner's arguments fail under clearly established Supreme Court authority.   The Supreme Court has approved California's capital punishment system in Tuilaepa and Pulley.   In Pulley, the Supreme Court held:

> By requiring the jury to find at least one special circumstance beyond a

229

1
2
3
4
5
6

> reasonable doubt, the statute limits the death sentence to a small sub-class of capital-eligible cases. The statutory list of relevant factors, applied to defendants within this sub-class, "provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty," Harris v. Pulley, 692 F.2d, at 1194, "guarantee[ing] that the jury's discretion will be guided and its consideration deliberate," id., at 1195. The jury's "discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S., at 189, 96 S.Ct., at 2932. Its decision is reviewed by the trial judge and the State Supreme Court. On its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under Furman and our subsequent cases.

7
Pulley, 465 U.S. at 53.

8
Thus, Petitioner's argument that Cal. Penal Code § 190.2 does not properly narrow the

9
class of death-eligible defendants is meritless.  Indeed, the Ninth Circuit rejected this claim in

10
Karis v. Calderon, 283 F.3d 1117 (9th Cir. 2002) and Mayfield v. Woodford, 270 F.3d 915 (9th

11
Cir. 2001).  In Karis, the Ninth Circuit held:

12
13
14
15
16
17

> [W]e reject Karis' argument that the scheme does not adequately narrow the class of persons eligible for the death penalty. The California statute satisfies the narrowing requirement set forth in Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The special circumstances in California apply to a subclass of defendants convicted of murder and are not unconstitutionally vague. See id. at 972, 103 S.Ct. 2733. The selection requirement is also satisfied by an individualized determination on the basis of the character of the individual and the circumstances of the crime.  See id. California has identified a subclass of defendants deserving of death and by doing so, it has "narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." Arave v. Creech, 507 U.S. 463, 476, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

18
Karis, 283 F.3d at 1141 n.11.

19
The same Shatz and Rivkind article relied on Petitioner here was also before the Karis court.

20
Shatz & Rivkind, 72 N.Y.U.L.Rev. 1283, 1326 n.252.

21
The claim was rejected in Mayfield as follows:

22
23
24

> Mayfield argues that California's death penalty scheme is unconstitutional because it does not adequately narrow the class of persons eligible for the death penalty. The 1978 death penalty statute pursuant to which Mayfield was convicted and sentenced narrows the class of persons eligible for the death penalty at both the guilt and the penalty phases.

25
26
27
28

> A defendant is eligible for the death penalty under the 1978 statute only if, at the guilt phase, the jury finds him guilty of first degree murder and finds to be true a statutorily defined special circumstance. See Jurek v. Texas, 428 U.S. 262, 270–71, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding capital punishment statute that required the jury to find at the guilt phase that the defendant's crime fell within one of five statutory categories of death-eligible murder). At the penalty phase, the class of defendants eligible for death is again narrowed by the jury's

application of a series of statutorily enumerated aggravating or mitigating factors. See Blystone v. Pennsylvania, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (holding statute sufficiently narrows the class of death-eligible defendants to survive constitutional scrutiny if it "allow[s] the jury to consider all relevant mitigating evidence"); Lowenfield v. Phelps, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (holding that a capital punishment statute is constitutional if it "broadly define[s] capital offenses and provide[s] for narrowing by jury findings of aggravating circumstances at the penalty phase"). A reasonable jurist could not debate, therefore, that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional.

Mayfield, 270 F.3d at 924.

Based on the foregoing, Petitioner cannot demonstrate that the state court rejection of these claims was contrary to, or an unreasonable application of, clearly established Federal law as established by the Supreme Court.

Respondent alleges that the claims are barred by Teague. However, the claims fail not because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather because the claims lacks merit for the reasons discussed above.

Petitioner fails to show that the state court decision was contrary to, or an unreasonable application of, clearly established Supreme Court authority.

Accordingly, the claims are denied..

**LL.    Claim 41**

In his next claim, Petitioner contends that his execution would be unlawful and unconstitutional because the method of execution in California constitutes cruel and unusual punishment and violates due process, as applied to Petitioner.

This claim was presented on direct appeal to the California Supreme Court.  The California Supreme Court denied the claim as follows:

Defendant contends that the methods of execution employed in California violate the Eighth and Fourteenth Amendment and requests that his death sentence be vacated. But the constitutionality of those methods bear "solely on the legality of the execution of the sentence and not on the validity of the sentence itself." (*People v. Samayoa, supra*, 15 Cal.4th at p. 864, 64 Cal.Rptr.2d 400, 938 P.2d 2.)

Vieira, 35 Cal. 4th at 304.

The claim was raised again on habeas.  The California Supreme Court ruled that the claim was premature and denied it without prejudice to Petitioner's filing of a renewed habeas

1  petition after an execution date has been set.

2      Petitioner and Respondent agree that the proper way to bring an "as applied" challenge to

3  a particular method of execution is through a 42 U.S.C. § 1983 action.  This claim does not

4  challenge the underlying conviction or sentence and is therefore not cognizable in a federal

5  habeas action.  Hill v. McDonough, 547 U.S. 573, 582 (2006); Brown v. Ornoski, 503 F.3d 1006,

6  1017 (9th Cir. 2007).  The claim is dismissed. There is no need to reach Respondent's assertion

7  of Teague bar.

8      **MM.   Claim 42**

9      Petitioner next alleges his death sentence violates international law, international treaties,

10  and international precepts of human rights.  He contends that the alleged violations of state and

11  federal law contained in his petition violate the provisions of the Universal Declaration of

12  Human Rights, the International Covenant on Civil and Political Rights, and the American

13  Declaration of the Rights and Duties of Man.

14      This claim was raised on direct appeal to the California Supreme Court, and it was denied

15  as follows:

16      Defendant contends that various errors made at trial and various aspects of the
       trial violate international law. As we have explained, the international treaties and
17      resolutions to which he points have not "been held effective as domestic law"
       (*People v. Ghent* (1987) 43 Cal.3d 739, 779, 239 Cal.Rptr. 82, 739 P.2d 1250);
18      (see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 511, 117 Cal.Rptr.2d 45, 40
       P.3d 754), and are therefore not a basis for reversing the judgment.
19

20  Vieira, 35 Cal. 4th at 305.

21      1.    International Agreements and Covenants

22      "[N]ot all international law obligations automatically constitute binding federal law

23  enforceable in United States courts."  Medellin v. Texas, 552 U.S. 491, 504 (2008).  The

24  Supreme Court "has long recognized the distinction between treaties that automatically have

25  effect as domestic law, and those that - while they constitute international law commitments - do

26  not by themselves function as binding federal law."  Id.  "[W]hile treaties 'may comprise

27  international commitments . . . they are not domestic law unless Congress has either enacted

28  implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is

1   ratified on these terms.'"  Id. at 505 (quoting Igartua-De La Rosa v. United States, 417 F.3d 145,

2   150 (1st Cir. 2005) (en banc) (Boudin, C. J.)); see also Restatement (Third) of Foreign Relations

3   Law § 111 (1987) ("Courts in the United States are bound to give effect to international law and

4   to international agreements, except that a 'non-self-executing' agreement will not be given effect

5   as law in the absence of necessary authority.").

6        The agreements and covenants on which Petitioner relies are not self-executing, nor has

7   Congress enacted implementing legislation for any of them.  The "American Declaration . . . is

8   an aspirational document which . . . did not on its own create any enforceable obligations on the

9   part of any of the OAS member nations."  Garza v. Lappin, 253 F.3d 918, 923 (7th Cir. 2001);

10  accord Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001) .   "[A]lthough  the  [International]

11  Covenant [on Civil and Political Rights] does bind the United States as a matter of international

12  law, the United States ratified the Covenant on the express understanding that it was not self-

13  executing and so did not itself create obligations enforceable in the federal courts."  Sosa v.

14  Alvarez-Machain, 542 U.S. 692, 735 (2004); see also Beazley v. Johnson, 242 F.3d 248, 267-68

15  (5th Cir. 2001); Buell, 274 F.3d at 372.  The "[Universal] Declaration [of Human Rights] does

16  not of its own force impose obligations as a matter of international law."  Sosa, 542 U.S. at 734.

17       Because none of the agreements are binding and enforceable in a federal habeas action,

18  the claim must be rejected.

19            2.    Customary International Law

20       Likewise, customary international law offers no relief for Petitioner.  "Courts have made

21  clear that '[i]nternational law does not require any particular reaction to violations of law . . . .

22  Whether and how the United States wishes to react to such violations are domestic questions.'"

23  Buell, 274 F.3d at 375 (citing Estate of Ferdinand Marcos, 25 F.3d 1467, 1475 (9th Cir. 1994),

24  quoting Tel–Oren v. Libyan Arab Republic, 726 F.2d 774, 779 (D.C. Cir. 1984) (Edwards, J.,

25  concurring)).  The Sixth Circuit further found:

26            [W]here customary international law is being used as a defense against an
              otherwise constitutional action, the reaction to any violation of customary
27            international law is a domestic question that must be answered by the executive
              and legislative branches. We hold that the determination of whether customary
28            international law prevents a State from carrying out the death penalty, when the

233

1
2
3

State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it their constitutional role to determine the extent of this country's international obligations and how best to carry them out.

4   Buell, 274 F.3d at 375-76.

5   Therefore, Petitioner's claim that his death sentence violates customary international law
6   must be denied.

7   3.   Teague

8   Respondent alleges that the claim is barred by Teague. However, this claim fails not
9   because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather
10   because the claim lacks merit for the reasons discussed above.

11   4.   Conclusion

12   Petitioner fails to show that the state court denial of his claim was contrary to, or an
13   unreasonable application of, clearly established Supreme Court precedent.   Accordingly, the
14   claim is denied.

15   **NN.   Claim 44**

16   In his next claim, Petitioner alleges he received ineffective assistance of counsel on
17   appeal, because his appellate attorney failed to raise five claims for relief, specifically, claims 9,
18   14, 15, 16, and 17 (*ante*).

19   This claim was raised on state habeas where it was denied as untimely and on the merits.
20   In reviewing the merits, it is Petitioner's burden to show "there was no reasonable basis for the
21   state court to deny relief," Richter, 131 S. Ct. at 784, and this Court "must determine what
22   arguments or theories supported or . . . *could have supported*, the state court's decision; and then
23   it must ask whether it is possible fair-minded jurists could disagree that those arguments or
24   theories are inconsistent with the holding in a prior decision of this Court."   Id. at 786 (emphasis
25   added).

26   1.   Legal Standards

27   Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the
28   Fourteenth Amendment.   Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).   Claims of ineffective

234

1   assistance of appellate counsel are reviewed according to <u>Strickland</u>'s two-pronged test.  <u>Miller</u>

2   <u>v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th

3   Cir. 1986).  There is a strong presumption that counsel's performance fell within the "wide range

4   of professional assistance."  <u>Strickland</u>, 466 U.S. at 689-90.  This presumption is even stronger

5   for appellate counsel because he has wider discretion than trial counsel in weeding out weaker

6   issues; doing so is widely recognized as one of the hallmarks of effective appellate assistance.

7   <u>Miller</u>, 882 F.2d at 1434.  "Experienced advocates since time beyond memory have emphasized

8   the importance of winnowing out weaker arguments on appeal and focusing on one central issue

9   if possible, or at most on a few key issues."  <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983).

10  Thus, in reviewing appellate counsel's decisions or omissions, "it is difficult to demonstrate that

11  counsel was incompetent."  <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000); <u>see also</u> <u>Gray v. Greer</u>,

12  800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger

13  than those presented, will the presumption of effective assistance of counsel be overcome").

14       2.    Review of Claim

15       As previously discussed, the five claims Petitioner contends appellate counsel failed to

16  raise are plainly meritless. Appellate counsel did not render ineffective assistance since failure to

17  raise a meritless legal argument does not constitute ineffective assistance of counsel.  <u>Shah v.</u>

18  <u>United States</u>, 878 F.2d 1156, 1162 (9th Cir. 1989); <u>Jones</u>, 463 U.S. at 754 (appellate counsel

19  must exercise professional judgment in selecting issues to be raised on appeal and does not have

20  the duty to raise every claim suggested by a client).

21       On the other hand, appellate counsel did research, raise and brief thirty-two issues on

22  appeal. (Lodged Doc. 1.)  The brief was comprised of 514 pages.  (Id.)  The California Supreme

23  Court analyzed the claims in depth and recognized that some claims presented close questions.

24  <u>Vieira</u>, 35 Cal. 4th 264.  In fact, one justice dissented and believed that relief should have been

25  granted on one claim.  <u>Id</u>. at 296-98.

26       Therefore, Petitioner cannot demonstrate that no reasonable jurist could have found that

27  he failed to make a prima facie showing of ineffective assistance of appellate counsel.

28       Respondent alleges that the claim is barred by <u>Teague</u>. However, this claim fails not

235

1  because Petitioner seeks to apply a new rule of criminal procedure under <u>Teague</u>, but rather

2  because the claim lacks merit for the reasons discussed above.

3      The claim is denied.

4      **OO.   Claim 45**

5      Petitioner claims his organic brain dysfunction, defective condition, neurological

6  impairments, neurofibromatosis, and developmental disabilities constitute a condition for which

7  the death penalty is cruel and unusual punishment.

8      Petitioner raised this claim in his state habeas petition.  It was denied as untimely and on

9  the merits.  In reviewing the merits, it is Petitioner's burden to show "there was no reasonable

10  basis for the state court to deny relief," <u>Richter</u>, 131 S. Ct. at 784, and this Court "must

11  determine what arguments or theories supported or . . . *could have supported*, the state court's

12  decision; and then it must ask whether it is possible fair-minded jurists could disagree that those

13  arguments or theories are inconsistent with the holding in a prior decision of this Court."  <u>Id</u>. at

14  786 (emphasis added).

15      1.   <u>Legal Standards</u>

16      The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines

17  imposed, nor cruel and unusual punishments inflicted."  "Embodied in the Constitution's ban on

18  cruel and unusual punishments is the 'precept of justice that punishment for crime should be

19  graduated and proportioned to [the] offense.'" <u>Graham v. Florida</u>, 560 U.S. 48, 59 (2010)

20  (quoting <u>Weems v. United States</u>, 217 U.S. 349, 367 (1910)).  The Supreme Court's cases

21  "addressing the proportionality of sentences fall within two general classifications. The first

22  involves challenges to the length of term-of-years sentences given all the circumstances in a

23  particular case. The second comprises cases in which the Court implements the proportionality

24  standard by certain categorical restrictions on the death penalty."  <u>Id</u>.   The classification

25  concerning categorical restrictions "consists of two subsets, one considering the nature of the

26  offense, the other considering the characteristics of the offender."  <u>Id</u>. at 60.

27      As noted by Respondent, the Supreme Court has issued categorical rules for only two

28  groups of defendants that render them ineligible for the death penalty: (1) those who committed

1  their crimes prior to the age of eighteen, Roper v. Simmons, 543 U.S. 551 (2005); and (2) those

2  suffering from mental retardation, Atkins v. Virginia, 536 U.S. 304 (2002).

3      In addition, the Eighth Amendment forbids executing a prisoner who is insane or who

4  suffers from a mental illness that prevents him from "comprehending the meaning and purpose

5  of the punishment to which he has been sentenced."  Panetti v. Quarterman, 551 U.S. 930, 959

6  (2007); Ford v. Wainwright, 477 U.S. 399, 401 (1986).  However, claims that the prisoner is

7  "incompetent" are usually considered premature until the execution is "imminent."  Stewart v.

8  Martinez-Villareal, 523 U.S. 637, 644-45 (1998).

9      2.   Review of Claim

10      Petitioner argues that his multifactorial condition of mental illness or impairments

11  renders him ineligible for the death penalty.  However, as noted above, the Supreme Court has

12  never held that persons with multiple and various mental illnesses or impairments are

13  categorically excluded from the death penalty, except those whose illness renders them mentally

14  incompetent to comprehend the meaning and purpose of the punishment, which is not the case

15  here.  Since the Supreme Court has not "squarely addressed the issue," Petitioner cannot

16  demonstrate that the state court rejection was contrary to or an unreasonable application of

17  Supreme Court precedent.  Wright, 552 U.S. at 125.

18      Petitioner argues that the reasoning in Roper v. Simmons should be extended to persons

19  with mental impairments such as himself, because he shares similar characteristics with those the

20  Supreme Court found significant in Roper.  However, the Supreme Court has held that habeas

21  relief is unavailable in instances where a state court arguably refuses to extend a governing legal

22  principle to a context in which the principle should have controlled.  White, 134 S. Ct. at 1706.

23      With respect to any claim that Petitioner is not competent to be executed, the claim is

24  premature.  Panetti, 551 U.S. at 947; Martinez-Villareal, 523 U.S. at 644-645.  The question

25  whether Petitioner is sufficiently competent to be executed must wait until such time as

26  execution is imminent.  Id.

27      Respondent alleges that the claim is barred by Teague. However, Respondent did not

28  timely assert Teague as a defense to this claim.  (See ECF Nos. 69, 74.)  Even if Teague had

1   been timely raised, this claim fails not because Petitioner seeks to apply a new rule of criminal

2   procedure under Teague, but rather because the claim lacks merit for the reasons discussed

3   above.

4          In sum, Petitioner fails to show that no reasonable jurist could have found that he failed

5   to make a prima facie showing that he is ineligible for the death penalty.  Additionally, any claim

6   that he is not competent to be executed is premature.  The claim is denied.

7          **PP.    Claim 46**

8          In his final claim for relief, Petitioner alleges that California's system of post-conviction

9   review is inadequate, unfair, and fails to protect against capriciousness, prejudice, and

10   arbitrariness.  He complains that the system fails to provide adequate compensation for post-

11   conviction and appellate counsel, experts, and investigators.  He argues that California's

12   timeliness standards are arbitrarily enforced and improperly restrict the presentation of claims.

13          This claim was presented by state habeas petition to the California Supreme Court where

14   it was denied as untimely and on the merits.  In reviewing the merits, it is Petitioner's burden to

15   show "there was no reasonable basis for the state court to deny relief," Richter, 131 S. Ct. at 784,

16   and this Court "must determine what arguments or theories supported or . . . *could have*

17   *supported*, the state court's decision; and then it must ask whether it is possible fair-minded

18   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

19   decision of this Court."  Id. at 786 (emphasis added).

20          1.    Legal Standards

21          A habeas petition must allege that the petitioner's detention violates the Constitution, a

22   federal statute, or a treaty.  28 U.S.C. § 2241(c)(3); Rose v. Hodges, 423 U.S. 19, 21 (1975) (per

23   curiam).  No constitutional provision or federal law entitles Petitioner to any state collateral

24   review.  Pennsylvania v. Finley, 481 U.S. 551, 557 (1987).  As the Ninth Circuit and nearly all

25   other circuit courts have found, "federal habeas relief is not available to redress alleged

26   procedural errors in state post-conviction proceedings." Ortiz v. Stewart, 149 F.3d 923, 939 (9th

27   Cir. 1998); Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989) ("a petition alleging errors in the

28   state post-conviction review process is not addressable through habeas corpus proceedings");

1   Williams v. State of Mo., 640 F.2d 140, 143 (8th Cir. 1981) (infirmities in the state's post-

2   conviction remedy procedure cannot serve as a basis for setting aside a valid original

3   conviction); Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) ("[T]he federal role in

4   reviewing an application for habeas corpus is limited to evaluating what occurred in the state or

5   federal proceedings that actually led to the petitioner's conviction; what occurred in the

6   petitioner's collateral proceeding does not enter into a habeas calculation."); Morris v. Cain, 186

7   F.3d 581, 585 n.6 (5th Cir. 1999) (finding that "errors in state post-conviction proceedings will

8   not, in and of themselves, entitle a petitioner to federal habeas relief"); Bryant v. Maryland, 848

9   F.2d 492, 493 (4th Cir. 1988) ("claims of error occurring in a state post-conviction proceeding

10   cannot serve as a basis for federal habeas corpus relief"); Millard v. Lynaugh, 810 F.2d 1403,

11   1410 (5th Cir. 1987); Kirby v. Dutton, 794 F.2d 245, 247-48 (6th Cir. 1986); Hopkinson v.

12   Shillinger, 866 F.2d 1185, 1218-20 (10th Cir. 1989); Spradley v. Dugger, 825 F.2d 1566, 1568

13   (11th Cir. 1987).

14       The Supreme Court has stated that "when a State chooses to offer help to those seeking

15   relief from convictions," due process does not "dictat[e] the exact form such assistance must

16   assume." Finley, 481 U.S. at 559. Since the petitioner has already been found guilty at a fair

17   trial, he has only a limited due process interest in post-conviction relief. Dist. Attorney's Office

18   for Third Judicial Dist. v. Osborne, 557 U.S. 52, 69 (2009). "[T]he question is whether

19   consideration of Osborne's claim within the framework of the State's procedures for post-

20   conviction relief "offends some principle of justice so rooted in the traditions and conscience of

21   our people as to be ranked as fundamental," or "transgresses any recognized principle of

22   fundamental fairness in operation." Id. (quoting Medina v. California, 505 U.S. 437, 446, 448

23   (1992). "Federal courts may upset a State's post-conviction relief procedures only if they are

24   fundamentally inadequate to vindicate the substantive rights provided." Id.

25       2.   Review of Claim

26       Petitioner's claim is meritless. The Constitution does not require the appointment of

27   counsel in post-conviction collateral review. Murray v. Giarratano, 494 U.S. 1, 4 (1989). In this

28   case, Petitioner was appointed two attorneys. Petitioner complains he was not provided adequate

1  funds for his collateral attack, but the amount of funds to be provided is completely a matter of

2  discretion left to the State. Finley, 481 U.S. at 559. The Constitution does not require that any

3  aid be provided in collateral proceedings, yet California provided Petitioner with sufficient funds

4  in this case that the attorneys were able to produce 255 exhibits and a 514-page petition.

5  Petitioner complains that his codefendants received more aid, but he has no constitutional right

6  to receive the same aid as others. It is sufficient that he was provided with such aid that he had

7  "an adequate opportunity to present his claims." Ross v. Moffitt, 417 U.S. 600, 616 (1974). He

8  further argues that California's timeliness standards arbitrarily and improperly restricted the

9  presentation of his claims. To the contrary, the Ninth Circuit has noted that "[t]he malleability of

10 California's indeterminate timeliness rule certainly is a boon for state habeas petitioners, who

11 otherwise would be required to adhere to unbending deadlines regardless of their individual

12 circumstances." Chaffer v. Prosper, 542 F.3d 662, 668 (9th Cir. 2008). It has been upheld by

13 the Supreme Court. Walker v. Martin, __ U.S. __, 131 S. Ct. 1120, 179 L. Ed. 2d 62 (2011).

14      Based on the foregoing, the claim presents only an issue of state law and is therefore not

15 cognizable on federal habeas review. Pulley, 465 U.S. at 41. Petitioner fails to show that no

16 reasonable jurist could have found that he failed to make a prima facie showing that California's

17 system of post-conviction review is inadequate, unfair, and arbitrary.

18      Respondent alleges that the claim is barred by Teague. However, this claim fails not

19 because Petitioner seeks to apply a new rule of criminal procedure under Teague, but rather

20 because the claim lacks merit for the reasons discussed above.

21      The claim is denied.

22                                          **VII.**

23                  **EVIDENTIARY HEARING AND EXPANSION OF THE RECORD**

24      On January 23, 2012, Petitioner filed a motion for evidentiary hearing and expansion of

25 the record. Petitioner claims that an evidentiary hearing is required on claims 1, 2, 3, 4, 7, 8, 9,

26 44, and 45. He further requests the record be expanded as to claim 43. Respondent filed his

27 opposition on March 15, 2012. Petitioner replied on April 19, 2012.

28      Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of

1  1996 (AEDPA), provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Cullen v. Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review." Pinholster, 131 S. Ct. at 1398, 1400.  Although the central holding of Pinholster pertained to § 2254(d)(1), the Supreme Court observed that "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" providing "additional clarity" that review under § 2254(d)(2) is also limited to the record before the state court.  Id. at 1400 n.7.  Therefore, for claims that were adjudicated on the merits in state court, Petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d).

Petitioner seeks an evidentiary hearing on the nine claims set forth above.  All of those claims were adjudicated on the merits in the state court.  As previously discussed, Petitioner fails to demonstrate that any of the nine claims overcome the limitation of § 2254(d).  Thus, Pinholster effectively bars a habeas court from any further factual development on these claims. Id. at 1411 n.20.

Petitioner further claims that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2). Not so, according to Pinholster.  "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."  Id. at 1401.  Analysis of the claims under § 2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2).  Id.  Thus, only if Petitioner overcomes § 2254(d) can the Court consider a hearing under § 2254(e)(2).  As Justice Breyer stated: "If the federal habeas court finds that the state-court decision fails [§ 2254](d)'s test (or if

[§ 2254](d) does not apply), then an [§ 2254](e) hearing may be needed." <u>Id</u>. at 1412 (Breyer, J., concurring in part and dissenting in part).  As discussed above, § 2254(d) applies to all nine claims since they were adjudicated on the merits, and Petitioner fails to overcome § 2254(d) with respect to any of the nine claims.

Petitioner's request to expand the record on the single claim, which claim also was adjudicated on the merits in state court, fails for the same reasons discussed above.

Accordingly, Petitioner's motion for evidentiary hearing and expansion of the record is denied.

## VIII.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)   (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of

1  appealability "if jurists of reason could disagree with the district court's resolution of his

2  constitutional claims or that jurists could conclude the issues presented are adequate to deserve

3  encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S.

4  473, 484 (2000).  While the petitioner is not required to prove the merits of his case, he must

5  demonstrate "something more than the absence of frivolity or the existence of mere good faith on

6  his . . . part." Miller-El, 537 U.S. at 338.

7          In the present case, the Court finds that, with respect to the following claims, reasonable

8  jurists could disagree with the Court's resolution or conclude that the issues presented are

9  adequate to deserve encouragement to proceed further:

10         1)      Claim 2: Whether defense counsel rendered ineffective assistance during the

11 penalty phase by failing to competently investigate, develop, and present mitigating evidence.

12         2)      Claim 6: Whether the prosecutor committed misconduct during the penalty phase

13 summation when he made reference to the Bible in his argument to the jury.

14 Therefore, a certificate of appealability is granted as these two claims.

15         As to the remaining claims and requests for evidentiary hearing and record expansion, the

16 Court concludes that reasonable jurists would not find the Court's determination that Petitioner is

17 not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to

18 proceed further.  Petitioner has not made the required substantial showing of the denial of a

19 constitutional right.  Accordingly, the Court hereby declines to issue a certificate of appealability

20 as to the remaining claims and requests for evidentiary hearing and record expansion.

21                                          **IX.**

22                                         **ORDER**

23         Accordingly, IT IS HEREBY ORDERED:

24         1)      All claims except claim 41 are DENIED; claim 41 is DISMISSED;

25         2)      The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

26         3)      Petitioner's motion for evidentiary hearing and expansion of the record is

27 DENIED;

28         4)      The Court ISSUES a certificate of appealability with respect to claim 2 and claim

6; as to all other claims and requests for evidentiary hearing and record expansion, a certificate of appealability is DECLINED; and

       5)     The Clerk of Court is DIRECTED to SUBSTITUTE as Respondent Ron Davis, Acting Warden of San Quentin State Prison, and to VACATE all scheduled dates and to ENTER JUDGMENT forthwith.

IT IS SO ORDERED.

Dated:  February 5, 2015                          

                                  SENIOR  DISTRICT  JUDGE